Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
20520 105th Ave., SW
Vashon, WA 98070
Tel: (206) 601-8476
claire@animalearthlaw.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiff, <br><br> v. <br><br> U.S. FOREST SERVICE, JOSHUA WHITE, Forest Supervisor, Colville National Forest, CARIN VADALA, Newport-Sullivan Lake District Ranger, U.S. Forest Service. <br><br> Defendants. | Case No. 2:24-cv-157 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# I.    INTRODUCTION

1.    Plaintiff Alliance for the Wild Rockies ("Alliance" or "Plaintiff") challenges the final decisions by the United States Forest Service ("Forest Service" or "Service") to proceed with the Sxʷutn-Kaniksu Connections Trail Project ("the Project" or "Trails Project"), and the three sales approved under that Project, as violations of the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA") and the Administrative Procedure Act ("APA"). Plaintiff challenges these decisions because the Forest Service failed to take the required "hard look" at the impacts of the Project's planned logging, burning, and road construction.

2.    Plaintiff also challenges the Service's 2020 decision to remap lynx habitat ("2020 Lynx Remapping") in order to facilitate this Project and other logging projects in the Colville National Forest ("Colville Forest" or "Forest"), because the Service conducted no analysis of the environmental impacts of this decision.

3.    The Trails Project allows 20 years of commercial logging, pre-commercial logging, burning, and road construction throughout a vast area covering more than 90,700 acres (the "Project Area") that includes 40,300 acres of Colville Forest land.

4.    The Project opens 36,400 acres to commercial logging, pre-commercial logging, and burning—or roughly 94% of the forested portions of the Project Area

COMPLAINT                    1

within Colville Forest boundaries. The logging and burning would impact between 61% and 88% of the Cee Cee Ah Creek, Middle Creek, Skookum Creek, Exposure Creek, and Cusick Creek watersheds.



*South Skookum Lake, a 29-acre mountain lake in the Trails Project Area. Photo from USFS.*

5.    Over the next 20 years, the Service expects the Project will generate between 134 and 224 million board feet ("MMBF") of timber—enough to fill roughly 30,000 to 55,000 semi-trailer logging trucks.

6.    The Project also includes significant road construction and restoration activities, including the construction of 57 miles of permanent and temporary roads

COMPLAINT                    2

1    and the reconstruction of 292 miles of existing road that is currently largely

2    impassable.

3        7.    The Project's logging, burning, and road construction would

4    significantly impact the health of the Colville Forest, leveling large swaths of

5    forestland, decreasing the Forest's resiliency to impacts of climate change, damaging

6    stands of old-growth trees, eliminating snags, spreading invasive species, degrading

7    riparian areas, compromising unique habitats, severing vital wildlife corridors, and

8    potentially displacing, disturbing, or killing sensitive, threatened, and endangered

9    species, including Canada lynx, grizzly bears, wolverine, whitebark pine, goshawks,

10   wolves, woodpeckers, and bats.

11       8.    NEPA requires the Forest Service to take a "hard look" at all of a

12   proposed project's potential environmental impacts, using a reasoned decision-

13   making process that relies on accurate scientific data and evaluates all of a project's

14   foreseeable direct, indirect, and cumulative impacts.

15       9.    The Service failed to meet these requirements here. It identified the

16   need for the Project based on incomplete data and insufficient science; failed to

17   consider an adequate range of alternatives to meet that need;  refused to define the

18   Project with enough specificity to fully evaluate its potential impact; failed to

19   seriously consider how the Project would contribute to climate change; ignored

20   many of the adverse consequences of road construction, conversion, and restoration;

COMPLAINT    3

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

and conducted a flawed and incomplete analysis of how the Project would impact Forest biodiversity and sensitive, threatened, and endangered species. The Service also failed to consider the foreseeable impact of a major land swap and performed an inadequate analysis of how the Project was impacted by a 2023 court ruling that invalidated the portion of the Colville National Forest Land Management Plan ("2019 Plan") that gave the Service greater latitude to cut down old-growth trees.

10.    The Forest Service also violated NEPA by refusing to analyze the Project through  an Environmental Impact Statement ("EIS"), even though the Project is based on controversial theories of forest management, involves intensive commercial logging that will impact a vast area over a long period of time, would adversely impact several sensitive, threatened, and endangered species, and according to the Service, could have a continuing impact on forest structure for more than 100 years.

11.    Plaintiff asks the Court to invalidate the Project, the three timber sales made under the Project, and the 2020 Lynx Remapping, and require the Service to go back and complete the thorough environmental analysis required by law.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), 2412 (costs and fees) and 1346 (United States as defendant). This cause of action arises

COMPLAINT                    4

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

1    under the laws of the United States, including the APA, 5 U.S.C. §§ 701-706 and

2    NEPA, 42 U.S.C. §§ 4321-4370m-12.

3        13.    The actions challenged are final agency actions, properly subject to

4    judicial review under the APA. An actual, justiciable controversy exists between the

5    parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and

6    5 U.S.C. §§ 701-06.

7        14.    Plaintiff has exhausted all available administrative remedies.

8        15.    Venue is proper in this Court under 28 U.S.C. § 1391, because a

9    substantial part of the events or omissions giving rise to the claims herein occurred

10   within this judicial district.

11       16.    The federal government has waived sovereign immunity in this action

12   pursuant to 5 U.S.C. § 702.

13   ### III.    PARTIES

14       17.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt,

15   non-profit public interest organization based in Missoula, Montana, which is

16   dedicated to the protection and preservation of the native biodiversity and

17   ecosystems of the Northern Rockies Ecoregion, which extends into the Colville

18   Forest and the Project Area. The Alliance participated in all phases of Project

19   development, submitting comments on the scoping letter and the draft environmental

20

COMPLAINT          5

assessment, and filing objections to the final Environmental Assessment ("EA"), and the Decision Notice.

18.    The Alliance has more than 2,000 individual members, many of whom observe, enjoy, and appreciate native wildlife, water quality, and terrestrial habitat quality within Colville Forest, and have plans to continue to do so in the future, including in the Project Area.

19.    The Alliance brings this action on its own behalf and on behalf of its members, whose aesthetic enjoyment of the Project Area and surrounding areas will be directly affected by the Project. The Alliance's members, supporters, and staff have an interest in ensuring that the Forest Service fulfills its obligation to manage the Forest as a whole, and the Project Area specifically, in a manner that does not impair the diversity, viability, or resiliency of the landscape and native wildlife. The Alliance's members, supporters, and staff also have an interest in ensuring that the Forest Service complies with all applicable federal statutes and regulations while authorizing forest management projects, and that the Forest Service fulfills its obligation to manage the Forest in a manner that does not impair the diversity, viability, or resiliency of either the ecological values of the Forest, or the native wildlife living there.

20.    The interests of the Alliance and its members, supporters, and staff have been, are being, and will be adversely and irreparably injured by Defendants' failure

COMPLAINT                                6

to comply with federal law, and this injury will continue until and unless the relief requested in this Complaint is granted. These are actual, concrete injuries, traceable to Defendants' conduct, which would be redressed by the requested relief.

21.     Defendant U.S. FOREST SERVICE is an agency of the United States within the Department of Agriculture and is charged with managing the public lands and wildlife of the Colville National Forest, in accordance and compliance with NEPA, NFMA, the APA, and their implementing regulations.

22.     Defendant JOSHUA WHITE is the Forest Supervisor for the Colville National Forest, responsible for its management in compliance with NEPA, NFMA, and the APA. Defendant Smoldon is sued in his official capacity.

23.     Defendant CARIN VADALA is the District Ranger for the Newport-Sullivan Lake Districts in which the Project Area is located. She signed the final Decision Notice and the Supplemental Information Report for the Project. Defendant Vadala is sued in her official capacity.

## IV.    LEGAL FRAMEWORK

### A.  National Environmental Policy Act

24.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two fundamental purposes: (1) to guarantee that agencies take a "hard look" at the consequences before taking an action, by ensuring that "the agency, in reaching its decision, will have available, and will carefully

COMPLAINT                                         7

consider, detailed information concerning significant environmental impacts"; and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-350 (1989).

25.    To that end, NEPA requires federal agencies to prepare a detailed EIS for all major federal actions that may significantly affect the quality of the human environment. *See* 42 U.S.C. § 4332(C). An agency may first prepare an environmental assessment to determine whether it needs to prepare an EIS. 40 C.F.R. §§ 1501.4(b); 1508.9. An environmental assessment is a concise public document that briefly describes the need for the project, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. If an agency concludes that a project is not likely to significantly impact the environment, it may issue a finding of no significant impact in lieu of preparing an EIS. 40 C.F.R. § 1501.6.

26.    When evaluating whether an EIS is required, agencies must evaluate both the context and intensity of an action to determine if a project will significantly impact the environment. 40 C.F.R. § 1508.27. Context refers to the significance of the action with regard to society as a whole, the affected region, the affected

COMPLAINT                                    8

interests, and the locality. *Id*. § 1508.27(a). Both short- and long-term effects are relevant to the action's context. *Id*.

27.    In evaluating the intensity of a project, an agency must consider ten factors, including: (1) impacts that may be both beneficial and adverse; (2) any effects on public health or safety; (3) unique characteristics of the geographic area, such as proximity to ecologically critical areas; (4) the level of controversy about potential environmental effects; (5) the degree of uncertainty, or existence of unique or unknown risks; (6) if it sets possible precedent for future actions; (7) the cumulative impacts of the action and other related actions; (8) any effect on scientific, cultural, or historical resources; (9) any effect on an endangered or threatened species or its habitat; and (10) if the action might violate federal, state, or local requirements imposed to protect the environment. 40 C.F.R. § 1508.27(b).

28.    The presence of any of these factors is sufficient to indicate the project may have a significant impact on the environment, necessitating the preparation of an EIS. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008). Indeed, an agency must prepare an EIS if any substantial questions exist regarding whether an action may have a significant effect on the environment, including if it may have a cumulatively significant effect when considered along with other past, present, and reasonably foreseeable actions. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

COMPLAINT                              9

29.    Both an EA and an EIS require consideration of a range of reasonable alternative actions and an assessment of direct, indirect, and cumulative environmental effects of the proposed alternatives. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502 and 1508. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. To take the required "hard look," agencies must consider all past, present, and "reasonably foreseeable" future impacts. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

30.    When an agency is engaged in long-term planning (such as with a Project scheduled over a 20-year time period), the question is not whether it must analyze site-specific details for each related action, but when it will do so.

31.    An agency may prepare a programmatic environmental assessment or EIS describing broad, program-level effects, and then conduct a subsequent site-specific NEPA analysis for each action as it occurs, tiered back to the programmatic evaluation. *See Se. Alaska Conservation Council v. United States Forest Serv.*, 443 F. Supp. 3d 995, 1006, 1011-12 (D. Alaska 2020). However, if an agency proposes a long-term project that would be implemented without further, site-specific NEPA

COMPLAINT                                      10

review, it must disclose the details of its proposed action at a site-specific level and perform detailed environmental analysis of the impact of that action. *Id.* at 1013-15.

32.     To determine whether an agency has complied with NEPA's requirements, courts apply a rule of reason, which involves "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Robertson,* 490 U.S. at 351.

## B. National Forest Management Act

33.     NFMA is the primary statute governing the administration of national forests. 16 U.S.C. §§ 1600-1614. NFMA and its implementing regulations provide for forest planning and management by the Forest Service on both the forest level and the individual project level.

34.     At the forest level, NFMA requires the Forest Service to develop, maintain, and revise a forest plan for each national forest. 16 U.S.C. § 1604(a). Forest plans consist "of broad, long-term plans and objectives for the entire forest." *All. for the Wild Rockies v. United States Forest Serv*., 907 F.3d 1105, 1109 (9th Cir. 2018). They are "designed to manage forest resources by balancing the consideration of environmental and economic factors." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

35.     NFMA also requires the Forest Service to adopt additional regulations for its forest plans. *Id.* § 1604(g)(3). These guidelines must ensure that forest plans

COMPLAINT                                        11

"provide for diversity of plant and animal communities" and "for steps to be taken to preserve the diversity of tree species." 16 U.S.C. § 1604(g)(3)(B).

36.     The Forest Service adopted forest planning regulations in 1982. 47 Fed. Reg. 43,026-43,052 (Sept. 30, 1982) ("1982 Rules").[1] The Forest Service revised these regulations in 2012 but included transitional provisions allowing it to elect to apply the 1982 Rules to the development or revision of forest plans initiated prior to 2012. 36 C.F.R. § 219.17(b)(3). The Forest Service elected to apply the 1982 Rules to the development of the 2019 Plan, which it began in 2003.[2]

37.     The 1982 Rules define "diversity" as the "distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 1982 Rules § 219.3. The Rules further specify that "diversity shall be considered throughout the planning process" and "inventories

---

[1]Available at https://www.fs.usda.gov/emc/nfma/includes/nfmareg.html.

In this Complaint, citations to the 1982 Rules will be in the form "1982 Rules § 219.xx."

[2] However, the Forest Service explicitly developed the Forest Plan's monitoring requirements in accordance with 36 C.F.R. § 219.12 of the 2012 planning rules.

COMPLAINT                              12                    ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." 1982 Rules § 219.26.

38.    The 1982 Rules also require that "wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 1982 Rules § 219.19.

~~39.~~    The 1982 Rules require a forest plan to designate certain "management indicator species" whose "population changes are believed to indicate the effects of management activities," including those activities that affect "vegetation type [and] timber age classes[.]" 1982 Rules § 219.19(a)(1).

40.    Under NFMA, all projects and activities authorized by the Forest Service must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); *see* 1982 Rules § 219.15 ("vegetation management practices…shall be defined in the forest plan with applicable standards and guidelines and the reasons for the choices"). A project or activity must conform to *all* components of the applicable forest plan, including its standards, guidelines, and desired conditions. *All. for the Wild Rockies v. United States Forest Serv.,* 907 F.3d 1105, 1110 (9th Cir. 2018).

41.    When undertaking projects that involve "vegetative manipulation of tree cover," the rules provide that the Forest Service must choose alternatives that are "best suited to the multiple-use goals established for the area with potential environmental, biological, cultural resource, aesthetic, engineering, and economic

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

impacts," as stated in the applicable forest plan, and not select alternatives "primarily because they will give the greatest dollar return or the greatest output of timber[.]" 1982 Rules § 219.27(b)(3).

## C. Administrative Procedure Act

42.    Final agency actions taken pursuant to NEPA and NFMA are reviewable under the APA, which provides a right of judicial review to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702.

43.    Under the standards of the APA, an agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A rule or decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

COMPLAINT                                14

## V.     FACTUAL ALLEGATIONS

### A. 2019 Colville Forest Plan

*1. Desired Conditions, Standards, Guidelines, and Management Areas*

44.     In 2019, the Forest Service adopted a new Colville National Forest Land Management Plan ("2019 Plan").

45.     The 2019 Plan sets forth Desired Conditions, Objectives, Standards, and Guidelines to direct future projects. It defines Desired Conditions as:

> Social, economic, and ecological attributes toward which management of the land and resources of the plan area is to be directed. Desired conditions are aspirations, not final decisions approving projects and activities, and may be achievable only over a long period of time. However, projects and activities will be designed to move the forest toward desired conditions. To be consistent with the desired conditions of the plan, a project or activity, when assessed at the appropriate spatial scale described in the plan (e.g., landscape scale), must be designed to meet one or more of the following conditions:
>
> - Maintain or make progress toward one or more of the desired conditions of a plan without adversely affecting progress toward, or maintenance of, other desired conditions; or
>
> - Be neutral with regard to progress toward plan desired conditions; or
>
> - Maintain or make progress toward one or more of the desired conditions over the long term, even if the project or activity would adversely affect progress toward or maintenance of one or more desired conditions in the short term; or
>
> - Maintain or make progress toward one or more of the desired conditions over the long term, even if the project

COMPLAINT                     15

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

or activity would adversely affect progress toward other desired conditions in a negligible way over the long term.

