Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
20520 105th Ave. SW
Vashon, WA 98070
Tel: (206) 601-8476
claire@animalearthlaw.com
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiff, <br><br> v. <br><br> U.S. FOREST SERVICE, JOSHUA WHITE, Forest Supervisor, Colville National Forest, CARIN VADALA, Newport-Sullivan Lake District Ranger, U.S. Forest Service. <br><br> Defendants. | Case No. 2:24-cv-00157-RLP <br><br> **MOTION FOR SUMMARY JUDGMENT** <br><br> 5/5/2025 at 1:30 p.m. <br> With Oral Argument |

# TABLE OF CONTENTS

ACRONYMS AND SHORT CITATIONS............................................................... iii

TABLE OF AUTHORITIES ............................................................................v

INTRODUCTION.........................................................................................1

BACKGROUND ..........................................................................................1

   **I.**   **Factual Background** ......................................................................1

      A.  2019 Forest Plan Weakens Protections for Old Growth Trees ...................1

      B.  Service Approves Trails Project Allowing Widespread Logging ...............2

      C.  Sanpoil Order Reinstates Eastside Screens Protections.............................4

   **II.**  **Legal Framework and Standard of Review** .........................................5

ARGUMENT ..............................................................................................6

   **I.**   **AWR Has Met Legal Prerequisites to Bring This Action**........................6

   **II.**  **2020 LAU Revision Violated NEPA (Claims 1 & 4)**...................................7

      A.  Washington's Lynx Population Is on Edge of Extirpation ........................7

      B.  Service Remaps Lynx Habitat Without NEPA Process.............................8

      C.  Service Violated NEPA By Revising Lynx Habitat Without Review........9

   **III. Trails Project Violates NEPA, NFMA, and the APA (Claims 2, 3 & 5)** 11

      A.  Project Lacks Sufficient Detail for NEPA Analysis (Claim 3) .................11

         1.  Service Uses Project to Stretch NEPA "Conditional" Review ..............12

         2.  Project Parameters Place Few Limits on Operations ............................13

         3.  Failure to Specify Project Details Violates NEPA .................................15

      B.  Trail Project Road Plans Violate NFMA and NEPA (Claims 2 & 5)........18

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

1        1.    Project Adds Significant Road Traffic to Area ......................................18

2        2.    Project Ignores 2019 Plan's Direction on Road Density.......................19

3        3.    Service Fails to Take a Hard Look at the Impact of Roads....................20

4    C.   Service Failed to Take Hard Look at Impact on Wildlife (Claim 5) .........21

5        1.    Service Does not Fully Evaluate Adverse Impacts on Diversity ..........22

6        2.    EA Fails to Assess Adverse Impacts to Lynx .......................................24

7        3.    EA Discounts Project Harms to Grizzly Bear .......................................26

8        4.    Service Ignores Cumulative Impacts to Goshawk.................................30

9    **IV. SIR Violates NEPA, NFMA, and Court Order (Claim 7) ......................34**

10    A.   Sanpoil Order Necessitates Changes to Trails Project................................34

11    B.   SIR Methodology Fails to Comply With Eastside Screens .......................35

12    **V.  Project Requires An Environmental Impact Statement (Claim 6).........38**

13    **CONCLUSION................................................................................................40**

**ANIMAL & EARTH ADVOCATES, PLLC**
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

## ACRONYMS AND SHORT CITATIONS

For the Court's convenience, the following is a list of the acronyms and short references for documents and statutes referenced in this brief.

| | |
|---|---|
| **2019 Plan** | 2019 Colville Forest Land Management Plan |
| **2019 Plan EIS** | Environmental Impact Statement for the 2019 Plan |
| **2020 LAU Revision** | Service's 2020 remapping of lynx habitat and LAUs |
| **Alliance** | Alliance for the Wild Rockies |
| **APA** | Administrative Procedure Act |
| **BA** | Biological Assessment |
| **BE** | Biological Evaluation |
| **DBH** | Diameter at Breast Height |
| **Eastside Screens** | 1995 Colville Forest Plan Amendment #2, restricting logging of old growth and LOS |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **Forest** | Colville National Forest |
| **FSH** | Forest Service Handbook |
| **HRV** | Historical Range of Variability |
| **LCAS** | Lynx Conservation and Assessment Strategy |
| **LAU** | Lynx Analysis Unit |
| **LOS** | Late and Old Structure Forest |

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

| | |
|---|---|
| **2019 LOS Guideline** | 2019 Plan's Guideline for Large Tree Management (FW-GDL-VEG-03) |
| **MBF** | Thousand Board Feet of Timber |
| **MMBF** | Million Board Feet of Timber |
| **NEPA** | National Environmental Policy Act |
| **NFMA** | National Forest Management Act |
| **Project Area** | Planning area for Trails Project |
| **Sanpoil Order** | *Kettle Range Conservation Group v. U.S. Forest Service*, et al., No. 2:21-CV-00161-SAB, 2023 U.S. Dist. LEXIS 107552 (E.D. Wash. June 21, 2023) |
| **Service** | U.S. Forest Service |
| **SIR** | Supplemental Information Report |
| **Trails Project** | Sxʷutn-Kaniksu Connections Trail Project |
| **USFWS** | U.S. Fish and Wildlife Service |

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
    464 F.3d 1083 (9th Cir. 2006) ........................... 12

4

*All. for the Wild Rockies v. U.S. Forest Serv.*,
    907 F.3d 1105 (9th Cir. 2018) .................. 20, 40

5

6

*All. for the Wild Rockies v. U.S. Forest Serv.*,
    No. CV 21-84-M-DLC, 2023 U.S. Dist. LEXIS 148464 (D. Mont. Aug. 23, 2023) .......................... 10

7

8

*Barnes v. U.S. DOT*,
    655 F.3d 1124 (9th Cir. 2011) .......................... 40

9

*Earth Island Inst. v. U.S. Forest Serv.*,
    442 F.3d 1147 (9th Cir. 2006) .......................... 21

10

11

*Ecology Ctr. v. Castaneda*,
    574 F.3d 652 (9th Cir. 2009) .......................... 5

12

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
    528 U.S. 167, 120 S. Ct. 693 (2000) .................. 7

13

14

*Idaho Sporting Cong. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) .......................... 5

15

*Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*,
    No. 1:19-cv-00195-DCN, 2021 U.S. Dist. LEXIS 25886 (D. Idaho Feb. 10, 2021) .......................... 17

16

17

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002) .......................... 11

18

19

*Kettle Range Conserv. Grp. v. U.S. Forest Serv.*,
    No. 2:21-CV-00161-SAB, 2023 U.S. Dist. LEXIS 107552
    (E.D. Wash. June 21, 2023) .......................... *passim*

20

21

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) .......................... 5, 6, 20-21

22

23

**ANIMAL & EARTH ADVOCATES, PLLC**
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

*Metcalf v. Daley*,
   214 F.3d 1135, 1146 (9th Cir. 2000) ................................................................. 40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ...................................... 6

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ..................................................................... 18, 24

*Native Ecosystems Council v. U.S. Forest Serv.*,
   866 F. Supp. 2d 1209 (D. Idaho 2012) ....................................................... 10, 11

*Or. Nat'l Res. Council Fund v. Forsgren*,
   252 F. Supp. 2d 1088 (D. Or. 2003) ........................................................... 10, 11

*Rapanos v. United States*,
   547 U.S. 715, 126 S. Ct. 2208, 165 L. Ed. 2d 159 (2006) ............................... 38

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989) .................................. 5

*Se. Alaska Conserv. Council v. U.S. Forest Serv.*,
   443 F. Supp. 3d 995 (D. Alaska 2020) ................................................. 12, 13, 16

*Summers v. Earth Island Inst.*,
   555 U.S. 488, 129 S. Ct. 1142 (2009) ............................................................... 7

*Wilderness Society v. Thomas*, 188 F.3d 1130, 1134 (9th Cir. 1999) ................... 11

*Wildlands v. Adcock*,
   No. 6:22-cv-01344-MK, 2024 U.S. Dist. LEXIS 206308 (D. Or. Apr. 10, 2024)
   ............................................................................................................................. 17

*Yellowstone to Uintas Conn. v. Marten*,
   No. CV 24-25-M-DLC, 2024 WL 3400524 (D. Mont. July 12, 2024) ............ 10

**Statutes**

5 U.S.C. § 702 ........................................................................................................ 6
5 U.S.C. § 706 ................................................................................................... 5, 40
5 U.S.C. §§ 701-706 ............................................................................................... 6
8 U.S.C. § 1391 ...................................................................................................... 6
16 U.S.C. §§ 1600-1614 ......................................................................................... 6
28 U.S.C. § 1331 .................................................................................................... 6

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

28 U.S.C. § 1346 ................................................................................. 6

28 U.S.C. § 2201-02 .......................................................................... 6

28 U.S.C. § 2412 ................................................................................ 6

42 U.S.C. § 4332 ........................................................................... 5, 9

42 U.S.C. §§ 4321 to 4370m-12 .................................................... 6

**Other**

36 C.F.R. § 220.7 ............................................................................... 5

40 C.F.R. § 1508.27 ......................................................................... 38

Forest Service Handbook, 1909.15 ch. Zero Code § 05 ........................... 39, 40

Forest Service Handbook, 1909.15, ch. 20 § 21.1 ................................. 38

Forest Service Handbook, 1909.15, ch. 40 § 42.1 ................................. 11

MOT. FOR SUMMARY JUDGMENT          vii

**ANIMAL & EARTH ADVOCATES, PLLC**
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

**INTRODUCTION**

The U.S. Forest Service ("Service") approved the Sxʷutn-Kaniksu Connections Trail Project ("Trails Project" or "Project") as a "test" for how far it could push the boundaries of the National Environmental Policy Act ("NEPA")— writing itself a blank check for two decades of aggressive logging, burning, and road work over a vast region, with few constraints. The result is a Project of uncertain proportions that continues to morph long after the opportunity for public involvement has closed, with unexplored impacts on old-growth trees, late-structure forest, and sensitive and threatened species. This is the antithesis of the accountability, transparency, and informed decision-making that NEPA demands.

