Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
20520 105th Ave., SW
Vashon, WA 98070
Tel: (206) 601-8476
claire@animalearthlaw.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiff, <br><br> v. <br><br> U.S. FOREST SERVICE, JOSHUA WHITE, Forest Supervisor, Colville National Forest, CARIN VADALA, Newport-Sullivan Lake District Ranger, U.S. Forest Service. <br><br> Defendants. | Case No. 2:24-cv-00157-RLP <br><br> **EXHIBIT 1** <br><br> *Kettle Range Conservation Grp. v. U.S. Forest Service,* No. 2:21-CV-00161-SAB (June 21, 2023) <br><br><br> With Oral Argument 5/5/2025 at 1:30 p.m. |

## *Kettle Range Conservation Grp. v. United States Forest Serv.*

United States District Court for the Eastern District of Washington

June 21, 2023, Decided; June 21, 2023, Filed

No. 2:21-CV-00161-SAB

**Reporter**

2023 U.S. Dist. LEXIS 107552 *; 2023 WL 4112930

KETTLE RANGE CONSERVATION GROUP, Plaintiff, v. U.S. FOREST SERVICE; GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service; RODNEY SMOLDON, Forest Supervisor, Colville National Forest; and TRAVIS FLETCHER, District Ranger, Republic Ranger District, U.S. Forest Service, Defendants.

**Subsequent History:** Appeal dismissed by *Kettle Range Conservation Grp. v. United States Forest Serv., 2024 U.S. App. LEXIS 3799 (9th Cir. Wash., Jan. 5, 2024)*

**Counsel:** **[*1]** For Kettle Range Conservation Group, Plaintiff: Claire Loebs Davis, LEAD ATTORNEY, Animal & Earth Advocates PLLC, Seattle, WA.

For US Forest Service, Glenn Casamassa, Pacific Northwest Regional Forester, US Forest Service, Rodney Smoldon, Forest Supervisor, Colville National Forest, Travis Fletcher, District Ranger, Republic Ranger District, US Forest Service, Defendants: Paul Gerald Freeborne, LEAD ATTORNEY, Enrd, ENRD, Natural Resources Section, Washington, DC; John Martin, Enrd, Wildlife & Marine Resources Section, Denver, CO.

**Judges:** Stanley A. Bastian, Chief United States District Judge.

**Opinion by:** Stanley A. Bastian

**Opinion**

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court are Plaintiff's Motion for Summary Judgment, ECF No. 48, Plaintiff's Motion for Leave to File Extra Record Evidence, ECF No. 46, and Defendants' Motion for Summary Judgment, ECF No. 54. The Court heard oral argument on the motions on February 9, 2023, in Spokane, Washington. Plaintiff is represented by Claire Loebs Davis. Defendants are represented by Paul Gerald Freeborne and John Martin. Having reviewed the parties' briefing, applicable law, and administrative record, the Court grants summary judgment in Plaintiff's **[*2]** favor.

## BACKGROUND

Plaintiff is an environmental organization challenging the U.S. Forest Service's (hereinafter "the agency") adoption of a forest management plan for the Colville National Forest in 2019. The Colville National Forest consists of 1.1 million acres of National Forest System land in northeastern Washington. Plaintiff also challenges a restoration and logging project in the Colville National Forest, known as the Sanpoil Project.

### A. Colville Forest Plan

In 1994, Congress assembled a scientific panel to assess the condition of old-growth forests in eastern Washington and Oregon. The panel determined that the country's old-growth forests had been transformed, and if logging rates continued, old-growth stands would soon occupy less than 10% of the forests. The panel found that only 1% of the

Colville National Forest consisted of old-growth stands protected from logging. The panel recommended adoption of a standard referred to as Eastside Screens.

In 1995, the agency adopted Eastside Screens to protect the remaining old-growth habitat in the Colville National Forest. Eastside Screens limited certain timber sales and prohibited the cutting of trees greater than 21-inches in diameter **[\*3]** at breast height (DBH). This is known as the 21-inch rule. Eastside Screens also required a historical range of variability analysis to compare current stand structure to historical conditions.

In 2003, the agency began the process of reviewing and revising the forest plan for the Colville National Forest. On October 21, 2019, the agency issued a final Record of Decision (ROD) for the 2019 Forest Plan. As part of the environmental review process, the agency considered six alternatives. The agency ultimately selected a forest management plan called Alternative P, which will open 63% of the Colville National Forest to logging. It is estimated to produce up to 62 million board feet of timber. Alternative P also eliminates Eastside Screens and the 21-inch rule.

