ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

HAYLEY A. CARPENTER (CA Bar No. 312611)
LAWRENCE K. PITTMAN (GA Bar No. 568134)
Trial Attorneys
Natural Resources Section
P.O. Box 7611
Washington, DC  20044
(202) 305-0242 (Carpenter)
(202) 305-0420 (Pittman)
hayley.carpenter@usdoj.gov
Lawrence.pittman@usdoj.gov

RICHARD R. BARKER
Acting United States Attorney

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. FOREST SERVICE, JOSHUA WHITE, in his official capacity as Forest Supervisor of the Colville National Forest; and CARIN VADALA, in her official capacity as Newport-Sullivan Lake District Ranger<br><br>    Defendants. | Case No. 2:24-cv-00157-RLP<br><br>**COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 5, 2025<br>Time: 1:30 p.m. PST<br>With Oral Argument |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND .......................................................................... 2

LEGAL BACKGROUND ............................................................................... 4

    I.     NEPA ................................................................................................ 4

    II.    NFMA ............................................................................................... 5

STANDARD OF REVIEW ............................................................................ 5

ARGUMENT ................................................................................................. 6

    I.     The Forest Service updated the Project area's lynx habitat map
           consistent with NEPA (Claims One and Four) ............................... 6

          A.    The Forest Plan has different direction for lynx core habitat and
                lynx secondary / peripheral habitat ...................................... 7

          B.    The Forest Service used better data to update its lynx habitat
                maps in 2020 .......................................................................... 8

          C.    The 2020 map updates are not a major federal action requiring
                NEPA analysis ..................................................................... 10

    II.    Condition-based Management complies with NEPA (Claim Three) ........... 13

          A.    Condition-based Management ........................................... 13

          B.    The Sxʷuytn-Kaniksu Project properly employs condition-based
                management .......................................................................... 14

          C.    Plaintiff's critique of the condition-based management approach
                is unavailing ........................................................................ 16

    III.   The Project's road improvement activities comply with NFMA and
           NEPA ............................................................................................ 22

          A.    The Project's road improvements are consistent with the Forest
                Plan ...................................................................................... 23

B.     The Forest Service complied with NEPA in analyzing the Project's road improvement impacts ................................................. 25

IV.    The Forest Service took a hard look at the Project's impacts to wildlife (Claim Five) ................................................................................ 29

     A.     Lynx ........................................................................................ 30

     B.     Grizzly Bear ........................................................................... 32

     C.     Goshawk ................................................................................. 37

     D.     Diversity ................................................................................. 40

V.     The Project SIR complies with NEPA, NFMA, and the *Sanpoil* Order (Claim Seven) ............................................................................. 42

     A.     The SIR's methodology complies with the Eastside Screens, and thus with NFMA and *Sanpoil* .......................................... 43

     B.     The SIR complies with NEPA ................................................ 46

VI.    The Forest Service complied with NEPA in its preparation of an EA ........ 47

CONCLUSION ................................................................................................. 50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for the Wild Rockies v. Marten,*
  464 F. Supp. 3d 1169 (D. Mont. 2020) .......................................................34

*All. for the Wild Rockies v. United States Forest Serv.,*
  No. CV 21-84-M-DLC, 2023 WL 5427921 (D. Mont. Aug. 23, 2023)............11, 12, 13

*Alliance for the Wild Rockies v. Weber*,
  979 F. Supp. 2d 1118 (D. Mont. 2013) .......................................................17

*Anderson v. Evans,*
  371 F.3d 475 (9th Cir. 2004) .......................................................48

*Bark v. Northrop,*
  607 F. App'x 652 (9th Cir. 2015) .......................................................48

*Barnes v. United States Dep't of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) .......................................................50

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) .......................................................47

*Blue Mountains Biodiversity Project v. Trulock*,
  Case No. 2:21-cv-01033-HL, 2023 WL 3645966 (D. Or. Apr. 27, 2023) ...................49

*Cascades Conservation Council v. United States Forest Serv.,*
  No. 2:22-CV-00293-SAB, 2024 WL 188374 (E.D. Wash. Jan. 17, 2024) ..2, 14, 16, 17, 19, 22

*Earth Island Inst. v. United States Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003) .......................................................30

*Env't Prot. Info. Ctr. v. United States Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) .......................................................5, 42, 49

*Friends of the Clearwater v. Dombeck,*
  222 F.3d 552 (9th Cir. 2000) .......................................................42

*Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci*,
  857 F.2d 505 (9th Cir. 1988) .......................................................36, 38

*In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. United States Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ...................................................................48

*Kern v. United States Bureau of Land Mgmt.*,
  284 F.3d 1062 (9th Cir. 2002) .................................................................39

*Kettle Range Conversation Grp. v. United States Forest Serv.*,
  No. 2:21-cv-00161-SAB, 2023 WL 4112930 (E.D. Wash. June 21, 2023) ...............2, 4

*Klamath Forest All. v. United States Forest Serv.*,
  746 F. Supp. 3d 761 (N.D. Cal. 2024) ......................................................49

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ..................................................................5

*Marsh v. Oregon Nat. Res. Council*,
  490 U.S. 360 (1989) ...............................................................................45

*Nat'l Wildlife Fed'n v. Espy*,
  45 F.3d 1337 (9th Cir. 1995) ..................................................................50

*Native Ecosystems Council & All. v. United States Forest Serv. ex rel. Davey*,
  866 F. Supp. 2d 1209 (D. Idaho 2012)......................................................12

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ...................................................................6

*Native Ecosystems Council v. United States Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ...........................................................48, 49

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ............................................................5, 44

*Neighbors of Cuddy Mountain v. United States Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998) .....................................................25, 30, 31

*Northcoast Env't Ctr. v. Glickman*,
  236 F.3d 660 (9th Cir. 1998) ..................................................................13

*Northern Plains Resource Council, Inc. v. Surface Transportation Board*,
  668 F.3d 1067 (9th Cir. 2011) .........................................................21, 41, 42

*Ocean Advoc. v. United States Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ..................................................................48

*Or. Nat. Res. Council Fund v. Forsgren,*
  252 F. Supp. 2d 1088 (D. Or. 2003)............................................................11

*Price Rd. Neighborhood Ass'n v. United States Dep't of Transp.,*
  113 F.3d 1505 (9th Cir. 1997) ..................................................................42

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ...........................................................................5, 34

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ...............................................................................13

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
  435 U.S. 519 (1978) .................................................................................6

*W. Watersheds Project v. United States Dep't of the Interior,*
  No. 223CV00435CDSDJA, 2023 WL 6880397 (D. Nev. Oct. 18, 2023)....................16

*Wetlands Action Network v. United States Army Corps of Eng'rs,*
  222 F.3d 1105 (9th Cir. 2000) ...................................................................6

*Wild Wilderness v. Allen,*
  871 F.3d 719 (9th Cir. 2017) ....................................................................47

*WildEarth Guardians v. Conner,*
  920 F.3d 1245 (10th Cir. 2019) .......................................................14, 16, 49

*Wilderness Soc'y v. United States Forest Serv.,*
  630 F.3d 1173 (9th Cir. 2011) ...................................................................6

*Wildwest Inst. v. Bull,*
  547 F.3d 1162 (9th Cir. 2008) ..................................................................10

*Yellowstone to Uintas Connection v. Marten*
  No. CV 24-0025, 2024 WL 3400524 (D. Mont. July 12, 2024) ..........................11

**Statutes**

42 U.S.C. § 4332(2)(C)..............................................................................5

5 U.S.C. §§ 701-06 ..................................................................................5

**Regulations**

36 C.F.R. § 212.1....................................................................................27

36 C.F.R. § 220.7(a) ............................................................................................. 5

40 C.F.R. § 1501.3(b) .........................................................................................48

40 C.F.R. pt. 1500...............................................................................................47

# INTRODUCTION

The Colville National Forest in northeastern Washington is no exception to challenges confronting western forests: past management, including timber harvest and fire suppression, coupled with a changing environment have resulted in unnatural and unhealthy forest stands. These conditions make the Forest susceptible to high intensity wildfires, insect infestations, and disease outbreaks.

To address these unhealthy conditions, the Kalispel Tribe of Indians (the "Tribe") proposed the Sxʷuytn-Kaniksu Connections Trail Project ("Project") as a partnership to advance the Tribe's and the Forest Service's shared interest in ecosystem restoration, forest health, and hazardous fuels reduction on National Forest lands adjacent to the Kalispel Indian Reservation.[1] The Washington State Department of Natural Resources ("DNR") later entered into an agreement with the Forest Service to assist with development and analysis of the Project given DNR's management of state land both within and near the Project boundary. The Tribe, along with the Forest Service and DNR, served on the interdisciplinary team that developed the Project with input from county leaders, members of the public, a local collaborative group (Northeast Washington Forest Coalition), other local Tribes, and other interest groups.

Plaintiff seeks to halt the Project based on speculative concerns that find no footing in the Administrative Record. First, Plaintiff is wrong that the National Environmental Policy Act ("NEPA") requires additional analysis regarding how the Project will impact Canada lynx, grizzly bear, and the northern goshawk—the Project area is not in a primary habitat zone for the lynx or grizzly bear, and the Project NEPA document, an

---

[1] Sxʷuytn roughly translates to "connection" or "trail" in the Kalispel Salish language.

Environmental Assessment ("EA"), thoroughly analyzes the minimal impacts the Project may have on the three species. Second, Plaintiff's attack on the Project's condition-based management approach has already been rejected by this Court in *N. Cascades Conservation Council v. United States Forest Serv.,* No. 2:22-CV-00293-SAB, 2024 WL 188374, at *7 (E.D. Wash. Jan. 17, 2024), and Plaintiff provides no good reason to depart from the Court's reasoned judgment on that issue. Third, the road-related activities authorized under the Project comply with NEPA and the National Forest Management Act ("NFMA") because they result in *fewer* roads on the landscape, and the EA accurately discloses and analyzes the impacts of these activities. Fourth, Plaintiff is wrong in alleging that the Forest Service has disregarded this Court's ruling in *Kettle Range Conversation Group v. U.S. Forest Serv.* (*Sanpoil*), No. 2:21-cv-00161-SAB, 2023 WL 4112930 (E.D. Wash. June 21, 2023). Last, Plaintiff's argument that its concerns require preparation of an Environmental Impact Statement ("EIS") is meritless.

