Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
20520 105th Ave. SW
Vashon, WA 98070
Tel: (206) 601-8476
claire@animalearthlaw.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>Plaintiff,<br><br>v.<br><br>U.S. FOREST SERVICE, JOSHUA WHITE, Forest Supervisor, Colville National Forest, CARIN VADALA, Newport-Sullivan Lake District Ranger, U.S. Forest Service.<br><br>Defendants. | Case No. 2:24-cv-00157-RLP<br><br>**COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY ISO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>5/5/2025 at 1:30 p.m.<br><br>With Oral Argument |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# TABLE OF CONTENTS

**ACRONYMS AND SHORT CITATIONS**............................................................. ii

**TABLE OF AUTHORITIES** ............................................................... iv

**INTRODUCTION**.........................................................................1

**ARGUMENT** .............................................................................1

**I.   2020 LAU Revision Violates NEPA (Claims 1 & 4)**............................1

   A.   Lynx Remapping had a Significant Impact on the Trails Project ..................2

   B.   2020 LAU Revision was  Major Federal Action Subject to NEPA ...............5

   C.   2020 LAU Revision is a Final Agency Action Ripe for Challenge ...............8

   D.   Trails Project Unlawfully Tiers to the 2020 LAU Revision ..........................9

**II.   Project's Lack of Specificity Violates NEPA (Claim 3)** ...........................11

**III.   Service Did Not Take a Hard Look at Project Impacts (Claims 2 & 5)**.16

   A.   Service Did not Disclose or Examine Impacts of Roads.............................16

   B.   Service Did Not Take a Hard Look at Impacts to Any Wildlife..................18

      1.   Service Failed to Take a Hard Look at Impacts to Lynx ..........................22

      2.   Service Did Not Take a Hard Look at Impacts to Grizzly Bear ...............22

      3.   Service Failed to Take a Hard Look at Impacts to Goshawk ...................23

**IV.   Service Failed to Comply with Plan and Sanpoil Order (Claim 7)** ........25

**V.   Service Must Complete EIS before Project May Proceed (Claim 6)** ......27

**CONCLUSION**..............................................................................30

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

## ACRONYMS AND SHORT CITATIONS

For the Court's convenience, the following is a list of the acronyms and short references for documents and statutes referenced in Plaintiff's briefs.

| | |
|---|---|
| **2019 Plan** | 2019 Colville Forest Land Management Plan |
| **2019 Plan EIS** | Environmental Impact Statement for the 2019 Plan |
| **2020 LAU Revision** | Service's 2020 remapping of lynx habitat and LAUs |
| **2019 LOS Guideline** | 2019 Plan's Guideline for Large Tree Management (FW-GDL-VEG-03) |
| **Alliance** | Alliance for the Wild Rockies |
| **Appendix or A-** | Appendix ISO Motion for Summary Judgment |
| **APA** | Administrative Procedure Act |
| **BA** | Biological Assessment |
| **BE** | Biological Evaluation |
| **Cross-Motion or Cross MSJ** | Defendants' Combined Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment |
| **DBH** | Diameter at Breast Height |
| **Defendants** | U.S. Forest Service and Joshua White and Carin Vadala in their professional capacities |
| **Eastside Screens** | 1995 Colville Forest Plan Amendment #2, restricting logging of old growth and LOS |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **FONSI** | Finding of No Significant Impact |
| **Forest** | Colville National Forest |

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX:206.456.5191

| | |
|---|---|
| **FSH** | Forest Service Handbook |
| **HRV** | Historical Range of Variability |
| **LCAS** | Lynx Conservation and Assessment Strategy |
| **LAU** | Lynx Analysis Unit |
| **LOS** | Late and Old Structure Forest |
| **MBF** | Thousand Board Feet of Timber |
| **MMBF** | Million Board Feet of Timber |
| **Motion or SJM** | Plaintiff's Motion for Summary Judgment |
| **Motion to Strike** | Motion to Strike Extra Record Materials |
| **NEPA** | National Environmental Policy Act |
| **NFMA** | National Forest Management Act |
| **Plaintiff** | Alliance for the Wild Rockies |
| **Project Area** | Planning area for the Trails Project |
| **Record** | Administrative Record |
| **Sanpoil Order** | *Kettle Range Conservation Group v. U.S. Forest Service*, et al., No. 2:21-CV-00161-SAB, 2023 U.S. Dist. LEXIS 107552 (E.D. Wash. June 21, 2023) |
| **Service** | U.S. Forest Service |
| **SIR** | Supplemental Information Report |
| **Trails Project** | Sxʷutn-Kaniksu Connections Trail Project |
| **USFWS** | U.S. Fish and Wildlife Service |

COMBINED OPPOSITION AND REPLY - iii

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Alaska Ctr. for the Env't v. Armbrister*,
   131 F.3d 1285 (9th Cir. 1997) ........................................................................ 19

4

5

*All. for the Wild Rockies v. U.S. Forest Serv.*,
   907 F.3d 1105 (9th Cir. 2018) ........................................................................ 30

6

*All. for the Wild Rockies v. U.S. Forest Serv.*,
   No. CV 21-84-M-DLC, 2023 U.S. Dist. LEXIS 148464 (D. Mont. Aug. 23,

7

   2023) .......................................................................................................... 10, 6

8

*All. for the Wild Rockies v. Weber*,
   979 F. Supp. 2d 1118 (D. Mont. 2013) ........................................................... 12

9

10

*Bark v. U.S. Forest Serv.*,
   958 F.3d 865 (9th Cir. 2020) ............................................................... 27, 29, 30

11

*Churchill Cnty. v. Norton*,
   276 F.3d 1060 (9th Cir. 2001) ........................................................................ 21

12

13

*Davey v. U.S. Forest Serv. ex rel. Davey*,
   866 F. Supp. 2d 1209 (D. Idaho 2012) .............................................................. 6

14

*Greater Hells Canyon Council v. Wilkes*,
   No. 2:22-cv-00859-HL, 2023 U.S. Dist. LEXIS 178671 (D. Or. Aug. 31, 2023)

15

   ........................................................................................................................ 29

16

*Kern v. U.S. Blm*,
   284 F.3d 1062 (9th Cir. 2002) ........................................................... 10, 21, 24

17

18

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) .......................................................................... 18

19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) .............................. 23, 26

20

21

*N. Cascades Conserv. Council v. U.S. Forest Serv.*,
   No. 2:22-CV-00293-SAB, 2024 U.S. Dist. LEXIS 8738 (E.D. Wash. Jan. 17,

22

   2024) ........................................................................... 12, 14-15, 16

23

*Native Ecosystems Council v. U.S. Forest Serv. ex rel. Davey*,
    866 F. Supp. 2d 1209 (D. Idaho 2012) ........................................................ *passim*

*Neighbors of Cuddy Mt. v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ............................................................. 16-17, 17

*Northcoast Env't Ctr. v. Glickman*,
    136 F.3d 660 (9th Cir. 1998) ........................................................................ 10

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998) ................................. 8

*Or. Nat'l Res. Council Fund v. Forsgren*,
    252 F. Supp. 2d 1088 (D. Or. 2003) ........................................................ *passim*

*Se. Alaska Conserv. Council v. U.S. Forest Serv.*,
    443 F. Supp. 3d 995 (D. Alaska 2020) .................................................. 1, 13, 16

*WildEarth Guardians v. Conner*,
    920 F.3d 1245 (10th Cir. 2019) ..................................................................... 27

*WildWest Inst. v. Bull*,
    547 F.3d 1162 (9th Cir. 2008) ........................................................................ 6

**Statutes**
    5 U.S.C. § 706 ............................................................................................... 30

**Other**
    40 C.F.R. § 1508.27 ...................................................................................... 28

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1

**INTRODUCTION**

2       The Service's Cross-Motion for Summary Judgment is rich with strawmen

3 and red herrings, but despite all the noise, it cannot escape from the fatal flaws that

4 permeate the Trails EA, Decision Notice, and the 2020 LAU Revision. Because the

5 "rule of reason" does not allow for a "pragmatic judgment" that the Service has met

6 the requirements of NEPA or NFMA, Plaintiff asks the Court to hold these decisions

7 invalid, vacate, and remand. *See Se. Alaska Conservation Council v. United States*

8 *Forest Serv.*, 443 F. Supp. 3d 995, 1006 and 1006 n. 81 (D. Alaska 2020).

