ADAM R. F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

HAYLEY A. CARPENTER (CA Bar No. 312611)
LAWRENCE K. PITTMAN (GA Bar No. 568134)
Trial Attorneys
Natural Resources Section
P.O. Box 7611
Washington, DC  20044
(202) 305-0242 (Carpenter)
(202) 305-0420 (Pittman)
hayley.carpenter@usdoj.gov
Lawrence.pittman@usdoj.gov

RICHARD R. BARKER
Acting United States Attorney

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>  Plaintiff,<br><br>  v.<br><br>U.S. FOREST SERVICE, JOSHUA WHITE, in his official capacity as Forest Supervisor of the Colville National Forest; and CARIN VADALA, in her official capacity as Newport-Sullivan Lake District Ranger<br><br>  Defendants. | Case No. 2:24-cv-00157-RLP<br><br>**DEFENDANTS' REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 13, 2025<br>Time: 2:00 p.m. PST<br>With Oral Argument |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................... 1

ARGUMENT.................................................................................. 1

    I.    The Forest Service's 2020 lynx habitat map updates comply with NEPA. ...................................................................................... 1

        A.    The lynx habitat map updates did not change how the Forest Plan's lynx management direction applies to the Project area. ........... 1

        B.    The 2020 map updates are not a major federal action......................... 4

        C.    Plaintiff's facial challenge to the map updates is not justiciable......... 6

        D.    The Project EA does not tier to the 2020 map updates. ...................... 7

    II.    The Project's condition-based management approach complied with NEPA. ...................................................................................... 8

    III.    The Forest Service took a hard look at the Project's impacts. ....................12

        A.    Road improvement activities.................................................12

        B.    Wildlife........................................................................13

        C.    Lynx ...........................................................................15

        D.    Grizzly Bear...................................................................15

        E.    Goshawk.......................................................................16

    IV.    The Project SIR complies with NEPA, NFMA, and the *Sanpoil* Order. .......17

    V.    An EIS is not required for the Project. .........................................18

CONCLUSION ............................................................................20

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. U.S. Forest Serv.* (*Greater Red Lodge II*),
  No. CV 21-84-M-DLC, 2023 WL 5427921 (D. Mont. Aug. 23, 2023)................5, 6, 7

*Anderson v. Evans*,
  371 F.3d 475 (9th Cir. 2004) .......................................................................19

*City of Davis v. Coleman*,
  521 F.2d 661 (9th Cir. 1975) .......................................................................17

*Conservation Council v. U.S. Forest Serv.* (*North Cascades*),
  No. 2:22-CV-00293-SAB, 2024 WL 188374 (E.D. Wash. Jan 17, 2024) ...............9, 11

*Ctr. for Sierra Nevada Conservation v. U.S. Forest Serv.*,
  832 F. Supp. 2d 1138 (E.D. Cal. 2011) ........................................................13

*Def. of Animals v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) .....................................................................19

*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) ....................................................................... 6

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) .....................................................................17

*Friends of Rapid River v. Probert*,
  427 F. Supp. 3d 1239 (D. Idaho 2019)..........................................................10

*Kern v. U.S. Bureau of Land Mgmt.*,
  284 F.3d 1062 (9th Cir. 2002) ..................................................................... 8

*Kettle Range Conservation Group v. U.S. Forest Serv.* (*Sanpoil*),
  No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wash. June 21, 2023) ...............12

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
  615 F.3d 1122 (9th Cir. 2010) .....................................................................18

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) .......................................................................16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................. 7

*Marsh v. Or. Natural Res. Council*,
  490 U.S. 360, (1989) ...............................................................................20

*Morongo Band of Mission Indians v. Fed. Aviation Admin.*,
  161 F.3d 569 (9th Cir. 1998) ...................................................................14, 15

*Native Ecosystems Council v. U.S. Forest Serv. ex rel. Davey,* (*Davey*),
  866 F. Supp. 2d 1209 (D. Idaho 2012)................................................5, 7, 8

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ..................................................................20

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1056 (9th Cir. 2012) ..................................................................18

*Northcoast Env't Ctr. v. Glickman*,
  136 F.3d 660 (9th Cir. 1998) ..................................................................... 6

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) ................................................................................. 6

*Or. Nat. Res. Council Fund v. Forsgren*,
  252 F. Supp. 2d 1088 (D. Or. 2003)........................................................5, 6

*Salmon Spawning & Recovery All. v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008) ................................................................... 7

*Southeast Alaska Conservation Council v. U.S. Forest Serv.* (*Alaska*),
  443 F. Supp. 3d 995 (D. Alaska 2020)......................................................8, 9

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................. 7

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012) ................................................................... 8

