# Exhibit 1
# District of Montana Findings and Recommendation

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.,*<br><br>    Plaintiffs,<br><br>vs.<br><br>U.S. FOREST SERVICE, *et al.,*<br><br>    Defendants,<br><br>    and<br><br>SUN MOUNTAIN LUMBER, INC., a Montana Corporation,<br><br>    Defendant-Intervenor. | Lead Case:<br><br>CV 23-110-M-DLC-KLD<br><br><br>FINDINGS AND RECOMMENDATION |

1

GALLATIN WILDLIFE
ASSOCIATION, a non-profit
organization, *et al.,*

     Plaintiffs,

vs.

MATT JEDRA, in his official capacity
as Forest Supervisor for the Custer
Gallatin National Forest,[1]

     Defendants.

     and

SUN MOUNTAIN LUMBER, INC., a
Montana Corporation,

     Defendant-Intervenor.

Member Case:

  CV 23-154-M-DLC-KLD

     This matter comes before the Court on cross-motions for summary judgment in a consolidated case. Center for Biological Diversity, Alliance for the Wild Rockies, and Council on Wildlife and Fish (collectively "CBD") are plaintiffs in the lead case. Gallatin Wildlife Association, Native Ecosystems Council, and WildEarth Guardians (collectively "GWA") are plaintiffs in the member case. The full list of defendants in the consolidated cases are the U.S Forest Service

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current public officers are substituted for their predecessors as named Defendants in both the Member and Lead case.

Case 2:24-cv-00157-RLP     ECF No. 48-1     filed 04/23/25     PageID.726     Page 4
of 69
Case 9:23-cv-00110-DLC     Document 69     Filed 03/31/25     Page 3 of 68

("USFS"); Leanne Marten, in her official capacity as Regional Forester of the U.S.

Forest Service Region 1; Matt Jedra, in his official capacity as Forest Supervisor

for the Custer Gallatin National Forest; the U.S. Fish and Wildlife Service

("FWS"); Tom Schulz, in his official capacity as Chief of the U.S. Forest Service;

Paul Souza, in his official capacity as acting Director of the U.S. Fish and Wildlife

Service; Doug Burgum, in his official capacity as Secretary of the Interior; the U.S.

Department of the Interior, and defendant-intervenor Sun Mountain Lumber

(collectively "Defendants").

CBD and GWA (collectively "Plaintiffs") challenge the approval of the

South Plateau Landscape Area Treatment Project ("Project" or "South Plateau

Project") on the Custer Gallatin National Forest and allege violations of the

Administrative Procedure Act ("APA"), National Environmental Policy Act

("NEPA"), the National Forest Management Act ("NFMA"), and the Endangered

Species Act ("ESA"). Pending before the Court are Plaintiffs' motions for

summary judgment (Docs. 45, 47), Defendants' cross-motions for summary

judgment (Docs. 54, 56), and CBD's motion to supplement the administrative

record or take judicial notice (Doc. 43). The Court held oral argument on March

11, 2025.

In briefing, CBD incorporated all arguments and issues raised by GWA on summary judgment. (Doc. 46 at 58). At oral argument, GWA indicated that it likewise joins in all arguments and issues raised by CBD on summary judgment.

For the reasons set forth below, it is recommended that Plaintiffs' motions for summary judgment be denied, Defendants' cross-motions for summary judgment be granted, and CBD's motion to supplement the administrative record or take judicial notice be denied.

## I.    BACKGROUND

The Project area consists of 39,909 acres in Gallatin County, Montana, in the Hebgen Lake Ranger District of the Custer Gallatin National Forest. (SP004475). The Project area is located west of Yellowstone National Park, south of US Highway 20, and east of the Montana-Idaho border. (SP004475). The Project is authorized to take place over a 15-year period. (SP004478).

The Project authorizes up to 16,462 acres of forest treatments within the Project area. (SP004476). Authorized treatments include 5,551 acres of clearcut harvest, 6,593 acres of commercial thinning, and 2,514 acres of non-commercial thinning. The Project also authorizes 56.8 miles of temporary roads and 1,804 acres of fuels treatments. (SP004476). The stated goals of the Project are to "increase landscape resilience to insects and disease, treat hazardous fuels, and contribute to a sustained yield of timber products." (SP004475).

Rather than identifying precisely where forest treatments will take place, the Project instead identifies areas as "preliminarily suitable for treatment actions." These areas include 19,630 acres, which exceeds the maximum of 16,462 acres authorized by the Project. (SP004340.) The precise location of treatments and temporary road building will therefore be determined according to conditions on the ground and using a "Treatment Matrix" to guide decision-making. (SP004505-07). Project Design Features provide further sideboards. (SP004340). To ensure compliance, the Project also "includes and makes binding the application of" Resource Review Checklists, and conditional NEPA Monitoring. (SP004475).

USFS indicates the Project's "landscape approach" is intended to "account for potential changes in on the ground conditions over the 15-year period of implementation." (SP004340). USFS anticipates that treatment consisting of timber harvest would occur via four to six timber sales. (SP004343).

Pursuant to its obligations under NEPA, USFS initiated a combined scoping and Environmental Assessment ("EA") comment period for the Project in August, 2020. (SP016464). The comment period ended in September, 2020. In 2022, USFS issued the Custer Gallatin National Forest Land Management Plan ("Forest Plan"). (SP000001). In light of the new Forest Plan, USFS prepared a Revised EA that was again subject to a 30-day comment period beginning in October, 2022. (SP004487). USFS then published an updated EA, along with a Draft Decision

Notice and Finding of No Significant Impact in March, 2023. (SP004487).

Following a 45-day objection period, USFS issued a Final Environmental

Assessment ("FEA") as well as the Project Decision Notice and Finding of No

Significant Impact in August, 2023. (SP004326; SP004487; SP004503).

The Custer Gallatin National Forest operates under the 2022 Forest Plan,

which guides natural resource management activities and establishes management

standards for the Forest. (SP000009-13). Particularly relevant to Plaintiffs' claims,

the Forest Plan includes standards related to grizzly bear and Canada lynx.

(SP000063-68; SP000060-61). Standard FW-STD-WLLX(01) concerns Canada

Lynx and incorporates the Northern Rockies Lynx Management Direction

("NRLMD"). NRLMD is incorporated into multiple forest plans in Montana,

Idaho, Wyoming, and Utah and provides "management direction that conserves

and promotes recovery of Canda lynx by reducing or eliminating adverse effects

from land management activities . . . ." (SP000508). Specifically relevant to

Plaintiffs' arguments is NRMLD Standard VEG S2, which limits regeneration

harvest within lynx habitat. (SP000567).

The Project FEA states the Project is located entirely within the Greater

Yellowstone Ecosystem, Grizzly Bear Recovery Zone. (SP004402). The Recovery

Zone is divided into Bear Management Units ("BMUs"), which are further divided

into subunits. (SP004402-03). The Project area overlaps portions of three

Case 2:24-cv-00157-RLP    ECF No. 48-1    filed 04/23/25    PageID.730    Page 8
Case 9:23-cv-00110-DLC    Document 69    Filed 03/31/25    Page 7 of 68
of 69

subunits—Henry's Lake #2, Madison #2, and Plateau #1. (SP004402). Each of these subunits is part of a distinct BMU. (SP004402).

Pursuant to Section 7 of the ESA, USFS engaged in consultation with FWS on the effects of the Forest Plan and the Project on grizzly bears. The Biological Opinion for the Forest Plan was issued in January, 2022. (Supp-FWS000001). FWS concluded that the Forest Plan would "not appreciably reduce the likelihood of both the survival and recovery of grizzly bears" and is not likely to jeopardize the continued existence of the grizzly bear. (FWS001273). The Biological Opinion for the Project was released in August, 2023 and similarly concluded that the Project is not likely to jeopardize the continued existence of the grizzly bear. (SP005187; SP005233).

CBD filed its complaint in this matter in the lead case on September 20, 2023. Subsequently, CBD filed an amended complaint on November 14, 2023. GWA filed its complaint in the member case on December 18, 2023. The Court consolidated the cases on December 28, 2023. The parties thereafter filed cross-motions for summary-judgment.

## II.  LEGAL STANDARDS

### a.  NFMA

NFMA provides a two-tiered approach for forest planning and management. *2-Bar Ranch Limited Partnership v. United States Forest Service*, 996 F.3d 984,

986 (9th Cir. 2021). The first tier involves planning at the forest level through the Forest Service's development of a forest plan. *2-Bar Ranch Limited Partnership*, 996 F.3d at 986. "Forest plans are broad, programmatic documents that 'guide sustainable, integrated . . . management of the resources within the plan area in the context of the broader landscape.'" *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (quoting 36 C.F.R. § 219.1(b)). The second tier involves implementation of the forest plan to individual site-specific projects, which "must be consistent with the forest plan." *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (internal quotations omitted); 16 U.S.C. § 1604(i).

"It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005). The Forest Service must show that a project it undertakes complies with the governing forest plan. *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d at 961 (citing 16 U.S.C. § 1604(i)). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 1110 (9th Cir. 2018).

When reviewing for compliance with a forest plan, the Court must "be able reasonably to ascertain from the record that the Forest Service is in compliance with [the forest plan]." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d at 963 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196-197 (1947)). The Court will award "substantial deference" to the "Forest Service's interpretation and implementation of its own forest plan . . . ." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

**b.    ESA**

Forest Service actions must comply with the ESA. Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems they depend upon. 16 U.S.C. §1531(b). The Supreme Court has deemed the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978). The hallmark of the ESA is its solemn resolve that endangered species "be afforded the highest of priorities" with the goal to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority*, 437 U.S. at 174, 184.

The ESA and its implementing regulations require agencies proposing actions to engage in consultation with the FWS to ensure the action "is not likely to jeopardize the continued existence of any endangered species or threatened species

or result in the destruction or adverse modification of habitat of such species . . . ."
16 U.S.C. § 1536(a)(2). To effectuate consultation, the ESA requires action
agencies to "conduct a biological assessment for the purpose of identifying any
endangered species or threatened species which is likely to be affected by such
action." 16 U.S.C. §1536(c)(1). After consultation is completed between the FWS
and the action agency, the FWS will issue a biological opinion "detailing how the
agency action affects the species or its critical habitat. If jeopardy or adverse
modification is found, the [FWS] shall suggest" reasonable and prudent
alternatives the action agency can employ in implementing the proposed action. 16
U.S.C. § 1536(b)(3)(A).

