FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 16, 2025

SEAN F. McAVOY, CLERK

1

2

3

4          UNITED STATES DISTRICT COURT

5          EASTERN DISTRICT OF WASHINGTON

6

7   ALLIANCE FOR THE WILD            No. 2:24-CV-157-RLP
    ROCKIES,
                    Plaintiff,
8

9   v.                              ORDER ON MOTION FOR
                                    SUMMARY JUDGMENT AND
    U.S. FOREST SERVICE, JOSHUA     MOTION TO STRIKE
10  WHITE, Forest Supervisor, Colville
    National Forest, CARIN VADALA,
11  Newport-Sullivan Lake District Ranger,
    U.S. Forest Service,
12
                    Defendants.
13

14          BEFORE THE COURT are the parties' cross motions for summary

15  judgment and Defendants' motion to strike extra record materials. ECF Nos. 24,

16  32, 33. A hearing was held in this matter on May 13, 2025. Claire Loebs Davis

17  appeared on behalf of Plaintiff Alliance for the Wild Rockies (Alliance). Hayley

18  Carpenter appeared on behalf of Defendants United States Forest Service (the

19  Service), Forest Supervisor Joshua White, and Newport-Sullivan Lake District

20  Ranger, Carin Vadala.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE -- 1

Alliance for the Wild Rockies is an environmental organization that challenges the Service's decision to proceed with a timber treatment project known as the Sxʷuytn-Kanisku Connections Trail Project (the Project).[1] Alliance argues the Service violated the National Environmental Policy Act of 1969 (NEPA) by failing to conduct an environmental impact statement (EIS) before approving the Project. It also argues the Project violates the National Forest Management Act (NFMA) because it does not adhere to the terms of the 2019 Colville National Forest Land Management Plan. The Service disputes these allegations. Both parties have filed motions for summary judgment in support of their positions.

For the reasons set forth below, each parties' motion for summary judgment is granted in part and denied in part. While the Court largely agrees with the arguments set forth by the Service, Alliance prevails on one issue. Specifically, the record shows a violation of NEPA because the maps identifying areas for commercial timber harvesting are too vague to ensure a hard look at the impact of harvesting and public comment. This flaw is sufficient to require judgment in favor of Alliance.

//

---

[1] Sxʷuytn roughly translates to "connection" or "trail" in the Kalispel Salish language. AR 00854.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 2

LEGAL STANDARD

The Administrative Procedure Act (APA) governs review of the Service's compliance with NFMA and NEPA. *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008), overruled on other grounds by *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365 (2008). Under the APA, courts must be deferential to the Service as a government agency, particularly when it comes to "scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989). A court cannot substitute its judgment for that of the Service. *See North Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 824 (9th Cir. 2025). Rather, the Service's decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

NEPA "is a procedural statute that 'requires federal agencies to take a 'hard look' at the environmental consequences of their actions." *North Cascades*, 136 F.4th at 821 (quoting *Env't. Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022)). The statute has twin aims. "First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062,

1066 (9th Cir. 2002) (alteration in original) (internal quotation marks and citation omitted).

"NEPA is a procedural cross-check, not a substantive roadblock." *Seven County Infrastructure Coal v. Eagle County, Co.*, 605 U.S. __, 145 S.Ct. 1497, 1507 (2025). The statute "does not require [an] agency weigh environmental consequences in any particular way. Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Id*.

NEPA requires agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "If an agency is unsure whether its action will have significant environmental impacts, it may prepare an Environmental Assessment ('EA') first." *North Cascades*, 136 F.4th at 821 (citing 42 C.F.R. § 1508.1(j) (2024)). "If the EA determines that the proposed action will significantly affect the environment, then the agency must prepare an EIS. If the EA reveals no significant effect, the agency may issue a Finding of No Significant Impact—or FONSI in NEPA parlance." *Native Ecosystems Council v. U.S. Forest Service ex rel. Davey*, 866 F.Supp.2d 1209, 1224 (D. Idaho 2012) (hereinafter "*Davey*").

"NFMA charges the Forest Service with the management of national forest land." *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 1109

(9th Cir. 2018). There are two levels of forest management under the NFMA: "(1) the forest level, and (2) the individual project level." *Id*. Forest-level management involves broad, long-term plans and objectives that are developed through a forest management plan. A forest-level management plan operates like a "zoning ordinance[ ], defining broadly the uses allowed in various forest regions, setting goals and limits on uses (from logging to road construction), but do not directly compel specific actions, such as cutting of trees in a particular area or construction of a specific road." *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 966 (9th Cir. 2003). An individual project consists of a site-specific plan. *Id*. It serves to implement a forest plan and must be consistent with the forest plan. 16 U.S.C. § 1604(i).