The project or activity documentation should explain how the project or activity is consistent with desired conditions and describe any short-term or negligible long-term adverse effects the project or activity may have concerning the maintenance or attainment of any desired condition. If a project will adversely affect progress toward one or more desired condition in more than a negligible way or short-term way, a Plan Amendment is required.

46.     The 2019 Plan provides the following definition of Standards:

Standards are constraints upon project and activity decision making. Standards are established to help achieve desired conditions and objectives and to ensure projects and activities on NFS [National Forest Service] lands comply with applicable laws, regulations, Executive orders, and agency directives. A project or activity must be consistent with all standards applicable to the type of project or activity and its location in the plan area. A project or activity is consistent with a standard when its design is in exact accord with the standard; variance from a standard is not allowed except by plan amendment. The project or activity documentation should confirm that the project or activity is consistent with applicable standards. Standards are explicitly identified in the Plan.

47.     The 2019 Plan provides the following definition of Guidelines:

Guidelines provide operational practices and procedures that are applied to project and activity decision making to help achieve desired conditions and objectives, to avoid or mitigate undesirable effects, or to meet applicable legal requirements. A project or activity is consistent with a guideline in either of two ways:

The project or activity is designed exactly in accord with the guideline; or

A project or activity design varies from the exact words of the guideline, but it is as effective in meeting the purpose of the

COMPLAINT                           16

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

guideline to contribute to the maintenance or attainment of the relevant desired conditions and objectives.

Guidelines are explicitly identified in the Plan. When a project or activity varies from the exact words of the guideline, the project or activity documentation must specifically explain how the project or activity design is as effective in contributing to the maintenance or attainment of relevant desired conditions and objectives. When deviation from a guideline does not meet the original intent, however, a plan amendment is required.

48.    The 2019 Plan divides the Forest into different management areas, including Focused Restoration Areas, Riparian Management Areas, and General Restoration Areas. Different Desired Conditions, Objectives, Standards and Guidelines apply to each type of management area.

49.    General Restoration Areas are all areas not included in another management area. Focused Restoration Areas include "habitat conditions for aquatic, plant, and wildlife species" and are "defined by the key watersheds and wildlife habitat including recovery areas or other management units for listed species." The management emphasis for Focused Recreation Areas is to "restore ecological integrity and ecosystem function at the landscape scale, using both active management (mechanical treatment and prescribed fire) and passive management (natural processes including disturbances and succession) to restore management natural processes and improve resiliency, while emphasizing important fish and wildlife habitats."

COMPLAINT                                    17

50.     The 2019 Plan includes the following Desired Conditions that apply to Focused Restoration Areas:

MA-DC-FR-01. Vegetation

The landscape contributes to the variety of native plant communities and the composition, structure, and patterns as defined in desired conditions for vegetative systems, aquatic, plant, and wildlife habitats. The desired conditions for vegetation are achieved through a combination of ecological processes and management activities. While the landscape is predominantly natural-appearing, there are some locations where the vegetation composition, structure, or pattern is slightly or moderately altered.

MA-DC-FR-02. Habitat

These areas contribute important habitat for plant, wildlife, and aquatic species that benefit from areas with relatively low road density (see MA-DC-FR-05) and high habitat effectiveness (relatively low level of human disturbances).

MA-DC-FR-05. Travelways, Roads

Road densities vary across the management area; however, there are no more than 1 mile of National Forest System road per square mile within the Focused Restoration Management Area within each subwatershed. Total road density is calculated as miles of National Forest System road per square mile of National Forest System lands. This road density calculation does not include roads under another jurisdiction, or roads that have been hydrologically stabilized and impassable to all vehicular traffic, or decommissioned.

MA-DC-GR-05. Travelways, Roads

Road densities vary across the management area; however, there are no more than 2 miles of National Forest System road per square mile within the General Restoration Management Area within each subwatershed. Total road density is calculated as miles of National Forest System road per square mile of National Forest

COMPLAINT     18

System lands. This road density calculation does not include roads under another jurisdiction, or roads that have been hydrologically stabilized and impassable to all vehicular traffic, or decommissioned.

### 2. 2019 Plan Revision of Policy Protecting Old Growth Trees

51.     A survey performed in 1936 estimated that old-growth stands dominated more than 70% of the forests in eastern Washington and Oregon. But in 1994, a scientific panel assembled by Congress warned that these forests had already been "transformed," and that if current rates of logging continued, old-growth stands would soon occupy less than 10% of these forests. The panel warned that such a loss would "jeopardize many components of the biological diversity of eastside forests and increase numbers of threatened, endangered, and extinct species." In particular, the panel found that only 1% of the Colville Forest consisted of old-growth stands protected from logging.

52.     In response to this study, the Forest Service created the Revised Interim Standards for Timber Sales on Eastside Forests ("Eastside Screen Standards"), which prohibit the harvest of trees greater than 21 inches in diameter at breast height ("DBH") and ban logging in any late and old structure ("LOS") tree stands in areas where that type of structure is below the historic rate of variability ("HRV"). In 1995, the Service amended the 1988 Colville National Forest Land and Resource Management Plan to incorporate the Eastside Screens Standards.

COMPLAINT                                    19

53.    Until this decision was reversed by a 2023 court ruling, the 2019 Plan eliminated the Eastside Screens Standards, replacing them with a Guideline allowing removal of trees over 20 inches DBH in many circumstances, including to: protect public health or safety, limit the spread of infestation or disease, facilitate management of emergency situations, "meet, promote, or maintain desired conditions for structural stages," "promote special plant habitats," and when "strategically critical to reinforce, facilitate, or improve effectiveness of fuel reduction in wildland-urban interfaces." (FW-GDL-VEG-03) ("2019 Large Tree Management Guideline"). While the 2019 Plan sets Desired Conditions for the percentages of different tree species that should be present in forests with late forest structure, it does not set a minimum amount of old-growth habitat to be preserved or quantify the amount of old growth that could be lost under the new guideline.

**B. Change to Lynx Analysis Units**

*1. Background on Lynx Protection*

54.    In the lower 48 States, lynx historically occurred in four areas, including the Cascades Range of Washington and Oregon and the Rocky Mountain region, including areas in eastern Washington.

55.    As the result of overtrapping, lynx populations in Washington dropped precipitously in the 1970s and 1980s. In 1991, Washington banned lynx trapping.

COMPLAINT                                    20

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

56.    In 1993, the Washington Department of Fish and Wildlife ("WDFW") published a lynx status report. It estimated the state's lynx population to be between 96 and 191 animals and raised concerns about the threats posed by overtrapping, logging, and other habitat alterations.

57.    Following WDFW's 1993 status report, lynx were listed as a "threatened" species under the Washington endangered species law. In 2001, Washington published a lynx recovery plan.

58.    In January 2000, the U.S. Fish and Wildlife Service ("USFWS") prepared a Lynx Conservation Assessment and Strategy ("2000 LCAS") to evaluate whether lynx in the lower 48 States should be listed as a threatened species under the federal Endangered Species Act ("ESA"). The 2000 LCAS identified a number of risk factors for lynx, including logging and recreation in lynx-occupied areas.

59.    Based on the 2000 LCAS, USFWS listed lynx as an ESA-threatened species in March 2000.

60.    In 2005, USFWS and representatives from the Forest Service developed a lynx "recovery outline" designed to serve as an interim strategy to guide recovery until USFWS completes a final recovery plan. USFWS has not yet prepared a final recovery plan for lynx.

61.    USFWS updated the 2000 LCAS in 2013 ("2013 LCAS"). The 2013 LCAS recognizes four primary threats to the lynx population: climate change, timber

COMPLAINT                          21                    ANIMAL & EARTH ADVOCATES, PLLC
                                                         20520 105TH AVE SW
                                                         VASHON, WA 98070-6557
                                                         206.601.8476

management, fire management, and habitat fragmentation. It also identified secondary threats, including incidental trapping and illegal shooting; recreation, especially winter recreation; and new roads and trails.

62. WDFW published a status review for lynx in 2016, which recommended that lynx be uplisted to "endangered" under the state endangered species law as the result of range contraction, the loss of lynx habitat to fires and logging, and ongoing threats from climate change. In response to this report, Washington uplisted lynx from "threatened" to "endangered."

63. USFWS published a status assessment for lynx in 2017 that recognized climate change as the most serious threat to lynx conservation and recovery.

64. In December 2023, USFWS published a Species Status Assessment Addendum for lynx in the lower 48 states to update the 2017 Status Assessment. It found that climate change continues to be the greatest threat to lynx populations.

65. The 2023 lynx assessment also recognized that logging and related activities are the most prevalent land use impact for lynx in the lower 48 states, which affect important elements of lynx and snowshoe hare habitat, including "stand age, structure, composition, and arrangement on the landscape." It recognized that:

> Timber harvest can create, restore, and maintain lynx and hare habitats, but it and related silvicultural activities (e.g., precommercial and commercial thinning, fuels management, fire suppression) can also diminish (sometimes temporarily) habitat quality, quantity, and distribution; alter natural disturbance

COMPLAINT                                       22

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

1

2

regimes; and preclude or postpone attainment of the dense horizontal cover that provides high-quality hare and lynx habitat.

2. *Lynx Analysis Units in the Colville Forest*

3

4

5

6

7

66.    The 2013 LCAS separated lynx habitat across the lower 48 states into three categories: core areas, secondary areas, and peripheral areas. Core areas have strong evidence of long-term persistence of lynx. Secondary areas have historical records of lynx presence, but fewer than in core areas, and no recent documentation of presence or reproduction.

8

9

10

67.    The 2013 LCAS labeled the portions of the Selkirk mountain range within the Colville Forest as a secondary area for lynx. Parts of this range lies within the Project Area.

11

12

13

68.    Washington is divided into six lynx management zones: (1) Okanogan; (2) Vulcan-Truck; (3) Kettle Range; (4) the Wedge; (5) Little Pend Oreille; and (6) Salmo-Priest. The Salmo-Priest zone lies in the Selkirk mountain range.

14

15

16

17

69.    Lynx Analysis Units ("LAU") are used within lynx management zones to evaluate the current and potential habitat conditions and management actions. LAUs are based roughly on watershed boundaries, but also take into account lynx home range. Cumulative impacts to lynx are measured for each LAU.

18

19

70.    Until 2020, the Selkirk range in the Colville Forest included 22 LAUs encompassing 351,734 acres.

20

COMPLAINT                        23

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

71.    In 2018, the Forest Service remapped the LAU boundaries in the Idaho Panhandle National Forest area adjacent to the Project Area, significantly decreasing the amount of land within LAU boundaries.

72.    In 2020, the Forest Service remapped the LAU boundaries throughout the Colville Forest, eliminating 26 LAUs and decreasing designated lynx habitat by more than 230,000 acres.

73.    The vast majority of this decrease came in the Selkirk area, where the Service eliminated 192,919 acres from within LAU boundaries, a 55% decrease. It also dissolved the 22 LAUs and replaced them with a single, contiguous area of designated lynx range. The 2020 Lynx Remapping also removed 24,476 acres from LAUs in the Kettle Range region of the Colville Forest.

74.    The LAUs within the Forest serve as a constraint on logging projects, because the Service is required to analyze the impact that proposed actions will have on lynx and lynx habitat on an LAU-by-LAU basis. For example, in 2022, the Service was forced to withdraw 34 logging units from the Sanpoil Project because they would have resulted in more than a 15% change to suitable lynx habitat in the West Sherman LAU within a 10-year period.

75.    Upon information and belief, the Service dramatically changed LAU boundaries in the Kettle Range and the Selkirks in conjunction with and in order to

COMPLAINT                                    24

facilitate large logging projects being planned in those areas at same time, including, but not limited to:

- the Trails Project in the Selkirks, initiated in 2018 and approved on May 3, 2021, to allow commercial logging on 24,400 acres within the 90,700 Project Area in secondary lynx habitat;

- the Bulldog Project in the Kettle Range, initiated in 2018 and approved on April 28, 2022, to allow 7,014 acres of commercial logging within a 43,261-acre project area in core lynx habitat; and

- the Dollar Mountain Project in the Kettle Range, initiated in 2019 and still pending a decision, which aims to allow 15,418 acres of commercial logging within a 50,783-acre project area in core lynx habitat.

76.     The Service changed the LAU boundaries behind closed doors. It did not conduct any public process when remapping the LAU boundaries, nor did it disclose the 2020 Lynx Remapping to the public, either when it was being planned or when it was completed.

77.     The Service did not comply with NEPA when remapping LAU boundaries. It did not prepare an environmental assessment or an EIS, provide public notice and opportunity to comment, consider a range of alternatives, or analyze the direct, indirect, or cumulative effects on lynx, lynx habitat, or lynx recovery.

COMPLAINT                                25

**C. Trails Project**

*1. Development and Approval*

78.   The Service initiated the Trails Project in 2018 under the Tribal Forest Protection Act of 2004 after it received a letter from the Kalispel Tribe of Indians asking it to engage in "hazardous fuels reduction" on Colville Forest land adjacent to the reservation.

79.   The Service engaged in a public scoping period in January 2020, published a draft Environmental Assessment in October 2020 followed by a 30-day public comment period, and released the final EA in December 2020, followed by a 45-day objection period. The Alliance and one of its members filed comments during the scoping period and in response to the draft environmental assessment, and the Alliance submitted objections to the final EA.

80.   The Service made no changes to the Project in response to public objections. On May 3, 2021, District Ranger Vadala signed the Decision Notice and Finding of No Significant Impact ("Decision Notice"). The Decision Notice adopts the proposed action and includes a finding that the Project will not have a significant impact on the quality of the human environment, rendering an EIS unnecessary.

81.   The EA contends the Trails Project is "needed to improve forest health and resilience to disturbance: address insect and disease outbreaks; reduce the potential for future outbreaks; limit the severity of wildland fires; meet state and

COMPLAINT                        26

federal water quality guidelines; provide quality aquatic and wildlife habitat; contribute to the local economy; and connect people to their landscapes."

82.     The EA outlines a proposed action purportedly based on direction from the 2019 Plan and designed to meet four objectives: (1) "Trend the forest to the historic range of variability, reduce hazardous fuels and improve resilience to disturbance," (2) "Improve water quality and aquatic/riparian habitat conditions," (3) "Improve habitat conditions for big game and federally protected wildlife species;" and (4) "Provide opportunities for members of the public to connect to the landscape and for projects that can contribute to the local economy."

83.     As the public comments and objections to the Project illustrate, there is significant controversy about several assumptions in the Project's statement purpose and need, including disagreement about whether: (1) the Service is able to accurately assess the "historic rate of variability;" (2) widespread logging and burning will return the Forest to its so-called "historic rate of variability;" (3) logging and burning will increase forest "resiliency;" and (4) logging and burning will reduce the threat of severe wildfires.

84.     There is considerable skepticism about the accuracy of the data, assumptions, and photographs that the Service uses to determine how the Forest looked historically, and because the Service looks only at Forest-owned land, it fails to capture the full picture of how the current landscape correlates with historic forest

COMPLAINT                                    27

conditions. The impacts of climate change weaken the Service's assumption that remaining trees will "grow more vigorously" after commercial "thinning," or that diverse tree species will flourish following burning or modified clearcuts. Even if the Service could reliably determine HRV and achieve it, climate change calls into question the wisdom of planning for the future by trying to return to past conditions. Finally, research has shown that logging may actually exacerbate severe forest fires, including by removing canopy cover and allowing the sun to dry out the understory and by spreading invasive plants.