Plaintiff Alliance for the Wild Rockies ("Alliance" or "Plaintiff") respectfully asks the Court to hold the Service to the requirements of NEPA, the National Forest Management Act ("NFMA"), and the Administrative Procedure Act ("APA"), by vacating the Decision Notice for the Trails Project, and the Service's unexamined decision to eliminate 400,000 acres of lynx habitat, and remanding them to the agency with instructions to comply with the governing law and forest plan.

**BACKGROUND**

I.    **Factual Background**

*A. 2019 Forest Plan Weakens Protections for Old Growth Trees*

In 1994, a panel commissioned by the U.S. Congress sounded the alarm about the widespread destruction of old-growth forests in eastern Washington and Oregon and the corresponding threat to biodiversity. *Kettle Range Conserv. Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 U.S. Dist. LEXIS 107552 (E.D. Wash.

MOT. FOR SUMMARY JUDGMENT- 1

June 21, 2023), at *2 (attached as Exhibit 1). The panel warned that at current logging rates, old-growth stands would soon occupy less than 10% of this region's forests. *Id.* Specifically, the panel found that only 1% of the Colville National Forest ("Colville Forest" or "Forest") was comprised of old-growth tree stands that the Service had protected from logging. *Id.*

The following year, the Service adopted forest plan amendments in Eastern Washington and Oregon containing new protections for old growth. *Id*; *see* AR 13166-76 (Colville Forest Plan Amendment #2, adopted June 12, 1995) ("Eastside Screens"). Those protections included a prohibition on most commercial logging of trees greater than 21 inches in diameter at breast height ("DBH"), which Eastside Screens used as a rough proxy for old-growth trees. AR 13174. Eastside Screens also banned nearly all commercial logging in late and old structure ("LOS") tree stands that are below historic levels. AR 13172.

On October 21, 2019, the Service finalized the 2019 Colville National Forest Land Management Plan ("2019 Plan"), replacing the 1988 plan as amended by Eastside Screens. AR 16485-734 (2019 Plan). The 2019 Plan eliminated Eastside Screens protections for old growth, replacing them with a flexible guideline that *encouraged* projects to "retain and generally emphasize recruitment of individual large trees" but allowed for the destruction of old growth under several broad circumstances. *See* AR 16539-40 (FW-GDL-VEG-03 Guideline for Large Tree Management ("2019 LOS Guideline").

*B. Service Approves Trails Project Allowing Widespread Logging*

The Service initiated the Trails Project in 2018 under the 1988 Plan but

MOT. FOR SUMMARY JUDGMENT- 2

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

completed it under the 2019 Plan. AR 1262 and 1265-66. The Service issued a draft Environmental Assessment ("EA") for the Project in October 2020, published a final EA in December 2020, and issued a Decision Notice and Finding of No Significant Impact on May 3, 2021. AR 1262 and 1266-70.

The Trails Project authorizes 20 years of logging, burning, and road construction on 36,400 acres within a vast 90,700-acre planning area ("Project Area"). AR 855, 859, and 862. Located within Pend Oreille County, the 142-square-mile Project Area is bounded by the Selkirk Mountain Range on the north, the Pend Oreille River on the west, and the Idaho Panhandle National Forest on the east. AR 855. The Project Area is a "checkerboard" of federal, state, tribal, and private land. *See* AR 856 (Project Area map) (reproduced in Appendix ISO Motion for Summary Judgment ("App.") at A-3 (Figure 2)).

The Project only authorizes action on land belonging to the Colville Forest, which encompasses about 44% of the Project Area—or roughly 40,300 acres. AR 855. The Project opens 94% of the forested portion of this land to commercial logging, pre-commercial logging, and burning. *See* AR 12283 (about 1,440 acres of the Colville land is unforested) and AR 862 (36,400 acres will be treated). It authorizes commercial logging on 24,400 acres, or roughly 60% of the Service's forested land in the Project Area. AR 863 and 1244. The Project also allows about 45,400 acres of non-commercial logging and burning, which overlap with one another and with areas designated for commercial logging. AR 863-64.

The Service offers widely varied estimates of the timber volume the Project is expected to produce. Over the 20-year life of the Project, the Economic Analysis

MOT. FOR SUMMARY JUDGMENT- 3

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

Report ("Economic Report") predicts it will generate approximately 134 MMBF of timber. AR 648. Meanwhile, the Project Silviculture and Fuels Resource Report ("Silviculture Report") estimates the Project will produce at least 80% more timber—a "minimum" of 244 MMBF. AR 1212.

To date, the Service has offered three Project timber sales: King's Lake and Mill Creek in May 2023 and Kalispel Moon in August 2022. App. at A-4.

### C. Sanpoil Order Reinstates Eastside Screens Protections

On June 21, 2023, Chief Judge Stanley Bastian of the Eastern District of Washington vacated the Sanpoil logging project and the portion of the 2019 Plan that replaced Eastside Screens with the 2019 LOS Guideline. Sanpoil Order at *33. Judge Bastian found that as to both the LOS Guideline and the Sanpoil Project, the Service had "failed to meaningfully consider the effects of eliminating Eastside Screens and the 21-inch rule, and its cumulative effect on old-growth trees and species dependent on them in the Colville National Forest." *Id* .at *32. The ruling reinstated Eastside Screens as the standard governing the Forest's management of old growth and LOS, unless and until the Service properly amended the 2019 Plan.

On September 12, 2023, Forest Supervisor Joshua White informed all district rangers of this ruling, conveying his expectation that all current and future projects would be consistent with Eastside Screens. AR 4294-95. Less than two weeks later, District Ranger Carin Vadala signed a Supplemental Information Report ("SIR") for the Trails Project, directing that Project implementation should continue without a new environmental assessment. AR 4296-4309. Plaintiff filed this action on May 13, 2024, following the Service's issuance of the SIR and decision not to conduct a

MOT. FOR SUMMARY JUDGMENT- 4

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

Supplemental EA regarding compliance with Eastside Screens.

## II.    Legal Framework and Standard of Review

Plaintiff challenges the Service for violations of NFMA, NEPA, and the APA. NFMA requires the Service to develop forest plans. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (citing 16 U.S.C. § 1604(a)). After a plan is adopted, subsequent agency actions must comply with that plan. *Id.*

NEPA is an "action-forcing" statute designed to ensure (1) that agencies will take a "hard look" at the environmental impacts of proposed projects before they take action; and (2) that relevant information will be made available to the public so it can play a role in the  decisionmaking process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50, 109 S. Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA requires an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). If the need for an EIS is unclear, the Service may first  prepare a more concise Environmental Assessment ("EA"). AR 13245 (36 C.F.R. § 220.7(a)). The Service must consider a project's direct, indirect, and cumulative impacts when combined with past, present, and "reasonably foreseeable" future projects. *Idaho Sporting Cong. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir. 2002)

Courts use the APA to review compliance with NEPA and NFMA. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) The APA requires courts to aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under this standard is narrow. *Lands Council*, 537 F.3d at 987. However, courts will require an

MOT. FOR SUMMARY JUDGMENT- 5

agency to "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L.Ed.2d 443 (1983)(internal citation omitted). A decision is arbitrary and capricious if an agency (1) relied on factors Congress did not intend it to consider, (2) "entirely failed to consider an important aspect of the problem," or (3) offered an explanation "that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987.

## ARGUMENT

## I.    AWR Has Met Legal Prerequisites to Bring This Action

This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. § 1331 (federal question), 2201 (declaratory relief), 2412 (costs and fees) and 1346 (United States as defendant). This action arises under the APA, 5 U.S.C. §§ 701-706; NEPA, 42 U.S.C. §§ 4321 to 4370m-12; and NFMA, 16 U.S.C. §§ 1600-1614; and those statutes' implementing regulations. Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims occurred in this judicial district. The federal government has waived sovereign immunity pursuant to 5 U.S.C. § 702. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. § 2201-02 and 5 U.S.C. §§ 701-706.

An organization may sue on behalf of its members if those members have standing in their own right, and the interests they assert are germane to the

MOT. FOR SUMMARY JUDGMENT- 6

organization's purpose. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693 (2000). Members have environmental standing if they show particularized harm to "recreational" or even "mere esthetic interests." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494, 129 S. Ct. 1142 (2009).