## B. Sanpoil Project

The Sanpoil Project is a proposed action issued under the 2019 Forest Plan. The Sanpoil Project authorizes timber harvests in 8,410 acres and prescribed burns in another 19,129 acres, requires the construction of 3.7 miles of temporary roads and improvements to roughly 8 miles of non-system roads, and opens 10,585 additional acres to grazing. The Sanpoil Project is estimated to generate 50 million board feet of timber. **[\*4]** The Sanpoil Project area is in the southern part of the Republic Ranger District, which is part of the Colville National Forest.

The agency released a draft Environmental Assessment (EA) for the Sanpoil Project on February 6, 2019, and a final EA on May 27, 2020. The agency issued the ROD for the Sanpoil Project on December 11, 2020, and found the Sanpoil Project would not have a significant impact on the environment. Therefore, the agency did not prepare an environmental impact statement (EIS).

## DISCUSSION

Plaintiff moves for summary judgment to vacate and remand the RODs for the 2019 Forest Plan and the Sanpoil Project. Plaintiff argues the agency violated the Administrative Procedure Act (APA), National Environmental Policy Act (NEPA), and National Forest Management Act (NFMA).

Under the APA, a federal court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary and capricious or without observance of procedures required by law. *5 U.S.C. § 706(2)*. An agency's action is arbitrary and capricious if (1) the agency fails to consider an important aspect of a problem, (2) the agency offers an explanation for the decision that is contrary to the evidence, (3) the agency's decision is so implausible that **[*5]** it could not be ascribed to a difference in view or be the product of agency expertise, or (4) the agency's decision is contrary to the governing law. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)*. An agency must examine the relevant data and articulate a satisfactory explanation for its action. *Id.* Courts resolve APA actions on summary judgment because there are no triable factual disputes. *Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2005)*. The NFMA and NEPA use the APA's standard of

review. *San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014)*.

## A. Scope of Review

Plaintiff moves the Court to supplement the administrative record with the Eastside Screens Report. Plaintiff claims the Eastside Screens Report is essential to considering the merits of the case. This Court agrees.

Cases involving challenges to final agency actions under the APA generally involve a review of only the administrative record. *Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971)*; *Powell, 395 F.3d at 1029*. However, the Ninth Circuit recognizes four exceptions to the rule:

> (1) if admission [of supplemental information] is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency **[*6]** bad faith.

*Id. at 1030* ("These limited exceptions operate to identify and plug holes in the administrative record."); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996)*.

The Court will consider the Eastside Screens Report. The new guideline for old-growth management in the 2019 Forest Plan was a substantial departure from prior management policy. The Eastside Screens Report was cited in public objections to the plan and is necessary to understand whether the agency considered and responded to these public

comments under the NEPA. It is necessary to determine whether the agency conducted informed decision making, considered all relevant factors, and adequately explained its decision before adopting the 2019 Forest Plan. Federal Defendants also contended at oral argument that the Eastside Screens Report supports the agency's decision—specifically, arguing that the report is outdated and based on crude science. As the agency relied on documents in this case that are not in the record to justify its decision, the Court concludes it is appropriate to review those documents.

## B. Ripeness and Exhaustion of Administrative Remedies

The agency contends Plaintiff's claims are not ripe for review and Plaintiff did not exhaust its administrative remedies. The **[*7]** Court rejects both arguments.

1. Ripeness

Ripeness serves to prevent the courts from entangling themselves in abstract disagreements over administrative policies, and to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 732-33, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998)*. To determine whether an issue is ripe, courts should consider the fitness of the issue for judicial decision, such as whether (1) the legal challenge is to a site-specific action that implements or is consistent with the policy or practice to be challenged, and (2) there is any hardship to the parties from withholding consideration of the issues. *Id. at 733-35*.

This case is ripe for judicial review. The agency formalized the 2019 Forest Plan and Sanpoil Project through APA procedures, and Plaintiff's challenges became ripe when the agency issued RODs for both agency actions. This case is fit for judicial decision because

the Sanpoil Project is a site-specific action governed by the 2019 Forest Plan. There is also a risk of prejudice to Plaintiff in delaying review, as the Sanpoil Project is scheduled to commence this year.

2. Exhaustion of Administrative Remedies

Section 6912(e) of Title 7 of the United States Code requires **[\*8]** a party to exhaust administrative remedies before it brings an action against a federal agency. The issues to be challenged must be raised to the agency first. *See* 5 U.S.C. § 704; *see also* 36 C.F.R. Part 215 (establishing agency appeal procedures). Exhaustion arguments are considered on a case-by-case basis. *Great Basin Mine Watch v. Hankins, 456 F.3d 955, 968 (9th Cir. 2006)*. For challenges under the NFMA, the Ninth Circuit has stated that claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims raised in federal court. *Native Ecosystems Council v. Dombeck, 304 F.3d 886, 899 (9th Cir. 2002)*.