## **FACTUAL BACKGROUND**

The Project is located on the Colville National Forest in northeastern Washington. The forested lands in the Project area are uniformly dominated by dense forest conditions and shade-tolerant species (species that are intolerant of fire and drought). AR00857, AR00881.[2] Historically, the Project area contained more open forests with large patches of younger and smaller trees and widely distributed large, old trees of fire- and drought-resistant species. *Id*. As fire suppression increased in the twentieth century, trees of fire-

---

[2] Defendants lodged the Administrative Record on October 25, 2024.  ECF No. 14. Citations to the Record are denoted as AR[Bates Page Number].

intolerant species began to dominate, creating a forest that is not resilient to wildfire, drought, insects, and disease. *Id*. The Project is designed to move the Forest toward historical conditions for tree size, density, and tree species (the historic range of variability or "HRV"). AR00857-58. The practical importance of mitigating wildfire risk by restoring historical conditions is underscored by the fact that the Project area falls within the Wildland Urban Interface, where risk of fire damage is higher given the proximity between forested land and communities or structures. AR00883.

To achieve these purposes, the Project authorizes, over twenty years, approximately 24,400 acres of commercial timber harvest and 45,400 acres of non-commercial restoration activities (including removal of saplings, shrubs, and other fuels, and prescribed burning). AR01216-17, AR00862-67. The commercial and non-commercial treatments overlap in some areas and result in a total of 36,400 acres of treatment. AR00862. The Project also authorizes other activities, including culvert replacement or removal, non-motorized trail creation, wetlands restoration, and road decommissioning. AR00862-67.

The Project was developed through an exhaustive public process. Between November 2018 and September 2019, the Forest held six public workshops and a field visit. AR01266. In early 2020, the Forest Service held a NEPA public scoping comment period, which included three additional public meetings. *Id*. When the Forest Service issued the Draft EA in Fall 2020, AR00384, it provided another 30-day public comment period and two more public meetings. AR01266. After considering public input, the Forest Service issued the Final EA and Draft Decision Notice and Finding of No Significant Impact ("DN/FONSI") for the Project in December 2020, AR00848, followed

by a 45-day administrative objection period. AR01266. After resolving administrative objections, the Forest Service issued the Final DN/FONSI authorizing the Project in May 2021. AR01270. The Forest Service has since laid out, advertised for bid, and contracted with purchasers for three timber sales under the Project.

In June 2023, this Court vacated a guideline in the Colville Forest Plan regarding harvest of large trees. *Sanpoil*, No. 2:21-cv-00161-SAB, 2023 WL 4112930. As a result, Forest Plan direction for the harvest of large trees on the Forest reverted to portions of a Forest Plan Amendment from 1995 (the "Eastside Screens") that prohibits harvest of trees over 21 inches in diameter in certain contexts and prevents all harvest within late and old structure ("LOS") stands in certain contexts. AR04296. In response, the Forest Service completed a Supplemental Information Report ("SIR") to determine if and how application of relevant portions of the Eastside Screens would change the effects analysis in the Final EA and DN/FONSI for the Project. AR04296-309. The agency concluded that the changed direction did not result in impacts beyond those considered in the EA, and thus supplemental NEPA was not required. AR04301.

On May 13, 2024, Plaintiff filed suit alleging seven violations of NEPA (Claims One, Three, Four, Five, Six, Seven, and Eight, Compl. ¶¶ 296-307, 326-79, ECF No. 1) and two violations of NFMA (Claims Two and Eight, Compl. ¶¶ 308-25, 373-79).[3]

## LEGAL BACKGROUND

**I.    NEPA**

NEPA is a procedural statute, requiring an agency to take a "hard look" at the

---

[3] Plaintiff has waived Claim Eight.  *See* Pl.'s Mot. for Summ. J. ("Pl.'s Br.") 40, n.2 ("Plaintiff is not seeking summary judgment on Claim 8"), ECF No. 24.

potential environmental consequences of its proposed actions, but it does not require the agency to adopt any specific substantive outcome. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). Under NEPA, federal agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. 4332(2)(C). To determine whether an action requires an EIS, the agency may prepare an EA. 36 C.F.R. § 220.7(a). An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted. *Id*. "If the agency concludes there is no significant effect associated with the proposed project, it may issue a FONSI in lieu of preparing an EIS." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006) (citation omitted).

## II.     NFMA

"NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The Forest Service first develops a forest plan containing "broad, long-term plans and objectives for the entire forest." *Id*. The agency then implements the forest plan through site-specific projects that must be consistent with the plan. *Id*. "[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Id*.

## STANDARD OF REVIEW

Challenges to agency compliance with NEPA and NFMA are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *Lands Council v. McNair*,

537 F.3d 981, 987 (9th Cir. 2008). Under the APA, an agency's decision may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). This standard of review is highly deferential, and an agency decision "will only be overturned if the agency committed a clear error in judgment." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114-15 (9th Cir. 2000) (quotation omitted), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). The court's task is simply "to insure a fully formed and well-considered decision, not necessarily a decision [the court] would have reached had [it] been [a member] of the decisionmaking unit of the agency." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978).

## ARGUMENT

The Court should deny Plaintiff's Motion for Summary Judgment and grant Defendants' Cross Motion for Summary Judgment because the Sxʷuytn-Kaniksu Project is well-fitted to satisfy forest health needs while safeguarding vulnerable resources like large trees and sensitive wildlife species. The Project's condition-based management approach allows it to be nimble over time and respond to changing needs on the Forest. However, as explained below, this flexible approach does not sacrifice an honest environmental impacts evaluation or the protection of important forest resources under NEPA, NFMA, and the APA.

## I.    The Forest Service updated the Project area's lynx habitat map consistent with NEPA (Claims One and Four).

Plaintiff argues in Claim One that the Forest Service was required to prepare a NEPA analysis for the agency's 2020 update of the lynx habitat map for the Colville

National Forest, and Plaintiff argues in Claim Four that, because the agency did not prepare a NEPA analysis on the map update, the Project EA's reference to the update constituted unlawful tiering under NEPA. Compl. ¶¶ 296-307, 339-45; Pl.'s Br. 7-11. As explained below, Plaintiff's arguments fail because Plaintiff incorrectly assumes that the Project area overlaps with lynx core habitat. It does not.

### A.    The Forest Plan has different direction for lynx core habitat and lynx secondary / peripheral habitat.

Lynx management direction on the Colville is provided by the 2019 Forest Plan, AR16485-734, and this direction was informed by the 2013 Canada Lynx Conservation Assessment and Strategy ("LCAS"), AR05786-918, which is the best available science on lynx recovery, AR06069.[4] The LCAS recommendations become mandatory direction only when they are incorporated into a Forest Plan. AR05878-79. The LCAS recommends conservation measures for lynx based on whether the activity is in a "core" area or a "secondary/peripheral area." AR05877-86. Core areas are places where long-term persistence of lynx and recent evidence of reproduction have been documented. AR05877. Secondary and peripheral areas are areas that cannot support home ranges or reproduction of lynx over time but may support temporary dispersal or exploratory movements. AR05877-78.

In core areas, the LCAS recommends delineating Lynx Analysis Units ("LAU"), AR05879, which approximate the size of a female lynx annual home range, AR05915. The LCAS recommends 34 conservation measures for core areas. AR05879-85. The

---

[4] Plaintiff mistakenly quotes from a 2000 edition of the LCAS (AR05281-413) rather than the 2013 edition (AR05786-918). *See* Pl.'s Br. 8-9.

LCAS contains only two conservation measures for secondary/peripheral habitat: the first recommends providing a mosaic of forest structure that includes early successional stands as well as mature multi-story stands and counsels that vegetation treatments should be designed with the HRV in mind. AR0886. The second recommends designing vegetative treatments to include young, densely-stocked regenerating stands in the mosaic for snowshoe hare (lynx prey) production areas. *Id*. The LCAS also says, "[i]t is not necessary to delineate LAUs in secondary/peripheral areas." *Id*.

The 2019 Forest Plan incorporates the LCAS's conservation standards for core areas, but only within the Kettle-Wedge Lynx *Core* Area. AR16560-61; *see, e.g.*, AR16560 ("FW-STD-WL-02. Canada Lynx – Vegetation Management within the Kettle-Wedge Lynx Core Area"). But the Forest Plan does not extend those standards to secondary/peripheral habitat. AR16560-61.

The Project area only includes secondary habitat in the Selkirk Mountains, and does not include any acreage in the Kettle-Wedge Core area. AR01006 (explaining that the Project area is wholly within the Selkirk Mountains secondary habitat area), AR06321 (a map with the core areas and secondary area).

## B.     The Forest Service used better data to update its lynx habitat maps in 2020.

Before the 2013 LCAS, the Forest Service produced a rough map in 1993 delineating LAUs on the Colville. AR06319. Lynx habitat maps are meant to identify types of forest, also known as potential vegetation types, that could serve as lynx habitat. In the Selkirk Mountains where the Project area is located, this means Subalpine fir/Engelmann spruce and Western redcedar/Western hemlock vegetation types. *Id*. However, in 1993, the Forest Service's vegetation type map of the Forest was coarse and

inaccurate, so the agency used elevation as a rough proxy for vegetation type. *Id*. The Forest Service simply delineated all Forest lands above a certain elevation line as LAUs, with minimal adjustment where vegetation data was available. *Id*. In 2012, the Forest Service refined and corrected its existing vegetation type map, collecting data at hundreds of plots on the Forest. AR06320. When comparing the new vegetation type map with the 1993 lynx maps, the Forest Service found that many mapped LAUs "contained only small islands of suitable habitat for lynx," while others "excluded some areas of adjacent suitable habitat." *Id*. The next year, the 2013 LCAS was issued, which instructed the Forest Service to treat core and secondary/peripheral areas differently, AR05876, and also "encourage[d] updating maps . . . [w]here new vegetation databases will improve identification of lynx habitat." AR05877.

Implementing this guidance from the LCAS, the Forest Service updated its lynx habitat maps in 2020 using the more accurate vegetation type map from 2012. AR06319. Following the LCAS guidance not to delineate LAUs in secondary or peripheral areas, the 2020 map did not delineate LAUs in the Selkirk Mountains secondary area where the Project is located. AR06322. Instead, the Forest Service identified "mapped lynx range" in the Selkirk Mountains, which includes the primary vegetation types mentioned above (Subalpine fir/Engelmann spruce and Western redcedar/Western hemlock) and some adjacent land to allow for connectivity. AR06322, AR06324, AR05886 (the LCAS recommending maintenance of landscape connectivity between areas of primary vegetation in secondary areas); AR06327 (map identifying 2020 mapped lynx range in the Selkirk Mountain secondary area overlaid with vegetation types). The Project EA uses the mapped lynx range from the 2020 map update to measure the Project's impacts

to lynx. AR00912-14.