9

**ARGUMENT**

10 **I.  2020 LAU Revision Violates NEPA (Claims 1 & 4)**

11       The Service does not dispute that the 2020 LAU Revision did not undergo

12 NEPA review. *See* Cross MSJ at 6-13. It does not deny that the revision significantly

13 changed the Forest's designated lynx habitat, or that these changes had substantial

14 impacts Forest-wide. *Id.* And it concedes that the Project relied on the new mapped

15 lynx range. *Id.* at 9-10 ("The Project EA uses the mapped lynx range from the 2020

16 map update to measure the Project's impacts to lynx.").

17       Because it cannot contest these central facts, the Service constructs a

18 strawman argument that it can defeat, by asserting that "Plaintiff incorrectly assumes

19 that the Project area overlaps with lynx core habitat." *See* Cross MSJ at 7. The

20 Motion contains no such assumption. Nor does it imply that Plaintiff's "real

21 concern" is with "the Forest Plan's and the LCAS's distinction between core and

22 secondary habitat." *See id.* at 10; *see also id.* at 11 (similar). Plaintiff's clearly stated

23 "real concern" is that the Service surreptitiously remapped the Forest's designated

COMBINED OPPOSITION AND REPLY- 1

lynx habitat— behind closed doors, without public notice, and in violation of NEPA—and then based the Project on the new mapped lynx range, without any explicit acknowledgement of the change.

A.  *Lynx Remapping had a Significant Impact on the Trails Project*

The 2020 LAU Revision profoundly impacted lynx protections, both in the Project Area and across the Forest. Across the Forest, the 2020 LAU Revision erased 28 of the Forest's 40 LAUs and removed 407,000 acres of habitat. *See* AR 6324 (Table 2); App. at A-1, A-2. The revision also targeted lynx core habitat in the Kettle Range/Wedge area, where it stripped 24,476 acres from those LAUs subject to the greatest protections under the Forest Plan. App. at A-1 and A-2; *see* Cross MSJ at 8, 10 (emphasizing the importance of this core habitat).

In the Selkirk Mountain region, the remapping erased all 22 LAUs and reduced designated lynx habitat by more than half, taking it from 351,734 acres down to 158,815. *See* SJM at 9, 24-25; AR 6322-26. This change was even more significant in the Project Area, where the remapping slashed lynx habitat by more than 70%, reducing it from 40,837 acres to 11,871. *See* Figure 7 at A-8; Second Declaration of Paul Sieracki ("2d Sieracki Decl.") at ¶ 9.

The Service does not dispute that the 2020 LAU Revision dramatically reshaped lynx protections Forest-wide, or even directly contend that it had no impact on the Project Area. Instead, it fixates on the fact that the Selkirk LAUs were in a "secondary" lynx recovery area, rather than part of the "core" recovery zone that is the focus of most Forest Plan standards. The Service stretches this observation into an assertion that the "2020 updates did not change *any* lynx *standards or guidelines*

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1    applicable to the Selkirk Mountains secondary area where the Project is located."

2    Cross MSJ at 10, ln. 6-8; *see id.* at 11 ("the map updates here did not remove the

3    application of *Forest Plan standards or guidelines*") (emphasis added to both); *see*

4    *also id.* at 10 (ln. 15-17), 12 and 13 (similar).

5        Even this carefully parsed assertion is incorrect. Some provisions of the Plan

6    apply to all designated lynx habitat. For example, all lynx habitat, including in the

7    Project Area, is governed by a Plan guideline providing that "[h]abitat for federally

8    listed wildlife species within designated recovery areas that occur on National Forest

9    System lands should be retained in public ownership and managed to support

10   recovery." AR 16562 (FW-GDL-WL-04); *see* AR 735 (BA, recognizing the

11   applicability of FW-GDL-WL-04 to the reduced lynx range). Also applicable is FW-

12   DC-WL-02, a Plan desired condition related to "Habitat Conditions for Threatened

13   and Endangered Species," which directs planners to move toward conditions that

14   "contribute to the recovery of federally listed threatened and endangered species."

15   AR 16557; *see* AR 735 (BA, applying this condition to the lynx range).

16       Another provision of the Plan directs all LAUs to move toward the desired

17   condition of "[f]orest successional stages within lynx analysis units," which will

18   provide a "mosaic of lynx habitat (including foraging, travel and denning

19   components)[.]" AR 16557 (FW-DC-WL-04). And the Plan's assessment and

20   monitoring provisions for lynx are focused on all forest LAUs. *See* AR 16555 (lynx

21   habitat conditions should be "assessed at the lynx analysis unit scale") and AR 16662

22   (changes to lynx habitat should be monitored every 5 years "by lynx analysis unit").

23       By erasing nearly 29,000 acres from lynx territory within the Project Area,

COMBINED OPPOSITION AND REPLY- 3

the 2020 LAU Revision also removed the protections integrated into the Project's design elements, which apply only to the new lynx range. This meant the Service was no longer required to retain "[c]losed canopy, multi-storied timber stands" on those 29,000 acres, and that the direction to "create no additional forest openings" no longer applied. *See* AR 735 (BA), AR 1000 (BE), and AR 873 (EA). It also smoothed the way for the Project to allow commercial logging on more than 10,000 acres formerly designated as lynx habitat. App. at A-7; Sieracki Decl. at ¶¶ 9-10.

This dramatic reduction in lynx habitat also fundamentally altered the Project's NEPA analysis. Since lynx are an ESA-listed species, NEPA requires the Service to consider the impacts of its actions on designated lynx habitat and on lynx within that designated habitat—regardless of whether the habitat was labeled as an LAU, a core lynx area, or a secondary/peripheral area. *See* AR 1269 (Decision Notice and Finding of No Significant Impact ("FONSI") (considering the "degree to which the action may adversely affect an endangered or threatened species or its habitat" as one of the factors an EA must consider).

Indeed, references to the new mapped lynx range are baked into virtually all the NEPA analyses of impacts to lynx. The Service's description of existing conditions for lynx focuses only on the new lynx range. AR 761-65 (BA); AR 1006-11 (BE); AR 912 (EA). The resource indicators the Project uses to measure impacts to lynx apply only to the new lynx range. *See* AR 1002-03 (BE); AR 739-40 (BA). The Service assesses the Project's impacts on lynx based primarily on how it affects the new lynx range. AR 774-75 (BA); AR 1011-1013, 1021, 1023 (BE); AR 912-14 (EA). And when evaluating cumulative impacts to lynx, the Service only considers

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1    other activities that impact the Project Area's new lynx range. AR 767 (BA); AR

2    1012-13 (BE); AR 913-14 (EA).