*WildEarth Guardians v. Conner*,
  920 F.3d 1245 (10th Cir. 2019) ....................................................10, 11, 19

*Yellowstone to Uintas Connection v. Marten*,
  No. CV 24-0025, 2024 WL 3400524 (D. Mont. July 12, 2024) ................... 5

## INTRODUCTION

Plaintiff challenges the Sxʷuytn-Kaniksu Connections Trail Project ("Project") by questioning the flexibility and additional, future analysis inherent in the Project's condition-based management approach. What Plaintiff sees as a weakness is a strength. The Project's condition-based management approach meets the needs of a changing landscape while complying with the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA"). Plaintiff mistakenly paints the Project area as crucial habitat for listed species, thereby inflating the minimal impacts of the Project and of updates to a lynx habitat map. The Project is lawful and will benefit forest health and resiliency. The Court should grant judgment to Defendants.

## ARGUMENT

### I.    The Forest Service's 2020 lynx habitat map updates comply with NEPA.

The 2020 lynx habitat map updates do not require NEPA analysis. Unlike map updates in prior cases, the updates here do not impact the Forest Plan's lynx management direction in the Project area. For the same reasons, and because the Forest Service independently prepared lynx habitat maps for the Project EA, the Project EA did not tier to the map updates.[1]

### A.    The lynx habitat map updates did not change how the Forest Plan's lynx management direction applies to the Project area.

The Forest Service's map updates did not change how the Forest Plan's lynx management direction applies to the Project area. Courts have found that map revisions

---

[1] The agency had no obligation to provide public notice of the map updates, but it did so anyway. AR01983 (a slide from a public presentation showing the mapped lynx range).

that change how forest plan standards for lynx apply are major federal actions that require NEPA analysis. *See infra* Section I.B. The Forest Plan standards Plaintiff invoked in its opening brief do not apply to any portion of the Project area. Defs.' Cross Mot. for Summ. J. ("Defs.' Br.") 10, ECF No. 32. Plaintiff raises three other Forest Plan components that are inapplicable or unavailing.

First, Plaintiff raises Forest Plan guideline FW-GDL-WL-04. Pl.'s Resp. and Reply in Supp. of Mot. for Summ. J. ("Pl.'s Resp.") 3, ECF No. 42. This guideline says that "[h]abitat for federally listed species within *designated recovery areas* that occur on National Forest System lands should be retained in public ownership and managed to support recovery." AR16562 (emphasis added). "Designated recovery areas" refers to designated critical habitat for lynx under the Endangered Species Act. AR05942 (defining critical habitat as areas "essential to the conservation of the species"). But there is no designated critical habitat for lynx on the Colville National Forest, so FW-GDL-WL-04 does not apply in the Project area. AR05979, AR05983 (two maps displaying currently designated critical habitat for lynx, which are outside of the Forest).

Moreover, Plaintiff's argument that FW-GDL-WL-04 applies to the Project's mapped lynx range relies on the fact that the guideline is listed a single time in the Biological Assessment. AR00735. However, this single listing was a mistake, as confirmed by the same document's mention of the different, but similarly numbered, FW-*DC*-WL-04 three separate times. That FW-GDL-WL-04 focuses on keeping land in public ownership—an issue that this Project has nothing to do with—further supports that it was a mistake to list the guideline rather than the desired condition. AR16562. FW-GDL-WL-04 does not apply to the Project.

Second, Plaintiff raises FW-DC-WL-02. Pl.'s Resp. 3. This desired condition sets a goal for habitat conditions to be "consistent with the historic range of variability . . . and contribute to the recovery of federally listed . . . species." AR16557. Application of this desired condition was not changed by the map updates because it does not specify where it applies, other than to the "habitat" of all listed species. *Id*. Thus, even if the 2020 map updates never happened, the Forest Service could have defined "habitat" of the lynx under FW-DC-WL-02 as the lynx range rather than the old Lynx Analysis Units ("LAUs"). Further, the map updates did not change the application of desired conditions like FW-DC-WL-02 because they are aspirational goals achievable over an extended time through more than one project—not mandatory standards. AR16511 (Forest Plan).

Third, Plaintiff claims that the map updates changed the application of FW-DC-WL-04. Pl.'s Resp. 3. Not so. This desired condition sets a goal of creating or maintaining forest successional stages within LAUs that provide a mosaic of lynx habitat with a landscape pattern consistent with the Forest's historic conditions. AR16557. The map updates did not change the application of FW-DC-WL-04 because the Project's mapped lynx range, to which the Forest Service applied FW-DC-WL-04, includes all potential lynx habitat. *See* Defs.' Br. 8-10. Therefore, all potential lynx habitat subject to FW-DC-WL-04 within the old LAUs is also in the new mapped lynx range and is still subject to FW-DC-WL-04.