Implementing regulations dictate the preparation and contents of the
biological opinion prepared by FWS. In formal consultation, the agency must
"[e]valuate the current status and environmental baseline of the listed species" and
"[e]valuate the effects of the action and cumulative effects on the listed species
. . . ." FWS must then "[a]dd the effects of the action and cumulative effects to the
environmental baseline and in light of the status of the species and critical habitat,
formulate [FWS'] opinion as to whether the action is likely to jeopardize the
continued existence of listed species or result in the destruction or adverse
modification of critical habitat." 50 C.F.R. § 402.14. In this context,
"environmental baseline" refers to

Case 2:24-cv-00157-RLP    ECF No. 48-1    filed 04/23/25    PageID.734    Page 12
Case 9:23-cv-00110-DLC    Document 69    Filed 03/31/25    Page 11 of 68
of 69

> [T]he condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

50 C.F.R. § 402.02.

c.    **NEPA**

NEPA is a procedural statute requiring government agencies to "take a hard look" at the "environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). An agency adequately conducts a "hard look" "by providing a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)). NEPA "does not mandate particular results", but "prescribes the necessary process" agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Robertson*, 490 U.S. at 350. The Court's review is complete if upon review of the record the Court is satisfied the agency took a "hard look" at the proposed action's environmental impacts. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

Pursuant to NEPA's implementing regulations, an agency may prepare an Environmental Assessment ("EA") to determine whether a proposed action may significantly affect the quality of the environment such that the agency must prepare a more detailed Environmental Impact Statement ("EIS"). *See* 40 C.F.R. §§ 1501.4, 1508.9 (2019). An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why the project's impacts are insignificant. *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). "'The statement of reasons is crucial' to determining whether the agency took a 'hard look' at the potential environmental impact of the project." *Save the Yaak Committee*, 840 F.2d at 717 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

**d.    Summary Judgment**

Courts review agency decisions under NFMA, NEPA, and the ESA by applying the standard of review set forth in the APA. *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1058 (9th Cir. 2017); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1065 (9th Cir. 2004). The Rule 56 summary judgment standard is therefore modified in cases requiring

12

review of an administrative record pursuant to the APA; courts are required to

uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law[,]" or "without observance of procedure

required by law." *Center for Biological Diversity v. Zinke*, 868 F.3d at 1057; 5

U.S.C. § 706(2)(A); 5 U.S.C. § 706(2)(D).

The APA standard of review is deferential. Courts must refrain from

substituting their judgment for that of the agency and should limit their review of

the agency's action to determine whether the agency "considered the relevant

factors and articulated a rational connection between the facts found and the

choices made." *Greater Yellowstone Coalition v. Servheen*, 665 F.3d 1015, 1023

(9th Cir. 2011) (citing *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475

F.3d 1136, 1140 (9th Cir. 2007)). An action is arbitrary and capricious "if the

agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or

is so implausible that it could not be ascribed to a difference in view or the product

of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In NEPA cases, a court's

"review is limited to whether an EIS took a 'hard look' at the environmental

impacts of a proposed action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

## III.    DISCUSSION

### a.    Supplementation of the Record

As a threshold matter, CBD has filed a motion requesting that the Court supplement the administrative record or, in the alterative, take judicial notice. (Doc. 43). Plaintiffs' request centers on a document prepared by USFS but not included in the administrative record—the Yale Creek Project Wildlife Report. Plaintiffs represent this report contains information relevant to Plaintiffs' NEPA, NFMA, and ESA claims. For the reasons below, Plaintiffs' motion is denied.

The court's review of an agency action is generally limited to the administrative record. 5 U.S.C. § 706. Administrative review accordingly disfavors consideration of extra-record evidence. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Indeed, "[w]hen a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980).

The Ninth Circuit recognizes four "narrow exceptions" to the general rule prohibiting extra-record evidence: (1) when supplementation is necessary to determine whether the agency has considered all factors and explained its decision; (2) when the agency relied on documents not in the record; (3) to explain or clarify technical matters or complex subjects; and (4) where plaintiffs make a strong showing of agency bad faith. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). These exceptions are limited in scope and must not undermine the general rule that the court's review is limited to the administrative record. *Lands Council*, 395 F.3d at 1030. Because the agency's "designation and certification of an administrative record" is entitled to a "presumption of regularity," the plaintiff must provide "clear evidence" that one of the above exceptions applies. *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1232 (E.D. Cal. 2013).

Here, Plaintiffs' request to supplement the administrative record is not well taken. As Defendants point out, the specific information that Plaintiffs seek to introduce is already reflected in the administrative record. Plaintiffs seek to introduce the Yale Creek Project Wildlife Report. Plaintiffs' argument in support of this request is premised on the fact that the Report discloses the total number of acres of secure habitat that will be reduced by the Yale Creek Project (1,012 acres). That same figure is represented in the Yale Creek Decision Notice document, which is included in the administrative record. (SP013018).

15

Regarding this duplicative request, Plaintiffs' reply indicates "this information is not found within any of [USFS's] analysis of the [Project] challenged in this case." (Doc. 50 at 7 (footnote omitted)). Yet, Plaintiffs fail to sufficiently explain why it is relevant *where* the information appears in the administrative record. Further, the information Plaintiffs seek to introduce is not material to their claims under the ESA, NEPA, NFMA, or APA. As explained below, USFS need not have considered the total number of acres of secure habitat impacted by the Yale Creek Project to comply with the ESA, NEPA, or NFMA. Therefore, the total number of acres of secure habitat reduced by the Yale Creek Project is unnecessary information.

As an alternative to supplementing the administrative record, Plaintiffs request that this court take judicial notice of the Yale Creek report pursuant to Federal Rule of Evidence 201(b). However, as courts in this District have previously held, "a party cannot circumvent the rules governing record supplementation by asking for judicial notice rather than supplementation." *Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1198 (D. Mont. 2019) (quoting *Alliance for the Wild Rockies v. Marten*, No. CV 16-35-M-DWM, 2016 WL 7174671 at *3 (D. Mont. Oct.3, 2016) (internal quotation marks omitted)).

Plaintiffs attempt to circumvent this limit, invoking a more recent Ninth

Circuit decision, *Lotus Vaping Technologies, LLC v. U.S. Food and Drug Admin*.

73 F.4th 657 (9th Cir. 2023). In that case, the court took judicial notice of

documents prepared by the defendant, U.S. Food and Drug Administration. 73

F.4th at 675-76. However, any such precedent from *Lotus Vaping* is inapplicable to

the instant matter for two reasons.

First, in *Lotus Vaping* the party seeking judicial notice had not previously

attempted to introduce the same documents via supplementation. Rather, the Ninth

Circuit *rejected* that party's request to supplement the record with *different*

documents. 73 F.4th at 676-77. Here, Plaintiffs are seeking to introduce the Yale

Creek report via judicial notice only as an alternative to supplementation. This

is clearly an attempt to circumvent established limits on supplementing the

administrative record. *See Alliance for the Wild Rockies v. Probert*, 412 F. Supp.

3d at 1198.

Second, while the Ninth Circuit elected to take judicial notice in *Lotus

Vaping*, the court noted that the introduced documents "do not alter our analysis."

73 F.4th at 677. Although the Yale Creek report would similarly not alter this

Court's analysis of the instant matter, Plaintiffs plainly advocate for the report's

materiality. Therefore, the facts at hand are distinguished from those in *Lotus

Vaping*, which offers little applicable precedent in this matter. This Court will

continue to apply established precedent that prevents judicial notice from being used to circumvent the requirements imposed on supplementing the administrative record. Accordingly, the motion should be denied.

### b.    USFS Compliance with the Custer Gallatin National Forest Plan

On summary judgment, Plaintiffs make two primary arguments concerning the Forest Plan. First, Plaintiffs argue the Project violates Forest Plan standards for grizzly bear secure habitat. Second, Plaintiffs argue the project fails to comply with the Forest Plan standards limiting timber harvest within lynx habitat. Both arguments fail for the reasons set forth below.

### 1.    Grizzly Bear Secure Habitat

Plaintiffs argue the Project violates NFMA because it fails to comply with the Forest Plan's standards for grizzly bear secure habitat. Plaintiffs specifically address three provisions from the Forest Plan that limit temporary changes in secure habitat. These provisions are written into Standard FW-STD-WLGB(03). All three provisions of FW-STD-WLGB(03) focus on "project activities," and provide limits to "temporary reductions in secure habitat below baseline" within the "recovery zone/primary conservation area . . . ." (SP000065).

### A.    The "One Project at a Time" Standard

FW-STD-WLGB(03)(a) limits the number of projects that may be active at any one time. The standard states "[o]nly one project affecting secure habitat

below baseline values may be active within a given bear management subunit at any one time." (SP000065). As above, the Project intersects portions of three separate BMUs. Each of the affected BMUs has two subunits. Project activities would occur in the Madison #2, Henry's Lake #2, and Plateau #1 subunits.

Plaintiffs' first argument regarding this standard relates to interpretation of the standard itself. In addition, Plaintiffs allege a violation of FW-STD-WLGB(03)(a) related to the existence of the nearby North Hebgen Project. Finally, Plaintiffs allege USFS failed to adequately address other, undisclosed projects.

### i.    Interpreting the Standard

As a threshold matter, Plaintiffs and Defendants advance differing interpretations of FW-STD-WLGB(3)(a). Either interpretation leads to a different conclusion regarding the fact that two distinct and ongoing projects would—at different times—reduce secure habitat below baseline in a single subunit. Specifically, both the South Plateau Project and the nearby North Hebgen Project include project activities that would reduce the Madison #2 subunit below baseline. (FS004706-07.)

Defendants argue that allowing the two projects to overlap in time does not violate the standard because the two projects will not occur simultaneously within a single subunit. "The Project will not be 'active' within Madison #2 until that subunit returns to baseline and Project activities are reviewed and implemented."

(Doc. 55 at 30). Defendants therefore interpret the standard to allow the existence of two projects that would each affect secure habitat below baseline within a single subunit, as long as only one project is active in the subunit at any given time. "FW-STD-WLGB-03(a) is focused on temporary reductions of secure habitat *within a subunit*, not the activities in adjacent subunits or the duration of a landscape-scale project." (Doc. 55 at 30).