## BACKGROUND

The Service initiated the Sxʷutn-Kanisku Connections Trail Project in 2018. AR 00854. One stated goal of the Project is to move the Colville National Forest toward historical conditions for tree size, density, and species. AR 00857-58. The Project area consists of approximately 91,400 acres and around 44% of the Project area (roughly 40,300 acres) is owned by the National Forest System. AR 12283. The Project authorizes approximately 24,400 acres of commercial timber harvest and 45,400 acres of non-commercial restoration activities (including removal of saplings, shrubs, and other fuels and prescribed burning). AR 00862-64. The

timeline for the Project is approximately 20 years. AR 01216.

The Service released a draft Environmental Assessment (EA) for the Project in the fall of 2020 and a final EA and Draft Decision Notice and Finding of No Significant Impact (DN/FONSI) later that year. AR 01266. The Service issued a final DN/FONSI authorizing the Project in May 2021. AR 01261-71. The Service has since contracted purchasers for three timber sales under the Project. AR 04302-04.

In 2023, this Court vacated a proposed action issued under the 2019 forest plan regarding harvesting of large trees, known as the Sanpoil Project. *Kettle Range Conservation Group v. U.S. Forest Service*, No. 2:21-CV-161-SAB (E.D. Wash, June 21, 2023) (ECF No. 74). The decision reinstated harvesting to the standards set in the 1995 Forest Plan Amendment, known as Eastside Screens. AR 04296. The Eastside Screens rule prohibited the harvesting of certain trees over 21 inches in diameter. *Id*. In response to the Sanpoil decision, the Service completed a Supplemental Information Report[2] (SIR) to determine any impact on the Final EA and DN/FONSI. AR 04296-4309. The Service concluded that reversion to the

---

[2]A SIR is a procedure that merely documents the agency's "hard look" at new information. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 561 (9th Cir. 2000).

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 6

1  Eastside Screens rule would not impact the project and thus a supplemental NEPA

2  review was not required. AR 04301.

3      Alliance filed suit on May 13, 2024, claiming violations of the NEPA and

4  NFMA. ECF No. 1. Alliance requests the Court vacate the Project and related

5  timber sales and vacate the decision, within the project, to eliminate roughly

6  400,000 acres of lynx habitat. ECF No. 48.

7  MOTION TO STRIKE

8      The Service has filed a motion to strike appendices to Alliance's Motion for

9  Summary Judgment, consisting of eight maps that were created by merging

10  administrative record documents with open-source Geographic Information System

11  (GIS) maps and with administrative record images. ECF No. 33. The maps were

12  generated for purposes of the current litigation and were not before the Service

13  during its agency decision-making process. The Service argues that the eight maps

14  should be stricken because Alliance never sought permission to expand the

15  administrative record as required by the Court's scheduling order and because the

16  maps do not meet the criteria for expanding the administrative record. The Court

17  agrees with the Service on both arguments.

18      Under the terms of the original scheduling order, Alliance had until

19  December 2, 2024 to file a motion to supplement the administrative record. *See*

20  ECF No. 11 at 7; ECF No. 13, ¶6(b). This deadline was subsequently extended to

ORDER ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE -- 7

December 13, 2024 at Alliance's request. ECF No. 18 at 2. Alliance never filed a motion to supplement the record as provided by the December 13 deadline. It therefore forfeited the right to do so. This circumstance alone justifies granting the Service's motion to strike.

With respect to the merits, there are four narrowly-construed circumstances where the Court may admit extra-record evidence in an agency review action:

> [D]istrict courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (internal quotation marks omitted). "Normally, if an Agency's administrative record is incomplete, we would expect litigants to seek to supplement the record in the agency before seeking to expand the record before the district court." *Id*. at 1029 n.10.

Alliance does not argue for application of any of the four exceptions. Instead, Alliance claims the Court can take judicial notice of the maps. The Court disagrees. In the current context, extra-record evidence admitted through judicial notice must still meet one of the established exceptions to the rule governing agency review. *See Friends of the Clearwater v. Higgins*, 523 F.Supp.3d 1213, 1222 n.4 (D. Idaho 2021); *see also Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d

977, 986 n.2. (9th Cir. 2015) (denying judicial notice because "judicial review of an agency action is [generally] limited to the administrative record on which the agency based the challenged decision") (alteration in original); *Greater Hells Canyon Council v. Wilkes*, 2023 WL 6443562 at *3 (D. Or. Apr. 20, 2023) (extra-record evidence admitted through judicial notice still must meet one of the *Lands Council* exceptions).

Because Alliance has not shown that the eight extra-record maps meet any of the four *Lands Council* exceptions, Alliance's effort to expand the record fails on the merits. Even though the records utilized by Alliance in creating the maps may be public records, it would be inappropriate for the Court to use the contents of public documents to second guess an agency decision. *See San-Luis & Delta Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014).