85.    In planning the Project, the Service considered only two potential actions in detail, the proposed action and a "no action" alternative. It eliminated several alternatives from detailed study because they would not meet the Project purpose and need, including:

- a proposal to keep the existing road system, without decommissioning any roads or closing them to the public;

- an alternative that would preserve half of the Project Area as an unroaded area, reduce the road density to meet Forest Plan desired condition levels, and eliminate any new road construction; and

- a proposal to designate part of the Project Area around Bead Lake as a forest preserve, eliminating roads and prohibiting logging and controlled burns.

2.  *Project Area*

86.    The Project Area includes approximately 90,700 acres (about 142 square miles) within Pend Oreille County, Washington, running from the southern

COMPLAINT                                28

Colville Forest boundary near Newport, WA to the Selkirk Mountain Range in the north, and bounded by the Pend Oreille River on the west and the Idaho Panhandle National Forest on the east. It encompasses the Exposure, Skookum, Cee Cee Ah, Cusick, and Middle Creek watersheds and includes a number of mountain lakes, the largest of which is the 717-acre Bead Lake. Although the topography of the Project Area is flat in the Pend Oreille River Valley, it becomes steep and mountainous toward the eastern edge near the Idaho Panhandle National Forest.

87.    The Project Area consists of a checkerboard of federal, state, tribal, and private lands, including about 40,300 acres that lie within the Newport-Sullivan Lake Districts of the Colville Forest. *See Figure 1*. The Forest Service manages about 44% of the Project Area, while roughly 41% is privately-owned, 9% is managed by the Washington Department of Natural Resources, and 4% is owned by the Kalispel Tribe.

88.    Private and tribal lands in the Pend Oreille River Valley within the Project Area are characterized by large, permanent forest openings with fields, pastures, and wetlands, while much of the Colville Forest land in the Project Area is heavily forested. More than 80% of these lands include dry Douglas fir and Northern Rocky Mountain mixed conifer stands, while some feature mesic Western redcedars and Western hemlock vegetation types. Subalpine fir and lodgepole pine occur in the highest elevation, along with patches of whitebark pine, which USFWS listed as an

COMPLAINT                                29

1    **Figure 1:** *EA map showing land ownership on the Project Area*



ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

ESA threatened species in December 2022. The Forest land within the Project area also includes about 1,440 acres that are not forested, including water and riparian areas and a few montane meadows.

89.    The Project Area is home to a rich diversity of species, ranging from deer, elk, and moose, to cougar, bobcat, and black bear. Its forests host numerous bird species, including owls, hawks, and woodpeckers, while its riparian habitats are home to frogs, salamanders, and trout. Numerous species in the Project Area have been designated as sensitive, threatened, or endangered, either nationwide and/or within the state of Washington.

90.    Of the Forest Service land within the Project Area, 51% is designated as part of a General Restoration Area and 48% is part of a Focused Restoration Area.

*3. Logging and Burning*

91.    The Project provides for extensive commercial logging, non-commercial logging, and burning over the next 20 years. The Project opens 24,400 acres to commercial logging (or more that 60% of Forest-owned land within the Project Area). This includes 6,720 acres of what the EA labels "shelterwood with reserves," which would essentially clearcut areas as large as 40 acres, while "typically" leaving "only 12 trees per acre," consisting vaguely of trees "needed for regeneration purposes" and those "exhibiting signs of wildlife use or unique late structure."

COMPLAINT                    31

92.     The Project also allows 8,850 acres of "commercial thinning," intensive logging that "typically" leaves more trees per acre than "shelterwood with reserves;" and 8,850 acres of "commercial thinning with group selection," which combines "commercial thinning" with clearcuts of about three acres.

93.     The Project also allows for 45,400 acres of non-commercial logging and burning, which overlap with one another and with areas designated for commercial logging. This includes 8,100 acres of precommercial thinning, 2,100 acres of thinning in Riparian Management Areas, 4,500 acres of prescribed burns in areas that were not logged, and 15,000 acres of whip felling to remove saplings and pole-size trees damaged during logging or displaying insect or disease concerns. Following logging, the Service would burn commercial logging slash on 6,500 acres, and pile and burn non-commercial logging slash on 8,400 acres.

94.     In all, the Project contemplates destroying trees with commercial logging, pre-commercial logging, and burning over 36,400 acres—or roughly 94% of the forested portions of the Project Area within Colville Forest boundaries. This activity would encompass between 61% and 88% of the Cee Cee Ah Creek, Middle Creek, Skookum Creek, Exposure Creek, and Cusick Creek watersheds.

95.     Over the 20-year life of the Project, the Trails Economic Analysis Report ("Economic Analysis") predicts it will generate approximately 134 MMBF of timber. However, the Trails Silviculture and Fuels Resource Report ("Silviculture

COMPLAINT                              32

Report") and other expert reports estimate the Project will produce a "minimum" of 244 MMBF. There is no explanation in the Project record for this discrepancy.

96.     The Project record does not indicate when timber sales will take place or how they will be staggered. In 2022, the Service published a "five year vegetation management schedule" for the Colville Forest. It indicated that the following sales were scheduled as part of the Trails Project: in 2023, the Kings Lake and Mill Creek sales were scheduled to produce 18,026 MMBF of timber on 2,214 acres; in 2025, the Little Skookum sale was scheduled to produce 22,600 MMBF of timber on 1,500 acres; in 2026, the East Bead and Sandwich sales were scheduled to produce 25,000 MMBF of timber on 2,200 acres; in 2027, the Indian Creek and Marshall sales were scheduled to produce 14,000 MMBF of timber on 1,500 acres.

97.     As of the date of this complaint, the Forest Service has offered three timber sales as part of the Project: King's Lake and Mill Creek in May 2023, and Kalispel Moon in August 2022. The Service did not do NEPA analysis on these sales.

98.     Following the final Project decision, Plaintiff acquired GIS data through the Freedom of Information Act ("FOIA") showing the areas marked for logging and burning throughout the Project Area, including those marked in the first three sales. *See Figure 2.*

COMPLAINT                                          33

**Figure 2.** *Project areas marked for commercial logging and non-commercial logging and burning, including areas designated in the first three timber sales*



ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

1    *4. Stand Prescriptions*

2        99.    The Trails EA is programmatic, not site-specific. It considers the broad

3    potential effects of an extensive project to be implemented within a vast area over a

4    period of 20 years. It does not contain site-specific details. Nevertheless, the Service

5    seeks to fully implement the Project without completing any further NEPA analysis.

6        100.    The EA does not disclose the location or timing of any of the Project's

7    planned commercial logging, non-commercial treatment, or burning, much less

8    detail how they would impact different species habitats and management areas

9    across the vast Project Area.  Instead of the detailed site prescriptions that it used to

10    provide for its projects, the EA included only three low-resolution maps. *See, e.g.,*

11    *Figure 3*. These maps mark nearly all the Forest-owned land in the Project Area for

12    some type of commercial logging or forest treatment that might take place at some

13    time over the next 20 years.

14        101.    In lieu of site-specific analysis, the EA purports to use a "flexible

15    toolbox approach." Under this approach "a series of current conditions is described

16    and then treatments identified that could be applied to move the landscape toward

17    desired conditions" and then "[d]ecision points based on conditions at the time of

18    implementation would be used to help lead to the desired condition." *Id.*

19

20

COMPLAINT                                35

1

2

**Figure 3**: *EA map of commercial harvest and timber treatments planned for the southern Project Area*



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

102.   The Service specifies that the "desired condition" is "generally" a target based on HRV. While the Service's HRV analysis has the appearance of specificity and certainty, however, it is little more than a guess based on incomplete information.

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

103.   The Service concedes that "[r]esearch on the historical patch size and arrangement of forest structure in western forests is ongoing." It acknowledges that it bases its assessment of the patch sizes by vegetation type on photos from 1935 that show "more open forests with large patches of early structure stages," while conceding that by the time the photos were taken, patch size did not reflect natural conditions, because it had already been affected by fires, grazing, homesteading, and logging. In addition, many of the Service's HRV assessments are so broad as to be meaningless, such as the speculation that "late open" dry Douglas fir stands historically constituted between 38 and 78 percent of the vegetation type within each watershed, while between 1 and 32 percent of the vegetation was in "late closed" stands of the same type—ranges that display 31 to 40 percentage points of uncertainty.

104.   The EA indicates that "HRV conditions of forest structure were analyzed at the watershed level, which differs from the planning area boundary." EA at 25. Since the planning area boundary does not follow watershed boundaries, "forest conditions must consider all vegetation within the watersheds that intersect the planning area." *Id.*

105.   However, the Service determines the historic and current rate of variability with reference *only* to Forest Service lands within each watershed, without taking into account the different forest structures on state, tribal, and private

COMPLAINT                                    37

1    land interspersed within each watershed. This omission renders the already

2    questionable HRV analysis meaningless—as it might indicate a particular watershed

3    has too high a percentage of "late closed" tree structure without sufficient patch

4    sizes, even when most of the land within that watershed may have been cleared by

5    state, tribal or private entities.

6        106.   The Service further explains its "toolbox approach" in response to

7    public comment:

8           Preliminary unit boundaries with detailed descriptions have been
            provided. The Silviculture/Fuels Report defines the "toolbox"
9           approach used during silvicultural reconnaissance. The toolbox
            approach is, if "X" condition is encountered [then] "Y" would be
10          the prescription. The "X" condition is species, stocking, disease,
            unique late closed structure, etc. that determines "Y", the
11          prescription.

12       107.   The Silviculture Report describes the "decision points" the Service will

13   use to "prioritize" stands for each type of commercial logging and timber following

14   "silviculture reconnaissance." Rather than specifying that "if 'X' condition is

15   encountered than 'Y' would be the prescription," the "decision points" provide that

16   after unspecified stands are selected for a type of commercial logging, that logging

17   will proceed as long as "some or all" of a list of parameters are met. For instance, a

18   "shelterwood harvest" would take place "if some or all" of the following conditions

19   are met:

20

COMPLAINT                          38

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

- Stands with a healthy overstory comprised of PP, WL, WWP, ES or DF where undesirable tree species may impact the available growing space.

- Vegetation types where the historical tree species composition has been altered and species conversion is needed to establish resilient species.

- Stands not predisposed to windthrow from environmental conditions (aspect, slope, soil type) or with a height to diameter ratio exceeding 80.

- Stands where site preparation, either prescribed fire or mechanical, can be applied if adequate, desirable regeneration is not present.

- Stands that are not within primary or secondary habitat for goshawk.

108.  Such broad conditions place no meaningful constraints on Service actions. A "shelterwood harvest" could proceed as long as the stand was not within primary or secondary goshawk habitat, even if none of the other conditions were met. On the other hand, if at least one of the other conditions was met, a stand could be decimated by shelterwood logging even if it were within primary goshawk habitat.

109.   Even after units are chosen at some point in the future for some type of commercial logging, the EA is not specific about what that logging will look like. For commercial thinning, "it is estimated that 50% of stands would retain a canopy cover of 40% or more immediately following commercial thinning treatments, though some may be lower." By contrast, in an estimated 60% of shelterwood

COMPLAINT                                    39

treatment units, canopy cover "may" be reduced to some unspecified point lower than 40%.

110.   The EA also places no definitive parameters around how many old growth trees will be cut or how much LOS forest will be logged. It promises only that "most" large-diameter trees will be retained—as long as they are healthy and "suited to the site." Meanwhile, the Silviculture Report indicates vaguely that the logging of trees over 20 inches DBH will be "coordinated with other resources as pertinent to the affected area and following direction in the Colville NF Land Management Plan (FW-DC-VEG-03 and FW-GDL-VEG-03)." Similarly, unique late structure would be "identified for retention in all treatment types," except that "portions of this structure class" may be removed for a variety of reasons, including for "safety, operations, to meet desired conditions for structural stages, limit the spread of insect infestation or disease, where needed for fuel reduction, or to promote special plant habitats."

111.   The Service's lack of specificity prevented the public from receiving sufficient notice of Project parameters to allow it to give meaningful comment. It also rendered the Service unable to consistently describe the parameters of the Project, much less reasonably anticipate its impact.

112.   While the EA provides that the Service will "implement all planned vegetation harvest work" within the first 10 years of the Project, the Silviculture

COMPLAINT                                    40

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

Report doubles that estimate, indicating that "commercial thinning treatments would take place over approximately 20 years." The Silviculture Report and the EA also disagree about the number of acres set to be treated. However, the Silviculture Report makes clear that these estimates mean little anyway, because actual treatment areas might vary by as much as 30%, based on on-the-ground conditions. While the Economic Analysis predicts the Project will lead to the commercial logging of 134 MMBF of timber, several other specialist reports estimate that the yield will be 80% higher (244 MMBF).

113.   Given all these uncertainties, the closest the Service can come to estimating the longevity of the Project's effects is to guess that it would impact forest structure "for the next 30 to 100 years or more."

5. *Road Construction and Reconstruction*

114.   Roads have significant adverse impacts on forest habitats and wildlife. Roads cause erosion, compaction, sedimentation, and the spread of noxious weeds, and can seriously impair water quality and the viability of aquatic wildlife. Roads disturb wildlife, destroy and fragment wildlife habitat, change distribution and migration patterns, and interfere with feeding, breeding, nesting, and denning. Roads also bring greater human traffic into the forest, allowing easier access for both legal hunting and poaching, increasing the chances of human-ignited wildfires, and facilitating increased human intrusion into sensitive areas.

COMPLAINT                                    41

115.   The 2019 Forest Plan recognizes the impact that roads have on wildlife, habitat, and riparian areas, and sets Desired Conditions to control and decrease road density in the Forest. In the Focused Restoration Management Areas that comprise 48% of the Forest-owed potion of the Project Area, the 2019 Plan provides that there should be no more than one mile of National Forest System road per square mile of Forest-owned lands (MA-DC-FR-05). In the General Restoration Management Areas that make up most of the rest of the Project Area, the 2019 Plan provides that there should be no more than two miles of National Forest System road per square mile of Forest-owned lands (MA-DC-GR-05).

116.   Under the Travel Management Rule, the Service must set forth rules for travel and transportation systems in national forests. 36 C.F.R. §§ 212.1-212.21. It requires the Service to identify the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of national forest system lands, and to designate roads for decommissioning. 36 C.F.R. § 212.5(b). The Service performs this analysis through completing a travel analysis report for a given area, which informs the agency's analysis during the NEPA process for particular projects.

117. The 2014 Travel Analysis Report developed under the Travel Management Rule identifies 30% of existing Forest roads that should be considered for decommissioning.

COMPLAINT                                 42                 ANIMAL & EARTH ADVOCATES, PLLC
                                                                    20520 105TH AVE SW
                                                                   VASHON, WA 98070-6557
                                                                        206.601.8476

118.   The Trails Transportation Resource Report ("Transportation Report") indicates there are about 446 miles of road in the Project Area, including 292 miles of National Forest Service Roads, 22 miles of collector roads, 270 miles of local roads,[3] and approximately 154 miles of private, county, tribal, and state roads. It adds that the roads in the Project Area "are popular with the public and receive a high amount of use for recreational activity, due to the proximity to the Spokane metro area and other nearby communities."