The Alliance has standing to sue on behalf of its members because those members assert interests at the heart of the Alliance's mission to protect the native biodiversity and ecosystems of the Northern Rockies Ecoregion, including the area marked for the Trails Project. Those members have shown that the Project has already harmed, and threatens future imminent harms to, these aesthetic and recreational interests. *See, e.g.*, Declaration of David Boswell ¶¶ 3-10 (discussing how the Project will diminish enjoyment of recreation and family property near Project Area); Declaration of Paul R. Sieracki ¶¶ 11-27 (describing frequent visits to the Project Area and how he has been and will be harmed by the Project).

The Alliance exhausted its administrative remedies by submitting comments and objections on the Trails Project in its own name and through its members. *See, e.g.*, AR 2486-561 (Mr. Sieracki's comments on scoping), 2562-74 (Alliance comments on scoping) 2821-905 (Alliance comments on draft EA), 2906-30 (additional comments on draft EA from Mr. Sieracki, Alliance, and another group), 2931-2018 (attachment), 3050-75 (comment on draft EA from Alliance and two other groups) and 3277-361 (Alliance objection).

## II.    2020 LAU Revision Violated NEPA (Claims 1 & 4)

### A. *Washington's Lynx Population Is on Edge of Extirpation*

Overtrapping caused Washington's Canada lynx population to drop

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

precipitously during the 1970s and 1980s. AR 5180. By the time the state banned trapping in 1991, only about 100 lynx remained. *Id.* Washington listed the lynx as a threatened species in 1993 and upgraded it to endangered in 2016. AR 5989-90. In 2000, the U.S. Fish and Wildlife Service ("USFWS") listed lynx as threatened under the federal Endangered Species Act ("ESA"), identifying the lack of protection on federal lands as a significant risk. AR 5415 and 5430 (USFWS status determination).

In 1993, a state and federal team mapped lynx habitat in the Colville Forest and divided it into Lynx Analysis Units ("LAUs"), to create a systematic way to assess the impact of forest projects on lynx and lynx habitat. AR 5274-5 and 6319. The 2013 Lynx Conservation Assessment and Strategy ("LCAS") provides that "[c]onservation measures will generally apply only to lynx habitat on federal lands within LAUs." AR 5370. It also emphasizes that "LAU boundaries will not be adjusted for individual projects," but "must remain constant." *Id.* Prior to 2020, the Colville Forest contained 40 LAUs. AR 6364 (Table 2), App. at A-2.

*B. Service Remaps Lynx Habitat Without NEPA Process*

The 2019 Plan does not mention any efforts to remap LAUs, although the project had begun behind closed doors by early 2019. *See* 16555 (2019 Plan referencing pre-2020 LAUs), AR 6315 (April 2019 email). The Service completed the remapping process in 2020 ("2020 LAU Revision"), without public notice or opportunity to comment. AR 6346 (letter to USFWS describing process used); AR 6347 (response). The 2020 LAU Revision dramatically reshaped lynx habitat in the Forest—erasing  28 of the Forest's 40 LAUs and removing 407,000 acres from within LAU boundaries. AR 6324 (Table 2); *see* App. at A-1 (map showing changes

MOT. FOR SUMMARY JUDGMENT- 8

to LAUs and lynx habitat); App. at A-2 (summary of changes from AR 6326, Figure 2). The revision included stripping 24,476 acres from the LAUs in the Kettle Range, which is a "core" area for lynx recovery. App. at A-1. It also "dissolved" all 22 LAUs in the Selkirk mountain area, replacing the 351,734 acres that had been protected by these LAUs with 158,815 acres of "mapped lynx range." AR 6322-26.

These changes clear the way for increased logging by removing the protections that the LAUs provided. *See*, *e.g.*, AR 16560-61 (FQ-STD-WL-02- 06) (plan standards limiting project impacts within LAUs). The LAU Revision also alters the nature of project impact analysis, because the 2019 Plan provides that habitat conditions for lynx are "appropriately assessed at the lynx analysis unit scale" AR 16555; *see* AR 16662 (requiring Service to measure project impacts "by lynx analysis unit"), AR 5370 (LCAS) (conservation measures apply in LAUs).

Project documents incorporate the new "mapped lynx range" without making any reference to the change. In fact, the Service based its analyses of impacts on the new mapping before it was even complete. *See* AR 12297 (June 15, 2020 draft Biological Evaluation ("BE") referencing new "mapped lynx range") and AR 6346 (September 17, 2020 letter to USFWS seeking input on the "propose[d]"). Ignoring direction from the 2019 Plan to analyze effects to lynx at the LAU scale, the Project EA designates the cumulative effects analysis area for lynx as "the portion of secondary lynx range which overlaps the project area." AR 913.

*C. Service Violated NEPA By Revising Lynx Habitat Without Review*

NEPA requires agencies to complete an environmental review for all "major Federal actions" not subject to a categorical exemption. 42 U.S.C. § 4332. The

MOT. FOR SUMMARY JUDGMENT- 9

Service did not conduct any NEPA analysis on the 2020 LAU Revision, a major federal action that eliminated 28 LAUs, removed 407,000 acres from LAU protection, and decreased designated lynx habitat by more than 230,000 acres. App. at A1-A2. Nor did the Project analyze this decision or its impacts. AR 913.

The 2020 LAU Revision is the Service's latest attempt to eliminate lynx protections while evading NEPA analysis. Every court to consider prior attempts has held that the Service must conduct a NEPA analysis before eliminating LAUs and erasing designated lynx habitat. *See All. for the Wild Rockies v. U.S. Forest Serv.*, No. CV 21–0084, 2023 WL 5427921 (D. Mont. Aug. 23, 2023) (unpublished), *appeal dismissed*, No. 23-3059, 2024 WL 1729833 (9th Cir. Feb. 7, 2024) ("*Red Lodge II*"); *Native Ecosystems Council v. U.S. Forest Serv.*, 866 F. Supp. 2d 1209 (D. Idaho 2012) ("Davey"); *Or. Nat. Res. Council Fund v. Forsgren,* 252 F. Supp. 2d 1088 (D. Or. 2003) ("*Forsgren*"); *see also Yellowstone to Uintas Connection v. Marten,* No. CV 24-0025, 2024 WL 3400524 (D. Mont. July 12, 2024) (unpublished) (weighing merits on motion for preliminary relief).

In *Red Lodge II*, the District of Montana rejected the Service's explanation that a revised LAU map that eliminated 19,000 acres of lynx habitat was just an update resulting from "improved data and methodology." 2023 U.S. Dist. LEXIS 148464, at *21; *id.* at *23 ("following Defendants' logic, the Forest Service could continuously revise its lynx habitat maps from project to project, removing or adding lynx habitat with each revision, without subjecting those changes to NEPA review. To allow this outcome would create a loophole that allows the agency to circumvent the requirements of NEPA[.]"). Similarly in *Davey*, the District of Idaho held that a

MOT. FOR SUMMARY JUDGMENT- 10

revised lynx map removing 400,000 acres from LAUs "falls nicely" in the definition of a "major federal action," and thus is subject to NEPA. 866 F. Supp. 2d at 1225.

An EA may be "tiered" to a prior analysis to eliminate repetitive discussions. AR 13248 (FOREST SERVICE HANDBOOK, ("FSH") 1909.15, ch. 40 § 42.1). However, the Project EA relied upon the 2020 LAU Revision without disclosing those changes and even though the remapping had not been analyzed under NEPA. Such tiering is improper. *See Kern v. BLM,* 284 F.3d 1062, 1073 (9th Cir. 2002) (it circumvents NEPA to rely on decision that has not itself been subject to NEPA review).

Because the Service did not perform an independent NEPA analysis of the 2020 LAU Revision before relying upon it in its Project EA, the Decision Notice for the Trails Project should be reversed and remanded. In addition, the 2020 LAU Revision is a "final agency decision" justiciable in its own right, which creates direct harms by removing protections for lynx in connection with other current, planned, and future Forest projects. *See Forsgren*, 252 F. Supp. 22d at 1099 (new habitat map directly harms plaintiffs because it will impact the Service's analysis of timber sales) (relying on *Wilderness Society v. Thomas*, 188 F.3d 1130, 1134 (9th Cir. 1999)). As a result, Plaintiff also asks the Court to reverse the 2020 LAU Revision and enjoin the Service from relying upon it in relationship to other Forest projects.

### III.    Trails Project Violates NEPA, NFMA, and the APA (Claims 2, 3 & 5)

#### A. *Project Lacks Sufficient Detail for NEPA Analysis (Claim 3)*

If an agency issues a "programmatic" environmental analysis or EIS that does not disclose details of future projects, it must perform a separate NEPA review of each project before proceeding. *See 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d

MOT. FOR SUMMARY JUDGMENT- 11

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

1083, 1094 (9th Cir. 2006). A forest plan is an example of a "programmatic" analysis that typically requires further site-specific review before execution. *Id.* On the other hand, if an agency proposes implementing a project without further NEPA review, it must disclose sufficient details to allow for a meaningful analysis of the project's reasonably foreseeable impact. *Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1006 (D. Alaska 2020).

1. Service Uses Project to Stretch NEPA "Conditional" Review

The details in the Trails Project EA are vague, indeterminate, and non-committal, largely devoid of specifics about what will be done, when, where, or how. In reality, the EA does little more than speculate about the potential effects of a project still in its development stage, to be implemented somewhere within a vast area, under conditions that have not yet been assessed, sometime in the next 20 years.