Plaintiff submitted objections to the Forest Plan throughout the environmental review and public comment process. On September 23, 2011, Plaintiff objected to the agency's proposed guidance for large and old trees and potential removal of Eastside Screens. On July 5, 2016, Plaintiff lodged a response to the draft EIS, objecting to the proposed management plan and arguing it should include a standard like Eastside Screens. Plaintiff presented detailed objections in a letter dated November 5, 2018, arguing the draft EIS violated the NFMA by failing to ensure wildlife viability, diversity, and connectivity. **[\*9]** In addition, on November 6, 2018, Plaintiff submitted comments contending the EIS failed to comply with the NFMA and adequately protect large and old trees; in those comments, Plaintiff again objected to the agency's decision to eliminate Eastside Screens.

2023 U.S. Dist. LEXIS 107552, *9

Plaintiff exhausted its administrative remedies. Plaintiff placed the agency on notice of its claims thoroughly and consistently during the public comment process. The record demonstrates Plaintiff's arguments regarding elimination of Eastside Screens, and the agency's purported failure to satisfy the requirements of the NFMA, were raised with the agency first. The agency had an opportunity to consider and decide those claims prior to this action. They come as no surprise to the agency, and the issues are now properly before the Court.

**Challenges to 2019 Forest Plan**

1. <u>National Forest Management Act</u>

Plaintiff contends the agency violated the NFMA, because the agency failed to explain how the 2019 Forest Plan maintains the viability of old-growth-dependent species. The Court agrees.

The NFMA requires the agency to develop regulations to "provide for diversity of plant and animal communities." *16 U.S.C. § 1604(g)(3)(B)*. The implementing regulation mandates that fish and wildlife habitat shall **[*10]** be managed to maintain viable populations of existing native and desired non-native vertebrate species.[1] *36 C.F.R. § 219.19 (1982)*. It provides that diversity shall be considered throughout the planning process and inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition. *Id.* § 219.26 (1982).

---

[1] The revised 1982 regulations are applicable. *See* 36 U.S.C. 219.19 *et seq.* (1982). The Forest Service adopted NFMA planning regulations in 1982. *47 Fed. Reg. 43,026-43,052 (Sept. 30, 1982)*. The agency revised these regulations in 2012, but included transitional provisions allowing it to apply the 1982 regulations to plans initiated before 2012. *36 C.F.R. § 219.17(b)(3)*. The Forest Service elected to apply the 1982 regulations to the 2019 Forest Plan, except that it developed the 2019 Forest Plan's monitoring requirements under the 2012 regulations.

Forest plans should designate management indicator species whose population changes are believed to indicate the effects of management activities. *Id.* § 219.19(a), (a)(1) (1982). The agency must estimate the effects of changes in vegetation type, timber age classes, community composition, rotation age, and year-long suitability of habitat related to mobility of management indicator species, and adequately evaluate planning alternatives in terms of both amount and quality of habitat and of animal population trends. *Id.* § 219.19(a)(1), (2) (1982).

Courts afford agencies the highest-level of deference in their scientific conclusions, *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1130 (9th Cir. 2010)*, and independently review the record to determine whether the agency has made a reasoned decision based on its evaluation of the evidence, *Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1301 (9th Cir. 2003)* (*Earth Island I*). The Ninth Circuit has approved the use of habitat proxies in place of direct population monitoring for management indicator **[*11]** species. *Earth Island Inst. v. U.S. Forest. Serv., 442 F.3d 1174, 1175 (9th Cir. 2006)* (*Earth Island II*), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, 555 U.S. 7 (2008)*. The agency can meet the species viability requirements of the NFMA by preserving habitat, but only where both the agency's knowledge of what quality and quantity of habitat is necessary to support the species and the agency's method for measuring the existing amount of that habitat are reasonably reliable and accurate. *See Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1250 (9th Cir. 2005)*. The agency is required to support its conclusions that a project meets the requirement of the NFMA with studies that the agency, in its expertise, deems reliable. The agency must also explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable. *See The Lands Council v. McNair, 537 F.3d 981, 994 (9th Cir. 2008)*.

In this case, the agency erred by failing to demonstrate that its data and methodology reliably and accurately supported its conclusions about the viability of old-growth dependent species under each planning alternative, and depicted the amount and quality of habitat.