## C.    The 2020 map updates are not a major federal action requiring NEPA analysis.

Plaintiff argues that the Forest Service's 2020 updates to the lynx map were a major federal action requiring NEPA analysis. Pl.'s Br. 8-11. Not so. The 2020 updates did not change any lynx standards or guidelines applicable to the Selkirk Mountains secondary area where the Project is located.

Plaintiff claims that the LAUs formerly in the Selkirk Mountains secondary area provided protections that the 2020 map updates removed, *id.* at 9, but this is incorrect. The protections that Plaintiff alleges the map updates removed are the five standards from the Forest Plan (FQ-STD-WL-02-06) applicable to *core* areas. AR16560-61 (setting forth the five standards, with each specifying that they apply within the Kettle-Wedge Lynx Core Area). Because the Project area is wholly within a secondary area and not a core area, the Forest Plan lynx standards in the Project area were not changed as a result of the 2020 map updates. Plaintiff's real concern appears to be with the Forest Plan's and the LCAS's distinction between core and secondary habitat rather than the 2020 map updates. But neither the Forest Plan nor the LCAS are challenged here.

Plaintiff suggests that the 2020 updates' removal of LAUs from the Project area violates NEPA because, as a result, the Project EA could not measure impacts to lynx at the LAU scale. Pl.'s Br. 9. But Plaintiff identifies no meaningful difference between an analysis completed at the LAU scale and the analysis the Forest Service prepared here at the mapped lynx range scale. AR00912-14; *see also Wildwest Inst. v. Bull*, 547 F.3d 1162, 1173 (9th Cir. 2008) ("Agencies have discretion to determine the physical scope used for measuring environmental impacts so long as they do not act arbitrarily and their

choice of analysis scale . . . represent[s] a reasoned decision." (quotation marks and citations omitted)). The LCAS counsels that LAUs need not be delineated in secondary habitat, AR0886, and the Forest Plan explicitly states that its lynx management direction was developed using the LCAS, AR16555. Again, Plaintiff's complaint appears to be with the Forest Plan and the LCAS, not the map updates.

The cases Plaintiff references are inapposite here because, unlike the Project at issue, the map updates in those cases changed what lynx standards applied to the project area. For example, the courts in *Greater Red Lodge II* and *Davey* ruled that remapping of lynx habitat was a major federal action requiring NEPA because remapping in those cases meant removal of lynx-protective standards from the project area. *All. for the Wild Rockies v. U.S. Forest Serv.* (*Great Red Lodge II*), No. CV 21-84-M-DLC, 2023 WL 5427921, at *7 (D. Mont. Aug. 23, 2023) ("The court's focus in *Davey* was on the removal of [forest plan] protections for previously protected areas, which is what happened here as well."). Similarly, in *Forsgren*, the court found that the map updates were a major federal action because they decreased protection for the lynx by eliminating protected habitat from the map. *Or. Nat. Res. Council Fund v. Forsgren*, 252 F. Supp. 2d 1088, 1105 (D. Or. 2003). In the last case Plaintiff references, which is merely a preliminary injunction order, the Court again emphasized the removal of land within the project area from forest plan lynx protections. *Yellowstone to Uintas Connection v. Marten*, No. CV 24-0025, 2024 WL 3400524, at *5 (D. Mont. July 12, 2024) (unpublished). Conversely, the map updates here did not remove the application of Forest Plan standards or guidelines to the Project area because the Forest Plan does not contain any lynx standards or guidelines for the Selkirk Mountains secondary area where the

Project area is located.

Last, Plaintiff's argument that the Project EA improperly tiers to the 2020 map updates fails. In *Greater Red Lodge* and *Davey*, the Court found that the project NEPA analysis inappropriately tiered to the map updates because "[w]ithout the adoption of the [revised] map . . . the [p]roject area would have been subject to the restrictions contained in the [forest plan]." *Greater Red Lodge II*, 2023 WL 5427921, at *6 (quoting *Native Ecosystems Council v. U.S. Forest Serv. ex rel. Davey* (*Davey*), 866 F. Supp. 2d 1209, 1225 (D. Idaho 2012)). Here, because the map updates did not remove any restrictions from the Project area, the Project EA did not tier to the map updates. As demonstrated in the EA, the Forest Service engaged in extensive data collection and mapping of lynx habitat in the Project area rather than relying on, or tiering to, the habitat maps alone. AR00912.

Contrary to Plaintiff's arguments, the Project will benefit lynx. For instance, the Project's commercial thinning will result in a more robust understory in the short- to mid-term, providing additional concealing cover for lynx. AR00912. Further, areas of timber harvest and burns authorized by the Project will provide summer forage for lynx prey species, and winter forage in the longer term. AR00912-13. And, in multi-storied forest stands, the Project includes construction of up to ten log "jackpots" to attract lynx for use as resting or den sites. AR00913.

Last, Plaintiff improperly asks the Court to reverse the lynx map updates and enjoin the Forest Service from using these maps in analysis for *other* projects.  Pl.'s Br. 11.  The Ninth Circuit has held that agency actions cannot be challenged facially if they "neither propose any site-specific activity" nor "call for specific actions directly

impacting the physical environment," because, until incorporated into a specific agency action, the challenged action is "more akin to research, development, and information-gathering." *Northcoast Env't Ctr. v. Glickman*, 236 F.3d 660, 667, 670 (9th Cir. 1998). The Court in *Greater Red Lodge II* specifically likened the agency action at issue in *Glickman* to lynx map updates. 2023 WL 5427921, at *6. Further, Plaintiff is without standing to mount a facial challenge to the updates because Plaintiff's alleged injuries are merely "conjectural and hypothetical" in the absence of a challenge to a project that will occur in a lynx core area. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

In sum, the Court should grant summary judgment to Defendants on Claims One and Four because the 2020 lynx map updates did not change Forest Plan standards for secondary/peripheral lynx habitat and thus were not a major federal action requiring NEPA analysis.

## II.     Condition-based Management complies with NEPA (Claim Three).

Plaintiff derides the condition-based management approach adopted for the Sxʷuytn-Kaniksu Project as vague and noncommittal, claiming the Project EA does not satisfy the Forest Service's NEPA obligation to provide site-specific analysis and allow for public participation. Pl.'s Br. 11-18. To the contrary, the Record shows a robust, data-driven approach that fully complies with NEPA's procedural requirements while enabling the agency to ensure treatments are applied in a manner and location that moves the Forest toward the desired conditions.

### A.     Condition-based Management

Condition-based management is a "flexible toolbox" approach to forest management, which allows the Forest Service to react to the dynamic nature of forest ecosystems by identifying specific treatments that may be used when previously

identified on-the-ground conditions are present within pre-defined areas. AR01214, AR00878. Before implementing any specific treatment, the agency conducts additional on-the-ground silvicultural reconnaissance to ensure treatments are aligned with current conditions and that they will move the forest toward desired conditions. *Id.*

Courts—including this one—have affirmed that the Forest Service's use of condition-based management is consistent with NEPA. For example, in *N. Cascades Conservation Council,* No. 2:22-CV-00293-SAB, 2024 WL 188374, at *7, this Court found the Forest Service's analysis and authorization of a condition-based management project that disclosed the areas where treatments were authorized, and the specific criteria for applying those treatments, satisfied the agency's NEPA obligations. Similarly, in *WildEarth Guardians v. Conner,* 920 F.3d 1245 (10th Cir. 2019), the Tenth Circuit affirmed the use of a condition-based approach, holding that an agency is *not* required to identify the exact locations of treatments in dynamic projects intended to respond to on-the-ground changes. *Id.* at 1258.

**B.    The Sxʷuytn-Kaniksu Project properly employs condition-based management.**

For the Sxʷuytn-Kaniksu Project, the Forest Service properly utilized a condition-based approach. The agency first comprehensively evaluated and documented stand conditions in the Project area, utilizing Light Detection and Ranging ("LiDAR"), aerial photos, reconnaissance, structure data from stand exams and past activities, sampling, modeling, observations, project field trips, and a landscape evaluation. AR00877, AR01214-16. This comprehensive analysis allowed the agency to estimate the acreage of specific treatments needed in the Project area. AR01214. The agency then identified a suite of vegetation management treatments (Commercial Thinning, Shelterwood with

Reserves, etc.) and developed "Decision Points" to guide which specific treatments are appropriate given on-the-ground conditions. *See* AR01216-18 (defining Decision Points for each of six vegetation treatments). Before implementing a treatment on the ground, the Forest Service conducts additional silvicultural reconnaissance to verify the treatment matches on-the-ground conditions and will lead to the desired conditions, and applies relevant standard practices and design elements to each unit. *Id.*, AR00867. In this manner, condition-based management provides more informed decision-making, as the Forest Service conducts multiple rounds of data collection prior to implementation.

To satisfy its NEPA burden to take a hard look at the environmental effects of the Project, while also accounting for the flexible nature of condition-based management, the Forest Service clearly defined the areas subject to treatment, the conditions under which they would be treated, and then assumed—in order to conservatively disclose and analyze the effects—that each authorized treatment would be applied to a maximum number of acres. AR00862-00867, AR00895-896, AR01209-01212*; see also* AR12339 ("These vegetation treatment estimates represent the maximum number of acres that may be treated, but the actual number of acres treated will likely be lower."). The Forest Service used these maximum treatment acreages to analyze effects on a variety of vegetation types, including Douglas-fir, Ponderosa Pine, and Rocky Mountain Mixed Conifer. AR01237-47. The Forest Service also considered impacts on multiple spatial scales, analyzing forest conditions at the stand level, landscape level, and watershed level; and multiple temporal scales, analyzing treatments' effects in the short term (1-10 years) and long term (11-50 years). AR01219. The Forest Service provided maps showing the site-specific proposed treatment areas for commercial and non-commercial activities, and

summary tables of the proposed treatments within those categories. AR00341-43, AR00398-403. The calculation and disclosure of maximum potential effects allowed the Forest Service to take a hard look at the Project's effects in the EA on various resources and provided the public with sufficient environmental information to weigh in and inform the agency decision making process, as NEPA requires. AR00421-65; *See WildEarth Guardians v. Conner*, 920 F.3d at 1258 (holding that the Forest Service properly accounted for uncertainty about treatment locations by assuming all areas were treated); *N. Cascades Conservation Council,* No. 2:22-CV-00293-SAB, 2024 WL 188374, at *5-6 (upholding similar condition-based NEPA analysis); *W. Watersheds Project v. U.S. Dep't of the Interior*, No. 223CV00435CDSDJA, 2023 WL 6880397, at *4 (D. Nev. Oct. 18, 2023) (holding an EA describing the maximum number of acres to be treated satisfied NEPA's hard look requirement).