3          The slashing of lynx habitat thus fundamentally changed how the Service

4    assessed the Project's impact on lynx, which, in turn, influenced its evaluation of

5    whether the Project would significantly impact the environment. The Service and

6    USFWS focused on impacts to the downsized lynx range when concluding that the

7    Project "may affect but is not likely to adversely affect" lynx. *See* AR 767 (BA), 919

8    (EA), AR 12344-45 (USFWS concurrence). In turn, the FONSI emphasized the

9    importance of this concurrence, as well as the fact that  "[n]o project activities will

10   occur within stands that are mapped as potential Canada lynx den habitat" and "[n]o

11   project activities will occur within other mapped multi-storied stands that could

12   provide habitat for lynx prey species." AR 1264. If the NEPA process had concluded

13   before the Service erased most lynx habitat from the Project Area, it would have

14   needed to either design the Project differently or reach a different conclusion.

15          B.     *2020 LAU Revision was Major Federal Action Subject to NEPA*

16          Plaintiff may bring a direct challenge to the 2020 LAU Revision because it is

17   both a "major federal action" to which NEPA applies and a "final agency action"

18   ripe for review. A major federal action includes the "[a]doption of formal plans, such

19   as official documents prepared or approved by federal agencies which guide or

20   prescribe alternative uses of Federal resources, upon which future agency actions

21   will be based." AR 13278 (FSH 1909.15 ch. 40 § 05) (citing prior version of C.F.R.

22   § 1508.18). A lynx mapping plan "falls nicely" within this definition because it

23   guides future agency actions such as logging projects regarding how to avoid,

COMBINED OPPOSITION AND REPLY- 5

1  measure, and determine the significance of impacts to lynx habitat. *See Native*

2  *Ecosystems Council v. U.S. Forest Serv. ex rel. Davey*, 866 F. Supp. 2d 1209, 1225

3  (D. Idaho 2012) ("*Davey*")

4      The Service nevertheless contends the 2020 LAU Revision was not a "major

5  federal action" because it did not change "Forest Plan standards" in the Project Area.

6  Cross MSJ at 10, 11, and 13. That is patently false. Even if it were not, the Service

7  offers no basis for looking exclusively at how lynx mapping affects the applicability

8  of *Forest Plan* standards, or for limiting that inquiry to only the Project Area.

9      The only case the Service affirmatively cites to support this proposition is

10 *WildWest Inst. v. Bull*, 547 F.3d 1162, 1173 (9th Cir. 2008). *See* Cross MSJ at 10.

11 The *WildWest* court found that the Service did not act arbitrarily by limiting soil

12 analysis to units marked for harvest rather than the whole landscape. *See* 547 F.3d

13 at 1173. The Service makes no connection between that finding and the facts here.

14     The Service also fails to squeeze any authority cited in the Motion into this

15 narrow box. *See* Cross MSJ at 11 (citing *All. for the Wild Rockies v. U.S. Forest*

16 *Serv.*, No. CV 21–84-M-DLC, 2023 WL 5427921, at *7 (D. Mont. Aug. 23, 2023)

17 ("*Red Lodge II"*); *Davey*, 866 F. Supp. 2d at 1225; and *Or. Nat. Res. Council Fund*

18 *v. Forsgren,* 252 F. Supp. 2d 1088, 1105 (D. Or. 2003) ("*Forsgren*")). *Red Lodge II*

19 did not reach a holding on whether the remapping of lynx territory was a "major

20 federal action" subject to independent challenge. *Red Lodge II*, 2023 U.S. Dist.

21 LEXIS 148464, at *23. Instead, the court held the Service violated NEPA by

22 unlawfully "tiering" the challenged project to the new map when it had not

23 undergone independent NEPA review. *Id.* at *20-23.

COMBINED OPPOSITION AND REPLY- 6

Of the two cases that examined this question, neither limited its analysis to the context of a forest plan or the narrow impacts on a single project. In *Davey*, the court considered whether NEPA applied to a new lynx habitat map that removed eight LAUs and eliminated almost 400,000 acres of lynx habitat across the Caribou-Targhee National Forest. *Davey*, 866 F. Supp. 2d at 1213. Plaintiffs challenged the new map through a small project involving just 7,000 acres. *Id.* at 1229. However, in finding that the remapping project was a "major federal action" subject to NEPA, the court considered the impact of the new map on all 400,000 acres of lynx habitat it erased forest-wide, including its impact future forest projects. *Id.* at 1225.

Similarly, in *Forsgren*, the court concluded the new lynx territory map was a "major federal action" because it "reduce[d] the recognized primary lynx habitat *within the Forest* by thousands of acres." *Forsgren*, 252 F. Supp. 2d at 1105 (emphasis added) (ordering the Service to prepare an EA to "determine whether the new mapping direction might significantly affect the lynx in the Forest."). Like *Davey*, the *Forsgren* court also considered the "far-reaching" future consequences of the remapping action." *Id.*

The Service summarizes these cases to say that their holdings were based on a finding that remapping "changed what lynx standards applied to the project area." *See* Cross MSJ at 11. The same is clearly true here, where the 2020 LAU Revision changed the standards applied to the Project Area by the Forest Plan, NEPA, the ESA, and the Project itself. Like the remapping challenged in *Davey* and *Forsgren*, however, the 2020 LAU Revision also has far-reaching consequences for future logging projects throughout the Forest, making it imperative for the Service carefully

COMBINED OPPOSITION AND REPLY- 7

1  consider its consequences through a NEPA analysis.

2          C.    *2020 LAU Revision is a Final Agency Action Ripe for Challenge*

3          The 2020 LAU Revision is ripe for challenge as a "final agency decision." An

4  agency action must fulfill two requirements to be considered a "final agency action"

5  under the APA: (1) it must mark the "consummation" of an agency decision-making

6  process and (2) it must be an action "by which rights or obligations have been

7  determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S.

8  154, 177-78, 137 L. Ed. 2d 281, 117 S. Ct. 1154 (1997) (internal quotations and

9  citations omitted). The 2020 LAU Revision meets both criteria: it is a final decision

10  on the Service's designation of lynx territory, and, as discussed above, it carries

11  myriad legal implications regarding the use of that land.

12          By asserting that the 2020 LAU Revision cannot be "challenged facially"

13  (Cross MSJ at 12-13), the Service appears to be invoking the standards set by *Ohio*

14  *Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 118 S. Ct. 1665, 140 L.Ed.2d 921

15  (1998). *Ohio Forestry* held that a forest plan's logging provisions were not ripe for

16  review until implemented through a site-specific project. *Id.* at 733-34.

17          The Oregon District Court rejected this defense in *Forsgren*, 252 F. Supp. 2d

18  at 1097-99. Plaintiffs there brought a direct challenge against a new lynx mapping

19  *direction*, which changed the guidelines for identifying lynx habitat but did not

20  directly create any new lynx habitat maps. *Id.* at 1092. The Service argued that the

21  action was "merely…using the best science available" to conduct "day-to-day

22  management activities," and that "[p]reparing maps from habitat descriptions can

23  hardly be said to affect the human environment." *Id.* at 1097, 1105; *compare* Cross

COMBINED OPPOSITION AND REPLY- 8

1  MSJ at 8-9 (contending the revision was just a "map update" using "better data").

2       However, the court found the Service had "substantially minimized the effects

3  of the new mapping direction," which "significantly changed the nature and the

4  extent of lynx habitat, and the consequences to the lynx may be far-reaching."