Plaintiff also claims that the map updates changed application of the Project's design elements, Pl.'s Resp. 4, but this argument has no merit because nothing required the agency to apply the design elements to any particular area, whether under the old or new maps. The Record supports application of design elements to the mapped lynx range,

which is all that NEPA requires. AR00912; Defs.' Br. 8-10. The design elements were finalized after the 2020 map updates, so the design elements' applicability could not possibly have been changed by the map updates. AR01270 (the Decision, dated 2021).

Last, Plaintiff suggests that the map updates changed the Forest Service's monitoring requirements for lynx and changed how the agency analyzed the Project's impacts to lynx in the EA. Pl.'s Resp. 3-5. Although the Forest Plan directs the agency to monitor habitat conditions at the LAU scale, in the next sentence the Plan identifies only the LAUs in the Kettle-Wedge core area, which is outside of the Project area. AR16555. Further, the new mapped lynx range includes all potential lynx habitat, so the Project EA's focus on the mapped lynx range is scientifically supported in the Record, and this focus would persist even if the Agency were operating under the old LAUs. AR00912 (explaining that the Forest Service engaged in extensive data collection and mapping of lynx habitat in the Project area rather than relying on the map updates); *See* Defs.' Br. 8-10 (explanation of how the map updates accurately captured all potential lynx habitat).

## B.     The 2020 map updates are not a major federal action.

Plaintiff relies heavily on earlier lynx map cases to assert that the 2020 map updates required NEPA analysis. That reliance is misguided. The cases turned exclusively on whether the lynx map revisions changed where Forest Plan standards applied. *See* Defs.' Br. 11-12. Because the 2020 map updates did not change where Forest Plan standards apply, this case is distinguishable, and the updates are not a major federal action requiring their own NEPA analysis.

Unlike the remapping at issue, each of the four earlier remapping cases involved changed protections for lynx in the project area. The courts in *Greater Red Lodge II* and

*Davey* ruled that remapping of lynx habitat was a major federal action because it meant removal of lynx-protective standards from the project area. *All. for the Wild Rockies v. U.S. Forest Serv. (Greater Red Lodge II)*, No. CV 21-84-M-DLC, 2023 WL 5427921, at *7 (D. Mont. Aug. 23, 2023) ("The court's focus in *Davey* was on the removal of [Forest Plan amendment] protections for previously protected areas, which is what happened here as well." (citing *Native Ecosystems Council v. U.S. Forest Serv. ex rel. Davey (Davey),* 866 F. Supp. 2d 1209 (D. Idaho 2012)). Similarly, in *Forsgren*, a changed lynx map direction was a major federal action because it "decreased protection for the lynx" by narrowing the definition of primary lynx habitat such that no primary habitat was left in the project areas. *Or. Nat. Res. Council Fund v. Forsgren*, 252 F. Supp. 2d 1088, 1105 (D. Or. 2003). Last, in *Yellowstone to Uintas Connection v. Marten*, No. CV 24-0025, 2024 WL 3400524, at *5 (D. Mont. July 12, 2024), the court held "the Forest Service could not rely on a new lynx habitat map that removed areas within the project boundary from [Forest Plan amendment] protections without reviewing the new map under NEPA."

Thus, contrary to Plaintiff's assertions, lynx habitat map revisions are only major federal actions when they remove Forest Plan lynx protections in a project area. Here, the Project area has only ever contained secondary habitat. There is no core or primary lynx habitat under either the old or new maps. AR01006, AR06321. Forest Plan standards for lynx have therefore never applied to the Project area, and accordingly, the remapping was not a major federal action. Plaintiff's site-specific challenge to the map updates fails.

The 2020 map updates are also not a major federal action in the context of Plaintiff's facial challenge because Plaintiff has not demonstrated that the map updates, through the Project, have impacts on the physical environment. The Ninth Circuit has

held that an agency action cannot be a major federal action if it "neither propose[s] any site-specific activity" nor "call[s] for specific actions directly impacting the physical environment." *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 667, 670 (9th Cir. 1998). The court in *Greater Red Lodge II* specifically analogized this reasoning to lynx habitat map updates, stating that *Glickman* held that the guidelines there "were not subject to NEPA review at the time they were adopted" and only would be, if at all, in the context of a site-specific action. 2023 WL 5427921, at *6 (citation omitted).