Defendants argue this interpretation of the standard is reasonable and entitled to substantial deference. (Doc. 55 at 30; Doc. 61 at 10). In support, Defendants cite to caselaw from the Ninth Circuit and the District of Montana, including *Oregon Natural Desert Ass'n v. U.S. Forest Service* and *Native Ecosystems Council v. Marten.* 957 F.3d 1024, 1035 (9th Cir. 2020); 612 F. Supp. 3d 1146, 1152 (D. Mont. 2020). Defendants further argue that this reading is "consistent with the plain language of the Standard." (Doc. 61 at 10).

In contrast, Plaintiffs argue that the standard should be read to preclude the two projects from *ever* occurring simultaneously, given that they both impact the same subunit. (Doc. 58 at 23). "If the North Hebgen project or others continue to be implemented or work still needs to be done, then no activities included in the South Plateau *project* can proceed without violating the [standard]." (Doc. 48 at 42). Under this interpretation, the South Plateau Project and the North Hebgen

Project cannot both be active at the same time without violating the standard, even though only one project will be active at a time in the Madison #2 subunit.

Defendants' interpretation of the standard is due substantial deference under Ninth Circuit caselaw. *Oregon Natural Desert Ass'n,* 957 F.3d at 1035. But even without deference, Defendants advance a more compelling, plain language reading of the standard. The standard clearly prohibits two such projects from being *active* within a single subunit. (SP000065). Nowhere does the standard indicate the Project must be postponed in all three relevant subunits until the North Hebgen Project in its entirety is complete. Given, (1) this plain language interpretation and (2) the fact that Project activities will not commence in the Madison # 2 subunit until North Hebgen activities in that subunit are complete and secure habitat is brought back to baseline, the Court finds no NFMA violation stemming from the Project proceeding simultaneously with the North Hebgen Project.

### ii.    North Hebgen

Plaintiffs next argue USFS "has not coherently or consistently explained how the North Hebgen Project is being factored into the analysis" regarding FW-STD-WLGB(3)(a). (Doc. 46 at 37). Plaintiffs claim USFS has failed to establish that all activities in the North Hebgen project will be completed by the time work begins on the South Plateau Project. Plaintiffs insist compliance with the standard requires that USFS disclose the dates (1) when the North Hebgen Project will be

completed and (2) when South Plateau Project activities will commence in the

Madison #2 subunit.

Defendants argue other projects, such as North Hebgen, were fully

considered and that the South Plateau Project will not commence until the Madison

#2 subunit is restored to baseline conditions. (Doc. 55 at 29). Short of providing

exact dates when North Hebgen will end and South Plateau will begin, Defendants

explain that it is sufficient to state that the one project will not start until the other

is complete. That time-order, Defendants argue, will be ensured via monitoring and

reporting measures built into the Project, including Design Feature 11 and the

Conditional NEPA Project Monitoring Form that USFS must submit to FWS.

(SP004499; SP004534). Defendants further indicate it would be impractical to

require the agency to specify the exact dates for project completion and initiation,

"given litigation and changing project timelines." (Doc. 61 at 9). Defendants

further assert that Project Design Features are binding obligations on the agency

and ensure compliance with the Forest Plan's standards. (Doc. 57 at 25).

The plain language of FW-STD-WLGB-03(a) sets forth a relatively simple

requirement—no more than one "project affecting secure habitat below baseline

values may be active within a given bear management subunit at any one time."

(SP000065). Nothing in this language implies the need for a precise quantitative

determination, or the exact dates when one project ends and another begins. A

qualitative statement that one project will commence after all others are complete

is enough for a court to reasonably ascertain compliance with the standard. *Native*

*Ecosystems Council v. U.S. Forest Service,* 418 F.3d at 961. Here, it is clear USFS

has considered the impact of the North Hebgen Project on secure habitat and will

stagger project implementation. (SP004511; SP006145; SP041099; FWS000572).

The adequately supported conclusion that South Plateau Project activities will

commence only once North Hebgen activities conclude in the Madison #2 subunit

does not violate FW-STD-WLGB(03).

### iii.    Undisclosed Projects

Beyond the North Hebgen Project, Plaintiffs assert that other projects may

affect secure habitat below baseline, and that because USFS has not considered

these projects, the agency cannot demonstrate compliance with FW-STD-

WLGB(03)(a). Plaintiffs state that the administrative record reveals "at least five

ongoing projects in the Madison #2 subunit that may already be affecting secure

habitat below baseline levels . . . ." (Doc. 48 at 40). Plaintiffs argue USFS has

violated FW-STD-WLGB(03)(a) because the agency has failed to provide

evidence that these projects do not impact secure habitat below baseline. (Doc. 58

at 23-24). The Project FEA indicates both the Henry's Lake #2 and Madison #2

subunits are below secure habitat baseline values. (SP004433). Therefore, if

Plaintiffs' theory that these unassessed projects affect secure habitat below

baseline is accurate, the South Plateau Project could not proceed in either subunit if one of the ongoing, unassessed projects were also reducing secure habitat below baseline in these subunits.

Regarding the existence of other, unaddressed projects, Defendants argue that the only project affecting secure habitat below baseline within the relevant subunits is North Hebgen. Defendants aver that although Plaintiffs identified or pointed to other projects, "there is no evidence that any of these projects impact secure habitat below baseline." (Doc. 55 at 29, footnote 5). In support, Defendants reference documents and passages in the administrative record that address other projects' effects on secure habitat, including the FEA, the Decision Notice and Finding of No Significant Impact, and the Wildlife Report. (SP004432; SP004511; SP041090).

Compliance with FW-STD-WLGB(03)(a) does not necessarily require USFS to address every potential project identified in Plaintiffs' briefing. Rather, USFS must simply provide data sufficient for a court to determine that there will not be more than one project affecting secure habitat below baseline values in a given subunit at one time. *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961. Effectively, Plaintiffs ask USFS to provide evidence of absence, which goes beyond what is required to show compliance with FW-STD-

WLGB(3)(a). USFS has plainly identified the one project that implicates the

standard—North Hebgen.

## B.    The "1%" Standard

FW-STD-WLGB(03)(b) addresses the total amount of secure habitat within

a bear management unit. The standard reads:

> Total acreage of secure habitat below baseline values within a given bear
> management unit shall not exceed 1 percent of the acreage in the largest
> subunit within that bear management unit. The acreage of a project that
> counts against the 1 percent limit (for example the amount of secure habitat
> affected) is measured as the acreage within the 500-meter buffer around any
> temporary motorized access route or low-level helicopter flight line that
> intrudes into existing secure habitat.

(SP000065). Plaintiffs' first argument regarding this standard relates to

interpretation of the standard itself. In addition, Plaintiffs allege a violation of FW-

STD-WLGB(03)(b) related to the locations of temporary roads. Plaintiffs further

allege USFS has failed to adequately consider secure habitat below baseline in

relevant subunits. Finally, Plaintiffs allege the Project likely exceeds the 1% limit

set forth in the standard.

### i.    Interpreting the Standard

As with FW-STD-WLGB(03)(a), Plaintiffs and Defendants advance

different interpretations of the standard. Plaintiffs argue FW-STD-WLGB(03)(b)

limits the cumulative total of impacts to secure habitat over the *lifetime* of a

project. (Doc. 46 at 32). Under this interpretation, the Project's "staging" of

activities would, in aggregate and over the course of years, reduce secure habitat below the 1% limit, in violation of the Forest Plan.

In contrast, Defendants argue FW-STD-WLGB(03)(b) is concerned with total impacts to secure habitat *at a given time*. (Doc. 55 at 32; Doc. 57 at 33). Defendants claim USFS's interpretation of the standard is entitled to substantial deference and that the plain text supports a point-in-time analysis of secure habitat.

As with FW-STD-WLGB(03)(a), the plain language of the standard supports Defendants' interpretation. FW-STD-WLGB(03)(b) is concerned with "temporary" impacts to secure habitat. "Temporary" indicates that the overall impact will change over time as secure habitat is impacted and restored. Further, the standard relies on present-tense language. Nowhere does it reference a cumulative total of all habitat that was once secure, lost that designation via project activities, and was then restored (as implied in Plaintiffs' interpretation). Therefore, Plaintiffs' arguments that the Project cannot be completed in stages to comply with the standard fail.

### ii.    Temporary Roads

Plaintiffs next argue that, to demonstrate compliance with FW-STD-WLGB(03)(b), USFS must disclose the location of all temporary roads authorized by the Project. Without committing to exact routes or locations, the Project authorizes the construction of a maximum of 56.8 miles of temporary roads.

Case 2:24-cv-00157-RLP    ECF No. 48-1    filed 04/23/25    PageID.750    Page 28
Case 9:23-cv-00110-DLC    Document 69    Filed 03/31/25    Page 27 of 68
of 69

(FS004479). Plaintiffs allege that, because roads affect the calculation of secure

habitat, more detail is required to demonstrate compliance with FW-STD-

WLGB(03)(b).

Defendants argue USFS has both limited the total number of miles of roads

and also indicated the expected location for those temporary roads. (Doc. 55 at 33-

34 (citing SP041208)). Further, USFS argues "[t]he Decision does not authorize

any temporary road construction that would conflict with the Design Features,

which require compliance with FW-STD-WLGB-03(b)." (Doc. 55 at 34).

Defendants add that USFS demonstrated "numerically" how secure habitat would

be impacted in each relevant subunit. (Doc. 57 at 29 (citing FS041089-91)).

On this issue, Defendants have the better argument. The as-yet-

undetermined placement of temporary roads does not violate FW-STD-

WLGB(03)(b). As above, the standard allows Project activities to be staged in

order to achieve compliance. Defendants point out that, although the Project

authorizes 56.8 miles of temporary roads, this number is the maximum amount

authorized over the lifetime of the Project. (Doc. 57 at 29 (citing FS041089)).

Further, Project activities are limited by Project Design Features, including Design

Feature 12. Design Feature 12 restates the limits imposed by FW-STD-

WLGB(03)(b). (SP004432). Ongoing compliance, throughout the duration of the

Project, will be ensured by requirements such as resource checklists and

conditional NEPA monitoring. (SP004475; SP004537; SP004756). These forward-looking measures, in conjuncture with the information provided by USFS are sufficient for this Court to reasonably ascertain compliance with FW-STD-WLGB(03)(b).