## NEPA AND NFMA ANALYSIS

Alliance alleges the Service's decision to go forward with the Project without an EIS violates NEPA, because: the Project remapped lynx habitat; the Project maps, designating treatment types, are impermissibly vague; and the Service failed to take a hard look at Project impacts regarding road construction/reconstruction, wildlife, and cumulative projects. Alliance claims the Project violated the NFMA because it is inconsistent with the 2019 Forest Plan with respect to road density. Finally, Alliance argues the Project violates NEPA

and NFMA because a SIR fails to comply with the district court's decision in *Kettle Range Conservation Group v. U.S. Forest Service*, No. 2:21-CV-161-SAB (E.D. Wash, June 21, 2023) (ECF No. 74). According to Alliance, the significance of the Project requires the Service to conduct a full EIS under NEPA.

The Service has filed a cross motion for summary judgment, arguing their actions complied with the NEPA and NFMA.

The Court addresses each of Alliance's contentions in turn.

*1. Whether the Project violated NEPA by remapping Lynx habitat without an EIS*

Throughout the 1990s, the Canada lynx were considered a threatened and/or sensitive species for the Colville National Forest. AR 06319. In 1993, biologists with the Colville National Forest and Washington Department of Fish and Wildlife compiled a map of primary lynx range on the forest, subdividing the area into individual Lynx Analysis Units (LAUs). *Id.* "An LAU is an area of at least the sized used by an individual lynx, from about 25 to 50 square miles, and must contain at least 10 square miles of primary lynx habitat to support reproduction and survival." *Davey*, 866 F.Supp.2d at 1214 (D. Idaho 2012).

In 2000, the United States Fish and Wildlife Service added the Canada lynx to the list of threatened species under the Endangered Species Act. 65 Fed. Reg. 16052-1, 2000 WL 299328 (Mar. 24, 2000) (codified at 50 C.F.R. pt. 17).

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 10

Thereafter, a federal interagency lynx biology team developed the Canada Lynx Conservation and Assessment and Strategy (LCAS) "as an interim and guiding conservation strategy for lynx on federal lands." *Davey*, 866 F.Supp.2d at 1214.

"The LCAS required the Forest Service and the [Fish and Wildlife Service] to delineate LAUs upon which direct, indirect, and cumulative effects from site-specific projects could be analyzed. The LCAS "did not actually develop any maps of lynx habitat." *Yellowstone to Uintas Connection v. Marten*, 2024 WL 3400524 at \*2 (D. Mont. July 12, 2024). "Instead, the LCAS instructed that specific national forests … should develop or refine maps of known lynx occurrence and potential lynx habitat." *Id*. The LCAS states it is not necessary to map LAUs non-core (i.e. secondary or peripheral) habitat areas. AR 06321.

Colville Forest's 2019 Forest Plan incorporated LCAS's conservation standards for core lynx areas within the Kettle-Wedge Lynx Core area. AR 16555. But there was no "other direction provided by the Forest Plan specific to mapping suitable habitat for lynx on the forest." AR 06322. The Forest Plan did not identify or discuss lynx habitat in non-core areas, such as the Selkirk Mountain area. The Selkirk Mountains is considered a secondary area for lynx. AR 06321.

In 2020, the Forest Service issued updated lynx habitat maps for the Colville National Forest. AR 06322. The maps adjusted LAUs within the Kettle Mountain Core area. AR 06322. The 2020 maps did not define any individual LAUs in the

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 11

Selkirk Mountain area. AR 06322. Rather, the Service eliminated 22 LAUs that had been previously defined in the area and instead identified "three areas of mapped lynx range" within the Selkirk Mountains. AR 06325.

The Project at issue here does not include any acreage within the Kettle-Wedge Core area. AR 01006. Rather, the Project is located in the non-core area of the Selkirk Mountains. AR 06321. The Project used the mapped lynx range from the 2020 map update to measure the Project's impact on lynx. AR 06322.

It is not disputed that the Service did not prepare an EIS for its lynx mapping decisions—no EIS was issued in conjunction with the 2020 lynx habitat maps and no EIS was issued in conjunction with the Project's adoption of the 2020 lynx habitat maps. The question is whether NEPA required an EIS.