119.   According to the EA, the Project will build 6 miles of new permanent roads and 51 miles of new temporary roads; convert 19 miles of roads designated for full-size vehicles only to also allow off-highway vehicles ("OHVs") such as ATVs, dirt bikes, and snowmobiles; construct 7 miles of non-motorized trails to create a loop around Bead Lake and connect to other trails; construct 1 mile of new OHV trail, and create up to 6 new rock pits with a maximum size of 3 acres each. Figure 4 depicts existing roads in the Project Area and the location of planned road construction, which the Service furnished to Plaintiff in response to a FOIA request.

---

[3] The report indicates that local roads are either in "storage" and not suitable for traffic, or roads that are open for use by high-clearance vehicles, including for hauling logs, which drivers use at their own risk.

COMPLAINT                                          43

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

**Figure 4:** *Trails Project proposed permanent and temporary roads and existing road structure*



*Data on proposed Project roads provided by the Service in response to a FOIA request. Data on existing open, gated, barriered, and impassible roads is from the Washington Department of Natural Resources GIS dataset.

COMPLAINT                    44

120.   The Project will also close 2 miles of road to non-administrative use; decommission 46 miles of undrivable roads and 5 miles of open roads; and convert 3 miles of roads to non-motorized trails.

121.   In addition, the Transportation Report details Project plans to reconstruct about 292 miles of "haul route" roads, including roads that have had little to no maintenance work over the past 20 years and have deteriorated into undrivable condition. This includes a plan to "open roads that have been closed and overgrown with vegetation for the past several years." These plans are not mentioned or analyzed in the EA, and the Service provide no information about the location of the roads slated for reconstruction.



Photograph from the Trails Biological Assessment of a system road that has not been maintained and has been overgrown to the point that it is not usable by any type of vehicle.

COMPLAINT                                45

122.   The EA calculates that the proposed action will reduce "open roads" in the Project Area by 6 miles, keeping the density at 2.1 miles of road per square mile, and reduce drivable roads (open and restricted access roads) in the Project Area by 4 miles, keeping drivable road density to 4 miles of road per square mile. It concludes that "(a)lthough the post-project acres within open road influence zones would be somewhat reduced from the current condition, the level of human influence would remain high."  The EA's calculations do not account for "road prisms or skid trails picked up by satellite imagery," which the Service says are "typically overgrown and unusable for travel." It provides that these roads will be "verified as needed at the project design phase," following the approval of the Project.

123.   Although this is not clearly disclosed, the EA's calculations also do not include the 51 miles of additional temporary roads the Project would add,  including 26 miles that would require construction of a new road bed. They also does not account for the 292 miles of largely undrivable roads that the Project plans to restore to drivable condition. These additions would substantially increase both the open road density and the drivable road density in the Project Area.

124.   The Service provides that the temporary roads will be closed to public access during Project operations, and once the Project concludes, the temporary roads will be closed to motor vehicle use. Closure involves placing the roads in

COMPLAINT                                    46

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

1  temporary storage, which would preserve the road bed but attempt to block entry

2  with materials such as gates or earthen berms.

3      125.   The EA does not specify what the road density is in either Focused

4  Restoration or General Restoration Management Areas, nor describe how the Project

5  is moving toward the 2019 Plan's Desired Conditions in these areas.

6      126.   The EA does not specify how long the new, temporary roads would be

7  open, given the 20-year length of the Project and the plan for subsequent logging

8  operations.

9      127.   The EA does not mention the planned reconstruction of 292 miles of

10  road, nor consider the impact of opening these deteriorated roads to traffic.

11      *6. Climate Change*

12      128.   In 2016, the Council on Environmental Quality instructed agencies

13  conducting NEPA review that "[c]limate change is a fundamental environmental

14  issue, and its effects fall squarely within NEPA's purview."

15      129.   Agencies are required to examine the extent to which a particular

16  project will add to the severe impacts of climate change. *350 Mont. v. Haaland*, 50

17  F.4th 1254, 1266 (9th Cir. 2022). Summary conclusions regarding a project's impact

18  on climate change are insufficient—agencies must perform "the high quality and

19  accurate scientific analysis that NEPA's implementing regulations demand of

20  environmental information produced by agencies." *Id.* at 1266. An agency may not

COMPLAINT                                    47

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

"skirt" the hard-look analysis required by NEPA by summarily declaring a project's climate impacts to be minor in comparison to a forest-wide, nationwide, or global scale. *Id.* at 1269-70; *Ctr. for Biological Diversity v. United States Forest Serv.*, No. CV 22-114-M-DWM, 2023 U.S. Dist. LEXIS 144726, at *27 and *32-33 (D. Mont. Aug. 17, 2023).

130.   Logging in U.S. forests is now responsible for as much greenhouse gas as burning coal. Logging emits three times as much carbon dioxide into the atmosphere per acre as wildfire. As hundreds of climate and forest scientists warned Congress and President Biden in 2020 and 2021, logging in U.S. forests releases 723 million tons of carbon dioxide into the atmosphere each year—more than 10 times the amount from wildfires and natural tree mortality combined.

131.   Nevertheless, the Service gives only passing thought to the Project's direct and cumulative impacts on climate change. The EA indicates that the Project's impacts on climate change "were considered but not brought forward for detailed analysis" due to the conclusions in the Trails Climate Change Report ("Climate Change Report").

132.   The Climate Change Report dismisses the impact the Project will have on climate change in less than three pages. It does not quantify the Project's overall contributions to climate change, or separately consider the magnitude of various impacts it would have, including by:

COMPLAINT                                    48

20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

- decreasing carbon storage by logging and burning 36,400 acres of forest;

- burning timber slash and logging byproducts;

- potentially raising the risk of wildfires by increasing traffic into the Forest through the construction and restoration of roads and trails;

- creating greenhouse gases by using various types of burns on nearly 10,000 acres of Forest; or

- producing emissions from tens of thousands of logging trucks.

133.    Without quantifying the impact of these activities separately or combined, the Climate Change Report concludes that the Project is "not considered a major source of GHC emissions." It does not identify who came to this conclusion, define what it means by a "major source," or explain what standards were used for this determination.

134.    This summary conclusion comes after a string of summary assertions. The report asserts that considering the size of global and nationwide levels of greenhouse gas emissions, "a project of this size makes an extremely small contribution to overall emissions." It hedges that it cannot judge the impact of this unquantified "small contribution," because climate change is a "global phenomenon" and "it is difficult and highly uncertain to ascertain the indirect effects of emissions from single or multiple projects of this size on global climate." And it dismisses any adverse impacts the Project would have on the climate by calling them

COMPLAINT                              49                    ANIMAL & EARTH ADVOCATES, PLLC
                                                            20520 105TH AVE SW
                                                            VASHON, WA 98070-6557
                                                            206.601.8476

only a "momentary influence on atmospheric carbon concentrations, because carbon will be removed from the atmosphere with time as the forest regrows, further minimizing or mitigating any potential cumulative effects."

135. The report dispenses with the NEPA requirement to consider direct, indirect, and cumulative impacts related to climate change with two sentences:

> Therefore, at the global and national scales, this proposed action's direct and indirect contribution to [greenhouse gases] and climate change would be negligible. In addition, because the direct and indirect effects would be negligible, the proposed action's contribution to cumulative effects on global [greenhouse gases] and climate change would also be negligible.

136. The Service also fails to examine the reasonably foreseeable impacts that climate change would have the Project, such as how it might exacerbate the adverse impacts of roads, increase the impact of logging on wildlife and wildlife habitats, prevent the regrowth of vegetation that the Service claims will increase forest diversity, or call into question the Project's goal of moving forest structure toward the historic rate of variability.

**D. Impacts to Wildlife**

137. The third objective of the Project is to "Improve habitat conditions for big game and federally protected wildlife species." The EA elaborates on this objective by explaining that "[h]abitat for big game and federally protected species can benefit from reducing open road density and improving the amount and quality of available forage, prey habitat and security."

COMPLAINT                                    50

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

138.   The Project fails to achieve this objective and fails to take the required "hard look" at the Project's impact on a wide range of endangered, threatened, and sensitive wildlife species. Similar failures compromise the Service's analysis of the Project's impacts on all wildlife.

139.   The Service does not fairly evaluate the length of time that the Project will impact wildlife, especially when combined with the cumulative impact of foreseeable future projects.

140.   The EA evaluates the impacts to wildlife in the short term (0-10 years), the mid-term (10-30 years), and the long-term (30+ years). This evaluation does not account for the fact that the Project is scheduled to last for 20 years, with overlapping logging and burning applied to the same areas over time. In its response to comments, the Service disclosed that:

> Treated areas would be receiving a multitude of treatments over the next 20 years that may include but are not limited thinning, burning, mastication, piling, and pruning. The timing and frequency of these activities would be in concert with the completion of other non-fuels related activities within and adjacent to the project area. As a result, **the short-term impacts will last at least 30 years.** (emphasis added).

141.   The Project impacts analysis also fails to consider the cumulative impact of foreseeable future projects. The EA anticipates future logging and burning at unspecified intervals to "maintain the fire resiliency of the landscape," which may include "utilizing natural ignitions, prescribed fire, and mechanical treatments such

COMPLAINT                                  51                ANIMAL & EARTH ADVOCATES, PLLC

as thinning and mastication." In areas in which it allows commercial logging, it anticipates future logging over the next 15-40 years:

> Most commercial thinning and commercial thinning with group selection stands would require another entry in about 15 to 25 years. A commercial entry would occur approximately 30 to 40 years following implementation of proposed regeneration units, aside from a precommercial thinning 15 years post-harvest. These treatments would trend forest conditions towards restoring the historical range of variability.

Taking these foreseeable future actions into account, the "short-term" impacts of the Project could last indefinitely, as the same areas continue to be subject to logging and burning.

142. The Service fails to fully evaluate the impacts to wildlife of temporary roads, restored roads, and roads opened to OHV use.

143. The Service provides that temporary roads built for this Project will be closed to the public while in use and shut down after the Project is completed in 20 years. The Wildlife Report acknowledges that "[n]ot all road closures are effective and some of these closures could be breached by motorized vehicles," and that this "could lead to an overall decrease in seclusion habitat available to wildlife in the project area, and an increase in harvest levels, both legal and otherwise." Since it "is difficult to accurately predict beforehand which, if any, road closures could be breached," however, the Service's "analysis assumes we would achieve a high degree of closure effectiveness in the project area."

COMPLAINT                                    52

1    144.   Given the Service's known and persistent issues with keeping traffic off

2   of closed roads, such an analysis based on the best-case scenario fails to accurately

3   assess the impact of these new roads on wildlife.



Photograph of a "closed" road in the Project Area, taken May 9, 2024.

145.   The Service provides no assessment of the impact to wildlife of

restoring up to 292 miles of road, a large (but unspecified) number of which have

deteriorated to undrivable conditions. Even though this restoration could have most

of the same impacts to wildlife as creating a new road, this aspect of the Project is

not even discussed in the EA, the Biological Assessment, the Biological Evaluation,

or the Wildlife Specialist Report ("Wildlife Report").

COMPLAINT                53

146.   The Service acknowledges that opening 19 miles of road to OHV traffic would increase noise, cause wildlife to move further away from these roads, and increase traffic onto spur roads. It fails to mention that the increased traffic on these roads would also result in increased harassment, hunting, and poaching of wildlife and exacerbate the risk of human-caused wildfires. And it fails to provide any site-specific assessment of where these changes will be made and what impact they will have on any specific wildlife species.

147.   The Wildlife Report acknowledges that the Service has incomplete information about the presence of wildlife:

> Accurate estimates of wildlife populations relative to the project area are difficult if not unfeasible to obtain. It is unlikely that all activity centers such as dens or nests have been found. This is due to the limitations of detection methods and the level of effort and time that would be required for a complete census. Some species occur at very low densities and have vast home ranges, making them very difficult to detect. A species' home range may only partially overlap the project area or may shift into or out of the project area over time.

Nevertheless, many of the measures the Service puts into place only protect *known* populations or known denning and nesting sites, and the Service routinely fails to assess the impact to *unknown* denning and nesting sites. As a result, the Service fails to fully evaluate the Project's impact on the wildlife populations that it admits it is unable to accurately assess or locate.

COMPLAINT                                          54

148.    Finally, the Service improperly relies on design elements in place of the site-specific details necessary to assess the Project's full impacts on wildlife. Because the Service does not disclose the details of site-specific plans, it cannot evaluate the impact of those plans as required by NEPA. As a result, the Service skips this impacts analysis, instead relying on the assumption that the Project's general design elements will mitigate the negative impacts on wildlife.

### 1.  Lynx

149.    The Canada lynx is an endangered species in Washington and is listed as threatened under the federal ESA.

150.    Lynx are habitat specialists that depend on mature, multi-story forest stands with dense horizontal cover. Lynx habitat in the West is dominated by stands of mixed conifer, including Engelmann spruce, subalpine fir, and lodgepole pine. Lynx are specifically adapted to travel through deep snow, with long legs and large, well-furred paws with webbed toes. As a result, their distribution is generally restricted to areas that receive deep, powdery, and persistent snow that allows them to outcompete other predators that are less efficient in these conditions.

151.    Lynx prey primarily on snowshoe hare. Snowshoe hare require forests with dense horizontal cover to provide cover from predators, thermal protection, and adequate forage. In Washington, snowshoe hare habitat typically includes areas with dense, horizontal cover at least 3-10 feet above the ground or snow level.

COMPLAINT                                55

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

152.    Red squirrels are an important secondary prey species for lynx, especially when there are low populations of snowshoe hare. Red squirrels rely on mixed conifer forest habitats, including fir, pine, and spruce. Red squirrels feed, nest, and breed in trees. Red squirrels need a large amount of forest to survive, and changes to the type or distribution of trees can have a negative impact on red squirrels.

153.    The average home range for lynx is between 5 and 100 square miles. Their movement is generally centered on areas of continuous forests, and they avoid areas with natural or man-made large openings. Lynx denning habitat must be in, or adjacent to, foraging habitat. Lynx denning sites are often found in areas of large, woody debris and dense horizontal cover.

154.    Logging in lynx habitat has been, and continues to be, one of the primary threats to the species.

155.    Four lynx management zones fall within the Colville Forest: Kettle Range, the Wedge, Little Pend Oreille, and Salmo-Priest. Prior to 2020, each of these management zones was divided up into Lynx Analysis Units. Built around the LAU system, the 2019 Plan provides that "[h]abitat conditions (e.g., current habitat compared to desired conditions) are appropriately assessed at the lynx analysis unit scale." The 2013 Lynx Assessment states that LAUs are not to be adjusted for individual projects and must remain constant to be effective.

COMPLAINT                                  56

1

2      156.   The Project Area lies within the Salmo-Priest lynx management zone,

3   a secondary lynx management area. Prior to 2020, there were 22 LAUs within this

4   management zone. In fall 2020, as the Project was being finalized, the Service erased

5   these LAU boundaries to create a "mapped lynx range," removing more than 28,000

6   acres of former LAU territory from the Project Area. *See Figure 5*.

7      157.   The Service did not disclose the 2020 Lynx Remapping during the

8   NEPA process for the Trails Project, evaluate how the 2020 Lynx Remapping

9   changed protections for lynx in comparison to the prior LAUs, or provide the public

10  an opportunity to consider this information during the comment or objection period.

11     158.   Although the Project's draft Biological Evaluation is dated June 15,

12  2020, *before* the purported completion of the 2020 Lynx Remapping, it makes no

13  mention of the LAUs that were still in place in the Project Area at the time. Instead,

14  the draft and final Biological Evaluation, as well as other Project documents, refer

15  only to "mapped lynx range."

16     159.   The Biological Evaluation indicates that the Service mapped the lynx

17  range with reference to the elevation and tree species designated as lynx habitat by

18  the 2013 LCAS. It does not reference any more recent evaluations of lynx habitat,

19  notably excluding reference to the status assessment that USFWS completed in

20  2020.