This is by design. Project leaders contemplated a "programmatic" NEPA analysis to "balance the needs of NEPA in a nontraditional way, with more flexibility and less specificity." AR 4352 (notes from Sept. 10, 2018, Project development meeting discussing "NEPA options"). They sought to "identify a rough proposed action" for NEPA, before the "40,000 acres is eventually pared down" by specific data, providing "for the most flexibility in 20 years." *Id.* The goal was to "collect the data and make decisions as we go." AR 4350. This approach was fueled by a desire to launch the Project quickly with minimal resources. AR 4352 (discussing need to stick to December 2020 decision date because of grant considerations and noting that the "FS doesn't want to do more data collection than is necessary").

At later meetings, team members refined this strategy. AR 4403 (May 1, 2019

MOT. FOR SUMMARY JUDGMENT- 12

warning to "[b]e clear in terminology, we're discussing conditional vs. programmatic approach"). They understood the Project would stretch the use of condition-based analysis due to the "lack of data in the area," but thought it might be validated by new NEPA regulations. AR 4405 ("we might just be a bit ahead of the proposal"). The team expressed hope the Project would set a precedent for future actions: "Let's test this approach where we don't have sufficient capacity." *Id.*

### 2. Project Parameters Place Few Limits on Operations

The EA does not disclose specific locations or timing for the Project's planned activities, much less detail how specific actions would impact different species habitats and management areas across the vast Project Area. Instead of site-specific logging prescriptions, the EA includes three low-resolution maps. AR 341-43 (map at AR 343 is reproduced in App. at A-5). These maps mark virtually all Forest-owned land in the Project Area for an indeterminate type of commercial logging or non-commercial action sometime in the next two decades. Consistent with its carefully worded terminology, the Service portrays this as "condition-based management." AR 1213. In lieu of site-specific details, the EA purports to use a "flexible toolbox approach, under which "a series of current conditions is described and then treatments identified that could be applied to move the landscape toward desired conditions" and then "[d]ecision points based on conditions at the time of implementation would be used to help lead to the desired condition." AR 1214.

The Service provides general descriptions of three types of commercial logging it will allow, with loose (and inconsistent) estimates of the amount of acreage to which each might be applied. *Compare* AR 1209-12 to AR 862-63.

MOT. FOR SUMMARY JUDGMENT- 13

1   According to the Silviculture Report, the Project will include an estimated 6,720

2   acres of what the Service euphemistically calls "shelterwood with reserves," which

3   uses clearcuts as large as 40 acres. AR 1210, 1233. This type of logging "typically"

4   leaves "about 12 trees per acre or more," consisting vaguely of trees "needed for

5   regeneration purposes" and those "exhibiting signs of wildlife use or unique late

6   structure." AR 1210. Meanwhile, the Project would include roughly 8,850 acres of

7   "commercial thinning," intensive logging that "typically" leaves more trees per acre

8   than "shelterwood with reserves;" and 8,850 acres of "commercial thinning with

9   group selection," which combines "commercial thinning" with three-acre clearcuts.

10  AR 1209-10. The Service notes that different logging types might overlap on an

11  indeterminate amount of acres but does not explain how that would work. AR 862.

12      The Silviculture Report purports to apply "decision points" to determine

13  which kind of logging will occur where, although over the lengthy 20-year Project

14  term, "conditions are likely to change over time." AR 1216. These "decision points"

15  include criteria so broad as to be meaningless. For example, "shelterwood-with-

16  reserves" logging would proceed "if some or all" of a list of conditions are met: for

17  example, if a stand has a healthy overstory comprised of any of five tree species

18  where an "undesirable tree species may impact the available growing space"; if

19  vegetation types have been altered from the "historical tree species composition;" *or*

20  if the stand is outside primary or secondary goshawk habitat. AR 1217. In other

21  words, the Service may apply 40-acre clearcuts to any area where there is an

22  "undesirable" tree species, regardless of other factors. And even if that condition is

23  not met, it may clearcut any area not within primary or secondary goshawk habitat—

MOT. FOR SUMMARY JUDGMENT- 14

1    a designation open to Service manipulation. *See infra* at III(C)(4); *see also* AR 1216-

2    18 (applying similar decision points for other logging).

3      Even after the Service selects a logging type, the EA is vague about what the

4    results will be. For commercial thinning, "it is estimated that 50% of stands would

5    retain a canopy cover of 40% *or more* immediately following commercial thinning

6    treatments, *though some may be lower*." AR 887 (emphasis added). Canopy cover

7    "may be fairly uniform within some commercial thinning units," but "there would

8    be many areas where canopy cover and stand density would not be uniform." AR

9    887. Tree density would be lower in shelterwood units, within 60% of which canopy

10   cover "may" be reduced to some unspecified point lower than 40%. AR 887.

11     The EA does not limit the destruction of old-growth trees and LOS forest. It

12   promises only that "most" large-diameter trees will be retained—as long as they are

13   "generally healthy" and "suited to the site." AR 889. The Silviculture Report

14   acknowledges that "[s]ome late open and late closed stands would be harvested

15   under the proposed action." AR 1242. It indicates vaguely that the logging of trees

16   over 20 inches DBH will be "coordinated with other resources as pertinent to the

17   affected area," under the direction of the 2019 LOS Guideline. AR 1213. Elsewhere,

18   it indicates that "unique late structure" would be "identified for retention in all

19   treatment types," although it does not define "unique late structure"—and it provides

20   that "portions of this structure class" could still be removed for a variety of reasons.

21   AR 1238 (listing some of the reasons included in the 2019 LOS Guideline).

22     3.  <u>Failure to Specify Project Details Violates NEPA</u>

23     The Project thus puts virtually no limit on the Service's ability to allow a wide

MOT. FOR SUMMARY JUDGMENT- 15

range of logging approaches, from tree thinning to clearcuts, on any portion of the 24,400 acres marked for commercial logging, at any point over the next two decades. The Project's lack of guardrails is illustrated by the wide disparity in the Service's estimates of how much timber it will  produce—cutting 134 MMBF of timber from 24,400 acres would look vastly different from taking nearly twice as much lumber from the same amount of land. *Compare* AR 648 *with* AR 1212.This timber could be cut anytime over the next two decades. While the EA indicates the Service will "implement all planned vegetation harvest work" within the first 10 years (AR 922), the Silviculture Report doubles that estimate, indicating that "commercial thinning treatments would take place over approximately 20 years." AR 1216. Nowhere does the Service indicate how many timber sales it plans over how many years, or the degree to which the same areas will be revisited over the 20-year period.

The Service's decision to defer Project design until *after* approval blocks the public from informed comment. *See, e.g.*, AR 12546 (Northwest Washington Forest Coalition expressing concern that without specific site prescriptions it is "difficult to understand the impacts"); AR 3304 (Plaintiff objecting that "[b]ecause of the lack of site specificity for logging prescriptions and unit boundaries, the commentators cannot make substantive inputs to the proposal"). The Service's failure to provide sufficient site-specific details to "ensure informed decision-making" thus violates NEPA because it prevents "meaningful public participation." *Id.* at 1009.

As the Service recognizes in its internal guidance, "If the Agency does not know where or when an activity will occur or if it will occur at all[,] then the effects of that action cannot be meaningfully evaluated." AR 13271 (FSH 1909.15, ch. Zero

MOT. FOR SUMMARY JUDGMENT- 16

Code § 01). Indeed, it is impossible to take a "hard look" at the impacts of a project without details about what that project will do. *See Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*, No. 1:19-cv-00195-DCN, 2021 U.S. Dist. LEXIS 25886, at *40 (D. Idaho Feb. 10, 2021) (unpublished) ("general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided"). The Service provides no justification for the lack of detail here—rather, the record shows it decided to rush NEPA approval before it had the time or resources to gather specific Project data. Otherwise, the Project is a "logging plan where the location of the areas to be logged is well-suited to standard site-specific analysis." *Wildlands v. Adcock,* No. 6:22-cv-01344-MK, 2024 U.S. Dist. LEXIS 206308 (D. Or. Apr. 10, 2024), at *19. While the Service is not "required to catalogue specific trees that will be removed," it fails to furnish enough detail here to "provide a sufficient picture of the … Project's cumulative effects." Sanpoil Order at *23 ("Without sufficiently specific information about site impacts, the Sanpoil Project's impact to old-growth trees and their dependent species is speculative.").

It is not enough for the Service to tell the public, as team members discussed, that "We have to be comfortable that most actions [will] improve on the current conditions in the decision that [the Regional Forester] ends up making," even if "other less desirable effects may result from our actions." AR 4405. NEPA does not permit the Service to say, "Trust us, we will figure it out later." Rather, it requires the Service to gather and evaluate the data to evaluate a project's impacts "before the proposed action is approved, not afterward." *SN. Plains Res. Council, Inc. v.*

MOT. FOR SUMMARY JUDGMENT- 17

*Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011).