The agency assessed how the six forest planning alternatives would impact the viability of wildlife. The agency analyzed four surrogate species that rely on old-growth habitat—the (1) northern goshawk, (2) pileated woodpecker, **[*12]** (3) American marten, and (4) white-headed woodpecker. The agency did not monitor the species directly, but instead, utilized old-growth habitat as a proxy to monitor their viability. FP 108667; FP 107840. The agency used LiDAR to show late-structure tree data, claiming it could constitute a forest-wide old growth survey. FP 107840. LiDAR is a remote sensing method that uses a pulsed laser to measure ranges and generate three-dimensional information about the shape of the Earth and its surface characteristics. FP 111371.

In assessing each alternative's contribution to the viability of the surrogate species, the EIS concluded that Alternative P provided "High" viability outcomes for the old-growth-dependent species. FP 108680 (Table 183). The EIS incorporated graphs that depict the amount of habitat that will be available over time for the four surrogate species. FP 103356-57. The graphs illustrated that, for all species but the white-headed woodpecker, Alternative P provides worse habitat outcomes. *Id.* In contrast, the data illustrated the No Action alternative provides more habitat than the selected alternative for three of the surrogate species. *Id.* The EIS also concluded that the **[*13]** No Action alternative "creates the most late structure of any alternative," FP 108317, while Alternative P produces the third most late forest structure, FP 108332; FP 108312 (Table 30).

However, the EIS concluded that the No Action alternative would not improve the viability outcomes for the surrogate species dependent on old-growth habitat. FP 108687. It found:

> Overall, alternative P would provide greater protection for LSOF (late successional old forest) habitats than no action, the proposed action and alternatives B, O, and R . . . [and] would improve the viability outcomes for surrogate species that are dependent on LSOF habitats.

FP 108687. In its discussion, the agency did not reference its data or explain why Alternative P was chosen considering that data. The agency did not explain how the No Action alternative was projected to create poor outcomes for the surrogate species based on its effects on habitat, yet its own figures indicated that the No Action alternative produces the most habitat. FP 108687.

The agency relies on Appendix B of the associated Wildlife Report to support its claim that Alternative P is superior for old-growth species. FP 103354 (Table 14). The Appendix **[*14]** includes a table summarizing the viability outcomes for each alternative. It assigns current and historical viability outcomes for the surrogate species through letter grades. Neither the EIS nor the Wildlife Report describe how the agency came to these scores for each species and action alternative. The agency did not define its methodology for assessing the letter grades, such as what factors it considered and the weight they were given. The grades assigned to each planning alternative lack explanation.

The agency failed to explain how its own data supports its conclusions about what alternatives provide the most old-growth habitat for surrogate species. Instead, the agency offered an explanation for its decision that is contrary to the record evidence, in violation of the APA.

The NFMA and its implementing regulations require the agency to maintain the viability of diverse wildlife. *16 U.S.C. § 1604(g)(3)(B)*; *36 C.F.R. § 219.19 (1982)*. Here, the agency did not ensure that the 2019 Forest Plan would maintain viable populations for species dependent on old-growth habitat. It is impossible to assess the accuracy of the agency's conclusions without a transparent methodology and explanation of how its data supported those conclusions. **[*15]**

The agency also did not provide a meaningful assessment of the amount and quality of old-growth habitat, as required by *36 C.F.R. § 219.19(a)(2) (1982)*. The agency claimed it used LiDAR structure data to perform a forest-wide old growth survey, but it did not explain how the data meets its requirement to describe the effect of its planning alternatives on both the amount and quality of old-growth habitat. In response to public comments on the issue, the record referred to the agency's evaluation of viability in the Wildlife Report, which does not discuss the amount and quality of habitat and population trends in reaching conclusions about how the planning alternatives would affect species viability. For the foregoing reasons, the agency acted arbitrarily and capriciously when it offered explanations that ran counter to the evidence before the agency and failed to satisfy the requirements of the NFMA.

2. National Environmental Policy Act

Plaintiff claims the agency violated other requirements of the NEPA. Plaintiff primarily argues that the agency erred when it failed to consider the impact of eliminating Eastside Screens.

The NEPA mandates that agencies take a hard look at the environmental consequences of an action. **[*16]** *Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989)*. The statute's hard look obligation must involve a

discussion of adverse impacts that does not improperly minimize negative side effects. *N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 975 (9th Cir. 2006)*. Agencies are required to respond to all responsible opposing views at appropriate points in the draft and final EIS, *40 C.F.R. § 1502.9*, and they must respond explicitly and directly to conflicting views, *Earth Island II, 442 F.3d at 1172-73*. An agency must address public criticisms of the scientific bases that the final EIS relies upon. *See Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1167 (9th Cir. 2003)*.