### C.    Plaintiff's critique of the condition-based management approach is unavailing.

Plaintiff contends that the Project EA is vague, devoid of specifics, and programmatic. Pl.'s Br. 12-13. Plaintiff is wrong. As explained above, the Forest Service used a narrowly-tailored, data-backed approach to decide the site-specific treatments that would take place within the Project area. For example, non-commercial treatments like mechanical piling, mastication, and pile burning are authorized to occur on up to 9,200 acres of the 40,300-acre Project area within two years of harvesting a commercial unit. AR01211-12, AR00935-37. The Forest Service mapped where these treatments could occur, established the Decision Point parameters that govern when the treatments would be used, and addressed the impacts of the treatments. AR01245-48, AR01218. The Project EA and the supporting Administrative Record provide more than sufficient

1

2    information to inform agency decision making and the public.

3        Plaintiff contends the EA does not show specific locations, timing for the planned

4    treatment activities, or details regarding how different species' habitats would be

5    affected. Pl.'s Br. 13. But the EA provided maps showing locations of the proposed

6    Project treatments in Appendix A and explained Project treatments' impacts to wildlife.

7    AR00862, AR00935-37, AR00903-20. The Silviculture and Fuels Resource Report,

8    incorporated into the EA by reference, also provides timing for the planned treatment

9    activities, and the Wildlife Specialist Report provides more in-depth analysis on Project

10   treatments' effects on species' habitat. AR00876, AR01216-18, AR01058-108. NEPA

11   does not require more. *See N. Cascades Conservation Council*, 2024 WL 188374 at 7

12   (holding that condition-based project EA satisfied NEPA specificity requirements by

13   providing maps of the proposed treatment areas and anticipated timing of treatments);

14   *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1125-26 (D. Mont. 2013)

15   (finding the Forest Service did not have to identify specifically where precommercial

16   thinning would take place within fifty-foot stream buffers, given that it had provided

17   maps showing the overall boundaries of the proposed activity).

18       Plaintiff portrays the Project as consisting of only clearcutting and intensive

19   logging, but the Project authorizes a series of prescriptions tailored to meet the Project's

20   goals and achieve the Forest Plan's desired conditions. Pl.'s Br. 13-14. The Shelterwood

21   with Reserves treatment retains 12 or more trees per acre and results in two age classes of

22   trees. AR01210, AR01238. The Group Selection treatment creates openings less than 3

23   acres in size within a matrix of thinned forest, resulting in multiple age classes of trees.

24   AR01210. The Project uses both treatments to stimulate regeneration of desired species.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AR00863, AR01210. The Project describes commercial thinning as leaving dominant (the largest) trees with generally 40% or higher canopy cover. AR01209. This reflects a light thinning approach, not intensive logging. AR08904-05.

Plaintiff claims the Project's lack of detail is shown in a disparity in the Record regarding timber production estimates and the timing of treatment activities. Pl.'s Br. 16. Timber harvest production is an estimate from treatment activities. AR00648. The Economic Analysis Report presented a best estimate of costs, while the Silviculture Report analyzed the Project's effects on forest vegetation. AR00648, AR01207. The reports analyzed treatment activities differently based on the each report's purpose, producing different timber harvest estimates. AR00648-49, AR01207-1209. The difference in timber harvest production between the reports had no impact on the Forest Service's effects analysis. Plaintiff claims treatments could occur anytime over the next two decades, and the same areas might be revisited for commercial harvesting. Pl.'s Br. 16. The EA does not state or authorize the Forest Service revisiting the same areas for commercial harvesting. AR00862. Further, the Forest Service based its long term recreation impacts analysis on a ten- to twenty-year period because ten years is the length of the standard timber sale contract, AR00922, and because the Project authorizes treatment activities for a twenty-year period, it was a reasonable decision to analyze longer term recreation impacts in the ten-twenty year period. AR01216-17, AR01219.

As for Plaintiff's contention that different logging types might overlap on an indeterminate number of acres, the Forest Service explained in the EA that non-commercial treatment activities might occur in the same area as commercial harvest, or multiple non-commercial treatments might overlap. Pl.'s Br. 14; AR00862. For example,

there is a possibility that the removal of small, damaged trees may need to occur in a commercially-thinned treatment area to reach desired conditions. AR00862-864. However, no commercial treatments under the Project would overlap. AR00862-63.

Plaintiff mischaracterizes the Decision Points in arguing that they are broad and meaningless, speculating that the Forest Service may apply a 40-acre clearcut in goshawk habitat anywhere there is an undesirable tree species. Pl.'s Br. 14-15. But the Decision Point Plaintiff references is only *one* Decision Point the Forest Service would consider when deciding whether stand conditions on the ground justify the shelterwood-with-reserves treatment to move stands toward the HRV. AR01217. Further, at least two of a treatment's Decision Points must be met before implementing the treatment. *Id.* ("*some or all*" of the Decision Points must be met before a treatment is authorized. (emphasis added)). Plaintiff also fails to mention that Project design elements and standard practices further restrain treatment activity. AR01217, AR00867-874, AR00938-51. For example, a design element requires that within mapped primary goshawk habitat, vegetation treatments would only occur as necessary to maintain desired habitat conditions in harvest units, as determined by the wildlife biologist. AR00873. Another example is a standard practice that requires harvest in Riparian Management Areas ("RMAs") to protect all hardwood trees and larges shrubs and minimize damage to hardwoods immediately adjacent to conifer trees identified for removal, with limited removal of dominant and co-dominant conifers in the overstory canopy in the RMA. AR00938. These detailed Decision Points and design criteria provide sufficient detail for the Project and its effects. *N. Cascades Conservation Council*, 2024 WL 188374, at *7.

Plaintiff claims that the EA is vague about treatment results, emphasizing the

Forest Service's disclosure that "[f]or commercial thinning, 'it is estimated that 50% of stands would retain a canopy cover of 40% or more immediately following commercial thinning treatment, though *some may be lower*.'" Pl.'s Br. 15 (emphasis in Plaintiff's brief). But variability of canopy cover is an objective within the Purpose and Need Statement and a desired attribute in the Forest Plan, and variable density thinning is encouraged by the Forest Plan. AR00857, AR16533, AR16677. Scientific research supports the idea that stand variability helps to restore forest resilience. AR15082, AR11649. While Plaintiff might prefer strictly-defined canopy covers in all circumstances, the variability in canopy cover expected for mid-open stands, a canopy cover of 10% or more and less than 40%, would allow stands to move from mid-open to mid-closed over time as the trees grow larger and would help many of the stands grow into late-closed. AR01221, AR00887. The EA plainly discloses: "[S]tand density would not be uniform within treatment areas. Thinning in dense stands . . . may result in 'variable density thinning.'" *Id*. The EA shows there would be some uniform and some variable areas of density and canopy cover; the variability is a result of working with the natural stand conditions. AR00887, AR01238. This forthright disclosure is all NEPA requires.

Plaintiff claims that the EA does not limit the destruction of old growth trees and late and old structure ("LOS") forest. Pl.'s Br. 15. Treatment does not equate to destruction. Scientific studies show that restoration activities reduce the vulnerability of wildlife habitats and uncharacteristic disturbances (like high severity wildfire) for LOS forest. AR11633-59, AR10106-136, AR10835-939, AR12047-168, AR12278-333, AR08529-57, AR08558-607, AR08900-36. The Project EA and the Wildlife Specialist

Report thoroughly analyzed impacts to LOS and associated habitat and found that those impacts would be minimal and consistent with the Forest Plan. AR00886-91, AR01051-52, AR01077-79, AR01088-90, AR01106, AR16557-58.

Plaintiff contends that the Project's condition-based management approach violated NEPA by preventing meaningful public participation. Pl.'s Br. 16-17. This claim is belied by the record, which is full of extensive public participation and collaboration on the Project. The Forest Service engaged with Plaintiff,[5] the Kalispel Tribe, AR04557, AR04601, AR04603, and other community partners, not to mention conducted field trips, AR02074, public meetings, AR01778, AR01872, AR01899, AR01932, AR02000, AR02034, AR02747, AR02762, and sent email communications sharing Project developments, AR12535, AR12548, AR02040.

The case law proffered by Plaintiff is inapposite. Unlike *Idaho State Snowmobile Association,* No. 1:19-cv-00195-DCN, 2021 U.S. Dist. LEXIS 25886, at *40 (D. Idaho Feb. 10, 2021), where the court found the Forest Service relied on dated and minimal data to support its conclusions regarding which species were within the project area, the Forest Service here provided robust evidence of conditions on the ground, and that data will be verified by on-the-ground reconnaissance before implementation of each timber sale under the Project. AR00879-98, AR01220-48. And, unlike *Northern Plains Resource Council, Inc. v. Surface Transportation Board*, 668 F.3d 1067, 1084 (9th Cir. 2011) and *Wildlands v. Adcock,* No. 6:22-cv- 01344-MK, 2024 U.S. Dist. LEXIS 206308, at *20

---

[5] AR02486-561, AR02821-905, AR02906-30, AR02931-3018, AR03277-613, AR03614-4080, AR04082-102, AR04103-29, AR4289-92, AR12373-76, AR12382-402.

(D. Or. Apr. 10, 2024), where courts faulted the agencies for failing to adequately display site-specific impacts, the Forest Service here conducted extensive field surveys and conservatively disclosed impact, based on a "worst case" assumption that the maximum possible acreage would be treated. AR01209-12; AR00341-43, AR00877-85, AR01061-63, AR00912, AR01219-31, AR12303, AR12311.

In sum, the Forest Service followed the approach to NEPA upheld by this Court in *North Cascades Conservation Council*, 2024 WL 188374, at *7. Here, as there, the agency disclosed the project area, identified and mapped where treatment activities were authorized, identified specific prescriptions ("harvest treatment details") that applied to each activity, explained the anticipated timing of implementation, and provided detailed decision criteria to be applied when ground conditions differed from expected conditions. AR00848-933, AR00935-37. And, as in *North Cascades Conservation Council,* the Forest Service here analyzed impacts based on the maximum acres for treatment, providing the public with the Project's maximum potential effects. AR00862-67. As with the project in *North Cascades Conservation Council,* the Court should uphold the agency's analysis here.