5  *Forsgren*, 252 F. Supp. 2d at 1105. After a lengthy analysis, the *Forsgren* court

6  found "a direct causal relationship" between the mapping direction and the alleged

7  harm suffered by plaintiffs, holding that the new mapping direction was "judicially

8  ripe for review as a final agency action. *Id.* at 1099 (citing *Wilderness Soc'y v.*

9  *Thomas*, 188 F.3d 1130, 1133-34 (9th Cir. 1999)).

10      Such is the case here. The 2020 LAU Revision is integral to Plaintiff's site-

11  specific challenge to the Trails Project for failure to take a hard look at its impacts

12  to lynx. That claim is directly connected to the reduced lynx range, which forms the

13  basis for the Service's evaluation of the Project's impacts to lynx. *See* AR 774-75

14  (BA); AR 1011-1013, 1021, 1023 (BE); AR 912-14 (EA). In turn, the Service relies

15  on those evaluations in finding that the Project "is not likely to adversely affect"

16  lynx and that it will not have a significant environmental impact. *See* AR 767 (BA),

17  919 (EA), AR 12338, 12344-45 (USFWS concurrence); AR 1264, 1269 (FONSI).

18      D.    *Trails Project Unlawfully Tiers to the 2020 LAU Revision*

19      The Trails Project EA and FONSI are also invalid because they are unlawfully

20  tiered to the 2020 LAU Revision, which did not go through SEPA review. The

21  Service contends the Trails Project did not tier to the 2020 LAU remapping because

22  "map updates did not remove any restrictions from the Project area." Cross MSJ at

23  12. That is clearly incorrect— the map updates even changed how the Project's *own*

COMBINED OPPOSITION AND REPLY- 9

restrictions applied. It is also legally irrelevant. The concept of "tiering" is not dependent upon the removal of restrictions—an agency tiers whenever it avoids "detailed discussion by referring to another document containing the required discussion." *Kern v. United States Blm*, 284 F.3d 1062, 1073 (9th Cir. 2002).

The Trails Project is tiered to the 2020 LAU Revision. Although the Service did not publicly acknowledge or evaluate the 2020 LAU Revision during the Project's NEPA process, the Record includes "supporting documentation" for the revision, explaining that the Service dissolved all the LAUs in the Selkirk Mountains, reduced designated lynx habitat, and created "three areas of mapped lynx range." *See* AR 6319-29. The Service admits the Project uses the new mapped lynx range from the 2020 LAU Revision. Cross MSJ at 9-10. And the Project's NEPA documents uniformly refer to this new "mapped range," *not* the pre-2020 LAUs. *See, e.g.*, AR 735, 761-67, 771-75 (BA); 1006-13, 1021 (BE); and AR 873, 912-14 (EA).

All the courts to consider the issue have held it is unlawful for the Service to tier logging projects to revised lynx territory maps that have not undergone NEPA review. *See Forsgren,* 252 F. Supp. 2d at 1107; *Red Lodge II*, 2023 U.S. Dist. LEXIS 148464, at *17-21; *Davey*, 866 F. Supp. 2d at 1224-28. In fact, that principle was established in the Service's own authority. *See Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 670 (9th Cir. 1998) (holding it is unlawful for an agency to tier to a document that had not undergone NEPA review) (miscited and misquoted by Cross MSJ at 13); *see also Kern*, 284 F.3d at 1072-73 (citing *Glickman*).

Plaintiff asks the Court to vacate and remand the 2020 LAU Revision because it was a "major federal action" that did not go through the required NEPA review.

COMBINED OPPOSITION AND REPLY- 10

1    In addition, Plaintiff asks the Court to vacate and remand the Trails Project, because

2    it illegally tiered its analysis to a document that had not undergone NEPA review.

3    **II. The Project's Lack of Specificity Violates NEPA (Claim 3)**

4    More than 200 pages of meeting notes in the Record illustrate that the Trails

5    Project is not a run-of-the-mill example of "condition-based management." *See* ECF

6    No. 14-1 at 38-44 (Record index showing notes). Rather, these notes paint the picture

7    of a Project team under pressure to complete the NEPA process without sufficient

8    time or resources. *See, e.g.*, AR 4411 (staff protest they can "only do so much in the

9    given time frame" and are advised that if they cannot be specific, they should "cover

10   generally what you need to do"); AR 4440 (aquatic staff told they need to make do

11   with data from the 2000s); AR 4441-42 (staff needs two seasons to do the proper

12   field work, but that would extend the Project decision to Jan. 2022). The Service

13   decides that the solution is not to delay the Project or allocate more resources, but to

14   use condition-based management to "modify the scope of the NEPA process to

15   ensure completion and effectiveness according to desired timing[.]" AR 4403. The

16   "outcome" of the discussion: "Let's test this approach where we don't have

17   sufficient capacity." AR 4405.

18   Now, the Service tries to advance its "test" by using "condition-based

19   management" as a talisman, going so far as to assert that Plaintiff's claim "has

20   already been rejected" by another ruling involving a different program in a different

21   forest. *See* Cross MSJ at 2 (citing *N. Cascades Conservation Council v. United States*

22   *Forest Serv.,* No. 2:22-CV-00293-SAB, 2024 WL188374, at *7 (E.D. Wash. Jan.

23   17, 2024) ("*Cascades*")). But while *Cascades* held that condition-based

COMBINED OPPOSITION AND REPLY- 11

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1    management is not arbitrary and capricious as a matter of law, it did not hold the

2    converse—that anything labeled "condition-based management" is *acceptable* as a

3    matter of law. *Cascades*, 2024 WL188374, at *20-21. Rather, the court upheld

4    condition-based management as applied to that case—based on facts that provide a

5    useful contrast here. *See id.*

6         In *Cascades,* the EA disclosed "specific prescriptions," indicating "where

7    within the project area vegetation treatment and fuel reduction treatment are

8    authorized," including by providing "maps identifying where those prescriptions

9    would be applied." *Id.* at *19-20. By contrast, the Trails EA designates 94% of the

10   Service's forested land in the Project Area for some sort of commercial logging, non-

11   commercial logging, and/or controlled burning. MSJ at 3 (explaining calculation).

12   The Service highlights the areas open to commercial logging in pink on low-

13   resolution maps. AR 341-43, App. at A-5. But from identifying "specific

14   prescriptions," as in *Cascades*, the Trails EA does not attempt to indicate which type

15   of commercial logging might be allowed within these seas of pink—leaving it open

16   to conjecture which areas will be subject to clearcutting ("shelterwood with

17   reserves"), commercial thinning, or something in between ("commercial thinning

18   with group selection"). *See* AR 341-343; AR 1209-10; *Cascades*, 2024 U.S. Dist.

19   LEXIS 8738, at *19; *see also Alliance for the Wild Rockies v. Weber*, 979 F. Supp.

20   2d 1118, 1125-26 (D. Mont. 2013) (cited at Cross MSJ at 17) (upholding a timber

21   sale that "identif[ied] the project boundaries down to the township and range level").