### C.   Plaintiff's facial challenge to the map updates is not justiciable.

The rulings in *Ohio Forestry*, *Ecology Center*, and *Forsgren* render Plaintiff's facial challenge to the map updates nonjusticiable. In *Ohio Forestry*, the Court held that facial challenges to programmatic-type actions like a Forest Plan generally are not ripe for review. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-37 (1998). The Ninth Circuit has further developed this rule, holding that "[c]hallenges to forest-wide management practices . . . must be made in the context of site-specific actions. The plaintiff must allege a 'specific connection' between the challenged site-specific action and the general practice." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009) (citing *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 734). Here, Plaintiff cannot allege a "specific connection" between the map updates and the Project because, as described above, the map updates do not impact lynx protections in the Project area. In *Forsgren*, the court applied *Ohio Forestry* in the lynx map revision context. It found plaintiffs' challenge ripe because they sought injunctive relief only for the site-specific timber sales they challenged. 252 F. Supp. 2d at 1098. By contrast, Plaintiff here seeks an injunction on any project on the Forest that references the 2020 map updates. Pl.'s Mot. for Summ.

J. ("Pl.'s Br.") 11, ECF No. 24.

Further, Plaintiff lacks standing for a facial challenge. Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum" of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Specifically, a plaintiff must show it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). For the causation element, a plaintiff must show that "they have a procedural right that, if exercised, *could* protect their concrete interests." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (citation omitted). Plaintiff cannot show that NEPA analysis on the map updates could protect their interest in the lynx because, in the only implementation of the map updates that is challenged by Plaintiff—the Project—the map updates had no impact on management direction for lynx.

### D.    The Project EA does not tier to the 2020 map updates.

Plaintiff incorrectly maintains that the Project EA tiered to the 2020 map updates. Pl.'s Resp. 9-11. Plaintiff does not engage with *Greater Red Lodge II* and *Davey*'s reasoning for why the NEPA analysis for those projects had unlawfully tiered to lynx map revisions. In those cases, the court found that the projects' NEPA analyses relied on, or tiered to, the map updates because "[w]ithout the adoption of the [revised] map . . . the [p]roject area would have been subject to the restrictions contained in the [forest plan]." *Greater Red Lodge II*, 2023 WL 5427921, at *6 (quoting *Davey*, 866 F. Supp. 2d at 1225 (D. Idaho 2012)). Because the map updates here did not remove any restrictions from the Project area, the Project EA did not tier to the map updates. Plaintiff claims that this fact

is "legally irrelevant," Pl.'s Resp. 10, but the courts in *Greater Red Lodge II* and *Davey* found it essential. *Id.* Further, the Project EA did not tier to the map updates because the Forest Service performed extensive data collection and mapping of lynx habitat for the Project EA rather than rely on the 2020 map updates for the required analysis. AR00912; *see Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002) (an agency tiers when it "refer[s] to another document containing the required discussion.").

## II.    The Project's condition-based management approach complied with NEPA.

The Project EA complied with NEPA by providing sufficient information to promote public participation and informed decision-making. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (NEPA analysis must "permit members of the public to weigh in with their views and thus inform the agency decision-making process." (citation omitted)).

The Project's condition-based management approach conforms to the approach this Court upheld in *North Cascades. See* Defs.' Br. 22. Plaintiff's comparison to *Southeast Alaska Conservation Council v. U.S. Forest Serv.* (*Alaska*), 443 F. Supp. 3d 995 (D. Alaska 2020) instead is inapposite. Pl.'s Resp. 13-14, 16. *Alaska* is inapplicable because, there, the Forest Service analyzed a condition-based management project on *1.8 million acres*, including timber harvest on 125,529 acres. 443 F. Supp. 3d at 1000-02, 1008. The large scale of the project was crucial to the court's determination that the Environmental Impact Statement ("EIS") at issue did not provide enough specificity. *Id.* at 1014. The Trail Project is considerably smaller, authorizing timber harvest on only 24,400 acres, within a Project area of approximately 40,300 acres of National Forest system lands. AR00863, AR00855. The court in *Alaska* rejected the agency's particular method of

analyzing the maximum impacts of timber harvest and roads, but only because the EIS assumed that "considerably more timber would be harvested than is actually authorized under each alternative," whereas, here, the commercial treatment authorized mirrors what the EA analyzed. 443 F. Supp. 3d at 1011. The court in *Alaska* also noted that "[w]hile an agency's analysis of a proposed action's maximum potential impacts *may be appropriate for an EA*, the Forest Service's analytical framework in this case is not sufficient to meet the requirements for an EIS." *Id*. at 1013 (emphasis added).

*North Cascades* is more apposite because both projects: were analyzed in an EA, set forth detailed decision criteria to determine where specific treatments would apply, developed maps that identified where treatments would be applied, and analyzed the maximum potential impacts of those treatments. *N. Cascades Conservation Council v. U.S. Forest Serv.* (*North Cascades*), No. 2:22-CV-00293-SAB, 2024 WL 188374, at *7 (E.D. Wash. Jan 17, 2024).