### iii.    Consideration of Other Subunits

Plaintiffs next argue compliance with FW-STD-WLGB(03)(b) requires that, where Project activities reduce secure habitat within a subunit, USFS must consider impacts to secure habitat across the entire BMU in which that subunit is located. For example, since the Project involves impacts to secure habitat in the Henry's Lake #2 subunit, Plaintiffs insist USFS must also consider all impacts to secure habitat in the Henry's Lake #1 subunit (the other subunit in the broader BMU). Plaintiffs claim USFS only considered the subunits directly affected by the Project, and that the administrative record fails to set forth the total acreage of secure habitat below baseline in each BMU. (Doc. 58 at 26). Plaintiffs therefore argue USFS applied the standard at the wrong scale.

Defendants respond that USFS understood "that the 1% Rule is measured 'at the scale of the entire BMU (not the Subunit scale).'" (Doc. 57 at 28 (citing FS041091; FS004662)). Further, Defendants represent that USFS will complete measures designed to ensure compliance with FW-STD-WLGB(03)(b). (Doc. 57 at 28 (citing FS004661)). Defendants add that—beyond Yale Creek and North

Hebgen—there are no other projects impacting secure habitat below baseline in the relevant BMUs. (Doc. 61 at 14 (citing SP041091)). Defendants further argue that in authorizing the Project, USFS did consider all subunits within each relevant BMU. (Doc. 61 at 13 (citing SP004511-12)).

Assessing compliance with FW-STD-WLGB(03)(b) requires data from subunits outside of the Project area. The standard limits a project's impacts to secure habitat across an entire BMU. To determine whether the 1% limit has been exceeded, USFS must look at all subunits within a BMU; those that are affected by the Project and those that are not. As above, USFS may achieve compliance with the standard by staging the project so that that 1% standard is satisfied at all times, even though the cumulative impact of all project activities over 15 years may exceed the 1% limit. NFMA provides wide latitude in how the agency demonstrates compliance with a forest plan, and the calculations "need not be perfect." *Native Ecosystems Council v. U.S. Forest Service,* 418 F.3d at 961-63. As above, USFS' "landscape" (or "condition-based") approach includes sufficient sideboards to ensure ongoing compliance and that allow the Court to reasonably ascertain compliance.

### iv.    Yale Creek

Regarding the Henry's Lake BMU, Plaintiffs claim that the presence of another project affecting secure habitat within the BMU—the Yale Creek

Project—is not properly accounted for and that USFS cannot demonstrate how many acres the South Plateau Project may remove from secure habitat while remaining in compliance with the standard. Although the existence of the Yale Creek Project is disclosed in the Project Biological Opinion (FWS000035) and the Decision Notice and Finding of No Significant Impact (SP004511), Plaintiffs claim USFS does not disclose the number of acres the Yale Creek Project will remove from secure habitat. (Doc. 46 at 28). Therefore, Plaintiffs claim, USFS cannot demonstrate compliance with FW-STD-WLGB(03)(b). Plaintiffs further argue that while USFS acknowledges that Yale Creek Project activities must be complete prior to South Plateau Project activities commencing in the Henry's Lake #2 subunit, the agency must offer something more than a "take-our-word-for-it" approach. (Doc. 48 at 50).

Defendants argue that, pursuant to project design features, only one project will reduce secure baseline at a time in the Henry's Lake BMU. Specifically, Project Design Feature 12 reiterates the requirements of FW-STD-WLGB(03)(b). (SP004511). Further, defendants point to several references in the administrative record indicating Project activities will not commence in Henry's Lake BMU until Yale Creek is completed and secure habitat is restored to Baseline. (SP004511-12; SP041091).

Plaintiffs' arguments here are unpersuasive. Defendants have highlighted numerous passages in the record that identify the Yale Creek Project and indicate that South Plateau Project activities will not be implemented until Yale Creek has concluded and secure habitat has been restored to baseline. (FS041091; FS041106). Most significantly, defendants point to the Decision Notice, where USFS indicates "[i]plementation of the South Plateau Project (Henry's Lake #2 Subunit) depends on the Yale Creek Project's impact to the 1%, as allowed temporary reduction below baseline is assessed at the scale of the entire Bear Management Unit, not the Subunit scale." (SP004511-12). USFS has therefore demonstrated compliance—the Project will not involve activities in the relevant subunit until Yale Creek activities there are complete. No further information regarding Yale Creek is required beyond this absolute statement. From these facts, the Court may reasonably ascertain compliance with the Forest Plan.

### v.    Overall Compliance with the 1% Standard

Plaintiffs next argue USFS cannot demonstrate compliance because, in general, the Project "will likely violate the 1% standard." (Doc. 48 at 48). Given the limited acres of secure habitat that USFS indicates can be reduced without violating the standard, Plaintiffs argue USFS has not provided "details or assurances about what possible future changes may be made to the [Project] to bring it into compliance with forest plan standards." (Doc. 48 at 51). Plaintiffs also

31

specifically maintain USFS has not and cannot demonstrate that the 1% limit on

secure habitat below baseline will be met in the Henry's Lake BMU. (Doc. 46 at

26). As noted above, the Project provides for sufficient sideboards and ongoing

monitoring to ensure compliance with the standard. Therefore, the Court may

reasonably ascertain compliance with the standard.

### C.    The "Four Year" Standard

FW-STD-WLGB(03)(c) establishes an overall time limit for project

activities reducing secure habitat below baseline. The standard reads:

> New temporary roads shall be limited to administrative purposes associated
> with project activities. Project activities shall not reduce secure habitat
> below baseline levels for more than four consecutive years. The collective
> set of temporary roads that affect secure habitat below baseline levels shall
> be closed to all motorized use after three years. Temporary roads shall be
> decommissioned such that secure habitat is restored within one year after
> closure.

(SP000065). Plaintiffs argue the Project violates this standard because it authorizes

activities that significantly exceed the standard's time limit. Specifically, Plaintiffs

claim that by staging the Project over the course of 15 years USFS violates FW-

STD-WLGB(03)(c) for three reasons.

First, Plaintiffs advocate for a narrow reading of the standard. Plaintiffs

assert that "collective set," as used in the standard, refers to all temporary roads

authorized by the project. (Doc. 48 at 52). Following this interpretation, all Project

roads would have to be closed three years after the initiation of the Project. In

support, Plaintiffs point to the Comment Consideration and Response document which states that "[f]or a project, the collective set of temporary roads affecting secure below baseline can only be used for implementation for up to 3 years . . . ." (SP017999). Similarly, an email from USFS to FWS staff indicates "[i]t does not matter whether there are multiple timber sales used to implement a project; any reduction below baseline secure habitat levels under this standard must be brought back up to (or above) baseline levels within 4 consecutive years of the point in time where secure habitat declined below baseline . . . ." (Supp-FWS002519-20).

Second, Plaintiffs argue USFS has employed inconsistent definitions of the term "project" to avoid the appearance of violating this standard. Plaintiffs point to an email in the administrative record, again between USFS and FWS staff. There, the USFS representative indicates that "project" can be read to refer to an individual timber sale. (FWS000581). According to Plaintiffs, this conflicts with other uses, where "project" simply refers to a suite of individual actions, such as the South Plateau Project. (*See* SP004338-52, SP041106).

Third, Plaintiffs argue USFS's interpretation and implementation of the standard would undermine the purpose of FW-STED-WLGB(03)(c). "The forest plan standard is designed to ensure reductions to secure habitat are actually temporary in nature . . . ." (Doc. 48 at 54-55). Under USFS' interpretation,

Plaintiffs allege USFS would be able to allow reductions that—other than a brief

pause every four years—would continue indefinitely.

Defendants argue Project Design Feature 13 ensures compliance with FW-

STED-WLGB(03)(c), because all roads affecting secure habitat below baseline

will be closed within three years. (Doc. 55 at 35). That assertion depends on a

broad reading of the standard. In support, Defendants cite to 36 C.F.R. § 212.1 for

the proposition that temporary roads are those associated with a contract, not a

project. In its reply brief, Defendants further assert that the standard applies to

"activities" rather than the whole project, and so the time limit is not applicable to

the project as a whole. Defendants further argue that USFS validly treats each

timber sale as a "collective set" and that this treatment is consistent both with the

FEA and Wildlife Report. (Doc. 57 at 26 (citing FWS000581; FS004343;

FS0004432; FS041091)). Defendants also point out that this issue is limited to

Henry's Lake Fork #2 subunit, because Project effects in other subunits would not

reduce secure habitat enough to trigger the standard's time limit. (Doc. 57 at 35

(citing FS041090)).

Here, Defendants have the better argument. As with FW-STD-WLGB(3)(a)

and (b), USFS' interpretation is due substantial deference. Incongruous staff emails

aside, USFS' interpretation appears to be generally consistent. In relevant part, 36

C.F.R. § 212.1 defines a "temporary road or trail" as a "road or trail necessary for

emergency operations or authorized by contract, permit, lease, or other written
authorization that is not a forest road or trail and that is not included in a forest
transportation atlas." Therefore, USFS argues "temporary roads" are only those
associated with a particular contract. This definition pegs the standard to the
timescale of a contract, which is logically consistent with authorization of projects
(such as the South Plateau Project) that last longer than four years and involve
multiple contracts.

### 2.    Lynx Management

Plaintiffs argue the Project violates NFMA because it fails to comply with
the Forest Plan's standards for Lynx habitat. Plaintiffs specifically address standard
VEG S2, which limits certain kinds of timber harvest within lynx habitat.

The VEG S2 standard reads: "Timber management projects shall not
regenerate more than 15 percent of lynx habitat on NFS lands within a [Lynx
Analysis Unit] in a ten-year period." (SP000567 (footnotes omitted)). USFS
defines "regeneration harvest" as "[t]he cutting of trees and creating an entire new
age class; an even-age harvest. The major methods are clearcutting, seed tree,
shelterwood, and group selective cuts." (SP000578).

Plaintiffs point out that (1) the Project is located within the South Madison
Lynx Analysis Unit ("LAU"), (2) the Project area contains 7,737 acres of lynx
habitat deemed suitable for regeneration harvest, and (3) the Decision Notice

authorizes "clearcut harvest, a type of regeneration treatment, on up to 5,551 acres in the South Plateau project area." (Doc. 46 at 39-40 (citing SP041108; SP004477)). Plaintiffs further indicate that the exact locations of regeneration harvest have not yet been determined.