The issue of whether the Service was required to conduct an EIS with respect to the lynx maps turns on whether the lynx mapping constituted a major federal action as contemplated by NEPA. *See* 42 U.S.C. § 4332(2)(C). The law provides no precise definition of what constitutes a "major" federal action under NEPA. Rather, an agency's factual decision that a proposed program is not a major action requiring an EIS is entitled to deference. *See Oregon Nat. Desert Ass'n v. Singleton*, 47 F. Supp. 2d 1182, 1191 (D. Or. 1998). Courts must ensure the agency "has taken a 'hard look' at the environmental consequences of its action and that its decision is 'founded on a reasoned evaluation' of relevant factors." *Friends of*

the *Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993). If the record shows the agency's decision was "truly informed," it is entitled to deference. *Id.*

The parties appear to agree that an EIS would have been required if the lynx mapping decision impacted habitat protections for the lynx. Case law from this circuit recognizes that remapping lynx habitat area can constitute major federal action in such circumstances. For example, in *Alliance for the Wild Rockies v. U.S. Forest Service*, an EIS was required because "the Forest Service adopted and relied on a revised lynx habitat map that removed areas within the project boundary from" lynx protections afforded by the 2007 Northern Rockies Lynx Management Division (NRLMD) amendments to the forest plan. 2023 WL 5427921 at *7 (D. Mont. Aug. 23, 2023). In *Davey*, the remapping "opened nearly 400,000 acres of land to … projects that would be prohibited under the earlier map and the restrictions applicable to LAUs."[3] 866 F.Supp.2d at 1227. In *Yellowstone to Uintas Connection*, remapping changed lynx protections that had been adopted through

---

[3] *Davey* referred to ten regulatory factors defining what constitutes a significant federal action under NEPA. 866 F.Supp. at 1228-231. The regulations discussed in *Davey* were not in effect at the time of the current EA. *See* former 40 C.F.R. § 1508.27.

1   the NRLMD amendments. 2024 WL 3400524 at *5. And in *Oregon Natural*

2   *Resources Council Fund v. Hells Canyon Preservation Council*, the court held that

3   either an EA or EIS was required prior to remapping because without this process,

4   the forest service was precluded from being able to "conclude [timber] sales would

5   not occur within primary lynx habitat and, therefore, would not impact the lynx

6   adversely." 252 F.Supp.2d 1088, 1105 (D. Or. 2003).

7        The Service argues that the remapping here did not require an EIS because

8   there was no impact on lynx protections. Unlike forest plans at issue in prior cases,

9   the 2019 Forest Plan at issue here does not confer any specific protections for lynx

10  in secondary, non-core habitat areas. AR 16555 (Forest Plan incorporating 2013

11  LCAS), 06321 ("The 2013 LCAS (page 96) states that it is not necessary to map

12  LAUs in secondary areas."). The Project area at issue is not within a core lynx

13  habitat area. AR 06321. Thus, the maps adopted by the Project have no impact on

14  protections to lynx within the Project area.

15       Alliance appears to recognize that no specific lynx protections apply in the

16  Project area; nevertheless, Alliance argues that remapping undermines protections

17  provided by general, forest wide provisions of the Forest Plan regarding wildlife

18  habitats. According to Alliance, the lynx remapping undermines one of the Forest

19  Plan's guidelines and two of its desired conditions. ECF No. 24 at 19-20.

20       Assessing Alliance's objections requires understanding what the Forest Plan

means by a "guideline," versus a "desired condition." *See* AR 16511-513, 16667-69. A guideline is essentially a binding condition. *See* AR 16513, 16668. Any meaningful deviation from a guideline requires a "plan amendment." AR 16513. But a desired condition is more flexible. "Desired conditions are aspirations, not final decisions approving projects and activities, and may be achievable only over a long period of time." AR 16511. A desired condition need not be met for every project or activity conducted during the life of the forest plan. AR 16667. When it comes to desired conditions, a project or activity must be assessed according to the desired conditions as a whole and the project or activity must meet one or more of four conditions addressing whether the project or activity promotes progress towards a desired condition. AR 16511, 16667-68.

Alliance fails to show how the Project undermines any specific guideline or desired condition.

The only guideline pointed to by Alliance is FW-GDL-WL-04, which addresses federally listed species, and provides that "[h]abitat for federally listed wildlife species within designated recovery areas that occur on National Forest System lands should be retained in public ownership and managed to support recovery." AR 16562. Because there is no designated critical habitat for lynx on

ORDER ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE -- 15

the Colville National Forest, let alone in the Project area, the mapping decision has no impact on lynx habitat under FW-GL-WL-04.[4]

Alliance points two desired conditions: (1) FW-DC-WL-02, which addresses habitat conditions for threatened and endangered species, and specifies a goal that "[h]abitat conditions (amount, distribution, and connectivity of habitat) [be] consistent with the historical range of variability … and contribute to the recovery of federally listed threatened and endangered species." AR 16557. (2) FW-DC-WL-04, which addresses habitat components for Canada lynx and provides that "[f]orest successional stages within lynx analysis units provide a mosaic of lynx habitat (including foraging, travel and denning components) with [a] landscape pattern that is consistent with the historical range of variability." AR 16557.