COMPLAINT                              57                  ANIMAL & EARTH ADVOCATES, PLLC
                                                          20520 105TH AVE SW
                                                          VASHON, WA 98070-6557
                                                          206.601.8476

**Figure 5:** *Comparison of new mapped lynx range to area covered by the LAUs Until 2020, showing overlap with units marked for logging and burning.*

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

160.   Although the Service purports to have mapped lynx range based on the existence of lynx habitat, nearly half of the new "lynx range" (6,941 acres) is within the perimeter of the 2015 Tower Fire. The Service declares 4,040 acres of this area to be "unsuitable habitat" because it contains "recently created openings that lynx may be reluctant to cross."

161.   The Forest Plan indicates that forest successional stages are to be measured for *each LAU*, to ensure they provide a "mosaic of lynx habitat (including foraging, travel and denning components) with landscape pattern that is consistent with the historical range of variability" (FW-STD-WL-02). Prior to the 2020 Lynx Remapping, the Service thus considered the cumulative impacts to lynx within each LAU, even when the LAU went outside project boundaries.

162.   Without reference to the Forest Plan Desired Conditions or the prior boundaries for its cumulative impacts analysis for lynx, the EA designates the cumulative effects analysis area for lynx as "the portion of secondary lynx range which overlaps the project area."

163.   The Project design element for lynx (DE-17) only applies to the "lynx range," without regard for former LAU boundaries. It requires the Service to maintain "[c]losed canopy, multi-storied timber stands" for lynx within the lynx range. Given the "surplus" of openings on the range created by the 2015 Tower Fire,

COMPLAINT                                    59

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

it also instructs the Service to avoid creating "additional forest openings" within the lynx range that would further inhibit lynx movement.

164.    The 2020 Lynx Remapping eliminated roughly 10,000 acres of potential lynx habitat from portions of the Project Area designated for commercial logging, and the EA does not evaluate the effects of logging on lynx in this area.

165.    The EA estimates that commercial thinning would occur on 940 acres of the remaining lynx range. Without specific stand analysis or logging prescriptions, the Service cannot reliably estimate the impact this logging will have on lynx. Instead, the EA bases its analysis on generalities, including that areas within the lynx range designated for commercial logging are "middle structural stages," which "*typically* lack large trees, dense understories, and concentrations of coarse woody debris" and "do not *appear* to be providing important habitat components for lynx."

166.    In disregard of the Project design elements for lynx, commercial thinning on the lynx range would create additional forest openings, although the extent of these openings is impossible to discern without the site-specific analysis that the Service refused to perform. The Silviculture Report's description of commercial thinning specifies only that it will "typically" leave more trees per acre than shelterwood with reserves, which in turn will "typically" leave only "12 trees per acre or more." Disregarding the Project design elements prohibiting the creation

COMPLAINT                                        60

of new openings, the EA only commits that it will retain an unspecified number of "un-thinned 'skips'" within these logged areas.

167.   The EA indicates that prescribed fire would be used on about 50 acres of lynx range, which is "mostly" not providing good cover for snowshoe hare.

168.   The EA and Biological Evaluation do not consider the potential effects to lynx in the remainder of the Project Area, including that portion of the Project Area that was within LAUs until just a few months prior to final Project approval.

169.   Lynx habitat includes dense stands of spruce, subalpine fir, lodgepole pine, and Western redcedar. However, these tree species have been labeled as above HRV in many areas, and thus targeted for logging. For example, before 2020, the upper third of the Skookum Creek watershed (the location of the King's Lake timber sale), was largely encompassed within LAU boundaries, and it still crosses over into the new "lynx range." However, the Project aims to significantly reduce dense structures of potential lynx habitat in this watershed. As indicated on Table 20 from the Silviculture Report, the Project includes logging and burning in this watershed that is designed to decrease Western redcedar/Western hemlock "mid closed" structure from 59% to 31%; subalpine fir/lodgepole pine "mid closed" structure from 37% to 19% and "late closed" structure from 5% to 2%; spruce/subalpine fir "mid closed" structure from 73% to 35% and "late closed" structure from 8% to 6%.

COMPLAINT                                      61

Table 20. Skookum Creek watershed, changes to historical range of variation by vegetation type and structure stage.

| Vegetation Type | | Early | Mid Open | Mid Closed | Late Open | Late Closed |
|---|---|---|---|---|---|---|
| Douglas-fir dry | Current (%) | 7 | 13 | 55 | 2 | 23 |
| | Post-Harvest (%) | 7 | 38 | 30 | 8 | 17 |
| | Historic (%) | 6-16 | 2-8 | 4-13 | 38-78 | 1-32 |
| Northern Rocky Mountain Mixed Conifer | Current (%) | 8 | 4 | 64 | 1 | 23 |
| | Post-Harvest (%) | 8 | 36 | 32 | 1 | 23 |
| | Historic (%) | 9-25 | 1-3 | 18-30 | 4-6 | 44-60 |
| Western Redcedar / Western Hemlock | Current (%) | 3 | 4 | 59 | <1.0 | 34 |
| | Post-Harvest (%) | 3 | 32 | 31 | 0 | 34 |
| | Historic (%) | 4-24 | 0 | 7-27 | 0 | 55-83 |
| Subalpine fir / Lodgepole pine | Current (%) | 31 | 27 | 37 | <1.0 | 5 |
| | Post-Harvest (%) | 31 | 45 | 19 | 2 | 2 |
| | Historic (%) | 45-65 | 0 | 33-53 | 0 | 3 |
| Spruce / Subalpine fir | Current (%) | 11 | 8 | 73 | <1.0 | 8 |
| | Post-Harvest (%) | 11 | 46 | 35 | 2 | 6 |
| | Historic (%) | 14-46 | 0 | 13-41 | 0 | 29-57 |

170.  Lynx also require nearby habitat that supports snowshoe hare, which require low, concealing cover such as that provided by dense stands of trees with thick understories. This habitat would be destroyed by commercial and non-commercial activities planned for the Project Area. The Service barely acknowledges these impacts in its EA or Biological Evaluation, although in response to comments it acknowledges that "[t]hinning harvests and prescribed burning would remove or adversely modify hare habitat where it exists." The Service nevertheless claims that the logging and burning would also have beneficial effects on snowshoe

COMPLAINT                                           62

hare, because logging that "creates openings *could* set the stage for snowshoe hare habitat development in 15-20+ years, as young trees in plantations grow."

171.    The Service does not provide a scientific basis for this conclusion. This analysis does account for the Project length of 20 years, which means that it may take 35-40 years for snowshoe hare habitat to *possibly* develop in these areas. It does not account for the Service's plan to re-enter these areas with new logging and burning in the next 15-30 years. It does not account for the fact that climate change could thwart future development of this habitat. And it does not evaluate the impact that destroying snowshoe hare habitat for such a long (perhaps indefinite) period of time would have on the Project Area's ability to support Canada lynx.

172.    The EA acknowledges that other considerations for the lynx population are "habitat connectivity and seclusion from human disturbance." Both are destroyed by roads and heavy road usage. However, the Biological Evaluation concludes that these factors do not need to be considered, because  there will be "no change to open road densities or designated snowmobile routes on the lynx range."

173.    This conclusion fails to account for increased traffic on existing roads due to extensive road reconstruction and the opening of some roads to OHV use; the impact of "temporary" new roads that could be open for another 20 years and could continue to be used even when "closed"; the addition of 19 miles of road open to

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

OHV use, or the fact that temporary and restored roads could open up more *non-*designated snowmobile routes.

174.   Based on the Project's destruction of habitat for both lynx and snowshoe hare, and the potential disruption to lynx of additional roads and road traffic, there was no reasonable basis for the Service to conclude that the Project "may affect, but it not likely to adversely affect lynx." There is also no basis for concluding that the Project serves its third objective, to improve habitat quality for federally protected species by improving the amount, distribution and connectivity of lynx habitat, improving prey habitat, or providing for greater security and seclusion.

### 2.  Grizzly Bear

175.   Grizzly bears are listed as endangered in Washington and as threatened on the federal ESA. Grizzly bears need fall foraging sites including mid-high elevation, berry producing shrubfields, meadows, and riparian areas. They usually den in alpine or subalpine areas with deep soils. Seclusion from human disturbance is a primary management objective. Their survival is jeopardized by increased habitat fragmentation caused by human activity.

176.   One of the two recovery areas for grizzly bear in Washington, the Selkirk Mountains Grizzly Bear Recovery Area, crosses into the northeast corner of the Colville Forest. That recovery area includes the LeClerc Grizzly Bear

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

Management Unit ("GBMU"), which borders the Project Area to the north. The Project Area also borders on the Priest Bears Outside Recovery Zone ("BORZ") to the east, an area outside recovery zone boundaries where enough bear use has been documented to warrant management. The entire Project Area has been designated by the USFWS as an area where grizzly bears "may be present." *See Figure 6.*

177.    Although many of the Forest's grizzly management standards apply only within designated GBMUs, the Service also has an obligation under the ESA and the 2019 Plan to consider the impact on threatened and endangered species when they occur within the Forest outside of recovery zones. The 2019 Plan includes a Desired Condition that habitat should be "consistent with the historical range of variability…and contribute to the recovery of federally listed threatened and endangered species" (FW-DC-WL-02). A 2019 Plan guideline further requires the Service to protect "unique habitats" for different species (FW-GDL-WL-03). The Biological Assessment specifies that "[u]nique habitats used by grizzly bears include ponds, marshes, wetlands, deciduous forest, and natural meadows."

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

1

**Figure 6:** *Map showing GBMUs and BORZ areas bordering the Project Area, and areas marked as having a medium probability of being selected for grizzly dens.*

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

178.   Grizzly bears have been frequently documented in and around the Project Area. Since 2012, a USFWS monitoring and research program has been monitoring the Selkirk grizzly population through bear sightings, captures, and hair snags, and has mapped male and female grizzly bear occupied range extending into the Project Area. *See Figure 7.*

**Figure 7:** *Overlap of grizzly-occupied range with Project Area*



ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

179.   As the Service describes in its 2014 Travel Analysis Report, roads into the Selkirk Mountains pose a particular threat to grizzly bears:

> Roads provide access for people into grizzly bear habitat. In areas of high road densities, grizzly bears are prone to being disturbed by vehicle traffic or people on foot. A bear may learn to avoid areas near open roads, forgoing access to suitable habitat which might occur in the road corridor. The risk of a grizzly being shot is higher in areas of high road densities, than in areas with few or no roads. In the Selkirk Mountains Ecosystem, human-caused grizzly bear mortality has been well documented and is considered the greatest threat to the continued existence of the animals (Knick and Kasworm, 1989).

180.   The Biological Assessment also recognizes the impact of roads on grizzly bears:

> Core habitat for grizzly bears is defined as areas lying further than 500 meters from open and restricted (gated) roads and motorized trails (USDA 2019). Within this 500-meter "zone of influence," grizzly bears are most prone to being disturbed and displaced from suitable habitat by encounters with vehicle traffic or people on foot. The risk of a bear being shot by a poacher, or mistakenly shot by a legal black bear hunter, is higher near drivable roads. The higher the road density the fewer acres of core habitat and the greater the risk of human-caused bear mortality.

181.   Within grizzly bear recovery areas, the 2019 Plan provides that federal actions shall not result in a reduction of core habitat below or an increase in road densities above the levels shown in Table 15 (FW-STD-WL-07).

COMPLAINT                                    68

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

Table 15. Grizzly bear habitat standards for the shared bear management units of the Colville and Idaho Panhandle National Forests

| Bear management unit | Maximum open roads >1 mi/sq. mi. | Maximum total roads >2 mi/sq. mi | Minimum percent core habitat |
|---|---|---|---|
| Salmo-Priest (99% NFS land) | 33% | 26% | 64% |
| Sullivan-Hughes (99% NFS land) | 24% | 19% | 61% |
| LeClerc (64% NFS land) | 48% | 60% | 27% |

182.   Under the 2019 Plan, no areas within 500 meters from an open road, restricted-use road, motorized trail, or high-use hiking trail can be considered "core" grizzly habitat.

183.   One of the new roads added by the Project would originate from an existing private logging road and run along the ridge on the eastern edge of the Project Area, where the EA notes grizzly bears have been documented. Nearby, new roads would encroach into a currently roadless area of the Colville Forest between the Priest BORZ and the LeClerc BMU.

184.   These new roads will run so close to the LeClerc GMBU that their 500-meter buffer zone would encroach into the GMBU and eliminate 143 acres of core grizzly habitat, reducing the amount of core habitat within the LeClerc GMBU to near the 26% minimum required under the 2019 Forest Plan.

185.   These roads would extend through potential grizzly bear denning habitat and enable commercial logging in a concentrated area of potential habitat

COMPLAINT                                          69

sandwiched between the LeClerc GBMU, the Hungry Mountain Roadless area, and

the Priest BORZ. *See Figure 8.*

**Figure 8:** *Overlap of grizzly-occupied range with Project Area*



\* The section outlined in heave black indicates a currently unroaded area within the Project Area that is contiguous with the Hungry Mountain IRA and has high ecological value. The new roads built under the Project would bisect this area, bringing traffic into an area with grizzly denning habitat between the Priest Borz, the LeClerc GBMU, and the Hungry Mountain IRA.

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

186.    The Service asserts that these new roads near grizzly core habitat would have only a minimal impact, because they are temporary roads that will only be used during Project activities and will be closed to the public afterwards.

187.    This assessment ignores the fact that the "temporary" roads may last for as long as the 20-year-life of the Project (or longer, if used for the next Project planned for this area); that these roads would have heavy traffic from logging trucks; that the disruption caused by the roads would be compounded by logging activities on the border of the LeClerc GBMU; and that it is likely that the roads will continue to be used after the project by motor vehicles, OHVs and hikers, presenting a long-term disruption to grizzly habitat seclusion.

188.    As the EA acknowledges, these impacts could be further exacerbated by the fact that logging, burning, and roads could all contribute to the spread of noxious weeds with the potential of outcompeting local forage plants essential for the grizzly population.

189.    The EA also acknowledges new roads and logging would also reduce grizzly hiding cover over the "short term," which it considers to be approximately 5-10 years. It does not account for the 20-year life of the Project, which would extend the "short term" to 25-30 years, nor does it consider the cumulative impact of foreseeable future logging projects, which could cause a permanent reduction in grizzly hiding cover.

COMPLAINT                                    71

190.   The EA does not evaluate the impact that additional traffic on up to 292 miles of reconstructed roads would have on grizzly habitat seclusion.

191.   The EA acknowledges that helicopters might be used to log remote timber stands where it would be difficult or costly to build timber stands, and that the intense and potentially extended impacts of helicopter noise could cause additional disruptions to grizzly bears.

192.   The EA generalizes that within areas proposed for commercial logging, "hiding cover would be degraded in direct relation to the amount of tree basal area removed." Since the Service did not perform a site-specific analysis that would allow it to judge the amount of tree basal area to be removed in any particular area, however, it cannot quantify the amount by which habitat cover would be decreased in prime grizzly habitat.

193.   The EA concludes summarily that the Service does not "expect timber harvest and other project activities to affect the suitability of potential den habitat." It provides no support for this conclusion. Although the Biological Evaluation indicates no dens have been documented in the area outside the LeClerc GBMU, it also identifies the eastern edge of the Project Area (where the ridgeline road will run) as "undoubtedly the best potential habitat for denning purposes." Indeed, both the ridgeline road and the planned logging at the northern tip of the Project Area transect

COMPLAINT                          72                    **ANIMAL & EARTH ADVOCATES, PLLC**
                                                         20520 105TH AVE SW
                                                         VASHON, WA 98070-6557
                                                         206.601.8476

areas that scientists have described as denning habitat with a "medium probability" that grizzlies will select it for dens.