   B. *Trail Project Road Plans Violate NFMA and NEPA (Claims 2 & 5)*

Roads have significant adverse impacts on forests. They cause erosion, compaction, and sedimentation, spread noxious weeds, and can seriously impair water quality and the viability of aquatic wildlife. *See, e.g.,* AR 3088-90, 15432. Roads disturb wildlife, destroy and fragment habitat, change distribution and migration patterns, and interfere with feeding, breeding, nesting, and denning. *See, e.g.,* AR 14599, 14606, 14619, 14621, and 3088-90. Roads also bring greater human traffic into the forest, allowing easier access for both legal hunting and poaching, increasing the chances of human-ignited wildfires, and facilitating increased human intrusion into sensitive areas. *See, e.g.*, AR 3088-90, 14615-16, 14619, 14621.

   1. Project Adds Significant Road Traffic to Area

The Project Area contains 446 miles of road, including 292 miles of Service roads, 22 miles of collector roads, 270 miles of local roads, and approximately 154 miles of private, county, tribal, and state roads. AR 634. The Project will build 6 miles of new permanent roads and 51 miles of new temporary roads, including 26 miles that require a new roadbed; decommission 46 miles of undrivable roads and 5 miles of open roads; and convert 3 miles of road to non-motorized trails. AR 866-67. The net effect is that the Project will add 4 miles of road to an already congested area. See App. at A-6 (Figure 5) (map of current and proposed roads in Project Area).

In addition, the Trails Transportation Report reveals that the Project will involve maintenance and/or reconstruction work on 292 miles of "haul route" roads "as economics and feasibility allow," including roads that have had little to no

MOT. FOR SUMMARY JUDGMENT- 18

maintenance work over the past 20 years and which have deteriorated into undrivable condition. AR 636-37, 641. This reconstruction will "open roads that have been closed and overgrown with vegetation for the past several years." AR 637. The Service provides no details about these plans, including how many miles of previously closed road it will open for use, the location of those roads, how they will be prioritized, or the extent of reconstruction required. However, a Project appraisal indicates the reconstruction will be extensive, costing $275,000 to reconstruct 25 miles, at a higher rate per mile than building temporary roads. AR 1685.

2.  Project Ignores 2019 Plan's Direction on Road Density

The 2019 Plan includes direction to control and decrease Forest road density. The Plan designates "focused restoration" areas in the Forest that include key habitat, for which its goal is to "restore ecological integrity and ecosystem function at the landscape scale." AR16604. The Plan's desired conditions specify that there should be no more than one mile of Forest system road per square mile within each subwatershed in focused restoration areas. AR 16605 (MA-DC-FR-05). The Plan requires that every project must "explain how the project or activity is consistent with desired conditions," describing any short-term or negligible long-term effects that are inconsistent with desired conditions. AR 16512. "If a project will adversely affect progress toward one or more desired condition in more than a negligible way or short-term way, a Plan Amendment is required." *Id*.

Although "focused restoration" areas comprise 48% of the Project Area on Colville Forest lands (AR 859), the Trails EA does not mention the Plan's restrictions on road density in these areas. The EA purports to calculate Forest road

MOT. FOR SUMMARY JUDGMENT- 19

densities in the Project Area (AR 916 (Table 21)) but does not separately calculate the road density in "focused restoration" portions of the Project Area, reveal how the Project will change that density, or describe how the Project is (or is not) moving toward the 2019 Plan's desired conditions in these areas. This disregards the Plan's Desired Conditions, in violation of NFMA. *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018) (projects must conform to forest plan standards, guidelines, and desired conditions.).

### 3. Service Fails to Take a Hard Look at the Impact of Roads

The Service does not assess the impact of restoring up to 292 miles of road, a large (but unspecified) number of which have deteriorated to undrivable conditions. AR 636-37 and 641. Although the restoration of undriveable roads would have many of the same impacts as the creation of new roads, this aspect of the Project is not even discussed in the EA, the Biological Assessment, the Biological Evaluation, or the Wildlife Specialist Report ("Wildlife Report"). On the contrary, the EA omits this aspect of the Project when misleadingly calculating that it will reduce drivable roads in the Project Area by 4 miles, keeping drivable road density to 4 miles of road per square mile. AR 916 (Table 21). The Service's failure to assess the environmental impact of such a significant aspect of the Project is a clear violation of NEPA. *See Lands Council*, 537 F.3d at 993 (court must review the agency record to ensure that an agency has not "entirely failed to consider an important aspect of the problem") (internal quotations and citations omitted).

In addition, the Service impermissibly minimizes the potential adverse impacts of the Project's new temporary roads. *Earth Island Inst. v. United States*

MOT. FOR SUMMARY JUDGMENT- 20

1    *Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006) (a "hard look" must involve a

2    discussion that does not improperly minimize negative side effects) (internal citation

3    omitted). The EA fails to account for the impact of these roads on open and drivable

4    road density in the Project Area. AR 916 (Table 21). Meanwhile, the Wildlife Report

5    dismisses the impact of temporary roads with reference to a "design element" meant

6    to protect wildlife "seclusion," which indicates new logging roads will be gated off

7    from the public and closed "[a]s soon as possible following their use." AR 1057. The

8    Service does not analyze the impact of logging traffic on wildlife seclusion or other

9    environmental values *while these roads are open*. Nor does it specify when the use

10   of the temporary roads will end, given that the Project's activities will continue for

11   up to 20 years, and the Service indicates that it expects to enter the same areas for

12   future "treatments" at 15-, 25-, 30-, and 50-year intervals. AR 863-64, 886.

13       In addition, the Service acknowledges that "[n]ot all road closures are

14   effective," and that breaches "could lead to an overall decrease in seclusion habitat

15   available to wildlife in the project area, and an increase in harvest levels, both legal

16   and otherwise." AR 1004. However, it dismisses such concerns summarily,

17   reasoning that since it is "difficult to accurately predict" which roads might be

18   breached, it should simply "assume[] we would achieve a high degree of closure

19   effectiveness in the project area." *Id.* Such an assumption is arbitrary and runs

20   counter to the evidence before the Service. *See, e.g.*, AR 3140-41.

21   *C. Service Failed to Take Hard Look at Impact on Wildlife (Claim 5)*

22       The Project's logging, burning, and road construction would significantly

23   impact the health of the Colville Forest, leveling large swaths of forestland,

MOT. FOR SUMMARY JUDGMENT- 21

damaging stands of old-growth trees, eliminating snags, spreading invasive species, degrading riparian areas, compromising unique habitats, severing vital wildlife corridors, and potentially displacing, disturbing, or killing sensitive, threatened, and endangered species, including Canada lynx, grizzly bears, wolverine, whitebark pine, goshawks, wolves, woodpeckers, and bats. However, the Service fails to reasonably assess the impact of the Project on wildlife diversity, either in general or as to specific Forest species.

1.  Service Does not Fully Evaluate Adverse Impacts on Diversity

As an initial matter, it is impossible for the Service to properly evaluate impacts on wildlife diversity without assessing specific information on how the Project will impact habitats across the Project Area, including specialized habitats such as old-growth trees and LOS stands. *See supra at* Section III(A).

In addition, the Service fails to accurately evaluate the length of time that the Project will impact wildlife, especially when combined with the cumulative impact of foreseeable future projects. The EA divides the Project's impacts to wildlife into three categories: short term (0-10 years), the mid-term (10-30 years), and the long-term (30+ years). AR 918 and 919-20 (Table 22). But these distinctions are meaningless for a project scheduled to last for 20 years, with repeated entries planned into the same areas for overlapping logging and burning activities. *See* AR 863-64. In  response to scoping comments regarding the efficacy of its fuel treatments, the Service conceded that "[t]reated areas would be receiving a multitude of treatments over the next 20 years, and that "[a]s a result, the short-term impacts will last at least 30 years." AR 2599. Having acknowledged these impacts in one

MOT. FOR SUMMARY JUDGMENT- 22

area, however, the Service failed to apply the same principles to its evaluation of the impacts on wildlife, for which it continued to revert to its definition of "short-term" impacts. *See* AR 919-20(EA), 1072-80 (Wildlife Report), and 774-76 (BA).

The Project also fails to consider the cumulative impact of foreseeable future projects. The Service anticipates future logging and burning at unspecified intervals to "maintain the fire resiliency of the landscape," including "utilizing natural ignitions, prescribed fire, and mechanical treatments such as thinning and mastication." AR 2599. In most areas, it anticipates more logging in 15-40 years. AR 886. These future activities are a fundamental part of the Service's long-term strategy that informs its claims that the Project will move the Forest toward desired conditions and create fire resiliency. AR 857-58, 886. They are thus among the "reasonably foreseeable" future impacts it must consider. Yet just a few pages after it describes the necessity of these future treatments, the EA concludes that "[n]o additional NFS projects were identified for the reasonably foreseeable future within the project subwatersheds." AR 902.

The Service may not have its cake and eat it too: if it is going to claim the supposed benefits of these future actions as part of a strategy to promote Forest health and fire resiliency, then it must also account for these future actions when measuring the adverse impacts of its actions. *See N. Plains Resource Council,* 668 F.3d 1078 ("reasonably foreseeable future actions need to be considered even if they are not specific proposals"). Taking these foreseeable future actions into account, the Service must assess the possibility that the "short-term" impacts of the Project could last indefinitely, as the same areas continue to be treated" in a constant cycle.