The 2019 Forest Plan adopted a whole landscape approach, which the agency claims will provide flexibility in responding to climate change impacts. FP 108306. The 2019 Forest Plan replaced Eastside Screens and the 21-inch rule, but still encouraged retention and emphasis of recruitment of individual large trees. Large trees may be removed or destroyed for several reasons, including:

• Where trees need to be removed for public health or safety (such as, but not limited to, danger/hazard trees along roads or in developed or administrative sites),

• Where trees need to be removed to facilitate management of emergency situations such as wildfire response,

• Where trees need to be removed to meet, promote, or maintain desired conditions for structural stages,

• Where trees **[*17]** need to be removed to control or limit the spread of insect infestation or disease,

• Where trees need to be removed where strategically critical to reinforce, facilitate, or improve effectiveness of fuel reduction in wildland-urban interfaces, and

• Where trees need to be removed to promote special plant habitats (such as, but not limited to, aspen, cottonwood, whitebark pine).

FP 109776-77. The 2019 Forest Plan did not designate a minimum amount of old-growth habitat for preservation. It also provided that, while individual projects should generally be consistent with the forest plan's guidelines, projects may deviate by showing how the action would be as effective in contributing to the maintenance or attainment of relevant desired conditions and objectives. FP 109905.

Plaintiff submitted objections to the draft EIS, claiming the 2019 Forest Plan's approach to managing old-growth habitats was ambiguous, and its exceptions too flexible to ensure preservation of old-growth forest and species viability on the project-level. Plaintiff argued the 2019 Forest Plan should maintain the 21-inch rule.

The agency responded that it believed maintaining the 21-inch rule would reduce the ability to [*18] attain the desired future condition of having most vegetation types in late structure, FP 109253, and science now supports a more ecologically based approach to management of old-growth trees, FP 107839. The agency did not provide citations or a response to the specific studies submitted in Plaintiff's objection, including the Eastside Screens Report. The ROD for the 2019 Forest Plan explained that the agency's motivation for eliminating the 21-inch rule was to provide adequate management flexibility to respond to emerging resource issues. FP 113689. In response to public objections, the agency stated the approach will provide flexible strategies to better integrate old forest conservation goals with other land management objectives—and specifically, to avoid numerous site-specific forest plan amendments to permit individual projects to log trees greater than or equal to 21 inches DBH. FP 107839-40.

The agency's cursory rejection of the science was insufficient to satisfy the requirements of the NEPA. Plaintiff's public comments raised the initial scientific rationale for adoption of the bright-line rule, as articulated in the Eastside Screens Report. The Eastside Screens

Report was **[\*19]** not included in the administrative record, and the agency continues to oppose its consideration upon judicial review. Its absence demonstrates that the agency failed consider the scientific rationale for adopting the 21-inch rule before deciding to discard it. The agency did not respond to viewpoints that directly challenged the scientific basis upon which the final EIS rests—and indeed, that was central to it. *Ctr. for Biological Diversity, 349 F.3d at 1167*. In doing so, the agency violated the NEPA. The absence of the Eastside Screens Report also demonstrates that the agency did not consider an important aspect of the issue, as required by the APA. *Motor Vehicle Mfrs. Ass'n., 463 U.S. at 43*.

The agency found that Alternative P would provide for the retention and restoration of late-successional forest structure, but the agency did not consider negative impacts, if any, from (1) elimination of the 21-inch rule or (2) retention of the exceptions in the new guideline. The NEPA requires the agency to discuss and not improperly minimize negative effects of a proposed action. *N. Alaska Envtl. Ctr., 457 F.3d at 975*. In this case, the EIS did not assess how often the new guideline's exceptions will be invoked and how the exceptions may impact the agency's conclusions about the environmental effects and species viability. **[\*20]** The agency acted arbitrarily and capriciously when it failed to meaningfully acknowledge and discuss any adverse effects of rescinding the 21-inch rule, in violation of the NEPA and the APA.

**Challenges to Sanpoil Project**

Plaintiff brings three challenges to the agency's approval of the Sanpoil Project. Plaintiff contends the agency violated the NEPA and NFMA when it failed to (1) analyze the

environmental impacts of the Sanpoil Project, (2) maintain species viability, and (3) develop an EIS.

1. Impacts Analysis

The NEPA's hard look requirement directs agencies to consider all foreseeable direct and indirect impacts. *Idaho Sporting Cong. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002)*. The NEPA regulation requires agencies to assess the direct and indirect effects, as well as the cumulative impact, of their actions on the environment. *40 C.F.R. §§ 1502.16*, 1508.25(c). A "cumulative impact" of an action is defined as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of **[*21]** time.

*Id.* § 1508.7. A cumulative impacts analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects. *Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993-94 (9th Cir. 2004)*.