## III.    The Project's road improvement activities comply with NFMA and NEPA.

The Colville National Forest must have a safe and sustainable system of roads that provides access to respond to public and administrative needs, and is managed to respond to and balance social, ecological, and economic conditions. AR16569. To create this system, the Colville Forest Plan includes Forest-wide direction establishing desired conditions, objectives, standards, and guidelines to direct the development of the road system. AR16568-72. The Access System desired condition, FW-DC-AS-01, and the

Access System objective, FW-OBJ-AS-01, direct the Forest Service to provide access to a safe and sustainable road system, and to review and designate an average of one new off-highway vehicle route annually to connect communities to and through the Forest. AR00632, AR16569-70. The Forest Plan also established desired conditions for focused restoration of wildlife habitat related to roads, MA-DC-FR-02 and MA-DC-FR-05. AR00857-858, AR01103, AR16604-05. These desired conditions assure that roads function to provide aquatic habitat connectivity, contribute to the attainment of water quality standards, and are minimized in subwatersheds. AR16604-05. In developing the Project's road improvement activities, the Forest Service considered and adhered to each of these Forest Plan desired components. AR16569-71.

## A.    The Project's road improvements are consistent with the Forest Plan.

To analyze the road system within the Project area, the Forest Service completed a Transportation Report. AR00628-44. The Transportation Report evaluated current road conditions and identified the minimum road system needed for safe and efficient travel for administration, use, and protection of National Forest System lands. AR00641-42, AR 05170-71. The Project area's road system has a range of conditions, with varied road reconstruction and road maintenance needs. AR00636-37. The Project proposes to construct 6 miles of new roads, construct 51 miles of new temporary roads, reconstruct up to 292 miles of roads, decommission 51 miles of roads, convert 3 miles of existing roads to non-motorized trails, and close 2 miles of existing roads to non-administrative use. AR00866-67.

The Project's road improvement activities are consistent with Forest Plan desired condition, FW-DC-AS-01, and objective, FW-OBJ-AS-01. AR01659-570. The Project's road reconstruction and road maintenance includes the rebuilding of fill slopes, heavy re-

grading, aggregate surfacing, roadside brushing, culvert replacements, restoring natural drainage features, and possibly installing new ditch-relief culverts that are in poor condition. AR00637. The Project will bring all the Project's Maintenance Level 1 roads to the appropriate standard. AR00638. The Trail Project improves the transportation access system, makes roads safe and sustainable, responds to administrative and public needs, and moves the area closer to being actively managed to respond to and balance changing social, ecological, and economic conditions. AR00641-42.

The Project's road closure and decommissioning activities lower the overall road density, aligning with the Forest Plan's road density goals, MA-DC-FR-02 and MA-DC-FR-05. AR00857-58, AR00861, AR16604-05. Road density is the measure of miles of Forest Service roads per square mile. AR00638. The Project's restoration activities will decommission 51 miles of National Forest System roads and convert 3 miles of existing roads to trails, which will reduce road density, restore watershed and fish habitat conditions, and benefit other wildlife habitats. AR00637, AR00641. The EA explains that full road density reduction to the Forest Plan's desired conditions levels would negatively affect access for residential owners within the National Forest and reduce public access to recreational opportunities. AR00861. The Project's road improvement activities comply with the management direction in the Colville Forest Plan and thus comply with NFMA.

The Forest Plan desired condition MA-DC-FR-05 specifies that "there are no more than 1 mile of National Forest System road per square mile within the Focused Restoration Management Area within each subwatershed." AR16605. Plaintiff claims that the Forest Service did not calculate road density in focused restoration areas. Pl.'s Br. 19-20. To the contrary, the Aquatics Report contains that calculation. AR01121-1202.

The Aquatics Report includes Watershed Condition Framework tables, which contain calculated road densities for CeeCee Ah and Exposure Creek, two focused restoration subwatersheds. AR01136, AR01159-60, AR01143, AR01170. Detailed within the Aquatics Report, the existing condition of road density for the CeeCee Ah Creek is 11.2 miles, AR01136, and for Exposure Creek, the road density is 7 miles. Project activities will reduce road density for CeeCee Ah Creek to 5.3 miles, AR01159, and reduce road density for Exposure Creek to 3.3 miles. AR01170.

While these densities are still higher than the Forest Plan desired condition in focused restoration areas, the Plan makes clear that desired conditions are aspirations and may be achievable only over an extended time. AR16511. Project activities should be designed to move the Forest toward the desired condition, but no particular project alone is required to achieve desired conditions. *Id*. The Plan further states that a project should "[m]aintain or make progress toward one or more of the desired conditions of a plan without adversely affecting progress toward, or maintenance of, other desired conditions." *Id.* Here, the Project's road treatment activities make progress toward reducing road density to the Plan's desired conditions without adversely affecting progress toward other desired conditions. The road treatment activities thus comport with Forest Plan guidance and comply with NFMA.

**B.** **The Forest Service complied with NEPA in analyzing the Project's road improvement impacts.**

An EA satisfies NEPA's hard-look mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). To analyze the Project's road improvement impacts, the Forest Service analyzed impacts

in the Transportation Report, AR00628-44, analyzed road impacts to species in the Biological Assessment, AR00739-76, the Biological Evaluation, AR00981-1033, and the Wildlife Specialist Report, AR001034-120, and analyzed roads impacts to aquatic resources in the Aquatic Report, AR01130-70. The Forest Service explained these impacts throughout the EA. AR00866-76, AR00913-26.

There are 292 miles of Forest Service system roads in the Project area, and all were identified as potentially needing to be reconstructed "as economics and feasibility allow." AR00641. The Project's authorized road reconstruction on Forest Service system roads may consist of any work beyond maintenance. AR00643. Road reconstruction efforts under the Project are unlikely to occur on all 292 miles of Forest Service system roads, as it is unlikely that reconstruction of all 292 miles will be necessary once the agency applies the relevant design elements and standard practices to each sale.

The Project's road improvements may result in: a short-term increase in turbidity levels in stream channels, the movement of woody debris to stream systems, and potential for short-term sediment increases. AR00636-37. However, the implementation of best management practices and the maintenance of existing structures will minimize any sediment increases and stream impacts. *Id*. The Forest Service's evaluation in the Aquatics and Wildlife Specialist Reports found that the Project's road improvement impacts will be minimal. AR 01148, AR01150, AR01158, AR01160, AR01166, AR01169, AR01178, AR01180, AR00904-05, AR00913-20, AR00925-26.

The Forest Service evaluated road construction, decommissioning activities, and open road density effects on wildlife. AR00901, AR00904-05, AR00915-18, AR01002, AR01010-13, AR01015-20, AR01105-08. The Forest Service identified and evaluated

species habitat, including habitat connectivity and seclusion, and provided design elements to ensure species connectivity. AR01000-04, AR01006-10, AR01015-20. The Wildlife Specialist Report acknowledged that "within road corridors animals are prone to disturbance from vehicle traffic," so, to minimize road disturbances, the Forest Service decided that "new roads constructed with the project and selected open roads would be closed to public use." AR01105, AR01107. The Forest Service also included a timing restriction to reduce the potential for disturbance to big game: "timber harvest and other project activities would be prohibited in units accessed by roads that are seasonally closed (December 1 to March 31) on the designated winter range." *Id.*

Temporary roads are not counted within the road density, as defined by 36 C.F.R. § 212.1. AR00643, AR00916. The EA analyzed temporary roads impacts, AR00867, AR00871-72, AR00916, AR00925-26, and the Biological Evaluation explained that, during Project implementation, public motorized travel would be prohibited by gates on all temporary roads. AR01018. Temporary roads will only be in used by the Forest Service or contractors during Project implementation and will be closed post-Project, so they will not contribute to open, drivable road density. *Id.* Temporary roads will be closed with native materials or by ripping up the road surface. *Id.*

The Forest Service took a hard look at the impacts of the Project's road treatment activities by considering and providing a thorough discussion of road reconstruction and maintenance, the creation of temporary roads, and the low potential of road closure breaches. The Forest Service complied with NEPA.

Plaintiff alleges the Forest Service failed to assess the impact of reconstructing up to 292 miles of road, minimized the potential adverse impacts of temporary roads, failed

to account for the impact of temporary roads on road density, will not properly monitor temporary roads, and has not ensured that road closure devices will be effective. Road reconstruction efforts under the Project are unlikely to occur on all 292 miles of Forest Service system roads once the agency applies the relevant design elements and standard practices to each sale.

Further, as previously detailed, the EA analyzed temporary road impacts, AR00867, AR00871-72, AR00916, AR00925-26. The Wildlife Specialist Report also provides effects of road maintenance and new road construction, AR01116, and the Biological Evaluation explained that, during Project implementation, public motorized travel on all temporary roads would be prohibited by gates. AR01018. As noted, temporary roads are not included in the road density calculation, as they will be closed after use. AR00643. Temporary roads will only be in used by the Forest Service or contractors and will be closed post-Project with native materials or by ripping up the road surface. AR01018. Based on experience, the Forest Service predicts that such native material road closures will achieve a high degree of closure effectiveness. AR01004.

Plaintiff claims this prediction of road closure effectiveness is arbitrary and capricious. Pl.'s Br. 21. But it is based on the Forest Service's deep experience in this arena and will also be confirmed by monitoring of all closure devices for five years post-Project. AR01004. Within this period, the Forest Service will periodically monitor and improve the closure as necessary. *Id*. This analysis follows best practices by spelling out assumptions and disclosing methodologies, more than satisfying the hard look standard.

Plaintiff claims that "the Service indicates that it expects to enter the same area for future treatments at 15-, 25-,30-, and 50-year intervals." Pl.'s Br. 21. This is a

misstatement. While the EA states that the Project stands likely would require another entry in about 15 to 25 years, the EA does not state that *this* Project will implement another entry in that timeframe. AR00886. So, while forest stands may need another treatment, those treatments are not authorized under the Trail Project and would have to undergo a new NEPA analysis.

Lastly, Plaintiff alleges that the Project is going to add road traffic by adding 4 miles of road and that the Project provides no detail about the reconstruction plans. Pl.'s Br. 18-19. The Forest Service is not adding a net 4 miles of road as Plaintiff suggests, but instead authorizes "up to 6 miles of new construction roads, along with 51 miles of decommissioned roads, which will result in a decrease of 45 miles of road within the project area." AR00642, AR00866-67. As temporary roads are closed after use, they do not contribute to road density and are not counted. AR00643, AR00741. The Transportation Report details the range of conditions and reconstruction needs for the road system within the Project area, including road reconstruction and road maintenance. AR00636-37. The Forest Service analyzed all 292 miles of National Forest Service Roads within the planning area, and all were identified as potentially needing maintenance or reconstruction, as economics and feasibility allow. AR00634-36; AR00641.  As explained above, road reconstruction is unlikely to be implemented on all 292 miles of roads within the Project area. The appraisal cost Plaintiff highlights shows that the Forest Service considered the maintenance and reconstruction work needed and plans to complete this work as economics and feasibility allow. *Id.*; Pl.'s Br. 19. The Forest Service complied with NEPA.