22        The Trails maps are even less useful for identifying locations for non-

23   commercial activities. The EA estimates non-commercial logging, burning, and

COMBINED OPPOSITION AND REPLY- 12

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

other activities will occur over 45,400 acres—an area that exceeds the 40,300 acres belonging to the Forest in the Project Area. AR 855, 863-64. The Service explains this difficult math by indicating that non-commercial activities will overlap both with one another and with areas designated for commercial logging. AR 863-64. The Service marks maps in yellow to show areas where non-commercial treatments only may be used, but the maps do not display any overlap—it is impossible to tell where pink areas might also be yellow, or which areas might be double yellow. AR 341-43; App. at A-5. Crudely coloring virtually all the forested, Forest-owned land in the Project Area with one of two colors can hardly be classified as "clearly defin[ing] the areas subject to treatment." *See* Cross MSJ at 15. Instead of resembling the project in *Cascades*, the Trails Project seems closer to the one invalidated by the court in *Se. Alaska Conservation Council*, where the Service provided a map showing only the "potential, and not the actual, locations of timber harvest and road building." *See* 443 F. Supp. 3d at 1017.[1]

The EA in *Cascades* also "explains the anticipated timing of implementation[.]" 2024 U.S. Dist. LEXIS 8738, at *19. But with the Trails Project, not even the Service seems sure of the timing in even the broadest sense. The Cross-

---

[1] The Service asserts that it covers its bases by making a "'worst case' assumption that the maximum possible acreage would be treated." *See* Cross MSJ at 22. But by marking everything, the Service conveys nothing. "The Forest Service's evaluation of the Project's maximum impacts does not evaluate the Project's actual expected impacts." *Se. Alaska Conservation Council*, 443 F. Supp. 3d at 1017.

COMBINED OPPOSITION AND REPLY- 13

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

Motion asserts that the Silviculture Report "provides timing for the planned treatment activities." Cross SJM at 17 (citing AR 1216-18). But the cited pages only indicate that commercial thinning, shelterwood logging, group selection logging, and precommercial thinning would "take place over approximately 20 years," or, in other words, at some point during the life of the project. AR 1216-18. And even this estimate is not solid, with the EA reporting that all the planned harvest work will be completed in the first 10 years. AR 922.[2] Once again, the Trails Project more closely resembles the project rejected in *Se. Alaska Conservation Council*, where the EIS did not "include a determination—or even an estimate—of when and where the harvest activities or road construction…will actually occur" over the 15-year life of the project. *See* 443 F. Supp. 3d at 1009; *see also City of Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir. 1985) (holding EIS inadequate because it did not indicate the location or timing of logging and road building).

In *Cascades,* the Service provided "detailed decision criteria" that established predictable outcomes for different conditions and ensured that "the actual conditions on the ground meet the expected conditions disclosed in the Final EA." *Cascades*, 2024 U.S. Dist. LEXIS 8738, at *20 ("If they do, the approved treatment will be

---

[2] This discrepancy is extreme, but unsurprising, for an agency that cannot decide if the Project will produce 134 MMBF or 244 MMBF of timber. *Compare* AR 648 *with* AR 1212. The Cross-Motion's explanation that these two reports "analyzed treatment activities differently based on each report's purpose"(Cross MSJ at 18), only reinforces the impression that neither of these estimates is real.

COMBINED OPPOSITION AND REPLY- 14

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

applied. If they do not, the treatment will not be applied."). By contrast, each set of "decision points" in the Trails EA includes between three and six broad requirements, and the described activity may take place if "some or all" are met. AR 1216-18. The Service puts a lot of pressure on the word "some" to make this seem more exacting, asserting that it does not mean just one, but "at least two." Cross MSJ at 19. That does not help much. For example, "post-harvest piling and burning or mastication" could occur anywhere that "underburning may unduly damage a residual stand" and "[p]roper access to stand for machinery is available." AR 1218. Some "decision points" do not even make sense: the Service could allow commercial thinning with group selection anywhere stands "meet all criteria for Commercial Thinning" and "[o]verall stand [basal area] may be variable." AR 1217.

Neither do the Service's design elements impose meaningful restrictions (Cross MSJ at 19), because they depend on conditions subject to change at the Service's discretion. For example, DE-19 directs the Service to retain more than 50% canopy closure in secondary goshawk habitat. AR 873. However, the Service has shown this requirement can be easily evaded—if it wants to log more extensively in secondary goshawk habitat, it will just "put it as not goshawk habitat." AR 1725-26 (erasing 3,111 acres of secondary goshawk habitat to open it for logging). Similarly, the design element for lynx habitat (DE-17) no longer applies to the 29,000 acres the 2020 LAU Revision disappeared from the "mapped lynx range." AR 873.[3]

_____

[3] This assumes the Service considers the design elements to be restrictions in the first place. A few pages before claiming the design elements "restrain treatment activity"

COMBINED OPPOSITION AND REPLY- 15

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476 FAX: 206.456.5191

Finally, in *Cascades*, the Service alleviated concerns about old-growth trees by committing to "[n]o overstory treatments in late successional reserves." *Cascades*, 2024 U.S. Dist. LEXIS 8738, at *6. The Trails EA only goes so far as to say the Service will retain "most" large-diameter trees "where suited to the site and generally healthy." AR 889. Meanwhile, the Silviculture Report acknowledges that "[s]ome late open and late closed stands would be harvested under the proposed action." AR 1242. The Service's assurance that "[t]reatment [of old growth trees] does not equate to destruction" is hardly comforting; *harvest* certainly does. *See* Cross MSJ at 20. Given such vague parameters, the Project's "impact to old-growth trees and their dependent species is speculative." *See* Sanpoil Order at *23.

Given the vague parameters of every aspect of the Project, it seems fair to say that *all* its effects were speculative, making it impossible to "perform a meaningful analysis of the project's reasonably foreseeable impact." *See Se. Alaska Conserv. Council*, 443 F. Supp. 3d at 1006 and 1006 n.81.

**III.    Service Did Not Take a Hard Look at Project Impacts (Claims 2 & 5)**

A.    *Service Did not Disclose or Examine Impacts of Roads*

The Service cannot point to a "reasonably thorough discussion"—or, indeed, any discussion *at all*—of the "probable environmental consequences" of the up to 292 miles of road reconstruction it planned as part of the Trails Project. *See*

(Cross MSJ at 19), the Service asserts that removing territory from the lynx range "did not remove any restrictions from the Project Area"—despite the existence of lynx design elements. *See* Cross MSJ at 12.

COMBINED OPPOSITION AND REPLY- 16

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1  *Neighbors of Cuddy Mt. v. United States Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir.

2  1998) (quoted at Cross MSJ at 25).

3        The Service claims the BA, BE, and Wildlife Specialist Report "analyzed road

4  impacts to species," but then unhelpfully cites the entire page range for each

5  document. Cross MSJ at 26. It points to a general discussion in the Transportation

6  Report about what road activities "usually," "can," "could," and have "the potential"

7  to do, without any analysis of what the *actual* impacts would be. AR 637(cited at

8  Cross MSJ at 26). It claims the Aquatics and Wildlife Specialist Reports found that

9  the "road improvement impacts would be minimal." Cross MSJ at 26. But the

10  citations that follow do not include any references to the Wildlife Specialist Report.

11  *Id.* Instead, the Service cites several pages of the EA and the Aquatics Report that

12  make *no mention* of planned road improvement or reconstruction work. *See* AR 913-

13  20, 925-26, 904-05 (EA) and AR 1178 and 1166 (Aquatics) (cited at Cross MSJ at

14  26). The few citations to the Aquatics Report that mention road reconstruction

15  include only generalities. *See* AR 1148, 1158 and 1169 ("Some sedimentation is

16  expected from road reconstruction activities."); AR 1150 and 1160 ("Short term

17  increases in sediment may occur during road reconstruction and barrier replacement

18  activities," but these activities "will decrease sediment in the long term."), and AR

19  1180 ("[s]tandard practices include reconstruction criteria and BMPs to minimize

20  impact on streams to the extent feasible.") (cited at Cross MSJ at 26).

21        Despite all this misdirection, the Service cannot point to anywhere in the EA,

22  BA, BE, or Wildlife Specialist Report that even mentions the Project's planned 292

23  miles of road reconstruction, much less that assesses the potential impact to wildlife.