In *Center for Biological Diversity v. United States Forest Service*, the District of Montana recently issued a Findings and Recommendation upholding an EA for a 15-year condition-based management project with similarities to this Project. Findings and Recommendations at 50-67, No. 23-cv-110 (D. Mont. March 31, 2025), ECF No. 69, attached as Exhibit 1. There, the Forest Service identified areas "preliminarily suitable for treatment actions." *Id*. at 5. The court noted that the "precise location of treatments and temporary road building will therefore be determined according to conditions on the ground and using a '[T]reatment Matrix' to guide decision-making," which mirrors the Project's Decision Points. *Id*. The Forest Service, like here, also conducted a worst-case scenario analysis to determine the maximum impacts of treatment activities. *Id*. at 56. As

1
2
there, the Court should find this Project consistent with NEPA.

3       Plaintiff objects to the Project's condition-based management approach for several

4   reasons, none of which have merit. First, Plaintiff's argument that the Forest Service

5   selected condition-based management to meet a targeted decision date is unavailing. Pl.'s

6   Resp. 11, citing AR04403. To the contrary, the Forest Service extended the Project

7   timeline by three months to allow more data gathering. AR04405. Plaintiff takes an out of

8   context statement regarding aquatics data to suggest that the Forest Service used stale

9   data for its analysis. Pl.'s Resp. 11, citing AR4440. Plaintiff is mistaken. The same

10  document states that "there is no concern [that the] data will be stale by implementation,"

11  AR04440, and there is ample evidence in the Record of recent data collection. *See, e.g.*,

12  AR00912, AR01010; *see also Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239,

13  1258 (D. Idaho) ("the fact that some of the data is 'old' does not mean that the data is

14  unreliable."). Further, all of Plaintiff's citations are from 2019 meeting notes, which

15  necessarily say very little about the robust analysis that was ultimately part of the 2021

16  Project Decision.

17
18      Second, the Forest Service produced maps showing locations for the Project's

19  commercial and noncommercial treatment activities. AR00935-37. Plaintiff argues that

20  the maps must identify the precise locations of treatment prescriptions and where

21  treatments will overlap. Pl.'s Resp. 12-13. NEPA does not require this level of detail. In

22  *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019), the Tenth Circuit

23  held an agency is *not* required to identify the exact locations of treatments in condition-

24  based management projects. The nature of the project—responding to changing

25  conditions over 10 to 15 years—made identification of specific sites for treatment

26
27
28

"impracticable." *Id.* at 1261. Likewise, it is impracticable to identify such areas here.

Next, Plaintiff's attack on the Forest Service's estimates of when implementation will occur fails. The Silvicultural Report states that "[c]ommercial thinning treatments would take place over approximately 20 years," and noncommercial treatment is estimated to occur two to three years after harvest. AR01216; AR01218. Plaintiff maintains that one errant statement regarding recreation impacts casts doubt on this timeline, Pl.'s Resp. 14, but the EA and greater Record are replete with references to the 20-year figure. AR00914, AR01212, AR01216-17, AR00770. Unlike Plaintiff's cited cases, Pl.'s. Resp. 14, the Project provides estimates of when and where treatment activities are to occur. *See North Cascades*, 2024 WL 188374, at *7 (maps identifying treatment locations and "estimates of the timing of implementation" satisfied NEPA).

Fourth, Plaintiff takes issue with the Decision Points. The Project employs Decision Points to direct Project treatments to appropriate stands, similar to the project in *North Cascades*. *Id.* ("The Final EA disclosed detailed decision criteria that will be applied during . . . implementation to ensure the actual conditions on the ground meet the expected conditions disclosed in the Final EA."). Plaintiff attempts to discredit the Decision Points by identifying only two out of context. Pl.'s Resp. 15. However, at the time of implementation, the Forest Service considers all Decision Points for any given treatment to thoughtfully prioritize a specific stand for that treatment. AR01217. The Project's design elements and standard practices further restrain Project treatments. Defs.' Br. 19; AR01214. Together, the Decision Points, design elements, standard practices, and specific treatment maximum acreages, AR00862-67, specify Project activity sufficiently under NEPA.