Given these facts, Plaintiffs argue that—without knowing where regeneration harvest will occur—it is not possible for USFS to demonstrate compliance with VEG S2. (Doc. 46 at 40-41). Plaintiffs insist that to ensure compliance, USFS must "disclose the precise location and size of the clearcut units so that the public and the Court may determine from the record how many acres the Project will regenerate in lynx habitat." (Doc. 46 at 40).

In response, Defendants argue that Project Design Feature 1 limits clearcutting in the LAU to 4,600 acres. (Doc. 55 at 36-37; Doc. 61 at 16 (citing SP004508)). Defendants insist that Project Design Feature 1 is binding on the agency, and that it contains the necessary calculations to demonstrate compliance with VEF S2. Defendants further argue that other design features and mandatory reporting will further ensure compliance with VEG S2.

Here, Plaintiffs' arguments are unavailing. Project Design Feature 1 limits the acres subject to clearcutting within the LAU and contains calculations sufficient to demonstrate compliance with the standard. In addition to restating the requirements of VEG S2, Project Design Feature 1 includes an "Application"

36

subsection indicating that (a) 31,309 acres of lynx habitat have been identified on
USFS lands in the LAU, (b) approximately 14 acres have been subject to
regeneration harvest on the LAU over the last ten years, and (c) 15% of 31,309 is
equal to 4,969. In light of these figures, the design feature further indicates that
"[t]his project will regenerate no more than 4,600 acres of lynx habitat to comply
with this standard." (SP004508). These limited calculations allow the Court to
reasonably ascertain compliance with the relevant standard.

### c.    Endangered Species Act

Section 7 of the ESA requires agencies proposing actions to engage in
consultation with FWS to ensure the action "is not likely to jeopardize the
continued existence of any endangered species or threatened species or result in the
destruction or adverse modification of habitat of such species[.]" 16 U.S.C. §
1536(a)(2). If formal consultation is deemed necessary, it culminates in the
issuance of a biological opinion by the FWS. 50 C.F.R. § 401.14(g)-(h).

The ESA's consultation requirement requires the FWS to, among other
things, "[e]valuate the effects of the action and cumulative effects on the listed
species or critical habitat." 50 C.F.R. § 402.14(g). The FWS' effects analysis
requires it to consider effects on the species from the proposed action and the
"consequences of other activities that are caused by the proposed action." 50
C.F.R. § 402.02. The environmental baseline "includes the past and present

impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02.

Plaintiffs challenge FWS' grizzly bear analysis in the Project and Forest Plan Biological Opinions. To that end, Plaintiffs make five primary arguments. First, Plaintiffs challenge the secure habitat definition employed by FWS in its analysis. Second, Plaintiffs challenge the 1998 secure habitat baseline used in the Biological Opinions. Third, Plaintiffs argue that FWS should have considered and incorporated the effects of the Yale Creek Project on grizzly bears. Fourth, Plaintiffs contend that FWS failed to adequately analyze and incorporate the effects of temporary roads on grizzly bears. Finally, Plaintiffs argue FWS impermissibly relied on inadequate mitigation measures in its analysis. All five arguments fail for the reasons set forth below.[2]

_____

[2] In its response brief, CBD also claims USFS "violated the ESA in relying on the Biological Opinion." (Doc. 59 at 37). This claim appears to have not been raised in CBD's brief in support of its motion for summary judgment. (Doc. 46). This issue aside, the claim fails because it rests on the assertion that the Project Biological Opinion is legally flawed. As addressed below, this Court finds no deficiencies with the Project Biological Opinion. Therefore, this claim is moot.

### 1. Secure Habitat Definition

In FWS' Biological Opinions for the Forest Plan and the South Plateau

Project, the agency relies on secure habitat to assess the effects of roads on grizzly

bears. (SP005199-201). Both Biological Opinions determine the overall quantity of

secure habitat using a 10-acre "patch size." This means that, for the purposes of

FWS' analysis, secure habitat exists only where a 10-acre parcel meets all the other

requirements for secure habitat.

Plaintiffs challenge the use of the 10-acre patch size, stating that there is "*no*

*scientific support* for the notion that patches of land as small as 10 acres provide

security for grizzly bears." (Doc. 48 at 27). Plaintiffs argue that the best available

science supports a much larger patch size, ideally large enough for a female grizzly

bear to forage for 24-48 hours. (Doc. 48 at 32 (citing FWS003694; FWS003897;

SP046203; Supp-FWS008476)). An area sufficient to meet those requirements

would encompass several thousand acres. As an example, Defendants point to the

2018 Northern Continental Divide Conservation Strategy, where the patch size is

set to 2,500 acres. (Doc. 48 at 30 (citing Supp-FWS0005031)).

In defense of the 10-acre patch size, Defendants explain that a larger patch

size results in a coarser analysis. For example, a larger patch size could obscure

additional roads built through non-secure habitat that might otherwise be deemed

secure under a smaller patch size. Any such roadbuilding would not register as a

change in secure habitat under a larger patch size, but might be captured using a

sufficiently small patch size. Therefore, Defendants argue, the smaller patch size

provides greater sensitivity for determining loss of secure habitat. The Project

Biological Opinion notes that while a larger patch size may indeed provide forage

for longer periods of time, grizzly bears nevertheless use smaller patches of secure

habitat for movements, foraging, and other activities. (FWS000040-41).

On this issue, both sides disagree on how to best interpret the scientific

literature. Lest this Court engage in a battle of the experts, it must defer to the

agency's expertise in selecting its own experts and drawing its own conclusions on

how to apply that science. *See Alliance for the Wild Rockies v. Kreuger*, 950 F.

Supp. 2d 1196, 1208-09 (D. Mont. 2013).

Further, it is clear that different patch sizes offer different analytical benefits.

While Defendants can point to evidence in the administrative record that the larger

patch size is better at documenting the full area a grizzly bear requires for foraging,

a patch size measured in thousands of acres results an inherently different analysis

than a smaller patch. The larger resolution analysis of a 2,500-acre patch might

allow profound changes to go unnoticed in areas that do not meet the strict

requirements for secure habitat. While perhaps insufficient to provide forage for a

bear for 24 or 48 hours, smaller patches clearly provide other analytical benefits

and, according to FWS and the administrative record, provide benefits utilized by

grizzly bears. A smaller patch size is better able to capture changes to important habitat that might otherwise go undocumented. For these reasons and because the agency's expertise is owed substantial deference, this Court finds that Plaintiffs arguments are unavailing.

### 2.    1998 Baseline

Plaintiffs challenge FWS' use of the 1998 secure habitat baseline in the Forest Plan and Project Biological Opinions, arguing that the 1998 baseline conflicts with the best available science. (Doc. 48 at 32). In support, Plaintiffs offer three primary arguments. First, Plaintiffs maintain that the 10-acre patch size for determining secure habitat, as used in the 1998 baseline, is meritless and conflicts with the best available science. Second, Plaintiffs maintain that the 1998 secure habitat baseline fails to account for "key habitat variables that the best available science says are needed for actual security." (Doc. 48 at 33). For instance, Plaintiffs argue that the 1998 baseline does not account for "*any* requirement that secure habitat include vegetation or cover required for functional grizzly bear habitat." (Doc. 48 at 34).

Finally, Plaintiffs argue the 1998 secure habitat baseline is outdated and does not account for significant changes that have occurred in the intervening years. (Doc. 48 at 36). These allegedly unconsidered changes include an increased

human population, climate change, residential development, and changes in "grizzly bear range, food sources, and habitat . . . ." (Doc. 48 at 36).

Plaintiffs' first argument regarding the 1998 secure habitat is unpersuasive. For the reasons explained above, USFS has demonstrated the purpose and applicability of the 10-acre patch size. Plaintiffs' second argument regarding the 1998 secure habitat is unpersuasive for many of the same reasons. As the Defendants argue, simply because the 1998 secure habitat baseline does not itself account for key habitat variables does not mean those variables are not considered. (Doc. 55 at 72 (citing SP041083-103)).

Plaintiffs' final argument regarding the 1998 secure habitat baseline—that the baseline fails to account for changes to the project area in the years since 1998—is similarly unpersuasive. The scope of information that the 1998 baseline may capture is inherently limited. However, FWS' analysis shows that the agency considered the same changes that Plaintiffs allege are not accounted for in the 1998 secure habitat baseline. (*See* SP_005230-39).

Moreover, as Defendants argue, "the 1998 baseline has made a significant contribution to the recovery of the GYE grizzly bear population" and "has been critical to maintaining grizzly bear recovery in the GYE." (Doc. 55 at 71; Doc. 61 at 37). These claims are supported by evidence of increases in the population of grizzly bears in the Greater Yellowstone Ecosystem. Overall, the population and

distribution of grizzly bears in the Greater Yellowstone Ecosystem has "more than

doubled" since the species was listed under the ESA. (Doc. 55 at 71). Further,

FWS indicates that grizzly bear in the Greater Yellowstone Ecosystem show no

signs of a population decline and "it may be that the [Greater Yellowstone

Ecosystem] grizzly bear population is nearing carrying capacity." (Supp-

FWS00105).

### 3.    Effects of Yale Creek Project

Plaintiffs next argue the Yale Creek Project falls within the South Plateau

Project's action area and should have been considered in FWS' analysis. (Doc. 46

at 47). Plaintiffs allege that the Project Biological Opinion lacks information

relating to Yale Creek's impacts. In support of these claims, Plaintiffs offers four

primary arguments.

First, Plaintiffs insist that the status of grizzly bears within the broader BMU

is a relevant factor that should have been considered. (Doc. 46 at 48). While the

Yale Creek Project occurs in a subunit that will not be directly impacted by the

South Plateau Project, Plaintiffs argue that it should nevertheless have been

considered because both projects occur in the same BMU. Second, Plaintiffs argue

that, because the amount of secure habitat that the South Plateau Project impacts

will depend on the area of secure habitat reduced by the Yale Creek Project, "the

total temporary reduction of secure habitat by Yale Creek is necessary information

43

. . . ." (Doc. 46 at 48). Third, Plaintiffs argue that the combined reduction of habitat between Yale Creek and the Project would violate FW-STD-WLGB-03(b). According to Plaintiffs, by failing to include Yale Creek in the environmental baseline, FWS made it impossible to determine whether the Project violates the 2022 Forest Plan Incidental Take Statement. (Doc. 46 at 49).