Alliance fails to explain how these desired conditions confer protections that are undermined by the Project. Consistent with the aforementioned desired conditions, the EA states that the one of the Project objectives is to "[t]rend the forest to the historic range of variability, reduce hazardous fuels and improve

---

[4] The Service proffers that the reference to FW-GDL-WL-04 in the Biological Assessment was likely a typo, as the same document mentions the similarly numbered desired condition—FW-DC-WL-04 three times. ECF No. 48 at 2.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 16

resilience to disturbance" by addressing "[h]igh-density forest conditions" that "reduce the resilience of these forest to disturbance and contribute to uncharacteristic fire activity." AR 00857. Alliance appears to disagree that the Project will contribute to this goal. But the Service's technical opinion on this issue is entitled to APA deference. *See Alpine Land and Reservoir Co*., 887 F.2d at 213. Furthermore, the two desired conditions identified by Alliance are not hard-and-fast rules. Even if the Project were in tension with some of the Forest Plan's desired conditions, the Service's conclusion that the Project furthers the overall Forest Plan would be entitled to deference.

Alliance complains that the maps adopted by the Project eliminated non-core LAUs. This complaint is at least somewhat misleading. The Forest Plan did not adopt any LAUs in non-core areas of the forest. *See* AR 16555. Thus, nothing was eliminated.

Alliance points out that the 2020 maps referenced by the Project contemplate changes to core Lynx habitat. This may be so. But the Project does not propose any action with respect to this aspect of the 2020 maps. Until incorporated into some sort of action, such as a new project, the 2020 map revisions to core lynx habitat are not ripe for judicial challenge. *See Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 669-70 (9th Cir. 1998).

Alliance may well be concerned that the Forest Plan fails to confer sufficient

protections in secondary, non-core lynx habitat areas. But this concern is one that goes to the Forest Plan, not the current project. Alliance has not challenged the Forest Plan. Thus, any inadequacies of that Plan are not before the Court.

*2. Whether the Project violates NEPA because it is too vague.*

The Project authorizes timber harvest on 24,420 acres of National Forest system lands within a total project area of 40,300 acres. AR 01209. There are three authorized categories of commercial timber harvesting: commercial thinning, which would keep an overhead canopy closure generally greater than 40% and maximum is estimated to cover 8,850 acres (AR 00989, 01209); shelterwood with reserves, which would reduce overhead tree canopy closure to lower than 40% immediately post-harvest and is estimated to cover 6,720 acres (AR 00989, 01210, 01238); and commercial thinning with group selection, which would result in few to no trees per acre and is estimated to cover 8,850 acres (AR 01210). The project also authorizes a variety of non-commercial restoration treatments. AR 01211-12. The expected timber harvest of the project is 244 million board feet over a project timeline of 20 years. AR 00989.

Project maps specify the locations for commercial and non-commercial treatments. *See* AR 00340-43. However, they do not further identify the specific treatments locations within each of these two restoration categories. For example, the maps do not disclose where commercial thinning will take place as opposed to

shelterwood with reserves.

Rather than provide specific locations for treatment types, the Project employs a harvest plan known as condition-based management. AR 01213-14. Condition-based management is defined as a flexible strategy "that allows predetermined treatments to be aligned, prior to implementation, with current conditions on the ground." AR 01214. It "involves developing treatments based on pre-identified management requirements but deferring specific decisions about which treatments will be applied in particular locations until the Forest Service conducts pre-implementation field reviews." *North Cascades*, 136 F.4th at 829. The Project identifies pre-defined "decision points" to determine locations of particular treatments at the time of implementation. AR 01214.

The Project identifies six decision points for commercial thinning (AR 01216), five decision points for shelterwood with reserves (AR 01217), and three decision points for commercial thinning with group selection (AR 1217). For a particular treatment type to take place, "some or all" of the decision points must be met. AR 01216-17. In addition, the stated primary goal of all commercial harvesting is to trend tree stands towards the HRV. AR 01217. There are also decision points governing non-commercial treatments. AR 01217-18.

Alliance argues that the Project's reliance on condition-based management violates NEPA because it prevents the Service and from taking a hard look at the

1   environmental impacts and stifles the public's ability to provide meaningful

2   comment. *See Tri-Valley CAREs v. U.S. Dept. of Energy*, 671 F.3d 1113, 1128 (9th

3   Cir. 2012) (EA must provide sufficient information to ensure an agency's hard

4   look and the public's ability to comment). The Ninth Circuit has expressed

5   concerns about "excessive reliance on condition-based management." *North*

6   *Cascades,* 136 F.4th at 829. Nevertheless, the court has approved condition-based

7   management when the area subject to condition-based management is "fairly

8   small" and the Service provided "extensive mapping" which consisted of "unit-by-

9   unit maps of the maximum effects of each treatment" type. *Id*.