194.   The EA discounts this long list of potentially adverse impacts to grizzly bear as inconsequential for two reasons. First, it contends that the impact will be contained because these activities will be restricted to daylight hours. It does not explain why it is less harmful to disturb bears during the day, when they are more likely to be trying to sleep or relax. Second, it contends that the disruptions will be confined in "space" to treatment areas or "groups of areas," so that bears "should" be able to move to more secluded areas. Without Project schedule or site-specific analysis, it is impossible to determine how extensive this "space" might be at any given point in time.

195.   The EA offers only a few speculative beneficial impacts that the Project could have for grizzly bears, including that logging and burning "could" improve the production of green forage plants and berry crops over the short- to mid-term.

196.   Based on the extensive list of adverse impacts to grizzly bears, there was no reasonable basis for the Service to conclude that the Project "may affect, but is not likely to adversely affect" grizzly bears.

197.   Based on the extensive list of adverse impacts to grizzly bears, there was no reasonable basis for the Service to conclude that the Project served its third objective, to improve habitat quality for grizzly bears by reducing open road density

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

and improving the amount, distribution, and connectivity of habitat, increasing forage availability, and increasing seclusion.

### 3. Wolverine

198.   In November 2023, the USFWS listed the wolverine as a threatened species under the federal ESA.

199.   Although the wolverine was a candidate for federal listing during the development of the Project, the proposed rule to list the wolverine was withdrawn on October 13, 2020 prior to Project approval. As a result, the draft Biological Evaluation included an analysis of the impacts to wolverine, but this was dropped from the final Biological Evaluation that was transmitted to UWFWS for consultation. The impacts to wolverine are also not considered in the Biological Assessment, and the EA addresses them only in passing.

200.   Only a small number of wolverines are estimated to live in Washington, and the species is a candidate for state protection.

201.   Wolverines are under increasing threat as climate change causes increasing fragmentation of their habitat. Prime wolverine habitat includes areas of large, sparsely inhabited forest characterized by deep snow, high altitudes, and an adequate prey base. Wolverines are opportunistic scavengers that consume a wide variety of plant and animal food including carrion, berry crops, and occasionally big game animals.

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

202.    Wolverine dens have not been documented within the Colville Forest. In 2007, the Service mapped potential wolverine denning habitat in the Forest but did not identify any potential habitat in the Project Area.

203.    Wolverines are notoriously elusive because they live in low densities across large home ranges. The initial draft of the Biological Assessment indicates the possible presence of wolverine in the Project Area. They have been documented in areas near the Project Area, such as in the Salmo-Priest Wilderness, and there was one unverified sighting reported in the Project Area in 2019.

204.    The Project Area includes potential wolverine foraging habitat and travel corridors for the species.

205.    In summarizing the Project's impacts to habitat seclusion for the wolverine, the EA references its discussion about disruptions to seclusion for lynx and grizzly bear.

206.    Regarding habitat connectivity for wolverine, the EA claims that no roads or openings would be created in the high elevation areas of the Project Area. However, the Project contemplates logging in several areas above 5,000 feet in elevation in the northern reaches of the Project Area.

207.    Regarding the cumulative effects to wolverine, the EA concludes that projects on Forest lands should not impede wolverine movement and cross-

COMPLAINT                                    75

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

references the predicted cumulative effects to grizzly bear related to forested cover and seclusion.

208.   The EA does not name or evaluate the cumulative impact of any other past current or foreseeable future logging Projects on Forest lands. Since the EA's analysis of the Project's impacts on wolverine cross-references the sections related to forest cover and seclusion for lynx and grizzly bear, it suffers from all the same shortcomings as those analyses.

*4. Goshawk*

209.   Older forests within the Project Area provide unique habitat for many species, including populations of northern goshawks, which are a sensitive species for Forest Service Region 6, the region that includes the Colville Forest, as well as candidates for the state endangered species list. The Service also uses goshawks as a surrogate species to monitor the impact of projects on old-growth forests. Logging is the largest threat to the survival of northern goshawks in Washington.

210.   The 2019 Forest Plan selects surrogate species intended to represent the health of various types of ecosystems and forest structures. Because goshawks depend on old growth forests, the Plan uses them as a surrogate species to monitor impacts to LOS forest structures, along with the pileated woodpecker, American marten, and white-headed woodpecker.

COMPLAINT                          76                          ANIMAL & EARTH ADVOCATES, PLLC
                                                                20520 105TH AVE SW
                                                                VASHON, WA 98070-6557
                                                                206.601.8476

211.    Northern goshawks are accipiters, which are woodland raptors with long, dark-banded tails and relatively short, rounded wings. They have evolved to hunt in closed forest structures, with shorter wings and longer tail that allow them maneuver below the forest canopy and through the forest. Goshawks are elusive and hunt by stealth, so have been nicknamed "phantoms of the forest" and "grey ghosts."

212.    The Project would have a significant impact on goshawk habitat. The EA indicates it would largely preserve 6,760 acres of "primary" goshawk habitat, which it defines as "mapped nest stands, alternative nest stands, and potential habitat in the mesic vegetation types." This mapping was completed based on a survey performed in 2019, and the Service has reserved the right to change mapped goshawk habitat subject to the results of site-specific review performed *after* the NEPA evaluation is complete.

213.    The Project would allow logging on all 14,020 acres of what the Service defines as "secondary" goshawk habitat, in Douglas fir stands or "dry" vegetation types. The EA acknowledges this will render the habitat unsuitable for goshawks:

> Within watersheds that are currently within or above historic wildlife habitat patterns for goshawk habitat, silvicultural treatments in secondary habitat could occur to accomplish other resource objectives, so long as the total habitat was not reduced below HRV. These treatments could be designed to move late closed stands to a late open condition - a structural stage that is below HRV for vegetation in the Douglas fir - Dry Vegetation type. The late open structural stage would normally provide

COMPLAINT                                77                    ANIMAL & EARTH ADVOCATES, PLLC
                                                                       20520 105TH AVE SW
                                                                     VASHON, WA 98070-6557
                                                                         206.601.8476

insufficient overhead canopy to be selected by goshawks for nesting.

214.    The Service predicts that these impacts would "likely last 15-20 years, until growing tree crowns start to close once again." Once again, however, it does not account for the fact that it expects that most logged areas will "require another entry in about 15 to 25 years," thus extending these impacts indefinitely.

215.    In addition, logging and burning would destroy dead wood habitats for goshawk, as well as habitat for important goshawk prey, including snowshoe hare. The extent of these impacts is impossible to judge due to the lack of specificity of the Project parameters:

> Within all proposed harvest units, live trees that are 20+ inches in diameter would be retained (not cut) *unless there is a clear silvicultural reason* why the removal of smaller trees alone cannot achieve the desired conditions. All snags that are 10+ inches in diameter would be retained in harvest units *to the extent feasible*. Any trees with old raptor nest platforms would be retained. *Up to 12 trees per acre* that are 14+ inches in diameter and that have broken-tops, broom rusts, or mistletoe brooms, would be retained. Down logs would be retained *consistent with* Forest Plan Desired Condition FW-DC-VEG-01. Snags and Coarse Woody Debris. Thus, the great majority of the existing structures that goshawks might select for nesting or prey preparation *should still be available* in the harvested units (emphasis added).

216.    The EA concludes that the "alternative as proposed may impact individual birds but would not affect the continued viability of goshawk populations on the forest."

COMPLAINT                               78

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

217.   This conclusion is not justified by the facts, given that the Service acknowledges that the Project would degrade all of the "secondary" goshawk habitat in the Project Area, it cannot estimate with any certainty the other impacts the Project with have on goshawks, and it does not have an estimate for how many goshawks remain in the Forest—and thus cannot know how many "individual birds" the Project would need to impact to affect the "continued viability of goshawk populations in the Forest."

218.   The Service acknowledges that it must evaluate cumulative impacts for the goshawk at a Forest-wide scale, and that "[o]f all the projects and activities that occur on the forest, timber sales by far have the greatest potential to cumulatively affect goshawks." Nevertheless, it dismisses these potential cumulative impacts merely by saying that all the timber sales within the Forest would incorporate similar standard practices and design elements as the Trails Project.

219.   The Service fails to list, much less evaluate, other past, present, and reasonably foreseeable logging Projects that would also have an impact on goshawk habitat, *despite the fact that* many of these other projects reached similar conclusions that they may impact individual goshawks but were not likely to have a broader impact on goshawk viability in the Forest. A few of these projects include:

- The Sanpoil Project, approved roughly five months before the Trails Project was finalized, which would have reduced goshawk habitat by nearly 5,000 acres.

COMPLAINT                              79

- The Bulldog Project, begun in 2018, which would destroy an unspecified amount of goshawk habitat and prey habitat. (The Bulldog environmental assessment incorrectly evaluated cumulative impacts to goshawk at only the project-area scale).

- The Dollar Mountain Project, begun in December 2019, which proposes logging more than 15,000 acres and burning more than 30,000 acres. The project's draft environmental assessment acknowledges that road-building, logging, and burning may disturb and displace goshawks and impact goshawk habitat.

220.   All or almost all of the Service's past, current, and foreseeable future logging projects are likely to have adverse impacts on goshawk habitat. Before it continues to destroy goshawk habitat piece by piece, the Service is required to take a "hard look" at the cumulative impacts of all these projects combined.

5. *Other Sensitive Species and Habitats*

221.   The Service performs a similarly inadequate review of the Project's impacts on other sensitive and state-listed species, including little brown bats, pileated woodpeckers, and gray wolves.

222.   The Project Area is home to the little brown bat, a Region 6 sensitive species and ESA candidate species.

223.   Little brown bats are found in a wide variety of forest habitats, and roost inside buildings and bridges, tree cavities, beneath tree bark, and within rock crevices, caves, and mines. They depend on rich forests with large snags and standing hollow and decaying trees, and areas.

COMPLAINT                                    80

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

224.   The biggest threats to little brown bats include white-nose syndrome, a fungal infection that can be spread by humans, and destruction of their habitats during logging. Little brown bats can die if disturbed while hibernating, because disturbances cause them to use up the fat reserves they need to survive the winter.

225.   Logging and burning in the Project Area would kill individual bats, destroy bat roosts, and eliminate snags, dead, and diseased trees that provide valuable bat habitat. Logging and road construction could disturb bats during hibernation, and they would be subject to increased human disturbance as a result of new roads, restored roads, and more roads open to recreational use.

226.   Nevertheless, the Wildlife Report concludes that the Project may "beneficially impact" individual bats or bat habitats. The basis for this conclusion is that logging and burning would "reduce the risk of widespread forest habitat loss to stand-replacing fires."

227.   Given the studies that show that logging and other "management" activities may actually increase the risk of fire, this is far from a foregone conclusion. Even if potentially true in the long term, however, the Service does not account for the likelihood of immediate adverse impacts on a species that is already on the brink of being listed as threatened or endangered under the ESA.

228.   Rather than attempt to assess the impact to bat habitat, the likelihood of destroying roosting spots, and the risk of disturbing bats during hibernation, the

COMPLAINT                          81

Service seems to rely on the assumption that these risks will be eliminated by Project "design elements" and "standard practices." Even if followed to the letter, however, the Project design elements fall far short of adequately protecting bats and bat habitat.

229. The design elements provide that to avoid disturbing bats, the Service will not log within 0.25 miles of abandoned mines from September 15 to May 15, and will avoid using prescribed fire within 400 feet of abandoned mines unless they determine they are not occupied by bats (DE-22).

230. The obvious problem with this approach is that bats do not just live in abandoned mines, but also in tree snags, within dead and diseased trees, beneath tree bark, and in rock crevices and caves. In the past, the Service has admitted that it has insufficient information about bats to accurately map their habitat or identify roosting sites. The EA does not suggest that the Service will seek to identify bat habitat and roosting sites before logging or burning an area.

231. The Service's conclusion that the Project will be "beneficial" for bats is thus baseless, because the Service fails to perform any analysis of the inevitable damage that logging and burning will do to both bats and bat habitat.

232. Pileated woodpeckers also live in the Project Area.

COMPLAINT                                    82

233.    Pileated woodpeckers are the largest woodpeckers in North America, easily recognizable by their bright red caps. They are often referred to as a keystone species, because they create nesting cavities used by a variety of other species.

234.    Pileated woodpeckers live in mature and old-growth forests, as well as second-growth forests with  snags and fallen trees. They nest, roost, and forage in large trees and snags (standing dead trees). Logging and burning that destroys large trees and dead, defective, or diseased trees is the largest threat to the pileated woodpecker. Even selective logging and burning can fragment their habitat and leave them more vulnerable to predation.

235.    The pileated woodpecker is a candidate for the state endangered species list, and the Service uses the species as a surrogate to monitor the health of old-growth forests, as well as to assess impacts to snag habitat.

236.    The Service mapped the same "primary" habitat for pileated woodpeckers as for goshawks, indicating that logging and burning would only occur in these habitats "as necessary" to maintained desired habitat conditions. However, the Project provides for extensive logging and burning in what the Service has labeled as "secondary" habitat for the pileated woodpecker. This includes turning 1,142 acres of "late closed" Douglas fir forest into "late open" forest, unsuitable for pileated woodpeckers.

COMPLAINT                                              83

237.   Logging and road construction would  also destroy snag habitat, while the logging of dry, diseased, and insect-infested wood would inhibit the creation of new snags, resulting in a "short to mid-term reduction in snag recruitment in harvest units." Meanwhile, burning would destroy more trees and snags, and new and improved roads would provide additional corridors for people to destroy snag habitat by cutting firewood.

238.   Despite these significant impacts to pileated woodpeckers—and all other species that depend on large-tree and snag habitat—the Service concluded that the Project "may impact individuals or habitat but should not contribute to a negative trend in species viability across the forest." Once again, the Service's reasoning was based on the hope that the Project would reduce the risk of severe fires, and the vague assertion that restoring HRV would improve "viability outcomes for all native wildlife species."

239.   The Service relies upon Project design elements to mitigate negative impacts to pileated woodpeckers, and as a substitute for any site-specific details about how the Project would impact pileated woodpeckers in any given area. It also dismisses the cumulative impact of similar projects forest-wide based on the general assertion that all projects contain "similar" elements, although it does not name or discuss any other Forest project.

COMPLAINT                                    84

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

240.   The Project Area is occupied by a significant population of gray wolves, including the Salmo, Goodman Meadows, and Snookum wolf packs.

241.   Gray wolves are a Forest Service Region 6 sensitive species, and a state-listed endangered species.

242.   Poaching is a significant threat to the Washington wolf population. Washington has seen an increase in wolf poaching over the past few years, with six wolves recently killed by poison in the Colville Forest. The threat of poaching increase with new or improved roads that provide easier access to wolf territory.

243.   The EA does not mention the gray wolf, much less consider the Project's impact on the species. The Wildlife Report acknowledges that the Goodman Meadows pack lives in the Project area and that "[l]imiting human-caused mortality is a primary management concern." The Wildlife Report also recognizes that road density has a significant impact on wolf populations but concludes that its proposed decommissioning of five miles of open roads would "reduce the risk of human-caused wolf mortality[.]"