MOT. FOR SUMMARY JUDGMENT- 23

Finally, the Service's analysis of impacts does not consider its deficit of information with regard to nearly all wildlife species. It claims "[a]ccurate estimates of wildlife populations relative to the project area are difficult if not unfeasible to obtain," conceding that "it is unlikely that all activity centers such as dens or nests have been found" and that it is particularly difficult to detect species that occur at very low densities and have vast home ranges. AR 1003. Nevertheless, the Service incorporates design elements that only protect *known* wildlife populations and their *known* denning and nesting sites. *See, e.g.*, AR 457-58, 733, 774, 776, 1055, 1060, 1084, and 1120. Such protections are clearly inadequate given that most species' populations and locations are unknown, and the Service fails to evaluate the Project's impact on these unknown populations.

2.  EA Fails to Assess Adverse Impacts to Lynx

The Service's assessment of the impacts of the Project on lynx is fatally compromised by its illegal remapping of lynx habitat without the benefit of NEPA analysis. *Supra* at II(C). The change dissolved all 22 LAUs in the Selkirk mountain area, replacing the 351,734 acres that had been protected by these LAUs with 158,815 acres in "mapped lynx range." AR 6322-26. *See* App. at A-7 (showing changes in Project Area). The Project includes 10,000 acres of commercial logging within former LAUs, but as a result of the 2020 LAU Revision, the Service no longer examines the potential impact of this activity on lynx or lynx habitat. App. at A-7.

The Service provides no information about the 2020 LAU Revision, but there are several obvious problems with what the Service now refers to as the "mapped lynx range." Although the Service purports to have mapped lynx range based on the

MOT. FOR SUMMARY JUDGMENT- 24

existence of lynx habitat (AR 12303), nearly half of the new "lynx range" (6,941 acres) is within the perimeter of the 2015 Tower Fire. AR 12304. Thus, the Service labels this area is part of the new "mapped lynx range," while simultaneously declaring 4,040 acres of it to be "unsuitable habitat" because it contains "recently created openings that lynx may be reluctant to cross." AR 12304. The Project design element for lynx (DE-17) only applies to the "lynx range," without regard for former LAU boundaries. AR 873. It requires the Service to maintain "[c]losed canopy, multi-storied timber stands" for lynx within the lynx range. *Id.* Given the "surplus" of openings on the range created by the 2015 Tower Fire, it also instructs the Service to avoid creating "additional forest openings" within the lynx range that would further inhibit lynx movement. *Id.*

Disregarding these restrictions, the EA estimates that commercial thinning would occur on 940 acres of mapped lynx range. AR 912. Without specific stand analysis or logging prescriptions, the Service cannot reliably estimate the impact this logging will have on lynx. Instead, the EA bases its analysis on generalities, including that areas within the lynx range designated for commercial logging are "middle structural stages," which "*typically* lack large trees, dense understories, and concentrations of coarse woody debris" and "do not *appear* to be providing important habitat components for lynx." *Id.* Commercial thinning on the lynx range would inevitably create additional forest openings in violation of the design element, although the extent of these openings is impossible to discern without site-specific details. Ignoring the Project design elements prohibiting the creation of new openings, the EA only commits that it will retain an unspecified number of

MOT. FOR SUMMARY JUDGMENT- 25

indeterminate "un-thinned 'skips'" within these logged areas. AR 912.

Lynx require nearby habitat that supports snowshoe hare, which require low, concealing cover such as that provided by dense stands of trees with thick understories. AR 5991. The Project's logging and burning activities would destroy this habitat, but the Service barely acknowledges these impacts in its EA or BE. In response to comments, the Service acknowledges that "[t]hinning harvests and prescribed burning would remove or adversely modify hare habitat where it exists." AR 3201. The Service nonetheless asserts that Project would have beneficial effects on snowshoe hare, because logging "creates openings *could* set the stage for snowshoe hare habitat development in 15-20+ years, as young trees in plantations grow." *Id.* The Service does not provide a scientific basis for this conclusion. It does not account for the Project length of 20 years, which means it may take 35-40 years for snowshoe hare habitat to *possibly* develop in these areas. And it does not account for the Service's plans to re-enter these areas over the next 15-30 years.

Based on the Project's destruction of habitat for both lynx and snowshoe hare, and the potential disruption to lynx of additional roads and road traffic, there was no reasonable basis for the Service to conclude that the Project "may affect, but is not likely to adversely affect lynx." AR 12310.

3.  EA Discounts Project Harms to Grizzly Bear

Grizzly bears are a state-endangered species in Washington and a threatened species under the federal ESA. AR 14284. Grizzly bear survival is jeopardized by increased habitat fragmentation caused by human activity, so a prime management objective is to provide habitat that allows for seclusion from humans. *Id.*

MOT. FOR SUMMARY JUDGMENT- 26

One of the two recovery areas for grizzly bear in Washington, the Selkirk Mountains Grizzly Bear Recovery Area, crosses into the northeast corner of the Colville Forest. AR 14551. That recovery area includes the LeClerc Grizzly Bear Management Unit ("GBMU"), which borders the Project Area to the north. AR 14303; App. at A-9 (map of Project Area showing proximity to grizzly bear recovery areas). The Project Area also borders on the Priest Bears Outside Recovery Zone ("BORZ") to the east, an area outside recovery zone boundaries where enough bear use has been documented to warrant management. *Id.*

Although many of the Forest's grizzly management standards apply only within GBMUs, NEPA also requires the  Service to consider impacts on threatened and endangered species outside recovery zones. The 2019 Plan directs that habitat should be "consistent with the historical range of variability…and contribute to the recovery of federally listed threatened and endangered species." AR 16557 (FW-DC-WL-02). A 2019 Plan guideline further requires the Service to protect "unique habitats" for different species. AR 16562 (FW-GDL-WL-03).

Grizzly bears have been frequently documented in and around the Project Area. AR 1014. Since 2012, USFWS has been monitoring the Selkirk grizzly population through bear sightings, captures, and hair snags, and it has mapped male and female grizzly bear-occupied range extending into the Project Area. *See* App. at A-10 (map showing grizzly-occupied range overlapping into Project Area and into commercial logging units). The entire Project Area has been designated by the USFWS as an area where grizzly bears "may be present." *Id.*

As the Service describes in its 2014 Travel Analysis Report, roads into the

MOT. FOR SUMMARY JUDGMENT- 27

Selkirk Mountains pose a particular threat to grizzly bears:

> A bear may learn to avoid areas near open roads, forgoing access to suitable habitat which might occur in the road corridor. The risk of a grizzly being shot is higher in areas of high road densities, than in areas with few or no roads. In the Selkirk Mountains Ecosystem, human-caused grizzly bear mortality has been well documented and is considered the greatest threat to the continued existence of the animals[.]

AR 5025. For this reason, the 2019 Plan specifies that no areas within 500 meters of an open road, restricted-use road, motorized trail, or high-use hiking trail can be considered "core" grizzly habitat. AR 16556. The 2019 Plan also prohibits actions that will reduce core habitat below certain levels by in GBMUs by increasing road densities. AR 16561 (FW-STD-WL-07); *see id.* at Table 15 (showing maximum total densities and minimum percentage of core habitat).

However, the Project would build new roads to enable commercial logging in a concentrated area of potential habitat sandwiched between the LeClerc GBMU, the Hungry Mountain Roadless area, and the Priest BORZ. *See* App. at A-11. As Plaintiff pointed out in comments and objections, the new roads will run so close to the LeClerc GBMU that their 500-meter buffer zone would eliminate 143 acres of core grizzly habitat there. *See* AR 3054-56, 3283-87. The Service conceded this point in its response. AR 3194. However, it contended this reduction would only bring core habitat in the LeClerc GBMU down to 27.6%, keeping it still a fraction of a percentage above the minimum 27% standard the Plan set for that GBMU. *Id.*

That is questionable. The Service's contention is dependent upon several roads that it says are closed being actually undrivable, despite the fact that it admits elsewhere "[n]ot all road closures are effective." AR 1004. Should any of the roads

MOT. FOR SUMMARY JUDGMENT- 28

the Service claims are "obliterated" still be in use, it could easily bring the core habitat in the LeClerc GBMU to below 27%. *See* AR 3257-58. Regardless, there is no question that these new roads would reduce and further degrade core habitat in a GBMU that is already highly fragmented and degraded==to the point where it has less than half the core habitat of the other GBMUs in the Colville Forest. AR 16561. The EA does not recognize this fact nor analyze its impact on the bear population.

In addition, the Project would build a new road that would run along the ridge on the eastern edge of the Project Area, bordering on the Priest BORZ. *See* App. at A-10. This road goes through the area that the Service's BE concedes is "undoubtedly the best potential habitat for [grizzly] denning purposes." AR 1015. Both the new road and the commercial logging units it serves will destroy this habitat, along with an important grizzly travel corridor. AR 3054-56 (Plaintiff's comment), 3282-83 (objection). The Service sidesteps this concern in its responses by claiming the new road will be "gated" and that "post-project," it would be "closed with native materials." AR 3202, 4126-27. It does not address the impact that this road, or the adjacent logging units, would have grizzly denning habitat during the 20-year life of the Project. *Id.* Instead, the EA claims, with no support, that the Service does not "expect timber harvest and other project activities to affect the suitability of potential den habitat." AR 915.