The agency is permitted to exercise its discretion and incorporate the expected impact of such a project into the environmental baseline against which the incremental impact of a proposed project is measured. *Cascadia Wildlands v. Bureau of Indians Affs., 801 F.3d 1105, 1112 (9th Cir. 2015)*. With respect to past actions specifically, the agency is not required to exhaustively list and analyze all individual past actions or consider the individual effects of those actions to determine the present effects. *36 C.F.R. § 220.4(f)*. Rather, the agency must determine what information regarding past actions is useful and relevant to the required analysis of cumulative effects. The statutory minima of the NEPA

is met where the underlying data base includes approved projects and pending proposals. *Cascadia Wildlands, 801 F.3d at 1113*. The agency is required to provide a clear explanation of its analysis to enable informed public comment on the project. *Id. at 1112*.

In the EA, the agency purported to provide an analysis and description of the identifiable present effects of past actions, to the extent that they are relevant and useful in analyzing effects. AR 06061. The agency **[*22]** also elected to aggregate past projects into an environmental baseline to assess the Sanpoil Project's impact. The agency catalogued the projects it considered. AR 06061-68 (Appendix A, Tables 14 and 15).

The agency did not adequately analyze the cumulative impacts of the Sanpoil Project, because it did not discuss past projects' aggregate effects. The NEPA permits the agency's environmental baseline approach and provides that an agency need not list and analyze individual past actions. While the agency claims it established an environmental baseline to analyze effects, the EA did not discuss or demonstrate how it aggregated the cumulative impacts of the noted projects, only citing to its catalogue of projects and ultimate perfunctory conclusions. *Cascadia Wildlands, 801 F.3d at 1111*. The agency did not provide a serious analysis on cumulative impacts from the Sanpoil Project.

Related to this issue, Plaintiff claims the agency erred when it did not specify the degree to which the Sanpoil Project will permit removal of trees greater than or equal to 21 inches DBH to meet desired conditions. The 2019 Forest Plan states it prioritizes retention of old growth trees but will destroy and remove trees under flexible exceptions. **[*23]** The agency found in the EIS that there was no threat to species viability based on the assumption the new management approach would better protect old-growth trees.

This conclusion was contrary to the evidence. The Sanpoil Project EA did not specify the frequency of which the new guideline's exceptions would be invoked, despite the 2019

Forest Plan's stated objective of preserving old-growth trees. The agency is not required to catalogue specific trees that will be removed, but in this case, the agency was required to provide site-specific details at the project planning stage to provide a sufficient picture of the Sanpoil Project's cumulative effects. *See WildEarth Guardians*, 920 F.3d at 1257. Without sufficiently specific information about site impacts, the Sanpoil Project's impact to old-growth trees and their dependent species is speculative.

The agency states the following in its internal guidance on compliance with the NEPA: "If the Agency does not know where or when an activity will occur or if it will occur at all[,] then the effects of that action cannot be meaningfully evaluated." *See U.S. Forest Service, Forest Service Handbook, FSH 1909.15.01(1)*. That is the case here. In failing to consider the cumulative and site-specific effects of the Sanpoil Project, the agency did **[*24]** not comply with the NEPA.

2. Viability

Plaintiff avers the agency failed to ensure that the Sanpoil Project will maintain species viability, as the agency failed to adequately assess the Sanpoil Project's impacts on (1) gray wolves and wolverine, (2) sensitive bat species, and (3) sensitive bird and invertebrate species. The same legal standards noted above regarding effects analyses under the NEPA and species viability under the NFMA apply.

a. *Gray Wolves and Wolverine*

The agency concluded that the Sanpoil Project "may impact" individual wolves but is not likely to lead to loss of viability. AR 06046. The agency's analysis of the Sanpoil Project's effects on gray wolves is contained in two sentences that relate to impacts on big game. *Id.* Otherwise, the agency referred to its grizzly bear analysis in its assessment of direct and cumulative impacts on the wolf habitat and population. *Id.*; *see also* AR 06308. The

agency also found the Sanpoil Project is not likely to jeopardize the existence of wolverines, and therefore, would not lead to loss of species viability. AR 06044; AR 06298. The agency again referred to its grizzly bear analysis for its consideration of the adequacy of wolverine **[*25]** habitat. AR 06297. The EA did not explicitly discuss or examine any negative direct effects to wolverine.

In this case, the agency erred when it failed to analyze the Sanpoil Project's effects on the gray wolf population. The agency's cursory reference to its effects analysis on grizzly bears does not constitute an adequate hard look under the NEPA, because the agency did not provide an adequate justification for tying the analyses together. The agency claims that reference to its grizzly bear assessment is appropriate because both species, at least in part, prey on big game. However, the agency did not determine that the species' diets were identical and did not consider or acknowledge any differences between the species that may alter the agency's analyses and conclusions regarding viability.