**IV.     The Forest Service took a hard look at the Project's impacts to wildlife (Claim Five).**

Contrary to Plaintiff's contentions, the Project EA demonstrates that the agency thoroughly analyzed and took a "hard look" at the Project's impacts to lynx, the grizzly bear, the goshawk, and wildlife diversity.

Under the "hard look" standard, agencies only need provide "a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain*, 137 F.3d at 1376 (cleaned up). Agencies are "entitled to wide discretion in assessing the scientific evidence, so long as [they] take[] a hard look at the issues and respond[] to reasonable opposing viewpoints." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003).

## A.    Lynx

The Forest Service took a hard look at the Project's impacts to lynx. As discussed above, the Forest Service produced a data-driven, accurate map of the lynx habitat throughout the Forest in 2020. Beyond this effort, the EA demonstrates that the Forest Service performed extensive, additional data collection in the field and through existing databases, AR00912, and created a detailed map of the Project area that shows mapped lynx range, and within it, which lands are foraging habitat, denning habitat, currently unsuitable habitat, and not lynx habitat (because they are not forested acres). AR01010. Using this technical information and its subject matter expertise, the agency found that Project activities will not negatively impact lynx because they will not be implemented in stands that are currently providing usable habitat. AR00912-13. In fact, the Forest Service found that Project activities will likely provide better concealing cover for dispersing lynx and improved forage for the lynx's prey, the snowshoe hare. *Id.*

The lynx portion of Plaintiff's hard look claim is critically flawed because it is primarily based on Plaintiff's misguided lynx map claim. As discussed above, under the

Forest Plan, the Selkirk Mountains secondary area where the Project is located was not "protected" by the old map's LAUs, *see supra* Section Argument I. A-B, so the 2020 map update's replacement of those LAUs with mapped lynx range was not the type of "significant aspect[] of probable environmental consequences" the agency needed to discuss under the hard look standard. *Neighbors of Cuddy Mountain*, 137 F.3d at 1376.

None of Plaintiff's additional attacks on the Forest Service's analysis of lynx impacts hold water. First, Plaintiff is critical of the agency's explanation that a large portion of the mapped lynx range was rendered unsuitable habitat by the 2015 Tower Fire. Pl.'s Br. 25. But the Forest Service's mapped lynx range is meant to capture potential habitat, not just areas that *currently* serve as habitat. AR06319. Contrary to Plaintiff's suggestion, this approach errs on the side of more thorough disclosure under NEPA because the agency is analyzing the Project's impacts to all potential habitat, which is a larger umbrella than current habitat.

Plaintiff also contends that the Project's commercial thinning in the lynx range will violate a Project design element meant to protect lynx. Pl.'s Br. 25. This design element urges that, on mapped lynx range, the Project maintain closed canopy, multi-storied timber stands and not create additional forest openings unless those stands are at imminent risk of tree mortality. AR00873. Consistent with that element, the Forest Service mapped multi-storied timber stands in the Project area, AR01010, and explicitly excluded these stands from *any* Project activities, AR00913. Likewise, the Forest Service has ensured compliance with the openings component of the design element by prohibiting any type of regeneration harvest—the only harvest that creates openings of meaningful size—in unsuitable habitat on the lynx range. *Id.*

Last, Plaintiff misleadingly quotes the Forest Service's response to a public comment to suggest that all thinning harvest and prescribed burning authorized under the Project will uniformly destroy snowshoe hare (a lynx prey species) habitat for 15-20+ years. Pl.'s Br. 26. Plaintiff omits that in the next sentence the Forest Service explained that "[h]owever, stand understories are likely to respond with robust new growth *within a few growing seasons*." AR03201 (emphasis added). Further, contrary to Plaintiff's claims, the agency provided an ample scientific basis for the Project's benefits to snowshoe hare habitat. AR00912 (the EA citing a scientific paper in support of the idea that recent harvest or burning can provide forage for snowshoe hare).

## B.    Grizzly Bear

Plaintiff claims that the Forest Service has failed to take a hard look at the Project's impacts to the grizzly bear, but this argument is based on gross exaggeration of the importance of the Project area for the grizzly bear and baseless speculation regarding the Project's road impacts. Pl.'s Br. 26-30.

Federal management direction for the grizzly bear generally focuses on two types of designated areas: the recovery zone and Bears Outside Recovery Zone ("BORZ"). The recovery zone is made up of all areas that currently contain either self-perpetuating or remnant populations of the grizzly bear; these are the areas where the U.S. Fish and Wildlife Service and land management agencies focus their recovery efforts. AR12834, AR00919. Within the recovery zone, Bear Management Units ("BMUs")—which approximate the range of a female grizzly bear—are delineated, which are used as a monitoring unit for grizzly bear habitat and population data. AR12834. BORZ are places where enough bear use has been documented to warrant some (lesser than the recovery

zone) level of management consideration for grizzly bears. AR00914. The Colville Forest Plan's mandatory standards for the grizzly bear apply only to BMUs in the recovery zone. *See, e.g.*, AR16561 (setting forth Standard FW-STD-WL-07, which applies road density limits and core habitat percentage minimums to the three BMUs on the Colville and Idaho Panhandle National Forests).

The EA explains that the Project—which is located entirely outside of BORZ and recovery zone BMUs—will have minimal impacts on the grizzly bear. AR00914-19. The Project's timber harvest and prescribed fire will improve growth of berries and other forage for bears. AR00914. Hiding cover might be decreased by the Project in the short term, but the Forest Service will maintain vegetative cover along roads to minimize this negative impact. AR00915. The Project is not expected to impact grizzly bear denning habitat, and the Forest Service has committed to various measures to limit disturbances to grizzly bear seclusion. AR00915-16. Last, the Project results in a net decrease of six miles of open motorized routes, and a 30-acre increase of roadless core habitat, again benefitting the grizzly bear by increasing seclusion. AR00916.

Plaintiff suggests that the Project area is crucial for recovery of the grizzly bear, but this premise finds no support in the Record. The Project is not within a recovery zone, AR00919, or BORZ area. AR00914. Instead, the Project area has seen occasional use by a handful of male grizzly bears. AR12755 (an email exchange and map depicting all grizzly bear location data for the past 15 years in the Project area and explaining that three specific bears are largely responsible for all detections in the Project area). Grizzly bear recovery benchmarks focus on female grizzly bears, not males. AR12837. Even so, the Project EA thoroughly analyzes the Project's impacts to the grizzly bear and finds

that it is not likely to adversely affect the species. AR00914-20.

Though conceding that many Forest Plan standards apply only to the recovery zone, Plaintiff inexplicably highlights a general wildlife desired condition and guideline from the Forest Plan to suggest that these Plan components require some sort of extra consideration for the grizzly bear under NEPA. They do not. NEPA is procedural. *Robertson*, 490 U.S. at 350 ("NEPA itself does not mandate particular results, but simply prescribes the necessary process."). Plaintiff does not allege a substantive violation under NFMA for this Forest Plan component. Plaintiff also highlights the importance of road density limitations in core grizzly bear habitat. Pl.'s Br. 28. But these limitations only apply to BMUs in the recovery zone, which is entirely outside the Project area. AR01015.

Plaintiff's other arguments regarding core habitat *adjacent* to the Project area are unavailing. The Forest Service acknowledges that new road construction under the Project will temporarily reduce core habitat in the adjacent LeClerc BMU, but not below the percentage of core habitat required by the Forest Plan. [6] AR03194. Plaintiff speculates that roads that are currently obliterated within the adjacent core habitat might actually be drivable, and thus the core percentage standard might be violated. Pl.'s Br. 29. But Plaintiff fails to explain why this speculative and unauthorized motorized use outside of the Project area must be analyzed in this Project's NEPA document. Even if analysis is so required for *confirmed* unauthorized use outside of the Project area, other courts have rejected plaintiffs' speculative, unsupported allegations of unauthorized motorized use in

---

[6] Though outside of the BMU, a Project road will temporarily decrease core habitat in the adjacent BMU because core habitat must have a 500-meter buffer of unroaded land. AR16556.

connection with grizzly bear NEPA claims. *See, e.g.*, *All. for the Wild Rockies v. Marten (Marten I)*, 464 F. Supp. 3d 1169, 1176 (D. Mont. 2020) (finding that "the mere possibility that planned road closures will be ineffective" does not render the agency's analysis arbitrary). Plaintiff also fails to mention that the new Project roads that will decrease core in the adjacent recovery zone are *temporary*—all new roads built under the Project will be kept closed to the public during their use and effectively closed following their use. AR00918.

Weaker still is Plaintiff's argument that the Forest Service did not adequately analyze a new road authorized by the Project on the eastern edge of the Project area. Pl.'s Br. 29. Plaintiff misleadingly omits language from the Project Biological Evaluation to imply that grizzly bear denning might be occurring in the area where the road is authorized, but no active grizzly bear dens have been documented in the entire Project area. AR01015. Plaintiff claims that the complete closure of this road to public use during the life of the Project, and the closure of the road with native materials post-Project, AR03202, does not address the impact that the road may have on denning habitat, but it is well established that less vehicle traffic and less foot traffic means that bears are less likely to be disturbed or displaced from habitat. AR01015 (Biological Evaluation). Further, Project activities would not occur during the denning period in the vicinity of the best potential den habitat on high elevation ridge systems, so the road would receive no traffic during any potential denning. AR01017.

Likewise, Plaintiff's arguments about hiding cover fall flat. Pl.'s Br. 29-30. Plaintiff claims that the roads authorized under the Project will degrade hiding cover, but Plaintiff does not contend with the Project's maintenance of strips or clumps of trees and

shrubs along open roads adjacent to created openings. AR00915. This practice would minimize adverse impacts to hiding cover by limiting line-of-sight distances from the road into the harvest unit. *Id*. Contrary to Plaintiff's assertions, post-Project, all new roads authorized under the Project will be closed with native materials, which is a closure method that has been successful at blocking unauthorized use by the public. AR03202. Per a Project Standard Practice, the Forest Service would then monitor these closures for any unauthorized use for 5 years and repair any ineffective closures. *Id*.

Plaintiff's attack on the Forest Service's seclusion analysis also misses the mark. Pl.'s Br. 30. The Forest Service found that, in general, ground-based heavy equipment, motorized vehicle operation, and the presence of humans associated with the Project could disturb or temporarily displace grizzly bears. AR01017. However, the agency also found the risk of adverse impacts to areas of seclusion for the bear is mitigated by multiple design elements, including only implementing activities during daylight hours and limiting Project operations to only a few active units at a time. AR01017. Plaintiff's complaint that the Forest Service did not provide additional reasoning for these spatial and temporal restrictions that will reduce impacts to bears has no merit.