COMBINED OPPOSITION AND REPLY- 17

1    It can point to nowhere in the entire Record that discloses any details of which roads

2    would be reconstructed, what that would entail, when it might happen, and what the

3    impacts might be. And it cannot claim that the EA takes the planned restoration of

4    an unspecified number of "closed and overgrown" roads into account when

5    calculating the Project's drivable road density. *See* AR 637, 916.

6        The best the Service can do is to offer assurances, without citing to the

7    Record, that road reconstruction efforts are "unlikely to occur on all 292 miles of

8    Forest Service system roads…once the agency applies the relevant design elements

9    and standard practices to each sale." Cross MSJ at 26. In other words, the Service

10    will figure it out later—years after the public NEPA process has closed—but it

11    probably will not be all that bad.

12        This answer is inexcusable, particularly given the vast scope of the Project's

13    potential road reconstruction effort, the possibility that the reconstruction of closed

14    roads could have virtually the same environmental impact as building new roads,

15    and the fact that roads have significant adverse impacts on forests and wildlife. *See*

16    discussion at MSJ at 18. This failure alone is sufficient to merit a finding that the

17    Trails EA and FONSI were arbitrary and capricious. *See Lands Council v. McNair*,

18    537 F.3d 981, 987 (9th Cir. 2008) (en banc) (a decision is arbitrary and capricious if

19    an agency "entirely failed to consider an important aspect of the problem."

20        B.    *Service Did Not Take a Hard Look at Impacts to Any Wildlife*

21        It was impossible for the Service to take the requisite "hard look" at the

22    Project's impacts to wildlife, because it lacked enough information to assess those

23    impacts—including which Project activities would take place, where, how often, and

COMBINED OPPOSITION AND REPLY- 18

to what degree. Plaintiff has highlighted just a few species of concern, but this lack of specificity fatally compromises the Service's evaluation of all impacts to wildlife. *See Alaska Ctr. for the Env't v. Armbrister,* 131 F.3d 1285, 1289 (9th Cir. 1997) (internal quotations and citation omitted) (agency must "reasonably set forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision").

Although the Service contends that the EA is "replete with time-specific descriptions of impacts to species," it fails to show that those time descriptions are accurate, consistent, or meaningful. Cross MSJ at 40. Consider the Project's plans for the relatively remote area at the northernmost tip of the Project Area. *See* App. at A-10 and A-11 (Figures 8 and 9). This area lies largely within the new lynx range, with some overlap into pre-2020 lynx territory, and is sandwiched between the Hungry Mountain IRA and the protected grizzly habitat in the LeClerc GBMU and Priest BORZ. It is among the most secluded portions of the Project Area, increasing the likelihood that increased human activity would have significant impacts.[4]

The Project includes plans for multiple "temporary" roads extending into the region. App. at A-11. However, the EA provides no estimate of how long it will take to build these roads, or any indication of whether they will be constructed all at once

---

[4] Meeting notes reveal that Service staff were conflicted about logging in these areas: " The north slopes have all of the timber volume, but there may be areas where we would keep denser stands of timber (according to latest ecologic scientific journals) or for wildlife reasons." AR 4393 (Feb. 26, 2019 meeting).

COMBINED OPPOSITION AND REPLY- 19

1  or staged over a period of years. It does not hint at when commercial logging

2  operations will begin or how long they will last. The Service has marked most of

3  this region in commercial-logging pink (AR 341) but does not indicate how much of

4  that area will *actually* be logged, or whether all areas will be logged at once,

5  sequentially, or over a period of years. When the commercial logging is finished,

6  there may (or may not) be a "multitude of treatments over the next 20 years," at

7  unspecified times and places in the same area, to thin additional trees, remove

8  "ladder fuels," and pile, burn, shred, or scatter logging slash. AR 862-64 and 2599.[5]

9  After the Project is complete, the Service anticipates more logging projects in

10  the same areas over 15-40 years. AR 1233. This prediction is not Plaintiff's

11  "speculative fear." Cross MSJ at 38; *see also id.* at 40, 41, and 42 (similar). It is what

12  the Service tells us—in the EA, the Silviculture Report, and its responses to public

13  comments. AR 886, 889, 1233-34, 1240, 2599. Yet even as it indicates that one

14  logging project might roll right over into another, the Service gives no consideration

15  to the likelihood that the "temporary" roads may remain in place long after this

16  Project concludes, much less what the cumulative impacts to wildlife would be if

17

---

18  [5] The Service calls Plaintiff's attention to a citation error in the Motion. *See* Cross

19  MSJ at 41; MSJ at 22, ln. 21-23 (erroneously quoting AR 2599 to say that "[a]s a

20  result, the short-term impacts will last at least 30 years."). Plaintiff apologizes for

21  this error, corrected in the concurrently filed Errata and Corrected Motion for

22  Summary Judgment. The Service also states that Plaintiff misquoted AR 2599 at

23  MSJ at 23, ln. 6-8, but those quotes are correct. *See* Cross MSJ at 41.

COMBINED OPPOSITION AND REPLY- 20

1   this were to happen. Instead, it waves that possibility off as "unfounded" speculation

2   (Cross MSJ at 38), protesting that even if that were to occur, it would not be part of

3   "*this* Project." Cross MSJ at 29. But the Service describes the Trails Project and the

4   subsequent logging of the same areas as part of a cohesive scheme to "trend forest

5   conditions towards restoring the historical range of variability." AR 886. NEPA does

6   not allow it to segment that scheme into "'multiple actions, each of which

7   individually has an insignificant environmental impact, but which collectively have

8   a substantial impact.'" *Kern*, 284 F.3d at 1078 (citation omitted); *see also Churchill*

9   *Cty. v. Norton,* 276 F.3d 1060, 1076 (9th Cir. 2001) (an agency cannot "escape the

10  existence of a comprehensive program with cumulative environmental effects by

11  'disingenuously describing it as only an amalgamation of unrelated smaller

12  projects'") (internal citation omitted).

13      If the "temporary" roads *are* ever closed, the Service concedes that "[n]ot all

14  road closures are effective." AR 1004. On other points, the Service prides itself on

15  making "worst case" assumptions, so as to "conservatively" disclose impact. Cross

16  MSJ at 22. But in this case, it takes a rosy outlook—adopting an analysis that

17  "assumes" it would achieve a "high degree of closure effectiveness." AR 1004.

18      Similar unknown risks are spread throughout the Project Area, where the

19  Service has marked 94% of its forested land for either commercial logging, non-

20  commercial logging and burning, or both. Given all these uncertainties and

21  unassessed risks, the Service has no reasonable basis for *any* conclusion about how

22  the Project is likely to impact lynx, bears, or any other wildlife.

23

COMBINED OPPOSITION AND REPLY- 21

1      1.  Service Failed to Take a Hard Look at Impacts to Lynx

2          Because its analysis of Project impacts to lynx is based on the unlawful tiering

3  to the 2024 LAU Revision, the Service failed to take the "hard look" that NEPA

4  requires. *See Davey*, 866 F. Supp. 2d at 1231. The Service dismisses this issue as

5  unimportant to a "hard look" claim, repeating its contention that removing 29,000

6  acres from the designated lynx range had no environmental impact. Just two

7  paragraphs later, however, the Service makes the contradictory assertion that lynx

8  will not be adversely impacted by the commercial thinning scheduled for the lynx

9  range, because they are protected by the Project design elements that extend to that

10  lynx range. *Compare* Cross MSJ at 30-31 (ln. 27 to ln. 6) *with id.* at 31 ln.17-27.