Plaintiff next argues the design elements do not impose meaningful restrictions. Pl.'s Resp. 15. But Plaintiff's reasoning is unpersuasive. First, the agency removed some specific units from goshawk secondary habitat after it identified that the units were infested with root disease, as explained below. AR01725. Second, Plaintiff's argument related to the design element for lynx habitat is addressed above. *See supra Section I.A.*

Last, Plaintiff argues that the Project's impacts on old growth trees and late and old structure are speculative. Pl.'s Resp. 16. However, the documents Plaintiff relies on were completed before issuance of the order in *Kettle Range Conservation Group v. U.S. Forest Serv.* (*Sanpoil*), No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wash. June 21, 2023). Following that order, the Forest Service prepared a Supplemental Forest Vegetation Report, AR04282-85, and a Supplemental Information Report ("SIR"), AR04296-309, to assess any potential changes to Project effects. As described below, the SIR included an effects analysis on vegetation, which included gathering extensive data on late and old structure for the Project area. AR04297-99.

## III. The Forest Service took a hard look at the Project's impacts.

### A. Road improvement activities

None of Plaintiff's arguments cast doubt on the Forest Service's analysis of the Project's road impacts. Plaintiff argues that the Forest Service does not provide the "actual impacts" of road reconstruction and maintenance. Pl.'s Resp. 17. But different Project analyses *do* explain such impact. For example, in the Aquatics Report, the Forest Service considered the road reconstruction's impacts to streams. AR01174-76. The Wildlife Specialist Report analyzes road treatments' impacts to wildlife. AR01116, AR01072-77, AR01082-84, AR01089-92. The Biological Evaluation also discusses road

reconstruction's impacts on Canada lynx and the grizzly bear, AR01010-12, AR01014-20. And the Biological Assessment explains the Project's road work, AR00725-26, and impacts on aquatic and terrestrial habitat, AR00732-71.

Although the Forest Service provides maps explaining where road work will occur, AR00993-95, Plaintiff claims the Forest Service did not identify which roads would be reconstructed, when, and how. Pl.'s Resp. 18. Plaintiff fails to explain how greater specificity would inform the NEPA process. *Ctr. for Sierra Nevada Conservation v. U.S. Forest Serv.*, 832 F. Supp. 2d 1138, 1160 (E.D. Cal. 2011) (holding lack of more specific data on roads "did not prevent the EIS from sufficiently 'foster[ing] both informed decision-making and informed public participation.'" (citation omitted)).

**B.    Wildlife**

Although Plaintiff has framed its non-species-specific hard look arguments differently over the course of briefing—first as impacts to "wildlife diversity," Pl.'s Br. 22, and now as impacts to general "wildlife," Pl.'s Resp. 18-21—it has consistently argued that the flexibility of the condition-based management approach prevents the agency from taking a hard look at the Project's impacts to wildlife. The EA and greater Record prove otherwise by disclosing and analyzing wildlife impacts.

First, Plaintiff's arguments concerning the northernmost region of the Project area fall flat. Pl.'s Resp. 19-20. Nearly all of Plaintiff's criticisms regarding this area are not specific to wildlife—rather, the arguments are iterative of its roads and condition-based management arguments. *See supra* Sections II, III.A. The only argument Plaintiff raises pertaining to wildlife in this region relies on one statement that "there may be areas" in the region "where we would keep denser stands of timber (according to latest ecological

scientific journals) or for wildlife reasons." AR04393. Contrary to Plaintiff's characterization, this quote only highlights that, at the time of implementation, the agency will stringently apply the design elements and standard practices that ensure minimal impacts to wildlife. AR01217, AR00867-74, AR00938-51.

Plaintiff next repeats its ill-supported fear of future logging impacts. Pl.'s Resp. 20-21. Again, Plaintiff overstates the Record's discussion of future projects and overlap of Project treatments. The Project authorizes reentry into units during the latter half of the Project (10-20 years) to implement non-commercial treatments like prescribed burning and mastication for wildfire mitigation. AR02599. Plaintiff does not explain how such noncommercial treatments will impact wildlife. The EA explains that, in order to continue moving the Project area toward historic conditions, more treatment under a different project would be necessary in 15-25 years. AR00886. In response, Plaintiff makes a new argument: that the agency must analyze this unknown project(s), which could take place in up to 25 years, in a single NEPA analysis with this Project. Pl.'s Resp. 21. This contention fails because this Project and any such future project(s) have independent utility. *See Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 580 (9th Cir. 1998) (holding that two projects need not be analyzed in a single NEPA analysis because each had "independent utility," and the project at issue was designed to mitigate "*existing* problems." (citations omitted)).

Last, without mentioning wildlife, Plaintiff again speculates that the Project's temporary roads will never be closed and that, even if they are, the closures will be ineffective. Pl.'s Resp. 21. Plaintiff does not address the Project's requirement to close all temporary roads after Project activities, AR01018, and that these closures will likely be

effective. AR01004, AR05168 (guidance to obliterate temporary roads within five seasons of commercial treatment). Regardless, the agency will be monitoring all road closure devices for 5 years post-Project and correcting any breaches. *Id*.