For the purposes of ESA consultation, "action area" refers to "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The scope of the environmental baseline is limited to "the condition of the listed species or its designated critical habitat *in the action area* . . . ." 50 C.F.R § 402.02 (emphasis added). An agency's action area determination is within its discretion and is accorded deference. *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 950 (9th Cir. 2014); *Nat'l Fam. Farm Coalition v. U.S. Envtl. Prot. Agency*, 966 F.3d 893, 927 (9th Cir. 2020).

Defendants argue the Yale Creek Project is outside the South Plateau's action area. (Doc. 55 at 69; Doc. 57 at 45). In support, Defendants reference the Project Biological Opinion, which states that the action area is defined by the Madison #2, Henry's Lake #2, and Plateau #1 subunits. (SP005199). The Yale Creek Project, however, is in the Henry's Lake #1 subunit.

The Defendants further argue that the Project Biological Opinion does

include consideration of Yale Creek's impacts to secure habitat. That consideration

is found in a brief reference in the Project Biological Opinion:

> Coordination with adjacent Forests within the action area and their projects
> will occur (i.e. the Caribou Targhee National Forest's Yale Creek Project
> affecting secure habitat below baseline on up to 1 percent in the Henry's
> Lake #1 Subunit must be completed and temporary routes decommissioned
> prior to South Plateau Project affecting any secure habitat below baseline in
> the Henry's Lake #2 Subunit.)

(SP005221).

Plaintiffs' arguments here are unpersuasive for three reasons. First, the Yale

Creek Project is conclusively outside the action area, as determined by FWS.

Although the quoted passage above is confusingly worded regarding the

boundaries of the action area, FWS conclusively and clearly defines the action area

elsewhere in the Project Biological Opinion. "Because grizzly bear subunits

provide the optimal scale for evaluating grizzly bear habitat and effects to grizzly

bears, for the purposes of this biological opinion, we have defined the action area

to be the Madison#2, Henry's Lake #2, and Plateau #1 subunits." (SP005199). This

determination is within FWS' discretion and is afforded deference. *Friends of the

Wild Swan,* 767 F.3d at 950; *Nat'l Fam. Farm Coalition*, 966 F.3d at 927.

Therefore, Yale Creek is outside the action area and need not be considered.

Finally, although Plaintiffs allege Yale Creek's impacts to secure habitat

underly a violation of FW-STD-WLGB-03(b), for the reasons stated above, the

45

Yale Creek Project's impact to secure habitat does not support a violation of the standard.

### 4.    Effects of Roads on Grizzly Bears

Plaintiffs argue the Project Biological Opinion fails to adequately analyze and incorporate the effects of temporary roads on grizzly bears. (Doc. 59 at 28). In particular, Plaintiffs argue that because USFS has not specified locations and timing for temporary roads, the Project Biological Opinion therefore amounts to "speculation or surmise." (Doc. 46 at 44 (quoting *Bennett v. Spear*, 520 US 154, 176 (1997)).

Regarding the location of roads, Plaintiffs cite to the administrative record for the proposition that the location of temporary roads is an important consideration when analyzing impacts to grizzly bears. In particular, the Project Biological Opinion states that the specific placement of roads may exacerbate effects on bears and have more pronounced effects on habitat loss depending on location. (FS005218, FS005213).

Regarding timing, Plaintiffs reference the Project Biological Opinion, which states that "[r]esearch suggests that grizzly bears benefit from road closures aimed at minimizing traffic on roads within important seasonal habitat, especially in low elevation habitats during the spring." (FS005213). According to Plaintiffs, the Government has neither identified the placement of roads to be constructed during

the Project, nor "identified any mandatory timing restrictions for road construction

or use." (Doc. 59 at 30).

Under Ninth Circuit precedent, FWS is owed deference in deciding how to

approach the jeopardy determination. *Gifford Pinchot Task Force v. U.S. Fish and

Wildlife Service,* 378 F.3d at 1066-67 ("the ESA does not prescribe how the

jeopardy prong is to be determined"). FWS enjoys this latitude "so long as the

effects of the agency action on a species have been considered and addressed."

*Karuk Tribe of California v. U.S. Forest Service,* 681 F.3d 1006, 1020, (9th Cir.

2012).

Defendants argue FWS primarily focused its analysis not on the timing and

location of roads, but on impacts to secure habitat. This decision was made

because—Defendants argue—secure habitat is a more important indicator and

predictor of grizzly bear survival in the Greater Yellowstone Ecosystem. (Doc. 55

at 60 (citing SP005402; FWS000029)).

Further, Defendants argue FWS considered both the timing and placement of

roads. Regarding placement, Defendants aver FWS considered the Biological

Assessment prepared by USFS, and that the Biological Assessment includes an

evaluation concerning road placement. (SP004658; SP041089). Regarding timing,

Defendants argue USFS considered timing and "tailored project activities so

47

effects would be 'for a relatively short period of time.'" (Doc. 55 at 62 (citing

SP_004710)).

Given the wide latitude afforded and deference due FWS, this Court finds

Plaintiffs' arguments unpersuasive. The agency employed a reasonable, justifiable

approach when it chose to focus on secure habitat as the primary consideration.

That choice is well-supported in the administrative record.

### 5.    Mitigation measures

Plaintiffs next challenge FWS' jeopardy determination by calling into

question the agency's alleged reliance on "unspecific and undetailed" mitigation

measures in its analysis. (Doc. 46 at 51). Specifically, Plaintiffs allege FWS'

determination relies on two mitigation measures that are neither sufficiently

definite nor binding on the USFS.

First, Plaintiffs question FWS' reliance on commitments USFS made to

coordinate between projects to ensure that impacts to secure habitat below baseline

stemming from other projects are completed prior to initiation of South Plateau

Project activities. Plaintiffs state that the Project Biological Opinion relies on such

coordination to mitigate impacts on grizzly bears. Further, Plaintiffs argue, such

coordination is uncertain, unspecific, and does not constitute a binding plan.

Second, Plaintiffs challenge the Project measures that rely on staging project

activities or dropping treatment acres (or a combination of both) to ensure

compliance with FW-STD-WLGB-03(b) and limit the Project's impacts to secure
habitat. According to Plaintiffs, the Project Biological Opinion "does not provide
any details regarding how either measure will be selected, under what
circumstances either measure will be required, and to what extent such measures
will be effective at reducing effects to secure habitat and grizzly bears." (Doc. 46
at 52-53).

In support of these arguments, Plaintiffs compare the facts at hand to *Center
for Biological Diversity v. Bernhardt*. 982 F.3d 723, 743 (9th Cir. 2020).  In that
case, the Ninth Circuit rejected mitigation measures addressed in a FWS Biological
Opinion because they did not constitute a "clear, definite commitment of
resources." *Center for Biological Diversity v. Bernhardt,* 982 F.3d at 748. The
court specified that "[m]itigation measures relied upon in a biological opinion must
constitute a 'clear, definite commitment of resources,' and 'be under agency
control or otherwise reasonably certain to occur.'" *Center for Biological Diversity
v. Bernhardt,* 982 F.3d at 743 (citing *Nat'l Wildlife Federation v. Nat'l Marine
Fisheries Serv.,* 524 F.3d 917, 936 & n.17 (9th Cir. 2008)).

As a threshold matter, it is not even clear that the measures at the heart of
Plaintiff's claim qualify as "mitigation measures." Rather, as Defendants argue, the
measures are an essential part of the project itself. While the design features in
question may provoke certain questions when assessing compliance with other

49

statutory schemes (such as NFMA), they are nevertheless integral parts of the

agency action that the Project Biological Opinion assesses. For this reason alone,

Plaintiffs' analogy to *Center for Biological Diversity v. Bernhardt* fails.

Furthermore, even if the measures in question were validly construed as

"mitigation measures," they are undoubtedly of sufficient definiteness and

manifest a clear commitment of agency resources. As Defendants point out, the

design features are binding commitments on the agency. This is a far cry from the

unspecified, aspirational measures addressed by the court in *Center for Biological

Diversity v. Bernhardt*. Therefore, Plaintiffs' arguments are unpersuasive.

### d.    NEPA

Plaintiffs make three primary arguments related to USFS' preparation of the

FEA. Plaintiffs first claim that the FEA fails to take a hard look at the Project's

impacts on grizzly bears. Second, Plaintiffs claim USFS failed to take a hard look

at the Project's effects on climate change. Finally, Plaintiffs' claim USFS was

required to have prepared an EIS.[3] For the reasons set forth below, this Court finds

that the USFS' preparation of the FEA violated neither NEPA nor the APA. The

---

[3] Plaintiffs also appear to argue USFS also violated NEPA by failing to comply
with grizzly bear and lynx standards in the Forest Plan (Doc. 46 at 22). Because the
Court has found the Project is consistent with the Forest Plan, Plaintiffs' claims to
this effect are moot.

FEA took a sufficiently hard look at the impacts of the Project, and USFS validly concluded that an EIS was not warranted.

The NEPA-related arguments in this matter make repeated reference to guidance and NEPA-implementing regulations issued by the Council on Environmental Quality ("CEQ"). Recent decisions in other circuits have called into question the present validity of CEQ regulations. *See Marin Audubon Socy. v. Fed. Aviation Administration*, 121 F.4th 902, 914–15 (D.C. Cir. 2024); *Iowa v. Council on Envtl. Quality*, No. 1:24-CV-00089, 2025 WL 598928, at *7 (D.N.D. Feb. 3, 2025); *but see Marin Audubon Socy. v. Fed. Aviation Administration*, No. 23-1067, 2025 WL 374897, at *1 (D.C. Cir. Jan. 31, 2025) (Srinivasan, C.J., with Millett, Pillard, Wilkins, Childs, Pan, and Garcia, JJ., concurring). Moreover, recent rulemaking casts doubt on the future of CEQ's implementing regulations. *See* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025).