10      The condition-based management analysis here goes beyond what has been

11  approved by the Ninth Circuit. While the current Project is somewhat comparable

12  in size to that approved by the Ninth Circuit, there is a stark difference when it

13  comes to mapping. Here, there is no unit-by-unit mapping of the maximum effects

14  of each treatment type. Instead, the maps developed by the Service only identify

15  locations for the two different restoration types—commercial and noncommercial.

16  *See* AR 00340-43. The Ninth Circuit characterized the propriety of condition-based

17  management in *North Cascades* as a "close case." *North Cascades,* 136 F.4th at

18  829.  Because this case goes further than *North Cascades* and involves a broader

19  approach to condition-based management, the Court must agree with Alliance that

20  the EA's reliance on condition-based management renders it too vague to satisfy

the requirements of NEPA.

*3. Whether the Project's roads plan violate NFMA and NEPA*

The Trails Project proposes six miles of new roads, 51 miles of new temporary roads, reconstruction of up to 292 miles of roads, decommission of 51 miles of roads, conversion of three miles of existing roads to non-motorized trails, and closure of two miles of existing roads to non-administrative use. AR 00637, 00866-67. Alliance claims the Project's road plans violate the NFMA and NEPA. Each statute is addressed in turn.

NFMA

Alliance argues that the Project's road plan violates NFMA because it fails to conform to the 2019 Forest Plan with respect to road density in focused restoration areas. *See Alliance for the Wild Rockies*, 907 F.3d at 1109 (under NFMA "[s]ite specific projects and activities must be consistent with an approved forest plan."). Desired condition MA-DC-FR-05 specifies that there should be no more than one mile of forest system road per square mile within each sub watershed. AR 16605. But Alliance argues the Project does not calculate road density in focused restoration areas.

The Service points out that the Aquatics Report accounts for road density within focused restoration areas. *See* AR 01136-37, 01142-43, 01157, 01159-60, 01168, 01170, 01195. Although the road densities calculated in the Aquatics

Report are higher than the Forest Plan's desired condition, desired conditions are not hard-and-fast rules. AR 16511. Furthermore, the Aquatics Report finds that the Project will reduce road densities in two focused restoration watersheds, CeeCee Ah and Exposure Creek. *See* AR 01136, 01143, 01159-60, 01170. And the Project will further other desired conditions of the Forest Plan (specifically FW-DC-AS-01) by improving road and trail access and safety. *See* AR 00642, 16569.

Alliance does not respond to the Service's arguments that the EA accounted for road density in focused restoration areas and that, despite the tension with the Forest Plan's desired conditions in focused restoration areas, the Project's road plan does not violate the terms of the 2019 Forest Plan. Alliance's NFMA challenge to the road plan therefore fails.

NEPA

Alliance also argues the Service violated NEPA because it failed to take a hard look at the environmental impact of the Project's road construction work. Specifically, Alliance complains the EA does not account for the impact of road restoration work or the potential adverse impact of new temporary roads.

Alliance's criticisms are not borne out by the record. As part of the EA, the Service prepared several reports that addressed the impact of road construction activities. Each determined that short-term disruptions caused by construction activity would have long term benefits, including addressing unmanaged drainage

1 issues and damaged culverts. *See* AR 00637 (Transportation Report), 00757

2 (Biological Assessment), 01197 (Aquatics Report). The long-term benefits of road

3 construction were determined to move the Project area towards its desired future

4 condition. AR 01178 ("Under the Proposed Action, some short-term impacts to

5 aquatics and watershed function would occur. In the long-term implementation of

6 the proposed action would improve watershed and riparian conditions. This

7 proposed action moves the area towards the desired future condition."). The EA

8 also noted that project activities would address "noxious weeds on roadsides" that

9 can be "spread" through "[e]quipment operation." AR 00905. Among other

10 benefits, this would minimize impact on "bear forage plants." AR 00915. The EA

11 also noted that wildlife impact would be minimized by adjusting the timing of

12 Project activities. *See* AR 00914, 00916. Further, the short-term impact of new

13 roads would be minimized by keeping new roads closed to unauthorized vehicles

14 and effectively closing the new roads "following their use." AR 00918.

15 The Court recognizes that the EA and supporting documents do not spend

16 much time differentiating between the environmental impact of temporary roads

17 versus the impacts of other road activities. But this is a specificity choice that

18 properly falls to the Service. *See Seven County*, 145 S.Ct. at 1512 (agency must be

19 given deference to determine level of detail). Significantly, the EA does not ignore

20 the impact of temporary roads. The EA includes an estimated quantity of

ORDER ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE -- 23

temporary roads. AR 00867. And there are design elements for temporary roads. AR 00871-72. According to the EA and supporting documents, the long-term impact of temporary roads will be reduced by ensuring they are un-drivable after use. AR 00741, 00916. Furthermore, the Service will monitor road closures "for five years" to ensure they are effective. AR 01004.