244.   The Wildlife Report does not assess the impact to wolves of the Project's plans for building 57 miles of permanent and temporary roads, reconstructing 292 miles of existing road that is currently largely impassable, or opening 19 miles of road to OHV use. It fails to assess the impact of "temporary" roads that may be used for at least 20 years, or the likelihood that the Service will be

COMPLAINT                                          85

ineffective at closing public access to these roads. It fails to quantify or evaluate the degree to which extensive road reconstruction will facilitate human traffic into new regions of the forest, how opening roads to OHV will increase recreational traffic.

**E.  Impacts to Whitebark Pine**

245.   Whitebark pine is a slow-growing, long-lived tree, with some trees documented to be over 1,000 years old. Whitebark pine occurs at high elevations across western North America and is considered a keystone species. Whitebark pine stabilizes soils, regulates runoff, slows the progression of snowmelt, and provides nutritious seeds for numerous species of wildlife, from birds to bears.

246.   Although whitebark pine occasionally occurs in pure or nearly pure stands at high elevations, it more typically occurs in stands of mixed species in a variety of forest community types.

247.   In 1991, USFWS denied a petition to list whitebark pine as endangered throughout its range and designate critical habitat for the species.

248.   USFWS received another petition in 2008, and delayed making a finding, citing staff and budget limitations. Following litigation, the USFWS issued a finding that the petition contained substantial information that listing whitebark pine may be warranted and announcing that it would conduct a status review.

COMPLAINT                                        86

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

249.   In 2011, USFWS decided that listing the whitebark pine was threatened or endangered was warranted but precluded by higher priority actions, adding whitebark pine to its list of candidate species.

250.   In December 2022, USFWS listed the whitebark pine as a threatened species under the ESA.

251.   The EA devotes two sentences to its consideration of the Project's impacts on whitebark pine:

> Whitebark pine, a species proposed for listing as threatened, is documented from the project area, although proposed treatment occurs outside of known occupied habitat. As such, implementation of project activities will result in no effect and will not result in jeopardy to the species.

252.   The Biological Assessment of Botany Resources summarizes the same in just a single sentence: "Whitebark pine, a species proposed for listing as threatened, is documented from the project area, although proposed treatment occurs outside of known occupied habitat."

253.   The Service provides no support for its conclusion that proposed logging and burning will occur outside known occupied habitat for whitebark pine. The Service provides no information on how it determined the occupied habitat of whitebark pine. The Service provides no site-specific evaluations demonstrating that it performed any surveys to check for whitebark pine in the areas marked for commercial logging, non-commercial logging, and burning.

COMPLAINT                                              87

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

254.   The documents for the Mill Creek sale in the northern portion of the Project Area indicate that there may be whitebark pine in that area, and delegate the responsibility for identifying and preserving whitebark pine to the commercial logging contractor.

255.   The Service's evaluation of whitebark pine does not contain the high quality and accurate scientific analysis required by NEPA.

256.   The Service's evaluation of whitebark pine does not provide sufficient support for its conclusion that the Project will have no effect on the species.

**F.  Development of Stimson Land Exchange**

257.   On December 16, 2020, the Service gave notice that it was considering a land exchange that would acquire 60,000 acres of land from the Stimson Lumber Company in exchange for 30,000 acres of land in the Colville Forest ("Stimson Exchange").

258.   This swap would lead to the Forest Service acquiring 13,356 acres in the Project Area, decreasing the "checkerboard" quality of that land, and increasing the percentage of land in the Project Area under Forest Service ownership from 44% to 60%.

COMPLAINT                                    88

1

**Figure 9:** *Land within Project Area to be acquired in Stimson Exchange*

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

COMPLAINT                    89

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

259.   Stimson has used clearcuts to maximize timber revenue on its land, so much of the land to be transferred to the Colville Forest is either deforested or contains early successional stages of forest.

260.   Since the HRV analysis in the EA only considered Forest Service land in its calculations, the inclusion of the Stimson land would significantly change the Services estimates of the percentage of land in the Project Area belonging to various successional stages. This would result in the Service being able to log fewer acres of mid and late successional stands under the restrictions of the 2019 Forest Plan and the Eastside Screens standards.

261.   If the Forest Service acquires Stimson lands and these changes are not made, the Project may have the effect of decreasing mid and late successional forests below the Service's calculations of HRV. The would move the Project Area away from the desired conditions, standards and objectives set by the 2019 Forest Plan to maintain Forest resiliency and species diversity, as well as preventing the Project from achieving its objectives.

262.   The Stimson lands also contain high road densities. Since the Service's analysis of road density does not include roads outside the Colville Forest, the inclusion of these new roads would push its road density even farther away from the desired conditions set by the 2019 Forest Plan.

COMPLAINT                                    90

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

263.   The Stimson Exchange was a reasonably foreseeable action while the Trails Project was under consideration.

264.   The Trails EA did not mention or evaluate the Stimson Exchange in its consideration of cumulative impacts, which require it to evaluate the impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions.

## G.  Project Supplemental Information Report

265.   There have been significant new developments bearing on the Project since its final approval on May 3, 2021.

266.   In December 2022, USFWS listed the whitebark pine as a threatened species under the ESA.

267.   In November 2023, the USFWS listed the wolverine as a threatened species under the federal ESA.

268.   On June 21, 2023, Chief Judge Stanley Bastian of the Eastern District of Washington vacated the portion of the 2019 Plan that replaced the Eastside Screens Standards with the 2019 Large Tree Management Guideline. *Kettle Range Conservation Grp. v. U.S. Forest Service*, No. 2:21-cv-00161-SAB, 2023 U.S. Dist. LEXIS 107552, at *32-33 (E.D. Wash. June 21, 2023) ("Sanpoil Ruling"). The Sanpoil Ruling concluded that "the agency failed to meaningfully consider the effects of eliminating Eastside Screens and the 21-inch rule, and its cumulative effect

COMPLAINT                                  91

on old-growth trees and species dependent on them in the Colville National Forest." The ruling reinstated the use of Eastside Screens to govern Forest projects, including its restriction on commercially logging trees more than 21 inches DBH and its limitations on logging within LOS stands.

269.   On September 12, 2023, Colville Forest Supervisor Josh White issued a memorandum to all Forest district rangers, informing them of this ruling and conveying his "expectation" that they will ensure all current and future projects under the 2019 Forest Plan will be consistent with the Eastside Screens Standard.

270.  NEPA regulations require agencies to prepare supplemental environmental analysis to evaluate "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" ( 40 CFR 1502.9( c )(ii)).

271.  The Forest Service's handbook on NEPA compliance requires reconsideration of decisions based on an EA when "new information or changed circumstances indicates that changes in the EA are needed to address environmental concerns that have a bearing on the action or its impacts." FSH 1909.15, 18.4.

272.  Less than two weeks after the memo from the Forest Supervisor, District Ranger Vadala signed a Supplemental Information Report ("SIR") concluding that the Sanpoil Ruling did not require the development of a supplemental environmental assessment or EIS. The SIR concluded that the

COMPLAINT                    92

Project's purpose and need continued to be valid and that the Project's objectives could still be met after modifications were made to comply with the Eastside Screens requirements.

273.   The SIR also concluded that changes to accommodate the Sanpoil Ruling would "not result in impacts beyond the scope and range of effects considered in the original analysis as documented in the decision."

274.   Large tree management was crucial to shaping the Project and assessing the impacts of  logging and burning on forest composition and on old-growth dependent species such as the Northern goshawk and pileated woodpecker.

275.   However, the EA only discusses the impacts to old growth and old-growth dependent species in general terms, without providing any site-specific information necessary to quantify that impact.

276.   The EA does not include any site-specific evaluation of old growth or LOS stands in any area marked for commercial logging, pre-commercial logging, or burning. It does not include an estimate of how many trees over 20 inches DBH would be cut or how much LOS forest would be logged under the original Project design, either throughout the entire Project Area or in any specific unit.

277.   The EA suggests that "most" large-diameter trees would be retained as long as they are "suited to the site." It does not explain what it means by "suited to the site," or specify who would make that subjective determination.

COMPLAINT                                    93

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

278.   The EA indicates that "unique" late structure will be "identified for retention in all treatment types," except that "portions of this structure class" may be removed for a variety of reasons, including for "safety, operations, to meet desired conditions for structural stages, limit the spread of insect infestation or disease, where needed for fuel reduction, or to promote special plant habitats." It does not explain the meaning of "unique," or specify who would make this subjective determination. It does not specify the extent to which "unique" late structure tree stands would be removed under the six listed exceptions, either Forest-wide or for any specific unit.

279.   The SIR recognizes that the original Project decision included treatment within LOS stands of all forest types and would have allowed the commercial logging of trees over 21 inches DBH.

280.   Since the Service did not provide any specifics about how the Trails Project would impact large trees *before* the Sanpoil Ruling, however, it was impossible for the SIR to quantify the degree to which that ruling has impacted the Project.

281.   Along with the SIR, the Service analyzed LIDAR data showing suspected areas of large/old growth trees in the three sale units that had been identified in the Project area. This analysis also included identification of potential LOS stands that were at least 10 acres in size and composed of forest structure that

COMPLAINT                               94

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

1 the Service had designated as "deficient" when compared to the historical rate of

2 variability.

3  282. The Service has not completed this analysis for any future Project

4 logging.

5  283. The Service's methodology does not recognize smaller "deficient" LOS

6 stands or indicate that logging prescriptions would be adjusted to avoid stands

7 smaller than 10 acres.

8  284. Plaintiff used LIDAR data to identify potential LOS/old growth stands

9 based on geospatial analysis. Through a FOIA request, Plaintiff acquired the

10 polygons that the Forest Service had marked "deficient LOS stands."

11  285. The SIR indicated that no treatment acres in the first three sale areas

12 were modified as a result of its LOS analysis following the Sanpoil Ruling. Maps of

13 the LIDAR data within these sale areas shows that logging during these initial sales

14 will take place in areas where there are potential old growth trees and LOS stands

15 less than 10 acres. *See Figure 10.*

16  286. These maps also indicate that the units identified for commercial

17 logging transect most of the areas the Service has identified as containing "deficient"

18 LOS stands containing forest structure below HRV. The areas designated for logging

19 include moist stands of old growth that are among the largest in the Colville Forest.

20

COMPLAINT     95

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

1

2

**Figure 10:** *Map of areas designated for logging by the EA and sale units in the King's Lake sale, showing overlap with USFS-designated LOS stands and other areas of potential old growth trees*



287.    The SIR indicates that "[t]reatment acres *may* be modified to exclude deficit LOS stands to meet Eastside Screens in units that have forest types with structure classes below HRV." (emphasis added). It includes charts identifying late structure stands below HRV in five watersheds, as well as the types of LOS structures that it has categorized as within or above HRV, where logging could continue.

COMPLAINT                                    96

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

288.   The Supplemental Forest Vegetation Report provided to support the SIR ("SIR Vegetation Report") indicates that the Service may continue to destroy trees larger than 21 inches DBH through methods other than commercial logging, because Eastside Screens "allows the management of some large diameter trees through methods other than harvest."

289.   As a result, the SIR Vegetation Report concludes that the Sanpoil Ruling will not impact the Project's ability to move the forest toward HRV, because the "change in method for accomplishing the work has no bearing on the effectiveness of the project implementation."

290.   Neither the SIR nor the SIR Vegetation Report estimates the number, acreage, or location of LOS stands that would be excluded from commercial logging as the result of the Sanpoil Ruling, either at a Project-wide or site-specific level.

291.   Neither the SIR nor the SIR Vegetation Report estimates the number, acreage, or location of LOS stands that would still be subject to commercial logging as the result of the Sanpoil ruling, either at a Project-wide or site-specific level.

292.   Neither the SIR nor the SIR Vegetation Report estimates the number, acreage, or location of large-diameter trees that the Service would still destroy following the Sanpoil Ruling, using methods other than commercial logging.

COMPLAINT                               97

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

293.   Neither the SIR nor the SIR Vegetation Report discuss how the Project or the analysis under the EA was impacted by the listing of the whitebark pine as threatened under the federal ESA.

294.   The Service did not publish any subsequent evaluation of whether additional environmental analysis was needed as a result of the listing of the wolverine as a threatened species under the federal ESA.

295.   The Service did not initiate formal or informal consultation regarding the impact of the Project following the listing of either the whitebark pine or the wolverine under the federal ESA.

## VI.   CLAIMS

### First Claim for Relief

*2020 LAU Change (NEPA)*

296.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

297.   NEPA requires agencies to complete an environmental assessment or an EIS for all major federal actions not subject to a categorical exemption.

298.   For proposed actions that are not likely to have significant effects or for which the significance of the effects is unknown, an agency may prepare an environmental assessment to determine whether an EIS is needed. 40 C.F.R. § 1501.5.

COMPLAINT                                    98

299.  For "major Federal actions significantly affecting the quality of the human environment," NEPA requires the preparation of an EIS. 42 U.S.C. § 4332(C).

300.  NEPA requires the Forest Service to adequately disclose, consider, and analyze the direct, indirect, and cumulative effects of its proposed actions. 42 U.S.C. § 4332 (C); 40 C.F.R. § 1502.16.

301.  NEPA requires the Forest Service to submit proposed actions for public review and comment.

302.  The Forest Service did not prepare an environmental assessment or an EIS when it remapped the LAU boundaries throughout the Colville Forest in 2020, eliminating 26 LAUs and decreasing designated lynx habitat by more than 230,000 acres.

303.  The 2020 Lynx Remapping eliminated roughly 10,000 acres of potential lynx habitat from portions of the Project Area designated for commercial logging.

304.  The Service changed the LAU boundaries behind closed doors. It did not disclose the 2020 Lynx Remapping to the public, provide public notice and opportunity to comment, consider a range of alternatives, or analyze the direct, indirect, or cumulative effects of the change on lynx, lynx habitat, or lynx recovery.

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

305.   The 2020 Lynx Remapping was a major federal action requiring environmental review under NEPA.

306.   The 2020 Lynx Remapping was a major federal action likely to significantly affect the quality of the environment, requiring preparation of an EIS.

307.   The Service's decision to proceed with the 2020 Lynx Remapping without preparing an environmental assessment or EIS analyzing its direct, indirect, or cumulative effects or providing the public the opportunity to review and comment was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

## Second Claim for Relief

*Failure to Follow 2019 Forest Plan and Service Regulations (NFMA and APA)*

308.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

309.   NFMA directs that all site-specific projects be consistent with the forest plan. 16 U.S.C. § 1604(i).

310.   The Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005); 16 U.S.C. § 1604(i). A project or activity must conform to *all* components of the applicable forest plan, including its standards,

COMPLAINT                              100

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

guidelines, and desired conditions. *All. for the Wild Rockies v. United States Forest Serv.,* 907 F.3d 1105, 1110 (9th Cir. 2018).

311.   Applicable statutory and regulatory requirements must shape a project's statement of purpose and need.

312.   Under the Travel Management Rule, the Service has a substantive duty to address its over-sized road system. *See* 36 C.F.R. § 212.5. The rule requires the Service to identify the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of national forest system lands, and to designate roads for decommissioning. 36 C.F.R. § 212.5(b); *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 895 (9th Cir. 2007).

313.   In 2014, the Service developed a Travel Analysis Report for the Colville Forest under the Travel Management Rule, which identifies 30% of existing Forest roads that should be considered for decommissioning.

314.   In the Focused Restoration Management Areas that comprise 48% of the Forest-owned potion of the Project Area, the 2019 Plan's Desired Conditions provide that there should be no more than one mile of National Forest System road per square mile of Forest-owned lands (MA-DC-FR-05). In the General Restoration Management Areas that make up most of the rest of the Project Area, the 2019 Plan's Desired Conditions provide that there should be no more than two miles of National Forest System road per square mile of Forest-owned lands (MA-DC-GR-05).