The EA maintains that new roads and logging would reduce grizzly hiding cover over the "short term," which it characterizes as "approximately 5-10 years." AR 915. However, this assessment ignores the fact that the "temporary" roads may be in place for as long as 20 years (or longer, if used for the next project planned for

MOT. FOR SUMMARY JUDGMENT- 29

this area) and that the roads will likely continue to be used after the project by motor vehicles, OHVs, and hikers, presenting a long-term disruption to grizzly habitat seclusion. The EA also does not evaluate the impact that any undrivable roads it plans to reconstruct as part of the Project would have on grizzly habitat seclusion.

Ultimately, the EA discounts the adverse impacts to grizzly bear as "confined in time… and space." AR 1022. First, it asserts the activity is inconsequential because it will be restricted to daylight hours but does not explain why it is less harmful to disturb bears during the day. *Id.* Second, it contends the disruptions will be confined in "space" to treatment areas or "groups of areas," so bears "should" be able to move to portions of the Project Area that "offer more seclusion." *Id.* Since the Service has not released specifics about the Project schedule or logging locations, it is impossible to determine how "confined in space" the Project will be at any given point in time, how those locations will relate to grizzly travel corridors, or where grizzly bears might be able to retreat to find "more seclusion."

Against these risks, the EA offers speculative beneficial impacts for grizzly, including that logging and burning "could" improve berry crops over the short- to mid-term. AR 1022. The record shows no reasonable basis to conclude that the Project "may affect but is not likely to adversely affect" grizzly bears. AR 919-20.

4. Service Ignores Cumulative Impacts to Goshawk

Older forests within the Project Area provide unique habitat for many species, including northern goshawks. Goshawks are a sensitive species for Forest Service Region 6, which includes the Colville Forest. AR 16685. The 2019 Plan selects surrogate species intended to represent the health of various types of ecosystems and

MOT. FOR SUMMARY JUDGMENT- 30

forest structures. Because goshawks depend on old-growth forests, the Plan uses them as a surrogate species to monitor impacts to LOS forest structures. AR15438.

The Project would have significant adverse impacts to goshawk habitat. The EA indicates the Project would largely preserve 6,760 acres of "primary" goshawk habitat, defined as "mapped nest stands, alternative nest stands, and potential habitat in the mesic vegetation types." AR 909. However, the Project would allow logging on all 14,020 acres of "secondary" goshawk habitat, in Douglas fir stands or "dry" vegetation types. *Id.* Project design elements indicate the Project would retain some "resource values" for goshawks in mapped secondary habitat, including that it would not reduce the canopy closure below 50%. AR 873 (DE-19). In addition, the Project would allow silviculture "treatments" in all secondary goshawk habitat in watersheds that are within or above HRV for goshawk habitat. AR 908.

The EA acknowledges that these "treatments" will likely render the habitat unsuitable for goshawks. AR 908. The Service predicts these impacts would "likely last 15-20 years, until growing tree crowns start to close once again." AR 907. Once again, however, it does not account for repeated logging and burning in the same areas over 20 years or reentry into the same areas in about 15 to 25 years, factors that could extend these impacts indefinitely. *See* AR 886. In addition, logging and burning would destroy dead wood habitats for goshawk, as well as habitat for important goshawk prey, including snowshoe hare. The Project's lack of specificity makes the extent of these impacts impossible to judge. With respect to "snags and coarse woody debris," the Service only commits that " the *great majority* of the existing structures that goshawks *might* select for nesting or prey preparation *should*

MOT. FOR SUMMARY JUDGMENT- 31

1    still be available in the harvested units." AR 1066 (emphasis added).

2        The EA concludes that the "alternative as proposed may impact individual

3    birds but would not affect the continued viability of goshawk populations on the

4    forest." AR 909. It provides no basis for this conclusion. The Service does not

5    indicate how many "individual birds" the Project will impact or describe the nature

6    or degree of those impacts. *Id.* It recognizes that "[o]f all the projects and activities

7    that occur on the forest, timber sales by far have the greatest potential to

8    cumulatively affect goshawks" and acknowledges that it must evaluate cumulative

9    impacts to goshawks at a Forest-wide scale. AR 909. But it fails to conduct this

10   analysis. Indeed, it does not evaluate the cumulative impacts of a <u>single</u> other past,

11   present, or reasonably foreseeable future logging project that would also adversely

12   impact goshawks. In fact, the EA's list of "recent or reasonably foreseeable

13   activities" does not list any projects occurring elsewhere in the Forest, limiting itself

14   to activities "within and Adjacent to" the Project Area. AR 1688.

15       For example, the Service does not evaluate the cumulative impacts of the

16   Boulder Park Ecological Restoration Project ("Boulder Park"), which planners were

17   developing simultaneously. *See* AR 4452 (team meeting discussing both sales as

18   "top priorities" and coordinating work), 4294 (Boulder Park signed Sept. 15, 2020).

19   This is even though the Boulder Park EA discloses adverse effects to goshawks. Ex.

20   2 at 32 (Boulder Park EA))("Project activities could disturb nesting birds, resulting

21   in reduced productivity or nest abandonment…[and] could adversely affect dead

22

23

MOT. FOR SUMMARY JUDGMENT- 32

wood and other habitats important to prey species.").[1] Neither did the Service evaluate cumulative impacts from the Sanpoil Project, approved at roughly the same time, which would have "reduced potential goshawk habitat by nearly 5,000 acres, or 17% of the habitat in the Sanpoil Project Area." Sanpoil Order at *28. Judge Bastian reversed the Sanpoil Project for a similar failure. *Id.* at *28-29 ("The Sanpoil Project itself is estimated to dramatically reduce forest-wide habitat, yet the agency declined to meaningfully consider a number of present and future logging and restoration projects that will have a cumulative impact on the Northern goshawk.").

Finally, the Service did not assess how impacts to goshawk would change as the Project morphed during implementation. The Project provides that mapped primary and secondary goshawk habitat "could be modified or fine-tuned as a result of further field review in order to ensure they best meet the definitions for these habitats." AR 907. Following approval, the Service used this loophole to erase habit to enable more logging. An internal memo discloses a recommendation to "just take some of the less desirable habitat and put it as not goshawk habitat," because then "there wouldn't be a need to ensure it stays close to 50% canopy closure." AR 1725. By erasing 3,111 acres of mapped secondary goshawk habitat within the Skookum Creek watershed, the memo indicates the Forest could make "a total of 3,891 additional acres…available for harvest." AR 1726. The EA provides no *limitation*

---

[1] Plaintiff requests judicial notice of the contents of the Boulder Park EA as a fact not subject to reasonable dispute that can be readily determined from a source whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2),

MOT. FOR SUMMARY JUDGMENT- 33

on the degree to which such adjustments could decrease the 14,020 acres of mapped

secondary goshawk habitat, nor does it assess the adverse impact of such changes.

## IV.    SIR Violates NEPA, NFMA, and Court Order (Claim 7)

### A. Sanpoil Order Necessitates Changes to Trails Project

The Sanpoil Order vacated the portion of the 2019 Forest Plan that replaced

Eastside Screens with the 2019 LOS Guideline. Sanpoil Order at *32-33. As a result,

Eastside Screens restrictions on large tree management were reinstated as part of the

operable Forest Plan. AR 4294. Eastside Screens prohibits the commercial logging

of trees at least 21" DBH. AR 13172. The rule also sets forth a process for the Service

to measure a proposed timber sale and its associated watershed against an estimate

of the Historic Range of Variability ("HRV")—the historic forest composition and

type that existed prior to human settlement. AR 13167-68. Eastside Screens prohibits

commercial logging in any type of LOS stand that is less plentiful than it was

historically ("below HRV") but allows limited logging in stands that meet historic

standards (are "within" or "above" HRV). AR 13172 and 13175-76.

Following the Sanpoil Order, the Service issued an SIR concluding that the

change did not require a supplemental EA, and that Project implementation would

continue under the Decision Notice. AR 4301. The SIR concedes that as originally

designed, the Project did not comply with Eastside Screens, because it allowed for

the "treatment within LOS in all forest types and allows the harvest of trees greater

than 21 inches dbh under specific conditions." AR 4282. However, it indicates that

the Service silviculturist analyzed the first three timber sales and determined the

Service did not need to change treatment acres to meet the new standards. AR 4299;

MOT. FOR SUMMARY JUDGMENT- 34

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

1    *see* AR 4284-85 (Supplemental Forest Vegetation Report, describing the

2    methodology used ). The SIR further indicates the Service will wait to analyze for

3    future sales to analyze modifications to the rest of the Project. AR 4299.

4         Despite this uncertainty, the SIR concludes that the new standards will result

5    in "no change to the effects determination relating to HRV" and any changes to

6    treatments will be "within the effects determination analyzed in the EA." AR 4300.

7         *B. SIR Methodology Fails to Comply With Eastside Screens*

8         The SIR's LOS methodology does not comport with  Eastside Screens. As a

9    result, the Project does not comply with the applicable Forest Plan in effect following

10   the Sanpoil Order, violating NFMA and the Court Order. First, the SIR Vegetation

11   Report excludes LOS stands under 10 acres from consideration. AR 4282. Eastside

12   Screens provides no basis for this exclusion, and the Service does not explain how

13   it comports with Eastside Screens. Given the fragmented and isolated nature of old-

14   growth and LOS throughout the Forest, this exclusion could result in commercial

15   logging of an unknown amount of LOS forest in violation of new plan standards.