The agency also erred when it failed to meaningfully assess the Sanpoil Project's impact on wolverine. The agency repeated its error by citing the grizzly bear assessment to determine whether there were impacts to wolverine habitat and population. The agency did not acknowledge whether there were any negative direct effects to wolverine from the Sanpoil Project, instead providing only a brief **[*26]** conclusion of viability. By failing to analyze the Sanpoil Project's specific impacts on the gray wolf and wolverine populations, the agency did not comply with the NEPA's hard look requirement and NFMA's related mandate that the agency maintain species viability.

b. *Bat Species*

The agency concluded the Sanpoil Project was not likely to lead to a loss of viability of sensitive bat species, including the little brown bat, Townsend's big-eared bat, and pallid

2023 U.S. Dist. LEXIS 107552, *26

bat. AR 06046. The agency stated that it was unable to do a viability assessment for the Townsend's big-eared bat or the pallid bat due to a lack of knowledge to adequately map habitat. AR 06259-60 (Table 1). It found the Sanpoil Project could decrease roosting sites for bats. AR 06264. The agency specifically noted that the highest conservation priority for the Townsend's bat is to reduce human disturbance and destruction of roost sites. AR 06264; AR 06310. The agency's analysis on the viability of sensitive bat species was deficient.

The agency reasoned that the Sanpoil Project was not likely to lead to a loss of viability of sensitive bat species, because activities would either be far enough removed from known bat roost sites to [*27] have no effect on species or would be timed to avoid periods that the sites would be occupied. AR 06046. The agency need not have a complete census of where bats live in the forest; however, it is unclear how the agency can ensure that the Sanpoil Project activities will not affect bat viability by avoiding roosting sites, when it admits it does not have sufficient information about those sites to map the species' habitat. The agency's conclusion that the Sanpoil Project would not lead to a loss of viability for bat species depends on the agency's ability to avoid bat roosting sites, which it admits it is unable to locate. The record indicates the agency did not make a reasoned decision on viability based on the evidence it had. *Earth Island I, 351 F.3d at 1301*. In failing to provide a reasoned explanation of the conclusions it drew from the data available, the agency violated the NEPA and NFMA. *The Lands Council v. McNair, 537 F.3d 981, 994 (9th Cir. 2008)*.

c. *Bird and Invertebrate Species*

The agency studied the impacts of the Sanpoil Project on the Northern goshawk, an old-growth-dependent species. The agency noted that the cumulative effects area for the

goshawk is the entire Colville National Forest, AR 06305, and that commercial logging has the greatest potential to reduce **[*28]** goshawk nesting and foraging habitat, AR 6304. The agency estimated that the Sanpoil Project will reduce potential goshawk habitat by nearly 5,000 acres, or 17% of the habitat in the Sanpoil Project area. AR 06304. Nonetheless, the agency concluded the Sanpoil Project would not lead to a loss of viability for the species. AR 06305.

The agency erred by not including a meaningful discussion of logging projects that, in conjunction with the Sanpoil Project, would impact the Northern goshawk habitat and population. The agency determined that commercial logging has the greatest potential to impact goshawk habitat. The agency found that other vegetation restoration projects would contribute to effects on the goshawk, AR06045 (Table 11), but the agency considered only a handful of approved and proposed projects in its effects assessment. AR 06305; AR 06317-22. The NEPA requires the agency to consider the cumulative environmental effects of past, present, and reasonably foreseeable future actions. *See* _40 C.F.R. § 1508.1_. The Sanpoil Project itself is estimated to dramatically reduce forest-wide habitat, yet the agency declined to meaningfully consider a number of present and future logging and restoration projects **[*29]** that will have a cumulative impact on the Northern goshawk.

As to sensitive invertebrates, the agency also concluded that direct and cumulative impacts of the Sanpoil Project would not lead to a loss of viability. The EA determined that less mobile sensitive invertebrates could be killed, that food plants could be damaged, and the increase in grazing has the potential to remove forage and host plants and alter the integrity of meadows and riparian habitats. AR 06046 (Table 11). One noted invertebrate species is the Western bumblebee.

2023 U.S. Dist. LEXIS 107552, *29

The agency further erred by failing to support its conclusions regarding the viability of the Western bumblebee. While the agency concluded the Sanpoil Project would not impact viability, the agency did not consider any specific effects of the Sanpoil Project on the Western bumblebee. The agency's conclusion lacked adequate explanation and reasoning and is insufficient to meet the mandates of the NEPA and NFMA.