Nor does Plaintiff's complaint about the Project's beneficial impacts to the grizzly bear have merit. Pl.'s Br. 30. The EA explains the Project's beneficial impacts to grizzly bear forage and seclusion. AR00914, AR00916. This explanation satisfies NEPA. *See Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (holding that the court may not "flyspeck" a NEPA document or "substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." (citation omitted)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.     Goshawk

The Forest Service took a hard look at the Project's impacts to the goshawk. The Forest Service identified all primary and secondary goshawk habitat in the Project area and compared this habitat to historic conditions through an ambitious surveying and mapping effort. AR00905-06. The EA explains that no vegetation treatments will occur in the 6,760 acres of primary goshawk habitat in the Project area unless those treatments are required to maintain desired habitat conditions for goshawks. AR00907, AR00909. The EA also explains that commercial thinning can occur on the 14,020 acres of secondary habitat in the Project area, but the thinning must retain some resource values for the goshawk such as 50 percent canopy closure. AR00908-09. The Project authorizes silvicultural treatments in the secondary habitat so long as: (1) the treatment would accomplish other resource objectives; (2) the watershed where the treatment would occur is within or above HRV for goshawk habitat: and (3) the silvicultural treatments would not reduce goshawk habitat below HRV. AR00908.

None of Plaintiff's complaints about the goshawk analysis have merit.  Plaintiff highlights that the silvicultural treatments in secondary habitat will likely render goshawk habitat unsuitable, but Plaintiff omits that these treatments are, first, only allowed on secondary habitat in excess of the HRV, and that these treatments will be beneficial to other sensitive species like the white-headed woodpecker. *Id*. Plaintiff does not provide the full picture when paraphrasing the EA to argue that the silvicultural treatments would likely render habitat unsuitable for 15-20 years. Pl.'s Br. 31. While commercial thinning would in the short term decrease stands' potential to support goshawk nesting, it also would reduce stand density, resulting—over the longer term—in a healthier forest with

more large diameter trees, which are preferred nest sites for goshawks. AR00907-08. As explained above, Plaintiff's speculative fear of repeated logging and reentry in secondary habitat is unfounded. *See supra* Section II.C.

Plaintiff complains about alleged impacts to dead wood habitat for goshawks, Pl.'s Br. 31, but the Project will retain all snags (standing, dead trees) that are 10+ inches in diameter in harvest units to the extent feasible, AR00909. Downed logs would also be retained consistent with the Forest Plan Desired Condition FW-DC-VEG-04, which has specific targets for the number of small and large snags, and coarse woody debris, in different vegetation types on the Forest. *Id*., AR16534.

Contrary to Plaintiff's assertions, the Forest Service described the Project's potential impact to individual goshawks in detail. And the agency reached the well-supported conclusion that goshawk populations on the Forest will not be significantly impacted because: no Project activities will occur in primary habitat, secondary habitat will not receive silvicultural treatments that would put any watershed below HRV for goshawk habitat, and snags and woody debris would be adequately maintained. AR00905-09. Plaintiff cannot credibly claim this sound analysis falls short of the hard look standard. *See Half Moon Bay Fishermans' Marketing Ass'n*, 857 F.2d at 508 (holding that the court may not "flyspeck" a NEPA document or "substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." (citation omitted)).

Plaintiff's cumulative impacts argument also misses the mark. The Forest Service identified standard practices and design elements that, if followed, will maintain goshawk viability across the Forest. *Id*. These standard practices and design elements are not only

mandated for this Project, but the Forest Service commits in the EA to including the standard practices and design elements on all other timber projects on the Forest. *Id.*; AR01067 (listing the standard practices and design elements). The universal application of these science-based practices and elements across all timber projects on the Forest ensures that no reasonably foreseeable timber projects will have significant cumulative impacts on the goshawk. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (holding that, under NEPA, agencies must consider whether the proposed action is related to other actions with individually insignificant but cumulatively significant impacts (citations omitted)).

Last, Plaintiff takes statements from the Record out of context to suggest that the Forest Service is converting secondary habitat to non-habitat to circumvent the 50% canopy requirement for secondary habitat. Pl.'s Br. 33-34. In context, the statements were written by a Wildlife Biologist after her visit with the District Silviculturalist to a handful of Project units—together, they determined that most stands in the units visited had root disease. AR01725. This observation led the biologist to recommend declassifying these infested stands from secondary habitat so that they could be removed before dying from root disease. AR01725. The biologist reasoned that removal of the diseased trees "could improve the health and resiliency of the stands, benefitting goshawks in the long term." AR01726. Notably, the recommended removal of the diseased trees would occur in a watershed that is above HRV for goshawk habitat. AR01725. The EA explicitly contemplates such a de-designation of goshawk habitat, stating that boundaries of secondary habitat could be modified as a result of further field review and explaining that diseased stands could be swapped out for more vigorous trees in consultation with the

wildlife biologist. AR00907.

### D.    Diversity

The Forest Service took a hard look at the Project's impacts to wildlife diversity. The EA thoroughly analyzes the Project's impacts to the goshawk, deer and elk habitats, threatened and endangered wildlife, and all sensitive, surrogate, and landbird species. AR00903-20, AR00952-71.

Plaintiff contends that the Forest Service offers no specific information on how the Project will impact habitats across the Project area, Pl.'s Br. 22, but the EA betrays this notion by describing specific types and locations of habitats across the Project area and how the Project will impact them. *See, e.g.*, AR00915 (stating that timber stands in the Bead Lake and Marshall Lake basins would be potential candidates for aerial logging and explaining this logging's impact on grizzly bears).

Plaintiff claims that the Forest Service does not accurately evaluate the length of time that the Project will impact wildlife, Pl.'s Br. 22, but the EA is replete with time-specific descriptions of impacts to species. *See, e.g.*, AR00914 (under the grizzly bear impacts section, explaining that prescribed fire under the Project would improve the quality and productivity of green forage plants for 5-10 years and would decrease the amount of berry-producing shrubs for 3-7 years). The time ranges that Plaintiff criticizes are merely categories to help organize a summary table of impacts to wildlife in the EA. The species-specific categories in the EA, the EA's Appendix C, and the Wildlife Report provide more specific time frames for impacts to specific types of habitat, from specific types of Project activity. *See* AR00903-20 (EA), AR00952-71 (EA Appendix C), AR01034-120 (Wildlife Report). As explained above, the Project's commercial

treatments will not overlap on any acreage, *see supra* Section II.C, so the Forest Service's analysis of the length of Project impacts to wildlife is not complicated by repeated commercial timber harvest in any area. *See, e.g.*, AR00907 (explaining that the Project's commercial thinning would reduce overhead canopy closure, crown complexity, and crown bulk density for 15-20 years, decreasing these stands' potential to support goshawk nesting during that time). Plaintiff belabors this incorrect premise by misquoting the Forest Service's response to scoping comments—produced when the Project was in its early development stage—to say that the Forest Service conceded that "short term impacts will last at least 30 years." Pl.'s Br. 22 (citing AR02599). This supposed quote appears nowhere on the page or in the document.

Plaintiff's claim that the Forest Service did not adequately consider impacts from foreseeable future projects is meritless. Pl.'s Br. 23. Plaintiff again misquotes from the Forest Service's response to scoping comments—neither the allegedly quoted page, nor the document as a whole, contains the quote appearing in Plaintiff's brief regarding future logging and burning in the Project area. *Id*. (citing AR02599). Plaintiff also overstates the EA's discussion of re-entry into units—the EA explains that, in order for the stands receiving commercial thinning or commercial thinning with group selection to continue to trend toward HRV, another commercial treatment would be required in 15 to 25 years. AR00886. Contrary to Plaintiff's contention, *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1079 (9th Cir. 2011), does not mandate that the Forest Service consider cumulative impacts from speculative reentry into Project stands in decades' time. In *Northern Plains Resource Council*, the Court held that the agency needed to consider cumulative impacts from a planned railroad construction and

coal bed methane wells that would be constructed in the future. *Id*. It was crucial for the Court that the precise route for the future railroad was known and that a prior programmatic NEPA document had set forth specific amounts and locations for future methane wells, field compressors, and gathering lines in the project area at issue. *Id*. Conversely, the possible reentry here is highly speculative, and if it did occur, would be decades after this Project's authorized treatment.

Last, Plaintiff attacks the Forest Service's disclosure that it lacks some wildlife population and habitat data for the Project area. Pl.'s Br. 24. NEPA does not require the Forest Service to have run down this information that would have been "difficult if not infeasible" to obtain. AR01003; *see Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) ("[N]or do we require the government to do the impractical, if not enough information is available to permit meaningful consideration." (citation omitted)).

## V.     The Project SIR complies with NEPA, NFMA, and the *Sanpoil* Order (Claim Seven).

The Forest Service used a Supplemental Information Report ("SIR") to determine if the *Sanpoil* ruling, and the reinstatement of portions of the Eastside Screens, required supplemental NEPA analysis. AR04296-309. The Forest Service prepares a SIR to determine whether new information is sufficiently significant to trigger the need for a supplemental EA or EIS. Forest Service Handbook ("FSH") 1909.15 § 18.1. The Ninth Circuit has recognized the use of SIRs to evaluate whether additional NEPA analysis is necessary. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000) (SIRs "are the Forest Service's formal instruments for documenting whether new information is sufficiently significant to trigger the need for [a supplemental NEPA

document].”); *see Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509-10 (9th Cir. 1997) (stating that the agency "must initially determine the significance of the impacts brought about by the proposed change in order to decide whether supplemental documentation is necessary.").

The Project SIR and its supporting documents provide an in-depth analysis of any change in impacts that will occur as a result of the reinstatement of the Eastside Screens. AR04296-309. Because application of certain Eastside Screens standards rely on whether a watershed is at or above HRV for LOS forest, the Project SIR and its supporting supplemental vegetation report compiled extensive data on, and field verified, all stands in the Project area to determine whether LOS is at or below HRV in each relevant watershed. AR04297-300; AR04283-84. The SIR determined that no treatment acres in the three sales that have been laid out so far needed to be modified as a result of the above HRV-LOS analysis and that for the remaining five planned timber sales under the Project, the Forest Service would augment treatment acres as needed to comply with the applicable Eastside Screens, and post this sale-specific analysis to a public website set forth in the SIR. AR04299. This analysis, and the commitment to repeat it publicly for every timber sale under the Project, more than demonstrates that application of the Eastside Screens does not render the Project's impacts significant or outside of the impacts originally analyzed.