11      2.  Service Did Not Take a Hard Look at the Impacts to Grizzly Bear

12         The Service cannot seem to decide whether roads adversely impact grizzly

13  bear, and if so, if it has any responsibility for that impact. Cross MSJ at 33-36; *but*

14  *see* AR 5025 (the 2014 Travel Analysis Report, which is unambiguous on this point).

15         To start, the Service asserts that the Project's net decrease of six miles of open

16  motorized roads will benefit grizzly bears by "increasing seclusion," even though

17  there is no evidence this insignificant decrease will be anywhere near grizzly habitat.

18  Cross MSJ at 33. On the next page, however, the Service discounts the importance

19  of the new "temporary" road that it is building close to, and *bordering on*, designated

20  areas of protected grizzly habitat. *Id.* at 34; *see* MSJ at 28; App. at A-11. Its argument

21  seems to be that as long as the Service follows the letter of the Forest Plan by

22  technically building its roads outside grizzly habitat, it is free from any responsibility

23  under NEPA to consider how these roads will impact grizzlies. Cross MSJ at 34. In

COMBINED OPPOSITION AND REPLY- 22

1    an impressive display of cognitive dissonance, the Service pivots again on the very

2    next page, disputing Plaintiff's assertion that merely gating roads off to the public

3    will not negate their adverse impact on grizzly bear, because it is "well established

4    that less vehicle traffic and less foot traffic means that bears are less likely to be

5    disturbed or displaced from habitat." Cross MSJ at 35.

6         The remainder of the Service's response on grizzly bears merely repeats the

7    rationale in the EA and the BA. *Compare* Cross MSJ at 35-36 *with* MSJ at 28-30.

8    The Service seems believe that once it reaches a conclusion, it has no responsibility

9    to explain how it got there. Thus, it declares there is no merit to Plaintiff's assertion

10    that the Service must explain how limiting logging to daylight hours will mitigate

11    the adverse impacts to grizzly seclusion. Cross MSJ at 36. That, of course, is not the

12    law. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43,

13    103 S. Ct. 2856, 77 L.Ed.2d 443 (1983) (internal citation omitted) (an agency must

14    "examine the relevant data and articulate a satisfactory explanation for its action,

15    including a 'rational connection between the facts found and the choice made'").

16         3.  Service Failed to Take a Hard Look at Impacts to Goshawk

17         In defending its analysis of the Project's impacts on goshawks, the Service

18    repeats now-familiar themes. It boasts about the protections afforded to goshawk in

19    the 14,020 acres of secondary habitat, without acknowledging that the Service

20    slashed this habitat by more than 20% soon after the Project was approved. Cross

21    MSJ at 37; MSJ at 33-34. In response to Plaintiff's concern that the next round of

22    logging after this Project is complete would destroy goshawk habitat just as it is

23    beginning to recover, the Service accuses Plaintiff of displaying an "unfounded" and

COMBINED OPPOSITION AND REPLY- 23

1    "speculative fear" of "repeated logging and reentry"—apparently, for repeating the

2    information found in the EA and the Silviculture Report. Cross MSJ at 38.

3         As discussed above, the Service is obligated to consider the "reasonably

4    foreseeable" future actions it describes in its EA. It cannot turn a blind eye to its own

5    assertions that secondary goshawk habitat might be logged again in about 15 to 25

6    years, preventing it from growing back into suitable goshawk habitat as it predicts.

7    *See* AR 907 (commercial thinning would reduce the canopy closure and crown

8    complexity, decreasing an area's ability to support goshawk nesting for 15-20 years);

9    AR 886 ("Most commercial thinning and commercial thinning with group selection

10   stands would require another entry in about 15 to 25 years.").

11        Not only did the Service fail to consider reasonably foreseeable future actions

12   impacting goshawk, but it also ignored the cumulative impacts of past and present

13   actions. The Service asserts that it had no responsibility to consider the cumulative

14   impact to goshawks from past and present Forest logging projects, because those

15   projects applied the same "science-based practices and elements" as the Trails

16   Project, which the Service asserts "ensure that no reasonably foreseeable timber

17   projects will have significant cumulative impacts on the goshawk." Cross MSJ at 39.

18   This is nonsense. Unsurprisingly, the Service offers no authority for its novel theory

19   that an agency is exempted from a cumulative impacts analysis as long as it believes

20   that related actions are adhering to similar standards. Any such rule would defeat the

21   entire purpose of a cumulative effect analysis—to determine whether the current

22   action "'is related to other actions with individually insignificant but cumulatively

23   significant impacts.'" *Kern*, 284 F.3d at 1075 (quoting 40 C.F.R. § 1508.27(b)(7)).

COMBINED OPPOSITION AND REPLY- 24

The example of the goshawk illustrates why this evaluation is critical. The Service acknowledges that timber sales have the "greatest potential to cumulatively impact goshawks," and that it must examine these cumulative impacts at a Forest-wide scale. AR 909. The Service found that the Trails Project "may impact individual birds but would not affect the continued viability of goshawk populations on the forest." *Id.* Meanwhile, the Sanpoil and Boulder Park projects were under development virtually simultaneously, and both also disclosed adverse impacts on goshawks. MSJ at 32-33. Before proceeding with any of these projects, the Service was required to evaluate the cumulative impacts of all three combined.

## IV.    Service Failed to Comply with Plan and Sanpoil Order (Claim 7)

The SIR mysteriously asserts that although the Service does not know the details of future logging contracts, it can be confident that the reinstatement of Eastside Screens will not require any significant changes to them. AR 4300. But what the Service describes falls far short of actual compliance, much less good faith compliance, with the Eastside Screens restrictions.

First, the Service presents no scientific or biological rationale for its decision to ignore LOS stands under 10 acres. Cross MSJ at 44. It claims this standard "matches the stand size used in seminal scientific assessments like the Interior Columbia Ecosystem Management Project," but that Project actually labels a 10-acre stand as a "mid-scale" size. AR 8063. NEPA requires a better explanation than that the Service is doing it this way because it has always done it this way. *See* Cross MSJ at 44. Unsupported conclusions are not entitled to deference. Rather, the Service must use its experience and expertise to draw a "rational connection between

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1    the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at

2    43 (internal citation omitted).

3         Second, the Service struggles to cast the entire Forest as a landscape that fits

4    Eastside Screen's requirements as a baseline for its HRV analysis. The Forest may

5    be "large," but it is not composed of "relatively uniform…forest types,

6    environmental settings, and disturbance regimes (fire and insects/disease)." As

7    illustrated by App. at A-14, the Forest is a compilation of fractured sections of land

8    stretching across a vast area and varied ecosystems, which have little in common

9    except their political designation. The Service articulates an *alternate* method of

10   setting an HRV baseline, but it is not the method that Eastside Screens proscribes.

11        Third, the Service provides no rationale for fragmenting watersheds by land

12   ownership, nor any justification for doing so under Eastside Screens. If the goal is

13   to return a "landscape" to HRV, "doing so makes no ecological sense. The Service's

14   insistence that its choice is "reasonable," without more, does not entitle it to

15   deference. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at  43.

16        Fourth, the Service does not explain how comparing the tree composition in

17   each watershed with the HRV for the entire Forest complies with the instructions of

18   Eastside Screens. *Compare* AR 4299-300 *with* AR 1224-25.

19        Finally, it strains credulity to suggest the Service is attempting to comply with

20   Eastside Screens in good faith, when its guidance advises Forest personnel to find

21   ways to recast the units that Eastside Screens would forced them to drop from

22   commercial sales into other sale types that will still allow them to be logged—for

23   example, by recategorizing a commercial sale as one that is suddenly necessary to

COMBINED OPPOSITION AND REPLY- 26

1    "protect health and safety." AR 4283. Absent such manipulation, it is impossible for

2    the Service to reasonably conclude that Eastside Screens will not alter the nature of

3    sales that it has not even started to plan.