## C.    Lynx

Plaintiff argues that, because the EA allegedly tiered to the 2020 map updates, the Forest Service failed to take a hard look at the Project's impacts to lynx. Pl.'s Resp. 22. As explained above, this argument fails because the EA does not tier to the map updates. Nor is Plaintiff successful when suggesting that a design element's application to the mapped lynx range constitutes a failure to take a hard look. Pl.'s Resp. 22. As part of the NEPA analysis for this Project, the Forest Service independently verified the Project area mapped lynx range without relying on the map updates. AR00912, AR01010. Thus, this design element's application to the mapped lynx range is supported in the Project EA.

## D.    Grizzly Bear

The Service has never made the inaccurate statement that roads do not adversely impact the grizzly bear, as Plaintiff suggests. Pl.'s Resp. 22. Rather, the agency has appropriately focused on the Project's net decrease in road mileage and 30-acre increase of roadless core habitat in the Project area. AR00916. The agency found that any adverse impacts from the Project's roads will be mitigated by: keeping all new roads built under the Project, and select other open roads in the Project area, closed to public use, AR01105, AR01107; closing all of the Project's roads post-Project, AR00918; and monitoring all road closures for five years post-Project, AR01004. Plaintiff's criticism of the Project's net decrease of six miles of roads as "insignificant" and nowhere "near grizzly habitat" is also misguided. Pl.'s Resp. 22. A net decrease of six miles of road is

not insignificant, given that bears are most prone to being disturbed or displaced within 500-feet of any road or motorized trail. AR01015. Further, many of the road segments to be decommissioned are on the Eastern side of the Project area, AR00728-30, where Plaintiff argues that suitable grizzly bear denning habitat is located. Pl.'s Br. 29.

Plaintiff argues the agency has not analyzed the impacts of a temporary road bordering, but outside of, core habitat in the recovery zone. Pl.'s Resp. 22. But this analysis is plainly contained in the Record at AR01067, AR01072-80. Plaintiff is wrong to suggest that the agency did not explain how limiting logging to daylight hours would mitigate impacts. Pl.'s Resp. 23. The Forest Service explained that operation of heavy equipment and increased human presence could disturb bears, so limiting these items to only certain times and a few active units at a time lessens this potential impact. AR01017.

### E.    Goshawk

Plaintiff retreads the same fruitless ground with its goshawk arguments, but the Record demonstrates the agency's thorough analysis of goshawk impacts. For example, Plaintiff alleges that the Forest Service has erased secondary goshawk habitat to circumvent goshawk protections, but this portion of secondary habitat is infested with root disease and therefore will likely suffer mortality through disease or wildfire. Defs.' Br. 39; AR01100, AR01216. This area is in a watershed with goshawk habitat above historic levels, and removal of the trees will improve goshawk habitat in the long term. *Id*. Further, Plaintiff overstates the Record's discussion of potential future projects—such projects, if they occur at all, are certainly not reasonably foreseeable. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014) ("Although projects need not be finalized before they are reasonably

1

2 foreseeable, they must be more than merely contemplated." (citations omitted)).

3          Nor does Plaintiff's cumulative effects argument hold water. Pl.'s Resp. 24. Far

4 from "ignor[ing]" cumulative impacts from other projects, the agency crafted standard

5 practices and design elements to address management considerations for the goshawk as

6 identified in a forestwide viability assessment. AR01066, AR11102. Similar standard

7 practices and design elements apply to all timber sales on the Forest. AR00909-10.

8 **IV.    The Project SIR complies with NEPA, NFMA, and the *Sanpoil* Order.**

9          Plaintiff demands that the Project SIR contain an exact accounting of each timber

10 sale under the Project over the next 20 years and demonstrate their consistency with the

11 Eastside Screens. The bar for NEPA compliance is not so high. *See Env't Prot. Info. Ctr.*

12 *v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) ("[N]or do we require the

13 government to do the impractical, if not enough information is available to permit

14 meaningful consideration." (citation omitted)). The agency analyzed late and old

15 structure in the entire Project area, consistent with the Eastside Screens, and confirmed

16 that the first three timber sales did not need to be changed to comply with the Eastside

17 Screens. *See* Defs.' Br. 43. Based on this analysis, the agency predicted that the

18 remaining five timber sales would also not need to be substantially altered. AR04299.

19 NEPA requires no more. *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975)

20 ("Reasonable forecasting and speculation is thus implicit in NEPA." (citation omitted)).