However, these regulatory complications do not affect this Court's decision in the instant matter. As set forth below, this Court has not found that Defendants failed to comply with CEQ guidance or implementing regulations. Accordingly, there is no need for this Court to consider the present validity or future status of these regulations and guidance. *Cf. Citizens Action Coalition of Indiana, Inc. v. FERC*, 125 F.4th 229, 240 (D.C. Cir. 2025) ("Because [the agency] complied with

51

CEQ guidance, we need not consider the effect of [*Marin Audubon*, 121 F.4th at

914] on [the agency's] NEPA obligations.").

### 1. Grizzly Bears

Plaintiffs make three arguments concerning the Project's impacts on grizzly

bears. First, Plaintiffs contend that the FEA does not adequately consider the

effects of staging Project activities. Second, Plaintiffs argue the FEA does not

adequately consider the effects of Project temporary roads. Third, Plaintiffs

challenge the adequacy of the FEA's cumulative effects analysis.

"NEPA requires agencies to take a 'hard look' at the environmental effects

of a proposed action before implementing it." *Environmental Defense Center v.

Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022). In order "[t]o

take the requisite hard look, an agency 'may not rely on incorrect assumptions or

data' in arriving at its conclusion of no significant impacts." *Environmental

Defense Center*, 36 F.4th at 872-73 (citing *Native Ecosystems Council v. U.S.

Forest Service*, 418 F.3d at 954). It thus "follows that the data the Forest Service

provides to the public to substantiate its analysis and conclusions must also be

accurate." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir.

2018).

## A.    Impacts of Staging

Plaintiffs argue USFS failed to adequately consider the effects of staging project activities, as prescribed in the project design features. Plaintiffs allege temporary roads have significant effects on grizzly bears and that these effects may be exacerbated by repeated impacts to secure habitat over the course of the Project. (Doc. 46 at 34-35; Doc. 48 at 57-58). Plaintiffs therefore argue that the impacts associated with repetitive reductions of up to 1% of secure habitat require analysis and consideration beyond what is found in the FEA. (Doc. 46 at 35-36; Doc. 48 at 58).

Moreover, Plaintiffs point out that bears displaced by staged project activities will be forced to move into areas that were recently logged and roaded. Although the Project calls for temporary roads to be obliterated after Project activities are complete, Plaintiffs assert "closing or obliterating a road by putting up a barrier does not immediately result in usable and quality secure habitat." (Doc. 46 at 36 (citing FS005121)). These impacts, they argue, will be substantial and different than if the Project were not staged, but implemented at one time. (Doc. 46 at 36).

In response, Defendants argue USFS did address the impacts of staging project activities on grizzly bears. Specifically, staging is addressed in the Wildlife Report.

> [I]mplementation would occur in 4 to 6 timber sales or other contracts.
> These sales would be implemented in portions of the project area in the
> shortest timeframe possible before they move into new areas. Displacement
> would, therefore, be limited in extent at any one time. While short term
> disturbance of grizzly bear would occur during implementation to some
> degree (dependent on-site factors such as screening vegetation, distance to
> roads, and type of treatment that occurs), it would be temporary. Once
> activities are completed, associated disturbance ends, and temporary roads
> are effectively decommissioned, bears would again use these areas.

(SP041092). The Wildlife Report also concludes that grizzly bears "operate at a

landscape level in the [Greater Yellowstone Ecosystem]" and will be able to adjust

"their spatial and/or temporal use patterns within their home range" in response to

Project activities. (FS041092-93). The Report further indicates "[s]uitable alternate

habitats are widely available in the immediate vicinity of treatment units located in

the Madison #2, Henry's Lake #2, and Plateau #1 Subunits." (FS041093).

Defendants' position is clearly supported by record. Therefore, Plaintiffs'

argument that "there is no evidence in the record that the Forest Service has

engaged in an analysis . . . that considers the relative impacts of repetitive 1%

reductions of different areas of secure habitat" is unavailing. (Doc. 46 at 35; *see

also* Doc. 48 at 58). The Wildlife Report indicates USFS considered (1) the

impacts of staging the Project in four to six timber sales, (2) the broader landscape

upon which grizzly bears live and operate, and (3) grizzly bears' likely response to

Project activities. Accordingly, the FEA adequately addressed the impacts of the

Project's staged approach on grizzly bears.

## B.   56 Miles of Roads

Plaintiffs next argue USFS failed to adequately analyze the effects of

authorizing over 56 miles of roads on grizzly bears. (Doc. 48 at 56). Plaintiffs

specifically challenge the undetermined timing and placement of roads. "The exact

location, timing of use, and when and how the roads will be closed and removed

from the landscape is unknown, making it impossible to take a hard look at the

effects such roads will have on grizzly bears." (Doc. 48 at 57). In support,

Plaintiffs cite the Project Biological Opinion, where FWS indicates that the level of

effects from motorized routes on female grizzly bears would "depend on such

things as location of the routes, length of the routes, and the frequency and

intensity of use." (Doc. 48 at 57; FWS000032). Therefore, Plaintiffs argue, USFS

must consider not just the total mileage of all roads, but the roads' locations as

well.

In response, Defendants argue that the FEA and Wildlife Report consider the

maximum authorized extent of all temporary roads. (Doc. 55 at 43 (citing

SP041089)). Defendants claim this "worst case" analysis is sufficient because

when the Project is implemented, the temporary roads will not exist at the same

time but will be staged to comply with project design features. Therefore,

Defendants argue, the effects of the temporary roads will "necessarily be less than

those disclosed in the analysis." (Doc. 61 at 20). In addition, Defendants argue

USFS considered grizzly bears' ability to migrate in response to Project effects as well as the presence of alternative habitat in the vicinity of Project activities. (Doc. 57 at 62 (citing FWS000037, FS041993); Doc. 55 at 42-43 (citing FS044298)).

Plaintiffs' argument is unpersuasive. Although the exact locations of the temporary roads would certainly provide more information, it would not meaningfully change USFS' analysis. The Government has considered the maximum impacts of the roads and has demonstrated that additional specificity would not meaningfully inform the analysis. The actual locations of the roads will be determined according to project design features that limit the total impacts to grizzly bears. These measures are sufficient to ensure that the ultimate locations of the roads comport with the worst-case analysis in the FEA. *See North Cascades Conservation Council v. U.S. Forest Service,* No. 2:22-CV-00293-SAB, 2024 WL 188374, at *7 (E.D. Wash. 2024) (holding that EA prepared for project employing condition-based management met NEPA's requirements).

## C. Cumulative Effects

Plaintiffs next challenge the sufficiency of the FEA's cumulative impacts analysis. In particular, Plaintiffs argue that the cumulative impacts analysis failed to consider the effects on grizzly bears of (1) the Yale Creek Project, (2) allegedly degraded baseline conditions, (3) and private land developments.

A cumulative effect or impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't. of the Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (citing 40 C.F.R. § 1508.7). "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why a more definitive information could not be provided." *Te-Moak Tribe*, 608 F.3d at 603. To prevail on a cumulative effects claim, environmental plaintiffs "need not show what impacts would occur. To hold otherwise would require the public, rather than the agency, to ascertain the cumulative effects of a proposed action." *Te-Moak Tribe*, 608 F.3d at 605.

### i.    Yale Creek

Plaintiffs argue USFS failed to adequately disclose the Yale Creek Project, and therefore failed to analyze the cumulative impacts of the South Plateau Project. (Doc. 46 at 31). In response, Defendants argue that an agency's determination regarding the geographic scope of their cumulative effects analysis is entitled to deference. (Doc. 55 at 44 (citing *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002)). As above, the Yale Creek Project is located in the Henry's Lake #1 subunit, outside the Project area.

Plaintiffs argue USFS did not provide a reasonable justification for excluding Yale Creek from its analysis. (Doc. 59 at 21). Plaintiffs further argue USFS cannot justify the decision not to include the Yale Creek Project, as the Forest Plan "establishes that compliance with [FW-STD-WLGB-03(b)] is determined at the BMU level." (Doc. 59 at 21 (citing SP000065; SP004511)).

Plaintiffs' arguments are unpersuasive for two reasons. First, USFS' scope of analysis is supported in the record. The agency's choice in selecting the analysis area in entitled to deference. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 902 (9th Cir. 2002). As previously discussed, the Project will occur in portions of three subunits. Although the total area of the Project is much smaller than the three combined subunits, USFS has elected to address all three subunits. As the Defendants point out, the court in *Friends of the Wild Swan v. Weber* upheld the use of a subunit for cumulative effects analysis. 767 F.3d at 944-45.

Second, Plaintiffs' arguments appear to merge the requirements of NEPA and the Forest Plan in a manner that is not supported by the law. While Plaintiffs are correct that FW-STD-WLGB-03(b) requires reference to the scale of a BMU, they have not explained why that standard must, under NEPA, provide the analysis area for the FEA.

### ii.    Degraded Baseline

Plaintiffs argue USFS failed to account for the allegedly degraded baseline condition for grizzly bears and therefore did not adequately analyze the cumulative effects of the Project. Citing the administrative record, Plaintiffs conclude that the baseline habitat conditions in the Project area are deficient and degraded. (Doc. 48 at 60 (citing FWS002132; SP039394; SP046204; SP046204). While Plaintiffs focus on habitat conditions, Defendants' briefing largely focuses on the grizzly bear population itself. Defendants argue that the grizzly population is stable and the Project area is frequently used or inhabited by grizzly bears. (Doc. 55 at 43) (citing SP041073; SP044023; SP043895).

Here, Plaintiffs' arguments are unpersuasive. While Plaintiffs argue that USFS should have considered a baseline they consider degraded, the relative condition of the habitat is, as USFS argues, an opinion more than a fact. (Doc. 61 at 24). USFS is entitled to rely on its own experts' opinion. *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 577 (9th Cir. 1998).

### iii.    Private Land Developments

Plaintiffs next argue that the FEA fails to sufficiently account for private land subdivisions, housing developments, and private land activities in the project area. (Doc. 48 at 61-62). In response, Defendants argue that NEPA does not require that the agency "predict and quantify the effects of future private

development." (Doc. 59 at 44). Defendants also point to references in the FEA and

Wildlife Report, arguing that USFS did consider the cumulative effects of private

development within the Project Area. (Doc. 55 at 44 (citing SP004712-13;

SP041100-01)). Plaintiffs' arguments here are unpersuasive. While USFS' analysis

does not rise to the level Plaintiffs demand, it nevertheless considered the issues

and satisfies NEPA's "hard look" requirement.