Alliance claims the EA fails to assess the need for future road access, beyond the current project. However, NEPA does not require an agency "to address the environmental effects of projects separate in time or place" from the current project. *Seven County*, 145 S.Ct. at 1508. The Service did not violate NEPA by failing to assess the environmental impact on road construction.

*4. Whether the EA failed to take a hard look at the impact on wildlife*

Alliance also argues the Service violated NEPA because it failed to take a hard look at the environmental impact of the Project on wildlife, specifically the impacts to lynx, the grizzly bear, the goshawk, and wildlife diversity.

Again, the record does not support Alliance's criticism. The EA includes sections addressing the Project's impact on habitats for the Canada Lynx (AR 00912-14), the Grizzly Bear (AR 00914-18), and the Northern Goshawk (AR 00905-910). The Project's Biological Assessment provides additional details regarding the Canada Lynx and Grizzly Bear. *See* AR 00739-742, 00760-774. And the Wildlife Specialist Report provides a more extensive discussion of the

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 24

Northern Goshawk. *See* AR 01058, 01060-67, 1079 (Northern Goshawk Nesting Habitat).

Alliance criticizes the EA for not developing enough information about existing wildlife conditions before making a determination of non-significance. According to Alliance, the Service failed to assess the number of goshawk and other wildlife in the Project area. For example, Alliance complains "[t]he Service does not indicate how many 'individual birds' the Project will impact or describe the nature or degree of those impacts." ECF No. 24 at 32. Without an accurate count, Alliance argues that the Service cannot reliably assess the significance of the Project. But the Service's determination of how much base information must be obtained before engaging in predictive modeling is a technical matter that this Court is ill-equipped to assess. Under NEPA, the question of whether an agency has gone into enough detail "requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Seven County*, 145 S.Ct. at 1512. The central tenet of NEPA is "deference" to an agency's expertise. *Id*. at 1511. In this case, this means deferring to the Service's factual determination it had sufficient information to make an assessment. This is not a case where the Service failed to engage in any inquiry at all before making its determination of non-significance. Considerable attention was made to the impact on wildlife. The Court is not in a position to "micromanage" the Service's determination of the right level

1    of investigation. *See id.* at 1513. Rather, NEPA deference on this issue is

2    warranted.

3         Finally, Alliance also faults the Service for failing to consider the

4    cumulative impact of foreseeable future projects on wildlife diversity and the

5    goshawk. But the Supreme Court's recent decision in *Seven County* holds that

6    courts should defer to an agency's decision regarding "whether to analyze

7    environmental effects from other projects separate in time or place from the project

8    at hand." *Id.*  Furthermore, the Court held that NEPA only requires an analysis of

9    "the project at hand—not other future or geographically separate projects." *Id*. at

10   1515.

11        The Court also notes that the administrative record fails to contain details

12   regarding the other projects identified by Alliance. These include the Boulder Park

13   Ecological Restoration Project and the Sanpoil Project. Without details regarding

14   other projects, the Court cannot assess whether the Service improperly drew "the

15   line" with respect to whether those projects were separate from the current Project.

16   *Id*. at 1513. The Court does note that Chapter Three of the EA discusses Project

17   impacts and recognizes the impact of ongoing or potential future projects. AR

18   00876-0927, 01115-18. Furthermore, when it comes to the Northern Goshawk, the

19   EA specifies that all timber sales on Service lands in the forest will incorporate the

20   similar practices and elements for goshawk preservation. AR 00909-910, 01066.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE -- 26

Thus, it is apparent that the Service at least considered other projects in issuing the EA.

Alliance's overarching concern appears to be that the EA fails to reflect sufficient concern for adverse impacts on wildlife. But the EA is governed by NEPA and NEPA "does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835 (1989). Should Alliance believe that the proposed project violates substantive environmental standards, then relief must be sought under a different statute. *Id*. at 51. "NEPA merely prohibits uniformed—rather than unwise—agency action." *Id*.

*5. Whether the Supplemental Information Report violates NEPA and NFMA*

In 2023, after the Service issued its Decision Notice and Finding of No Significant Impact, the United States District Court for the Eastern District of Washington issued an order in *Kettle Range Conservation Group v. U.S. Forest Service*, vacating a forest plan guideline governing large tree management. No. 2:21-CV-161-SAB (E.D. Wash, June 21, 2023) (ECF No. 74). The order reinstated the 1995 Eastside Screens Forest Plan Amendment ("Eastside Screens"). *Id*. The Eastside Screens guidelines generally restrict harvesting trees that have a diameter greater than 21 inches at breast height and prohibit commercial harvesting in any Late and Old Structure stand that fails to meet or exceed the HRV. AR 04282,

04296, 13172, 13167-68.[5] After receipt of the court's order, the Service issued a SIR, concluding that application of the Eastside Screens restrictions would have no impact "beyond the scope and range of effects considered in the original" environmental assessment. AR 04301.