COMPLAINT                                     101

315.    The EA calculates that Forest lands within the Project Area have an open road density of 2.1 miles of road per square mile and a drivable road density of 4 miles of road per square mile. The EA does not break down the road densities by management area.

316.    The Trails Project will increase the density of both open and drivable roads.

317.    The Trails Project will reconstruct hundreds of miles of roads that are now in undrivable condition. The Service did not consider the possibility of decommissioning these roads rather than returning them to service.

318.    In approving the Trails Project, the Forest Service refused to consider reasonable alternatives that would have complied with its obligations under 36 C.F.R. § 212.5(b) to designate unneeded roads for decommissioning and move the Service toward achieving the 2019 Plan's Desired Conditions for roads.

319.    In approving the Trails Project, the Forest Service failed to analyze, discuss, and demonstrate compliance with the direction for roads in the 2019 Plan, the Travel Management Rule, or the 2014 Travel Analysis Report.

320.    The 2019 Plan provides that "[h]abitat conditions (e.g., current habitat compared to desired conditions) are appropriately assessed at the lynx analysis unit scale." 2019 Plan at 57. The Forest Plan indicates that forest successional stages are to be measured for each LAU, to ensure they provide a "mosaic of lynx habitat

COMPLAINT                                    102

(including foraging, travel and denning components) with landscape pattern that is consistent with the historical range of variability" (FW-STD-WL-02).

321.   The 2020 Lynx Remapping made it impossible to assess impacts to the lynx at the LAU scale when it eliminated all the LAUs from the Project Area, in conjunction with the development of the Trails Project.

322.   The Service did not assess the impact of the Trails Project at the LAU scale but looked instead only at "the portion of secondary lynx range which overlaps the project area."

323.   The Forest Service's 2020 Lynx Remapping is inconsistent with Plan components for lynx and violates forest plan standards and guidelines for lynx and lynx habitat.

324.   The Forest Service's approval of the Trails Project is inconsistent with Plan components for lynx. The Trails Project violates forest plan standards and guidelines for lynx and lynx habitat.

325.   The Service's decision to proceed with the Project without complying with Plan components and Service regulations governing roads, or Plan components related to lynx and lynx habitat, was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

COMPLAINT                                   103

### Third Claim for Relief

*Failure to Develop Site-Specific Project Plans (NEPA)*

326.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

327.    NEPA requires that agencies take a "hard look" at the consequences of prospective actions by "carefully consider[ing] detailed information concerning significant environmental impacts." *Robertson*, 490 U.S. at 349.

328.    NEPA analyses must consider a range of reasonable alternative actions and thoroughly assess direct, indirect, and cumulative environmental effects of the proposed alternatives. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502 and 1508.

329.    When an agency proposes a project to be implemented without further, site-specific NEPA review, it must disclose the details of its proposed action at a site-specific level and perform a detailed environmental analysis of the reasonably foreseeable impact of those site-specific actions. *Alaska Conservation Council*, 443 F. Supp. 3d at 1006.

330.    If the agency issues a "programmatic" environmental analysis or EIS that does not disclose the details of future projects, it is required to perform a separate NEPA review of each project.

331.    The Service states the following in its internal guidance on compliance with NEPA: "If the Agency does not know where or when an activity will occur or

COMPLAINT                                104

1    if it will occur at all[,] then the effects of that action cannot be meaningfully

2    evaluated." *See* U.S. FOREST SERVICE, FOREST SERVICE HANDBOOK, FSH

3    1909.15.01(1).

4        332.   The Service failed to develop or disclose site-specific plans for its

5    logging, burning, and road construction prior to finalizing the Trails Project,

6    rendering the analysis in the EA not meaningful and not in accordance with 50 C.F.R.

7    § 1508.23.

8        333.   The Service failed to perform a detailed analysis of the impact of the

9    Project's planned logging and burning.

10       334.   The Service failed to perform a detailed analysis of the impacts of the

11    Project's road construction, reconstruction, and repurposing under the Project.

12       335.   The Service failed to perform a detailed analysis of the Project's

13    impacts on old-growth forests and snag habitats.

14       336.   The Service failed to perform a detailed analysis of Project's impacts

15    on climate change.

16       337.   The Service failed to perform a detailed analysis of Project's impacts

17    on wildlife, including sensitive, threatened, and endangered species.

18       338.   The Service's decision to approve the Project and conduct timber sales

19    without disclosing site-specific actions or taking a "hard look" at the effects of those

20    actions was therefore arbitrary, capricious, an abuse of discretion, and not in

COMPLAINT                                105

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**Fourth Claim for Relief**

*Improper Tiering (NEPA)*

339.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

340.   NEPA's implementing regulations encourage agencies to "tier" to a prior EIS to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision." 40 C.F.R. § 1502.20 (2020).

341.   "Ultimately, when reviewing for NEPA compliance, [the Court] look[s] to whether the agency performed the NEPA analysis on the subject action." *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1119 (9th Cir. 2018).

342.   The Project's analysis of its direct, indirect, and cumulative impacts to lynx was based on the newly mapped lynx range developed by the 2020 Lynx Remapping.

343.   The 2020 Lynx Remapping did not go through NEPA review and was not analyzed through an environmental assessment or an EIS.

344.   It was a violation of NEPA for the Project to rely on the new mapped lynx range without first reviewing the 2020 Lynx Remapping under NEPA—either separately or as part of the environmental review for the Project.

COMPLAINT                                   106

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

345.   The Service's decision to proceed with the Project without performing NEPA analysis on the 2020 Remapping Project was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

## **Fifth Claim for Relief**

*Failure to Take Hard Look at Project Impacts (NEPA)*

346.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

347.   NEPA requires agencies to take a "hard look" at the impact that a proposed action would have on the environment. When evaluating the impact of a project on the environment, an agency must consider that action in conjunction with all other past, present, and reasonably foreseeable future actions. *Idaho Sporting Congress*, 305 F.3d at 973.

348.   The Service failed to perform sufficient analysis of the direct, indirect, and cumulative impact of the Project's plan to build new roads, expand the use of current roads, and restore hundreds of miles of roads to drivable condition.

349.   The Service failed to perform sufficient analysis of the Project's direct, indirect, and cumulative impact on climate change.

COMPLAINT                                          107

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

350.  The Service failed to perform sufficient analysis of the Project's direct, indirect, and cumulative impacts on several state and federal endangered, threatened, and sensitive wildlife species.

351.  The Service failed to perform sufficient analysis of the Project's direct, indirect, and cumulative impacts on Forest vegetation, including old-growth and snag structures that furnish unique habitat for many species and help to mitigate climate change.

352.  The Service failed to perform any analysis of the cumulative impacts of the Project when combined with the reasonably foreseeable Stimson Exchange.

353.  The Service failed to explain how its own data supports its conclusions about the direct, indirect, and cumulative impacts of the Project.

354.  The Service did not adequately analyze the cumulative impacts because it did not discuss aggregate effects from past, current, and reasonably foreseeable Forest projects.

355.  The Service did not perform any additional NEPA analysis before proceeding with three timber sales under the rubric of the Trails Project.

356.  The Service's decision to proceed with the Project, and offer timber sales under the Project, without taking a hard look at its direct, indirect, and cumulative environmental impacts was arbitrary, capricious, an abuse of discretion,

COMPLAINT                                    108

1    and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C.

2    § 706(2).

3                          **Sixth Claim for Relief**

4                          *Failures to Develop EIS (NEPA)*

        357.   Plaintiff realleges and incorporates by reference the preceding

5    paragraphs.

6        358.   NEPA requires federal agencies to prepare an EIS for "major Federal

7    actions significantly affecting the quality of the human environment." 42 U.S.C. §

8    4332(C). In considering whether a project has a significant effect on the

9    environment, agencies must consider "[w]hether an action is related to other actions

10   with individually insignificant but cumulatively significant impacts." 40 C.F.R. §

11   1508.27(b)(7). Agencies are required to evaluate both the context and intensity of an

12   action to determine the significance of its impact on the environment. *Id.* § 1508.27.

13       359.   An agency should consider a number of factors when evaluating a

14   Project's intensity, including the degree to which it impacts public health or safety;

15   the degree to which it is likely to be highly controversial; the degree to which its

16   possible effects on the environment are highly uncertain or involve unique or

17   unknown risks; the degree to which the project may establish a precedent for future

18   actions; whether the action is related to other actions with individually insignificant

19   but cumulative significant impacts; and the degree to which a Project may impact an

20

COMPLAINT                             109

endangered or threatened species or its habitat. 40 C.F.R. § 1508.27(b)(2), (4), (5), (6), (7), (9). Courts have found that the presence of any one of these factors, or a combination of multiple factors, may be sufficient to indicate that the project may have a significant impact on the environment, necessitating the preparation of an EIS. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

360.  Courts have found that the presence of any one of these factors, or a combination of multiple factors, may be sufficient to indicate that the project may have a significant impact on the environment, necessitating the preparation of an EIS. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

361.  Several factors indicate the Service should have developed an EIS for the Trails Project, including, but not limited to, the fact that the Project: (1) is designed to fundamentally alter forest structure across tens of thousands of acres for "30 to 100 years or more"; (2) involves extensive commercial logging that would impact a large area of Forest for a lengthy period of time; (3) concerns issues of significant controversy, such as the impact of logging on climate change, the efficacy of logging as a way to prevent forest fires, the wisdom of attempting to use logging to return forests to "historic" conditions, and the increase in road density in national forests; (4) contains elements of great uncertainty, including uncertainties about how

COMPLAINT                                   110

the Project will be implemented, what its cumulative impacts will be when combined with foreseeable future actions, and how it will impact wildlife species that the Service is unable to accurately and fully assess; (5) would have adverse impacts on multiple state and federal sensitive, threatened, or endangered species and their habitats; (7) will set a precedent for the Forest Service's use of the new lynx range developed through the 2020 Lynx Remapping; (8) would have significant adverse cumulative impacts on Forest habitat and wildlife when combined with past, current, and reasonably foreseeable future projects.

362. The Service's failure to prepare an EIS for the Project was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**Seventh Claim for Relief**

*Failure to Develop Supplemental EA/EIS (NEPA)*

363. Plaintiff realleges and incorporates by reference the preceding paragraphs.

364. NEPA regulations require agencies to prepare a supplemental environmental analysis to evaluate "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" (40 CFR 1502.9( c )(ii)).

COMPLAINT                                          111

365.   There have been significant new developments bearing on the Project since its final approval on May 3, 2021.

366.   In December 2022, USFWS listed the whitebark pine as a threatened species under the ESA.

367.   In November 2023, the USFWS listed the wolverine as a threatened species under the federal ESA.

368.   On June 21, 2023, Chief Judge Stanley Bastian of the Eastern District of Washington vacated portions of the 2019 Plan and reinstated Eastside Screens as the standard governing the logging of old-growth trees and LOS stands.

369.   The Service developed an SIR in September 2023 that concluded that the impacts from the implementation of Eastside Screens were not beyond the scope and range of the initial analysis. The Service failed to support this conclusion because it offered no quantitative or qualitative analysis of the Project impacts before the Sanpoil Ruling or after the Sanpoil Ruling, preventing the two from being compared in any meaningful way.

370.   The Service has not performed any additional environmental analysis of Project impacts following the listing of the whitebark pine and the wolverine as threatened species under the ESA.

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

371.   NEPA requires the Service to conduct a supplementary environmental assessment or EIS examining the impacts of these changes to the Project's purpose, need, and anticipated impacts.

372.   The Service's failure to prepare a supplementary EA or EIS for the Project was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

### **Eighth Claim for Relief**

*Failure to Fulfill Project Purpose and Need and Examine Sufficient Alternatives (NFMA and NEPA)*

373.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

374.   NEPA requires an agency to develop and assess appropriate alternatives in any proposal involving unresolved conflicts concerning the uses of available resources. 42 U.S.C. § 4332(E); 40 C.F.R. §§ 1507.2(d), 1508.9(b). The Ninth Circuit has found that agencies have improperly dismissed alternatives from detailed analysis when a project's purpose and need are written too narrowly. *EPIC v. USFS*, 234 Fed. Appx. 440, 443 (9th Cir. 2007). Alternatives may not be eliminated from detailed study solely because they would make less progress towards meeting one of multiple purposes. *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013).

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

375.   In evaluating the Project, the Forest Service failed to analyze a range of meaningful alternatives, by looking only at a "no action" alternative and the proposed action. In particular, the Forest Service improperly precluded serious consideration of an alternative that would avoid the construction of additional roads and would decommission unnecessary roads in accordance with directions in the 2019 Forest Plan and the Travel Management Rule.

376.   The alternative that the Service selected failed to meet at least two of the four objectives outlined in the Project's statement of purpose and need.

377.   The Project will not meet the first objective of trending the Forest toward the HRV, because the HRV calculations fail to account for forest conditions on interspersed parcels of land belonging to tribal, state, and private parties, some of which will transfer to the Forest upon the completion of the Stimson Exchange.

378.   The Project will degrade habitat quality for the Canada lynx, grizzly bear, and wolverine, and thus fail to meet the third objective of improving habitat conditions for federally protected wildlife species.

379.   The Service's decision to proceed with the Project without an examination of sufficient alternatives and even though the selected alternative failed to meet the Project's purpose and need was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

COMPLAINT                                  114

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

## VII.   REQUEST FOR RELIEF

Plaintiff therefore respectfully requests that this Court grant the following relief:

A.    Declare that the Forest Service has violated and continues to violate NEPA, NFMA, and the APA, as detailed above;

B.    Declare the Trails Decision Notice, the EA and supporting documents, and all decisions, actions, permits, or contracts implementing the Trails Project invalid pursuant to the APA, 5 U.S.C. § 706(2), because they are arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence in the record, and because they violate NEPA and NFMA, and therefore are not in accordance with law;

C.    Vacate the Trails Decision Notice, the EA and supporting documents, and all decisions, actions, permits, or contracts implementing the Trails Project;

D.    Remand the Trails Decision Notice, the EA and supporting documents, and all decisions, actions, permits, or contracts implementing the Trails Project to the Forest Service, with instructions to comply with the APA, NEPA, and NFMA, including by completing an EIS;

E.    Enjoin the Forest Service from taking or allowing any further action to implement the Project until it has complied with the APA, NEPA, and NFMA, including by completing an EIS;

COMPLAINT                                    115

F.  Declare the 2020 Lynx Remapping invalid, pursuant to the APA, 5 U.S.C. § 706(2), because it is arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence in the record, and because it violates NEPA and NFMA, and therefore is not in accordance with law;

G.  Vacate the 2020 Lynx Remapping and enjoin the Forest Service from basing any future projects on that remapping, and from continuing to implement any ongoing Projects unless and until they have been evaluated using the pre-2020 LAU boundaries;

H.  Remand the 2020 Lynx Remapping the Forest Service, with instructions to use the pre-2020 LAU designations to determine the scope and impact of all current and future Projects, unless and until it has changed those designations in compliance with NEPA, NFMA, and the EPA;

I.  Retain jurisdiction over this case until the Forest Service complies with the requirements of NEPA, NFMA, and the APA;

J.  Award Plaintiff it reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

K.  Issue any preliminary injunctive relief that Plaintiff may request; and

L.  Grant such further relief as the Court deems just and proper.

COMPLAINT                              116

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE SW
VASHON, WA 98070-6557
206.601.8476

Respectfully submitted this 13th day of May 2024.

ANIMAL & EARTH ADVOCATES, PLLC

By _____

*Claire Loebs Davis*
*Attorney for Plaintiff*

COMPLAINT                                    117