16        Second, the Service violates the instructions of Eastside Screens by using

17   conditions across the entire Forest to set the HRV baseline. *See* AR 16534 (showing

18   HRV estimates for the entire Forest), AR 1223-25 (using those same estimates as

19   the historic baseline for conditions in each watershed in the Project Area). Forest

20   boundaries are an arbitrary area for analysis, which do not correspond with any

21   natural "landscape," but include fractured sections of land spread over 10 different

22   ecoregions and many different forest types. *See* App. at A-14 (Figure 12, showing

23   Forest boundaries on an ecoregion map). This approach violates Eastside Screens,

MOT. FOR SUMMARY JUDGMENT- 35

which requires baseline HRV conditions to be determined for "large landscapes across which forest types, environmental settings, and disturbance regimes (fire and insects/disease) are relatively uniform." AR 13168.

Third, the Service does not follow Eastside Screens when selecting the areas to compare to this baseline. Eastside Screens provides that each watershed should be compared to the HRV for the larger landscape. *Id.* Although the Service purports to examine conditions by watershed, it only includes Forest-owned lands, ignoring the patchwork of land under state, tribal, and private ownership. *See* AR 1223-25 (HRV charts for each watershed, showing "National Forest System lands only"). This omission could significantly skew the analysis because it does not account for the forest composition of land in the watershed under different ownership.

Fourth, the Service incorrectly attempts to force the tree composition in each watershed to match the HRV for the entire Forest. *See* AR 4299-4300 (mirroring more explicit comparison in Silviculture Report at AR 1224-25). Eastside Screens warns against this approach, specifically instructing the Service to evaluate the "sum of conditions across watersheds" within the landscape analysis area. *See* AR 13168.

Fifth, the Service ignores Eastside Screens' restrictions banning any regeneration or "group selection" logging within LOS stands over 100 acres, even if they are above HRV. AR 13176. Nearly 65% of the logging planned for the Project Area is "group selection" and "shelterwood," a regeneration harvest method.AR 862-63. However, the SIR indicates the Service has no plans to restrict the use of these logging types within LOS stands, saying only that if LOS structure is above HRV, the Project's "treatments will remain unchanged." AR 4283.

MOT. FOR SUMMARY JUDGMENT- 36

The Service's determinations that certain areas are "within" or "above" HRV thus bear no resemblance to the analysis Eastside Screens requires before commercial logging can take place within LOS stands, and its plans for continuing logging in LOS stands violate Eastside Screens' explicit prohibitions. As a result, the Service must suspend future Project work until it has revised its approach to satisfy Eastside Screens and meet the requirements of the applicable Forest Plan.

*A. Service's Estimate of Impact of Eastside Screens Has No Basis*

There is no support for the Service's conclusion that the use of Eastside Screens will not impact the Project's goals or change its environmental impacts.

Because the Service failed to provide sufficient details on how the original Project would impact old-growth trees and LOS stands, it has no basis for determining how the Sanpoil Order changes that impact. Based on flawed methodology, the Service purports to have analyzed changes required for the first three Project sales. But the Service does not explain how it can assess the impact of changes needed to the rest of the Project when it has not analyzed what those changes would entail. Indeed, the only way the Service could guarantee the Sanpoil Order would not impact the Project is if it refused to comply with that order. It hints at this. For example, its methodology instructs that if Eastside Screens would prevent commercial logging in an LOS stand because it is below HRV, planners should consider evading those restrictions by using non-commercial treatments or switching to a sales type exempt from Eastside Screens. AR 4283 (suggesting, for example, relabeling a commercial sale as one necessary for "health and safety").

Absent an intent to act in contempt of Court, the Service can only speculate

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

about the impact of the Sanpoil Order, building upon its speculation about the impact of the original Project, until it is "'turtles all the way down.'" *See Rapanos v. United States*, 547 U.S. 715, 754, 126 S. Ct. 2208 (2006) (internal citation omitted).

## V.    Project Requires An Environmental Impact Statement (Claim 6)

NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In determining whether an EIS is required, the Service must evaluate a project's "context and intensity." *See* AR 13291 (FSH 1909.15, ch. 20 § 21.1), 13281-82 (FSH 1909.15 ch. Zero Code § 05) (quoting 40 C.F.R. § 1508.27) (defining "significantly"). The context of a project includes its short- and long-term impacts on a locale. AR 13282 (FSH 1909.15, ch. Zero Code § 05).

The Trails Project is significant in both scope and impact. It will directly impact a vast 90,700-acre region for the next 20 years. AR 855. It involves commercial logging on 24,400 acres, which the Silviculture Report estimates will produce "a minimum" of 244 MMBF of timber. AR 863, 1212. By Service estimates, this is enough timber to fill roughly 81,480 semi-trailer logging trucks. *See* AR 1668- 70 (estimating average volume per load of 3 MBF). This logging will combine with 45,400 acres of non-commercial treatments to transform between 61% and 88% of the land within five significant watersheds. AR 864 and 885.

Indeed, the Project's *purpose* is to fundamentally alter forest structure across this region for "30 to 100 years or more" (AR 1249), changing "stand structures to increase patch sizes, tree diameter, age, spacing and species composition" (AR 857). The Service predicts these alterations will improve the health and resilience of the

MOT. FOR SUMMARY JUDGMENT- 38

forest and reduce wildfire severity. *Id.* But the fact the Service expects these impacts will be beneficial does not lessen their significance, as a project's "intensity" includes both "beneficial and adverse" effects. AR 13282 (FSH 1909.15 ch. Zero Code § 05) ("A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial.") (quoting 40 C.F.R. § 1508.27).

In almost every regard, this Project creates larger impacts than those Judge Bastian found significant enough to require an EIS in the Sanpoil Order. It will authorize commercial logging on three times as much forest, produce up to nearly five times as much timber, construct more than 15 times as many miles of road, and potentially reconstruct up to 36 times as many miles of road. *Id.* at *3 (Sanpoil Project authorized logging on 8,410 acres to generate 50 MMBF of timber while constructing 3.7 miles of road and improving 8 miles of road).

The Project also implicates several intensity factors the Service must evaluate in determining the need for an EIS. *See* AR 13282 (FSH 1909.15 ch. Zero Code § 05) (citing 40 C.F.R. § 1508.27) (listing intensity factors). For example, the Project "may adversely affect an endangered or threatened species or its habitat," with potentially significant adverse impacts on the Canada lynx and grizzly bear. *See id.* The Project is also "related to other actions" that could create "cumulatively significant impacts," including the 2020 LAU Revision and other Forest projects impacting wildlife habitat. *See id.* The Project's lack of specificity makes it "highly uncertain" and creates "unknown risks." *See id.*; Sanpoil Order at *31. These risks are heightened by the SIR's additional layer of uncertainty in the SIR. Even more so than with the Sanpoil Project, therefore, "the lack of quantified or detailed

MOT. FOR SUMMARY JUDGMENT- 39

information" about Project impacts "creates substantial questions about whether the action will have a cumulatively significant environmental impact." *Id.* at \*31-32; *see Barnes v. U.S. DOT*, 655 F.3d 1124, 1140 (9th Cir. 2011) (EIS required when "uncertainty may be resolved by further collection of data"). As with Sanpoil, this uncertainty also renders the Project highly controversial. Sanpoil Order at \*32.

Finally, the Project will "establish a precedent for future actions." *See* AR 13282 (FSH 1909.15 ch. Zero Code § 05). The Project will set a precedent for the continued use of the 2020 LAU Revision in future timber sales, and for the interpretation of the Sanpoil Order going forward, potentially implicating the entire Forest's management approach toward old-growth and LOS. Even more broadly, the Service sees the Project as a "test" for how far it can push "conditional" management to evade the environmental analysis that NEPA requires. *See* AR 4405. The Project is thus not only vast in scope, with substantial but uncertain effects, but it will set the stage for future actions impacting the entire Forest. An EIS is required.

## CONCLUSION[2]

Plaintiff respectfully asks the Court to hold unlawful, vacate,[3] and remand the Service's 2020 LAU Revision and Decision Notice for the Trails Project as violations of NFMA, NEPA, and the APA. *See* 5 U.S.C. § 706.

---

[2] Plaintiff is not seeking summary judgment on Claim 8 from the Complaint.

[3] Vacatur is the presumptive remedy for NEPA and APA violations. *All. for the Wild Rockies*, 907 F.3d at 1121-22; *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000).

MOT. FOR SUMMARY JUDGMENT- 40

1 | ANIMAL & EARTH ADVOCATES, PLLC

2

3 | /s/ Claire Loebs Davis
Claire Loebs Davis

4 | 20520 105th Ave. SW
Vashon, WA 98070

5 | Tel: (206) 601-8476
claire@animalearthlaw.com

6

7 | *Attorney for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

MOT. FOR SUMMARY JUDGMENT- 41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2025, I electronically filed the foregoing with the

Clerk of the Court using the CM/EMF system, which will send notification of this filing to all

counsel of record.

*s/ Claire Loebs Davis*

Claire Loebs Davis