3. Development of an EIS

The agency concluded the Sanpoil Project would not have significant effects on the quality of the human environment, and therefore, an EIS need not be prepared under the NEPA. AR 06784-95.

Before undertaking any major federal **[*30]** action significantly affecting the quality of the human environment, the NEPA requires an agency to prepare a detailed EIS. *42 U.S.C. § 4332(2)(C)*; 40 C.F.R. § 1508.11. To decide whether an EIS is necessary, an agency must first prepare a shorter, less comprehensive document called an EA. *Id.* § 1508.9. An EA must briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement. *Id.*; *see also Weldon*, 697 F.3d at 1053. If the EA concludes the proposed action will not have a significant effect on the environment, an EIS is not necessary, and the agency may issue a "Finding of No Significant Impact" and proceed with the action. 40 C.F.R. § 1508.13.

In determining whether a project has a significant effect on the environment, and thus warrants creation of an EIS, agencies must evaluate both the context and intensity of an action to determine the significance of its impact. 40 C.F.R. § 1508.27(a), (b) (2005). Context refers to the significance of the action with regard to society as a whole, the affected region, the affected interests, and the locality. *Id.* § 1508.27(a). To assess an action's intensity, the agency should analyze beneficial and adverse factors, unique

characteristics of the geographic areas, the degree to which the effects are likely to be highly controversial, **[\*31]** highly uncertain or unknown risks, and the degree to which the action may establish a precedent for future actions with significant effects. *Id.* § 1508.27(b)(1)-(7). The agency must also consider whether an action is related to other actions with individually insignificant but cumulatively significant impacts, among other things. *Id.* § 1508.27(b)(7). Courts have found that the presence of any one of these factors, or a combination of multiple factors, may warrant a significant impact to the environment, necessitating an EIS. *Ctr. for Biological Diversity v. Nat'l Hwy. Safety Admin., 538 F.3d 1172, 1220 (9th Cir. 2008).*

Considering the context and intensity of the Sanpoil Project, the agency was required to develop an EIS. The Sanpoil Project creates uncertain risks to old-growth forests and the wildlife dependent on them. The action is significant considering the context and history of the Colville National Forest. In addition, the Sanpoil Project sets a precedent for future actions that utilize the new old-growth guideline, each of which may be individually insignificant, but create a cumulatively significant impact when applying the new guideline.

The lack of quantified or detailed information about the Sanpoil Project's impacts in this respect creates substantial questions about whether the action will have **[\*32]** a cumulatively significant environmental impact. *Bark v. U.S. Forest Serv., 958 F.3d 865, 873 (9th Cir. 2020).* The Sanpoil Project is also highly controversial due to the same questions about its size and nature and effect of the action on old-growth dependent species. *See id. at 869-70.* The record indicates the effects on balance are likely to be "significant"—and at the very least, those effects and risks are unknown, mandating an EIS.

## CONCLUSION

The NEPA mandates that federal agencies consider the environmental impacts of their decisions. The NFMA requires that the agency maintain the viability of diverse species in National Forests. In approving the 2019 Forest Plan and Sanpoil Project, the agency failed to meaningfully consider the effects of eliminating Eastside Screens and the 21-inch rule, and its cumulative effect on old-growth trees and species dependent on them in the Colville National Forest.

The agency is empowered by Congress to alter forest management policy, and it is not the role of this Court to select an appropriate action on behalf of the agency. However, any decision of the agency must be within the confines of the substantive and procedural mandates of the NFMA and NEPA. For the reasons expressed above, the agency's actions were arbitrary **[*33]** and capricious under the APA. The relevant portions of the 2019 Forest Plan and Sanpoil Project are vacated and remanded to the agency.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Leave to File Extra Record Evidence, ECF No. 46, is **GRANTED**. The Eastside Screens Report, ECF No. 47-1, is **ACCEPTED into the record**.

2. Plaintiff's Motion for Summary Judgment, ECF No. 48, is **GRANTED**, and Defendants' Motion for Summary Judgment, ECF No. 54, is **DENIED**.

3. The parties are directed to meet and confer and notify the Court within **thirty (30) days** regarding what the next steps should be for this case, if any.

4. The Clerk of Court is directed to **ENTER JUDGMENT** against Defendants and in favor of Plaintiff.

2023 U.S. Dist. LEXIS 107552, *33

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order and provide copies to counsel.

**DATED** this 21st day of June 2023.

/s/ Stanley A. Bastian

Stanley A. Bastian

Chief United States District Judge

---

**End of Document**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 11, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/EMF system, which will send notification of this filing to all counsel of record.

*s/ Claire Loebs Davis*
Claire Loebs Davis