A.    **The SIR's methodology complies with the Eastside Screens, and thus with NFMA and *Sanpoil*.**

Plaintiff argues that the SIR's methodology for analyzing impacts violates the Eastside Screens, thereby violating NFMA and the Court's order in *Sanpoil*. Pl.'s Br. 35-37. Plaintiff is wrong because its arguments are based on misunderstandings of the SIR's

methodology and of the Eastside Screens.

First, Plaintiff attacks the SIR's and supplemental vegetation report's use of ten acres as a minimum stand size when delineating LOS. Pl.'s Br. 35 (citing AR04282). The Eastside Screens are silent on the size of stand to be considered in the HRV-LOS analysis. AR13166-76 (the Eastside Screens using the term "stand(s)" 49 times, but never defining the size of a stand). The Forest Service has long used the ten-acre stand size on the Forest in part because it matches the stand size used in seminal scientific assessments like the Interior Columbia Ecosystem Management Project. AR08052 (describing a prior assessment for the Management Project, where researchers characterized landscape conditions "at a finer scale" of ten acres); AR08063 (the same Management Project document discussing that historical vegetation data estimates forest cover type at a 10-acre scale). In the absence of stand size direction from the Eastside Screens, the Forest Service is entitled to deference for its reasonable interpretation of scientific terms in the Eastside Screens Forest Plans Amendment. *See Native Ecosystems Council*, 697 F.3d at 1056.

Second, Plaintiff faults the Forest Service's SIR analysis for using forest-wide LOS HRV conditions (against which it compared each watershed's current LOS levels). Pl.'s Br. 35-36. However, again, the Forest Service's use of scale in the LOS HRV baseline is consistent with the Eastside Screens. The Eastside Screens provides that "HRV should be developed for large landscapes across which forest types, environmental settings, and disturbance regimes (fire and insects/disease) are relatively uniform." AR13168. The Forest Service ensured that its LOS HRV ranges were developed across a large landscape by setting the Forest boundaries as the geographic scale. AR16534. But

what Plaintiff misses is that the Forest Service also ensured that HRV ranges reflected relative uniformity in forest types, environmental settings, and disturbance regimes by breaking out LOS HRV ranges by vegetation type, AR04299-300 (SIR showing HRV measured by vegetation type), and by developing the HRV ranges within vegetation type by cross-walking the vegetation type with plant association group data (plant groups with similar moisture and temperature needs) and LandFire biophysical settings (which represent vegetation that persisted on the Forest in historical disturbance regimes), AR16255-56. The Forest Service puts all of this data into a statistical model that has been used to develop HRV ranges in multiple peer-reviewed scientific papers. AR15065. The LOS HRV ranges are reasonable and above reproach by Plaintiff, who has not even identified the above scientifically-supported process, much less credibly challenged it. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (holding that an agency has substantial discretion "to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

Third, Plaintiff criticizes the SIR's choice, when comparing current LOS to the HRV LOS, to only include current LOS on National Forest lands (for the current LOS figure). Pl.'s Br. 36. But the Eastside Screens says nothing about including lands in private or other governmental ownership in the analysis. It is reasonable for the Forest Service to only compare the land it manages to the HRV.

Fourth, Plaintiff provides a misleading snippet of the Eastside Screens to criticize the SIR. *Id.* The Eastside Screens counsels that "the sum of conditions across watersheds within the area for which HRV is developed should reflect ranges of conditions determined in the HRV evaluation." AR13168. Plaintiff has failed to demonstrate how

the Forest Service's HRV-LOS comparison in the SIR violates this guidance.

Last, Plaintiff misrepresents a restriction from the Eastside Screens to suggest that the SIR is deficient. Pl.'s Br. 36. The Eastside Screens' "non-fragmentation standard[]" is very narrow—it only applies to timber harvest within a biophysical environment, within a watershed where LOS is above HRV. AR13175-76. Within that category, it applies more narrowly to the interior (beyond 300 feet from the edge) of LOS stands greater than 100 acres. AR13176. Plaintiff incorrectly states that group selection harvest is not permitted in these narrow areas, but the Eastside Screens explicitly allows this treatment "when openings created either mimic the natural forest pattern, and do not exceed ½ acre in size." *Id*. Plaintiff points to nothing in the SIR that suggests future violation of this narrowly hewn standard. The Forest Service will simply avoid the violative treatments if and when they come across this extremely specific type of LOS stand in sale areas.

**B.      The SIR complies with NEPA.**

Plaintiff is wrong in arguing that the SIR provides no basis for its effects conclusions. Pl.'s Br. 27. As explained above, the Forest Service thoroughly analyzed the Project's impacts on old growth and LOS forest, so the SIR had a solid baseline against which to adduce any changes as a result of the resumption of certain Eastside Screens standards. *See supra* Section II.A. Plaintiff claims that the SIR does not analyze these changes beyond the first three timber sales, but the Project SIR and its supporting supplemental vegetation report compiled extensive data on, and field verified, all stands in the *entire Project area* to determine whether LOS is at or below HRV in each relevant watershed. AR04297-300, AR04283-84. For the remaining five planned timber sales under the Project, the Forest Service would, like it did for the first three sales, augment

treatment acres as needed to comply with the Eastside Screens, and post this analysis to a public website set forth in the SIR. AR04299. This analysis provides a sound basis for determining that any changed impacts were within those analyzed in the Project EA. Further, Plaintiff's suggestion that the Forest Service plans to violate the applicable standards of the Eastside Screens is inaccurate. The page of the Record that Plaintiff cites merely advises Forest personnel that they can take advantage of options *within the Eastside Screens* to treat stands in areas below HRV. AR04283. Far from evincing an intent to circumvent the Eastside Screens, this guidance outlines options for compliance.

Because the SIR demonstrates how the Project complies with the applicable Eastside Screens standards and shows that the Project's impacts will be within those analyzed in the EA, the Forest Service reasonably determined that additional NEPA analysis was not required. The Court should grant Defendants judgment on Claim Seven.

## VI.    The Forest Service complied with NEPA in its preparation of an EA.

Under NEPA, "an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). "Whether an action 'significantly' affects the environment requires analyzing both 'context' and 'intensity.'" *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 C.F.R. § 1508.27 (2017)).[7] Context refers to the setting in which the proposed

---

[7] The Council on Environmental Quality ("CEQ") promulgates regulations implementing NEPA. All citations to the CEQ's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018). These regulations have gone through multiple

action takes place." *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(b) (2005)). "[T]he regulations identify ten factors that agencies should consider in evaluating intensity." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (citing 40 C.F.R. § 1508.27(b)(1)-(10) (2014)). An agency can "reasonably rel[y] on its own expert reports and technical expertise in concluding that the impact of the project would be insignificant." *Bark v. Northrop*, 607 F. App'x 652, 655 (9th Cir. 2015) (unpublished). A FONSI "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004).

The Forest Service considered all the required factors under 40 C.F.R. § 1501.3(b). AR001267-69. The Forest Service considered the context and intensity in the EA, DN/FONSI, and the record as a whole and concluded that preparation of an EIS was not needed because the Project would "not have significant effects on the quality of the human environment." AR001267. The DN/FONSI and supporting documents explain the basis for this conclusion, providing a "convincing statement of reasons" as to why the Project's impacts are not significant. *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citation omitted).

Plaintiff argues that the Project is significant in scope and impact and thus warrants an EIS. Pl.'s Br. 38-39. Although the Project area is 90,700 acres, and commercial

changes in recent years, but these changes are not material to the Project or claims at issue.

treatments may occur on up to 24,000 acres, "[s]ize in itself does not establish significance." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262 (10th Cir. 2019); *See also Klamath Forest All. v. United States Forest Serv.*, 746 F. Supp. 3d 761, 778 (N.D. Cal. 2024) ("[T]he large size of the Projects, alone, does not necessarily raise a substantial question as to significant environmental impacts."). That this Project area is larger in size than the project in *Sanpoil* does not prove significance. *Blue Mountains Biodiversity Project v. Trulock*, Case No. 2:21-cv-01033-HL, 2023 WL 3645966, at *1, 18-21 (D. Or. Apr. 27, 2023) (upholding FONSI for project with 40,000 treatment acres).

Plaintiff next argues that the Project may have significant adverse impacts on Canada lynx and grizzly bear and that the alleged lack of detailed information creates unknown risk for cumulative impacts. Pl.'s Br. 39-40. In assessing significance under NEPA, an agency is "to consider the degree of adverse effect on a *species*, not the impact on individuals of that species." *Env't Prot. Info. Ctr.*, 451 F.3d at 1010 (emphasis added) (citing *Native Ecosystems*, 428 F.3d at 1240). The Forest Service explained why the effects to these species are not significant. AR01011-13, AR01016-20; *see also supra* Section IV.A-B. The Fish and Wildlife Service concurred with the Forest Service's determinations that the Trail Project is not likely to adversely affect either species. AR12338-46. The Forest Service in the EA and specialist reports also evaluated the Project's cumulative effects based on the maximum treatment acreages and provided detailed information on treatments and when they would occur. *See also supra* Section II.

Last, Plaintiff argues that this Project will set a precedent regarding the 2020 lynx map update and interpretation of the *Sanpoil* Order. Pl.'s Br. 40. As the question of whether lynx map updates require NEPA analysis is a highly fact dependent inquiry,

taking into account where the project is located, what specific lynx standards apply, and how the map was revised in the update, this Project does not set a precedent for this issue. As for *Sanpoil*, this Project EA, like all EAs, is "highly specific to the project and the locale, thus creating no binding precedent." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011). Further, how *Sanpoil* will impact future projects on the Forest will again be very fact- and project-specific—for example, projects that need to harvest large trees to accomplish their goals will be impacted much differently than projects that need not harvest large trees. In sum, the Record supports the FONSI, and Plaintiff has not met its burden of showing that the agency neglected to produce a convincing statement of reasons for why impacts would not be significant.[8]

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment in favor of Defendants on all claims and deny Plaintiff's motion for summary judgment.

Respectfully submitted this 18th day of March, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

  */s/    Hayley A. Carpenter*
HAYLEY A. CARPENTER (CA Bar No. 312611)

---

[8] The Court is not required to vacate the Project if it finds legal error. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has the power to do so, it is not required to set aside every unlawful agency action."). If the Court finds error, Defendants request an opportunity to brief what remedy is appropriate.

LAWRENCE K. PITTMAN (GA Bar No. 568134)
Trial Attorneys
Natural Resources Section
P.O. Box 7611
Washington, DC  20044
(202) 305-0242 (Carpenter)
(202) 305-0420 (Pittman)
hayley.carpenter@usdoj.gov
lawrence.pittman@usdoj.gov

RICHARD R. BARKER
Acting United States Attorney

*Attorneys for Defendants*