4    **V. Service Must Complete EIS before Project May Proceed (Claim 6)**

5         The environmental significance of the Trails Project speaks for itself. The

6    Project is massive, impacting a 90,700-acre Project Area, with 24,400 acres of

7    commercial logging, producing up to 244 MMBF of timber. AR 862-64, 1212.

8    While size alone does not prove environmental significance, large federal projects

9    are more likely to have significant environmental impacts. *See WildEarth Guardians*

10   *v. Conner*, 920 F.3d 1245, 1262 (10th Cir. 2019) (there is "no categorical rule that

11   sizable federal undertakings *always* have a significant effect on the quality of the

12   human environment") (emphasis in original).

13        The scope of the Project has bearing on both its context and intensity, the two

14   elements the agency must consider when deciding whether an EIS is required. *Bark*

15   *v. United States Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020). The Project's

16   significant impacts are further illustrated through 8 of the 10 factors it is instructed

17   to consider when evaluating intensity. Cross MSJ at 48; AR 13282 (FSH 1909.15

18   ch. Zero Code § 05, listing factors and citing 40 C.F.R. § 1508.27). The Service's

19   failure to properly explore these factors in the FONSI renders its decision arbitrary

20   and capricious. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety*

21   *Admin.*, 538 F.3d 1172, 1181 (9th Cir. 2008).

22        1. <u>Service Asserts the Project will have Significant Beneficial Impacts</u>

23        The Service *designed* the Project to have significant environmental impacts

COMBINED OPPOSITION AND REPLY- 27

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191

1  by fundamentally changing Forest structure for "the next 30 to 100 years or more."

2  AR 857, 1249. By trending the Forest toward its "historic range of variability," the

3  Service contends the Project will "improve forest health and resilience to

4  disturbance; address insect and disease outbreaks; reduce the potential for future

5  outbreaks; limit the severity of wildland fires…contribute to the local economy; and

6  connect people to their landscapes." AR 857; Cross MSJ at 1 (Project seeks to

7  address unhealthy conditions caused by past management that "make the Forest

8  susceptible to high intensity wildfires, insect infestations, and disease outbreaks").

9  The Service must consider both beneficial and adverse impacts when determining

10 significance. *See* AR 13282 (citing 40 C.F.R. § 1508.27).

11      2.  The Service Claims the Project Will Impact Human Safety

12      In its Cross-Motion, the Service emphasizes that the Project could impact

13 human safety, by impacting the severity of fires in the Wildlife Urban Interface that

14 encompasses the Project Area. Cross MSJ at 3; AR 883

15      3.  Project's Impacts are Highly Uncertain, Creating Unknown Risks

16      The Project's impacts are highly uncertain for many reasons. The Service has

17 deliberately created much of this uncertainty by failing to provide sufficient

18 information about the Project to enable a meaningful assessment of its impacts. *See*

19 Sanpoil Order at *21-32 ("the lack of quantified or detailed information" about a

20 project "creates substantial questions about whether the action will have a

21 cumulatively significant environmental impact"). The Project's use of the 2020 LAU

22 Revision creates additional uncertainty, because the impacts of that remapping have

23 never been considered through the NEPA process. *See Davey*, 866 F. Supp. 2d at

COMBINED OPPOSITION AND REPLY- 28

1229 (holding that a lynx remapping project satisfies several significance factors). Finally, the level of uncertainty surrounding the Project is compounded by its 20-year lifespan, during which the climate, weather, fire patterns, habitat conditions, and Forest structure may shift dramatically.

4. The Project May Adversely Impact Threatened Species

As described *supra*, the uncertainty surrounding the Project's impacts, its reliance on the 2020 LAU Revision, and the gaps in its assessment of risks to wildlife create substantial unknown risks for endangered and threatened species, including the Canada lynx and the grizzly bear.

5. Project Poses Uncertain Risks to Old Growth Trees and LOS

The uncertainty surrounding the Project also raises unknown risks to old-growth trees, LOS forests, and the species that depend on these habitats. Old-growth trees and LOS stands are unique characteristics in the Forest, especially since so little of this habitat remains. A project's impacts on old growth are one of the factors the Court can consider when determining significance. *Greater Hells Canyon Council v. Wilkes*, No. 2:22-cv-00859-HL, 2023 U.S. Dist. LEXIS 178671, at *26-27 (D. Or. Aug. 31, 2023) (citing Sanpoil Order at *11).

6. Elements of the Project are Highly Controversial

The Project is highly controversial, as there is "substantial dispute" about its "size, nature, or effect." *Bark*, 958 F.3d at 870 (quotations and citations omitted). As *Bark* notes, there is considerable scientific and expert disagreement about whether commercial logging and fuels treatments to restore historical conditions will mitigate wildlife risk or increase the severity of wildfires in some circumstances. *See* Cross

COMBINED OPPOSITION AND REPLY- 29

MSJ at 3; *Bark*, 958 F.3d at 870-71; *see, e.g.,* AR 2503 (comment expressing concern that "[c]ommercial thinning on moist sites creates ladder fuels"). The Project's reliance on the 2020 LAU Revision also makes it controversial, as there is substantial dispute about the nature and effect of those revisions. *See Davey*, 866 F. Supp. 2d at 1228-29. The Project's level of uncertainty adds to this controversy. Sanpoil Order at *32.

### 7. Project Could Have Significant Cumulative Impacts

As discussed *supra*, the Trails Project could have significant cumulative impacts, when combined with "reasonably foreseeable" future projects or past and present projects impacting other areas of the Forest.

### 8. Project Will Establish a Precedent for Future Actions

Finally, the Project will establish a precedent for future actions. In addition to establishing a precedent for how the Service will implement the Sanpoil Order and the 2020 LAU Revision, the Project is a test for how far the Service can stretch the boundaries of condition-based management.

Because nearly all factors weigh in favor of a finding of significance, the Trails EA and FONSI should be remanded with instructions to complete an EIS.

## CONCLUSION

Vacatur is the presumptive remedy for NEPA and APA violations. *All. for the Wild Rockies,* 907 F.3d at 1121-22. Plaintiff respectfully asks the Court to hold unlawful, vacate, and remand the Service's 2020 LAU Revision and the EA, FONSI, and Decision Notice for the Trails Project, as violations of NFMA, NEPA, and the APA. *See* 5 U.S.C. § 706.

COMBINED OPPOSITION AND REPLY- 30

1  ANIMAL & EARTH ADVOCATES, PLLC

2                    /s/ Claire Loebs Davis

3

4                    Claire Loebs Davis
                     20520 105th Ave. SW
5                    Vashon, WA 98070
                     Tel: (206) 601-8476
6                    claire@animalearthlaw.com

7                    *Attorney for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

COMBINED OPPOSITION AND REPLY- 31

1

## <u>CERTIFICATE OF SERVICE</u>

2

3      I hereby certify that on April 9, 2025, I electronically filed the foregoing

4  with the Clerk of the Court using the CM/EMF system, which will send

5  notification of this filing to all counsel of record.

6

7                         *s/ Claire Loebs Davis*

8                         Claire Loebs Davis

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ANIMAL & EARTH ADVOCATES, PLLC
20520 105TH AVE. SW
VASHON, WA 98070
206.601.8476  FAX: 206.456.5191