21          Plaintiff maintains its faulty criticism of the SIR's use of ten acres as a minimum

22 stand size. Pl.'s Resp. 25-26. The Eastside Screens is silent on the size of stand to be

23 considered in late and old structure analysis. AR13166-76. And since the Eastside

24 Screens are a forest plan amendment, the Forest Service is entitled to substantial

25

26

27

28

deference in interpreting its own plan. *Native Ecosystems Council*, 697 F.3d at 1056. There is ample scientific support in the Record for a 10-acre minimum stand size. AR08052 (stating ten acres is a "finer scale"), AR08063 (characterizing ten acres as a "small patch[]" and describing prior studies that used a ten-acre scale).

Plaintiff's second argument—that the SIR uses forest-wide late and old structure conditions as a baseline—also fails. Pl.'s Resp. 26. The Eastside Screens' guidance for identifying the baseline is vague, and the Forest Service has interpreted this guidance in a scientifically-supported manner, using its technical expertise. Defs.' Br. 44-45; *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (holding that the court's deference to the agency "is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise.").

Plaintiff's third argument also misses the mark. The Eastside Screens does not require the agency to consider non-National Forest System lands in the LOS analysis. Pl.'s Resp. 26. In fact, the agency has strong support from the Forest Plan for excluding these lands. AR16532 ("Historical range of variability will be evaluated *on National Forest System lands* at the appropriate scale." (emphasis added)). Weaker still is Plaintiff's last argument against the SIR: that the agency has allegedly advised its personnel to circumvent the Eastside Screens standards. Pl.'s Resp. 26-27. Far from circumvention, the agency simply identified a treatment option affirmatively allowed under the Eastside Screens. AR13167 (the Eastside Screens stating that "sales to protect health and safety" are not subject to certain standards).

## V.    An EIS is not required for the Project.

Plaintiff fails to show the Finding of No Significant Impact ("FONSI") was arbitrary, capricious, or a violation of law, *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004), or explain what would be accomplished by an EIS "that would be material to whether the Project should proceed as planned." *WildEarth Guardians*, 920 F.3d at 1263-64 (upholding a condition-based management project's FONSI).

Plaintiff first repeats its meritless argument that the Project's size requires an EIS. Pl.'s Resp. 27. Other courts have rejected this notion and upheld FONSIs for larger projects. *See* Defs.' Br. 48-49. Plaintiff then presses that the Project will have significant beneficial impacts. Not so. That the Project will *trend* the Project area toward desired conditions does not mean it will have significant impacts. In fact, the agency disclosed in the EA that stands receiving Project treatment would need other treatment, authorized under other projects, to continue to trend toward historical conditions. AR00886.

Plaintiff argues the Project's impacts are highly uncertain because the agency allegedly failed to provide enough information regarding the 2020 lynx map updates or the specifics of Project treatments. But NEPA "regulations do not anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain*." In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1070 (9th Cir. 2014). The Forest Service analyzed the Project's impacts and provided sufficient information to foster informed decisionmaking. AR00876-97; s*ee supra* Section II. The Project EA's reference to the 2020 map updates does not render impacts highly uncertain because the EA does not tier to the map updates and provides a thorough consideration of lynx impacts. *See supra* Section I.D, III.C. Plaintiff fails to show that any of these arguments create true uncertainty, much less the high level of uncertainty required to

trigger this factor.

Plaintiff next argues the Project poses risk to endangered and threatened species, old growth trees, and late and old structure stands but does not support its assertions. Pl.'s Resp. 29. The agency evaluated impacts to listed species and determined that impacts would not be significant. *See supra* Section III.B-E. Further, the agency analyzed the Project's impacts to late and old structure forest and old growth within the Vegetation Report, AR01233-50, and relied on scientific articles, AR11633-59, and agency experts to determine that the Project would not have a significant effect on these resources, AR12210-14; Defs.' Br. 20-21, 43. Plaintiff also argues the Project is highly controversial, citing its own comment regarding impacts to old growth and late and old structure. Pl.'s Resp. 29-30. But "[s]imply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005). As explained above, the agency analyzed impacts to LOS and old growth. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts.")

Last, Plaintiff argues the Project will establish a precedent. However, Plaintiff presents no reason to distinguish this EA as uniquely precedential. *See* Defs.' Br. 49-50.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendants on all claims and deny Plaintiff's motion for summary judgment.

Respectfully submitted this 23rd day of April, 2025.

ADAM R. F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

 /s/    Hayley A. Carpenter
HAYLEY A. CARPENTER (CA Bar No. 312611)
LAWRENCE K. PITTMAN (GA Bar No. 568134)
Trial Attorneys
Natural Resources Section
P.O. Box 7611
Washington, DC  20044
(202) 305-0242 (Carpenter)
(202) 305-0420 (Pittman)
hayley.carpenter@usdoj.gov
lawrence.pittman@usdoj.gov

RICHARD R. BARKER
Acting United States Attorney

*Attorneys for Defendants*