## 2.    Climate Change

Plaintiffs argue USFS failed to take a hard look at the climate related

impacts of the Project. (Doc. 46 at 54). The substance of Plaintiffs' claim depends

on a recent decision in this District, *Center for Biological Diversity v. U.S. Forest*

*Service.* 687 F. Supp. 3d 1053 (D. Mont. 2023) ("*Black Ram*"). Plaintiffs argue

that, as in *Black Ram*, USFS performed only a perfunctory analysis and concluded

without proper consideration that the climate impacts of the Project are

insignificant.

In *350 Montana v. Haaland*, the Ninth Circuit considered whether the

Department of the Interior had, without proper consideration, dismissed as minor

the emissions of a coal mine expansion project. 50 F.4th 1254 (9th Cir. 2022).

There, the reviewing agency concluded that the mine expansion would not have

significant impacts on the environment because its "contribution *relative to other*

*global sources [of greenhouse gases] would be minor* in the short-and-long-term

on an annual basis." 50 F.4th at 1266. The Ninth Circuit rejected that explanation

and held that, lacking a scientifically supported basis for its conclusion, the agency

had not fulfilled the requirements of NEPA. 50 F.4th at 1266, 1272.

The Ninth Circuit's decision in *350 Montana* provides much of the legal

support for the District of Montana's decision regarding NEPA and climate change

in *Black Ram*. That case considered the Kootenai National Forest Black Ram

Project in northwest Montana. The court found that the Black Ram Project's EA

was insufficient because, "although the USFS took steps to explain how the Project

could impact carbon emissions, it did so only in general terms, which does not

meet NEPA's 'hard look' standard." 687 F. Supp. 3d at 1075. The court explained

that USFS' climate impacts analysis did not satisfy NEPA because (1) it relied

primarily on "the cookie-cutter and boilerplate Project Climate Report" and

therefore "did not utilize high quality and accurate information which NEPA

requires" and (2) it also relied, without scientific explanation, on the assertion that

"the short-term loss of carbon from logging would be outweighed by the net

increase in carbon sequestration resulting from a healthier forest . . . ." 687 F.

Supp. 3d at 1075. The agency concluded that the project's impact would make up

"only a tiny percentage of forest carbon stocks of the Kootenai National Forest,

and an infinitesimal amount of total forest carbon stocks of the United States." 687

F. Supp. 3d at 1075.

Here, the Project FEA "tiered" its analysis to the 2022 EIS for the Forest

Plan. (SP004372). In the EIS, USFS concluded that "even the maximum potential

management levels described by the plan alternatives would have a negligible

impact on national and global emissions and on forest carbon stocks." Based on

that determination, USFS concluded that "a quantitative analysis of carbon effects

is not warranted and thus is not meaningful for a reasoned choice among plan

alternatives." (SP001437-38). The EIS further concluded that the carbon-related

impacts of management activities such as timber harvest would be mitigated or

perhaps reversed over time.

Plaintiffs argue that deficiencies in USFS' analysis in this Project match

those in the Black Ram Project. Plaintiffs assert that, as in *Black Ram*, USFS relied

on "cookie cutter analysis" to conclude that the "short term release of carbon due

to project activities is likely to be offset by improvements to forest conditions."

(Doc. 46 at 55-56) (citing FS038618). Plaintiffs further assert that USFS based its

determination on meaningless comparison to the overall amount of carbon stored

in the forest. (Doc. 46 at 56).

Despite some factual similarities, Plaintiffs' comparison to *Black Ram* falls

short. As the Court in *Black Ram* pointed out, the fatally inadequate, "cookie-

cutter" analysis depended on a verbatim reproduction of analysis from another

forest. 687 F. Supp. 3d at 1074 n.7. Although Plaintiffs have highlighted

similarities in some of the language used to assess carbon impacts in the Project,

they have failed to show that significant analysis supporting USFS' conclusions

was borrowed from elsewhere.

Similarly, Plaintiffs have failed to show that USFS' conclusions regarding

climate related impacts are unscientific. USFS' analysis does repeat the conclusion

that active management of the Forest might lead to a healthier forest, able to

sequester carbon in the future. However, Plaintiffs have not gone so far as to fully

explain a challenge to the scientific evidence underlying the carbon analysis at

hand. Nor have Plaintiffs rebutted the quantitative estimates that were included in

the Forest Plan EIS and which underly the decision to prepare a qualitative analysis

for the Project. (*See* SP001440). Therefore, the matter at hand is distinguished

from *Black Ram*.

### 3. EIS

"A threshold question in NEPA cases is whether a proposed project will

'significantly affect' the environment, thereby triggering the requirements for an

EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d at 1212. To

determine whether an action significantly affects the environment, the agency must

consider the context and intensity of the project. 40 C.F.R. § 1508.27 (2019).

Context means "that the significance of an action must be analyzed in several

contexts such as society as a whole, the affected region, the affected interests, and

the locality." 40 C.F.R. § 1508.27(a) (2019). Intensity "refers to the severity of impact" and is evaluated using ten factors. 40 C.F.R. § 1508.27(b)(1)–(10) (2019).[4] An agency's finding of no significant impact "may be overturned only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Anderson v. Evans*, 475 F.3d 475, 486 (9th Cir. 2004). The presence of just "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005).

For purposes of determining whether an action requires an EIS, an agency may prepare an EA. 40 C.F.R. § 1501.4(b) (2019). Here, USFS prepared the FEA and summarized its finding of no significant impacts in its Decision Notice and Finding of No Significant Impact. (SP004470). Plaintiffs contend USFS did not fully address five intensity factors—(1) unique characteristics of the geographic area, (2) potential adverse effects on a listed species, (3) highly controversial effects, (4) highly uncertain effects, and (5) threatened violations of Federal law. Thus, Plaintiffs argue, there are "substantial questions" about whether the Project

---

[4] NEPA regulations have changed several times since 2019. The parties appear to disagree as to which regulations are applicable to the situation at hand, particularly regarding whether an EIS was required. (*See* Doc. 48 at 65, footnote 4; Doc. 61 at 30, footnote 7). The Court has considered both sets of regulations cited by the parties and concludes that the differences are immaterial for the resolution of this matter. For the sake of clarity, the Court has followed Plaintiffs in citing to the 2019 regulations.

will cause significant effects, warranting the preparation of an EIS. (Doc. 48 at 65)
(citing *Alliance for the Wild Rockies v. Gassmann,* 678 F. Supp. 3d 1249, 1293 (D.
Mont. 2023)).

First, Plaintiffs maintain that the Project is in an "ecologically significant
area." (Doc. 48 at 66). In support, Plaintiffs point to a variety of landscape
characteristics. Plaintiffs indicate that the Project will occur within the Greater
Yellowstone recovery zone and the Dry Canyon Inventoried Roadless Area. (Doc.
48 at 66). Plaintiffs also indicates that the Project is "adjacent to an important link
for wildlife between Yellowstone National Park, a recommended wilderness area,
the Two Top Inventoried Roadless Area [*sic*]." (Doc. 48 at 66 (citing SP004377,
SP039383)). Plaintiffs further indicate that the Project area "includes large portions
of 'unroaded areas' and three wilderness inventory areas." (Doc. 48 at 66-67
(citing SP039391)).

Considering this first factor, Plaintiffs have failed to raise a "substantial
question" about whether the project will cause effects triggering the need for an
EIS. Plaintiffs have generally pointed to features of the landscape and described
some of the effects, but have not sufficiently explained why this information merits
the preparation of an EIS.

Second, Plaintiffs assert the Project will have "not insignificant" effects on
grizzly bears and "substantial questions have been raised." (Doc. 48 at 67). In

support, Plaintiffs highlight (1) preexisting threats to grizzly bear in the Project area and (2) doubts about the Government's abilities to accurately assess and mitigate harms to the species. (Doc. 48 at 67-68). Regarding preexisting threats, Plaintiffs indicate that the area is a "population sink" for grizzly bears and allege that the habitat is already deficient. (Doc. 48 at 67 (citing SP046204; FWS000043)). Plaintiffs further argue the FEA was likely deficient, and that there is no guarantee USFS will comply with Forest Plan standards that mitigate impacts to grizzly bears. (Doc. 48 at 68).

As above, Plaintiffs have failed to demonstrate that a substantial question exists, or to explain why these allegations support the need for an EIS. Defendants convincingly explain that, while there may be impacts to individual grizzly bears, the effects on the species as a whole do not rise to a level of significance. (Doc. 55 at 56) (citing *Environmental Protection Information Center v. U.S. Forest Service*, 451 F.3d 1005, 1010 (9th Cir. 2006)).

Third, Plaintiffs argue there is a "high degree of controversy and uncertainty over the effects of the project given the agency's adoption of a 'wait-and-see' approach." (Doc. 48 at 68). Plaintiffs also call attention to alleged controversy regarding a "lack of specificity in the EA . . . ." (Doc. 48 at 68). In support of these arguments, Plaintiffs cite to their own briefing on the issues. Plaintiffs also aver that the same issues underlying their ESA-related claims support the need for an

66

EIS, namely, that USFS's "definition of 'secure habitat' and continued reliance on

a 1998 baseline for the [Project] is also highly controversial and . . . conflicts with

the best available science."

As above, Plaintiffs fail to demonstrate that these two factors (controversy

and uncertainty) require the preparation of an EIS in this case. While it is clear that

Plaintiffs contest those issues, they have not pointed to facts in the record that

support the contention that the challenged Project is highly controversial nor that

its effects are highly uncertain.

Finally, Plaintiffs argue an EIS should be required because the Project is

likely to violate NFMA. (Doc. 48 at 68). This Court has found that the Project does

not violate NFMA. Therefore, this argument and factor do not support the

preparation of an EIS.

## IV.    Conclusion

For the reasons set forth above,

IT IS RECOMMENDED that Plaintiffs' motions for summary judgment

(Doc. 45; Doc. 47) be DENIED and Defendants' cross-motions for summary

judgment (Doc. 54; Doc. 56) be GRANTED.

IT IS FURTHER RECOMMENDED that Plaintiff CBD's motion to

supplement the administrative record or take judicial notice (Doc. 43) be denied.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of

the Findings and Recommendation of the United States Magistrate Judge upon the

parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after entry hereof, or

objection is waived.

DATED this 31st day of March, 2025.

Kathleen L. DeSoto
United States Magistrate Judge