In issuing the SIR, the Service utilized 10 acres as the minimum stand size when delineating Late and Old Structure forests. AR 04282. And the Service used a forest-wide approach to determine whether a Late and Old Structure stand meets the HRV. AR 16533-34 (showing HRV estimates for the entire forest), AR 01223-25 (using the same estimates as the historic baseline for conditions in each watershed in the Project area). The SIR determined none of the treatment areas that were subject to timber met this standard and that for remaining timber sales, the Service would augment treatment acres as needed to comply with Eastside Screens. AR 04299.

Alliance claims the SIR is invalid because its purported compliance with Eastside Screens rests on a flawed methodology. Alliance argues that it was improper to restrict its analysis of Late and Old Structure forests to stands 10 acres and larger, as Eastside Screens sets no such restriction. And Alliance argues that it

_____

[5] The Eastside Screens restrictions recognize some exceptions, including timber sales "to protect health and safety." AR 13167.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 28

was improper to assess HRV on a forest-wide basis since Eastside Screens requires

this assessment to be determined for "large landscapes across which forest types,

environmental settings, and disturbance regimes (fire and insects/disease) are

relatively uniform." AR 13168.

Alliance's criticisms of the SIR fail to afford the Service adequate deference.

Eastside Screens does not define the stand size to be used to determine whether a

Late and Old Structure stand fails to meet or exceeds the HRV. The Service asserts

that it has long used 10 acres as an appropriate stand size. ECF No. 32 at 51.

Alliance fails to point to anything that would contradict this claim. Outside of any

such contradiction, the Service's interpretation, which is part of its interpretation of

its own forest plan, "is entitled to substantial deference." *See Native Ecosystems*

*Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

In addition, in issuing the SIR, the Service did not simply look at the

Colville National Forest as a whole, but broke out its HRV analysis by vegetation

type and then developed HRV assessments within vegetation types. AR 04299-

300. The Service's determination that focusing on vegetation type sufficiently

accounts for the requirement of a uniform forest type is entitled to deference.

Alliance argues that, regardless of issues of stand size and a forest-wide

approach, the SIR's analysis is invalid because it fails to account for forest

composition on land outside the National Forest System. However, nothing in

ORDER ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE -- 29

Eastside Screens requires an assessment of non-Forest-owned lands. Again, the Service's determination that Eastside Screens only requires an analysis of forest service land is entitled deference. *See Native Ecosystems Council v. Weldon*, 697 F.3d at 1056.

Alliance makes two additional criticisms, both of which fail. First, Alliance argues the SIR incorrectly attempts to force tree composition in each watershed to match the HRV for the entire Forest. The applicable language from Eastside Screens states as follows, "Each component watershed should not be expected to reflect the average conditions for the lager landscape, but the sum of conditions across watersheds within the area for which the HRV is developed should reflect ranges of conditions determined in the HRV evaluation." AR 13168. Alliance fails to explain how the SIR's analysis fails to comport with this standard. Second, Alliance argues the SIR ignores Eastside Screens' restrictions on certain logging within Late and Old Structure stands over 100 acres even if they are above the HRV. *See* AR 13176. However, Alliance does not point to anything in the SIR indicating the Service will allow violations of this provision.

*6. Remedy*

As set forth above, the Court determines that the EA in this case violates NEPA in one limited respect. Specifically, the Project maps place excessive reliance on condition-based management, rendering them too vague to comply

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE -- 30

with NEPA. Given this fundamental flaw, the Court cannot conclude that the Service would have issued a FONSI despite this error. *See Seven County*, 145 S.Ct. at 1514. Rather, the appropriate remedy is to vacate the FONSI and remand for further agency action.

ACCORDINGLY, IT IS ORDERED:

1. Plaintiff's Motion for Summary Judgment, **ECF No. 24**, is **GRANTED in part** and **DENIED in part**.

2. Defendants' Cross Motion for Summary Judgment, **ECF No. 32**, is **GRANTED in part** and **DENIED in part**.

3. Defendants' Motion to Strike, **ECF No. 33**, is **GRANTED**.

4. The Finding of No Significant Impact is hereby **remanded** to the U.S. Forest Service for further evaluation under NEPA consistent with this decision.

The Clerk of this court shall enter this Order, enter judgment in favor of Plaintiff, and close this file.

**DATED** September 16, 2025.

_____
Rebecca L. Pennell
United States District Judge

ORDER ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE -- 31